14-17175

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

STEVE WILSON BRIGGS,
*Plaintiff-Appellant,*

v.

NEILL BLOMKAMP, SONY PICTURES ENT., INC., TRISTAR PICTURES,
INC., MEDIA RIGHTS CAPITAL, QED INTERNATIONAL
*Defendants-Appellees.*

_____

Appeal from The United States District Court
for the Northern District of California
Case No. 4:13-cv-4679 PJH
The Honorable Phyllis J. Hamilton

_____

**APPELLEES' ANSWERING BRIEF**

_____

Michael J. Kump (SBN 100983)
Gregory P. Korn (SBN 205306)
KINSELLA WEITZMAN ISER KUMP &
ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
(310) 566-9800


Attorneys for Defendants and Appellees
NEILL BLOMKAMP, SONY PICTURES ENTERTAINMENT INC., TRISTAR
PICTURES, INC., MEDIA RIGHTS CAPITAL II, L.P., AND
QED INTERNATIONAL LLC

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Media Rights Capital II, L.P. hereby states that it has no parent corporations and that no publicly held corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Sony Pictures Entertainment Inc. hereby states that it is an indirect subsidiary of Sony Corporation and that no other publicly held corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee TriStar Pictures, Inc. hereby states that it is an indirect subsidiary of Sony Corporation and that no other publicly held corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee QED International, LLC hereby states that it has no parent corporations and that no publicly held corporation owns 10% or more of its stock.

DATED: April 9, 2015                    KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP


By:  /s/ Michael J. Kump
　　　Michael J. Kump
　　　Attorneys for Defendants and Appellees
　　　NEILL BLOMKAMP, SONY PICTURES
　　　ENTERTAINMENT INC., TRISTAR
　　　PICTURES, INC., MEDIA RIGHTS
　　　CAPITAL II, L.P., AND QED
　　　INTERNATIONAL, LLC

i

# **TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ........................................................1

ADDITIONAL ISSUES PRESENTED FOR REVIEW ...........................1

STANDARD OF REVIEW .................................................................2

STATEMENT OF THE CASE.............................................................3

STATEMENT OF FACTS ..................................................................5

    A.    *Elysium* Is An Original Work Of Oscar-Nominated
          Writer/Director Neill Blomkamp ........................................5

    B.    Plaintiff's Infringement Claim Is Based On A Speculative,
          Improbable, And False Theory Of Access.............................6

    C.    Synopses Of The Works Illustrate That They Are Not Similar...........7

    D.    Procedural History Of The Underlying Lawsuit.................12

SUMMARY OF THE ARGUMENT .....................................................14

ARGUMENT ...................................................................................15

    A.    The District Court Correctly Held That Plaintiff's Copyright
          Claim Fails As A Matter Of Law ......................................15

          1.    Legal Standards For Copyright Infringement...........15

          2.    Courts May Decide As A Matter Of Law That Two
               Works Are Not Substantially Similar ......................16

          3.    Plaintiff Failed To Raise A Genuine Issue As To Access........17

          4.    The District Court Did Not Err In Defining Striking
               Similarity..............................................................23

          5.    The Screenplay And Film Are Not Substantially Or
               Strikingly Similar As A Matter Of Law. ..................25

               (a)    The Plots Are Dissimilar. ..............................25

(b)    The Sequences Of Events Are Dissimilar ......................30

(c)    The Settings Are Dissimilar ...........................................34

(d)    The Works Contain No Similar Dialogue ......................37

(e)    The Characters Are Dissimilar .......................................37

(f)    The Works Explore Different Themes ...........................42

(g)    The Mood And Pace Of The Works Are *Scenes A Faire*................................................................................43

6.    Plaintiff Cannot Claim Infringement Of A Collection Of Unprotected Elements ................................................................44

B.    Plaintiff's Other Claims Of Error Regarding The Finding Of Non-Infringement Are Without Merit....................................................47

1.    Testimony From Defendants' Expert Supported The Court's Holding And Was Properly Considered .....................47

2.    The District Court Did Not Err In Comparing The Screenplay To The Film Version Of Elysium .........................49

C.    The Court Committed No Procedural Errors ......................................51

1.    The District Court Properly Denied Plaintiff Leave To File A Second Amended Complaint .........................................52

2.    The District Court Did Not Err In Continuing Pretrial Deadlines For A Shorter Period Than Plaintiff Requested.......55

CONCLUSION .....................................................................................................58

iii

**TABLE OF AUTHORITIES**

**Page**

<u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................18, 55

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
581 F.3d 1138 (9th Cir. 2009) ...............................18, 19, 20, 21

*Benay v. Warner Bros. Entertainment, Inc.*,
607 F.3d 620 (9th Cir. 2010) .............................................passim

*Berkic v. Crichton*,
761 F.2d 1289 (9th Cir. 1985) ...........................................passim

*Bernal v. Paradigm Talent & Literary Agency*,
788 F. Supp. 2d 1043 (C.D. Cal. 2010)..............................passim

*Cavalier v. Random House*,
297 F.3d 815 (9th Cir. 2002) ....................................16, 17, 29, 47

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...........................................................17, 18

*Chafir v. Carey*,
2007 WL 2702211 *3 (S.D.N.Y.) ...........................................19

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ...................................................54

*Estate of Gonzalez v. Hickman*,
2007 WL 3237639 *1 (C.D. Cal. Jan. 8, 2007)..........................54

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
462 F.3d 1072 (9th Cir. 2006) ...........................................passim

*Gable v. National Broadcasting Company*,
727 F.Supp.2d 815 (C.D. Cal. 2010)..........................................47

*Home Depot U.S.A., Inc. v. U.S. Fidelity & Guar. Co.*,
2009 WL 981321 *4 (N.D. Cal. Apr. 13, 2009)..........................54

*Idema v. Dreamworks, Inc.*,
162 F. Supp. 2d 1129 (C.D. Cal. 2001)..............................26, 39

*In re W. States Wholesale Natural gas Antitrust Litig.*,
715 F.3d 716 (9th Cir. 2013) .....................................................53

*Ingham v. U.S.*,
   167 F.3d 1240 (9th Cir. 1999) ...........................................................55

*Johnson v. Mammoth Recreations, Inc.*,
   975 F.2d 604 (9th Cir. 1992) .............................................................53

*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994) ...................................................... passim

*L.A. Printex, Inc. v. Aeropostale, Inc.*,
   676 F.3d 841 (9th Cir. 2012) ...................................................... passim

*Lichtfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ..................................................... 29, 33

*Martel v. County of Los Angeles*,
   56 F.3d 993 (9th Cir. 1995) ......................................................... 2, 55

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).........................................................................17

*Metcalf v. Bochco*,
   |294 F.3d 1069 (9th Cir. 2002) ..................................... 44, 45, 46, 47

*Narell v. Freeman*,
   872 F.2d 907 (9th Cir. 1989) .............................................................37

*Olson v. National Broadcasting Co.*,
   855 F.2d 1446 (9th Cir. 1988) ...........................................................37

*Parker v. Joe Lujan Enterprises, Inc.*,
   848 F.2d 118 (9th Cir. 1988) ...............................................................2

*Peter F. Gaito Architecture, LLC v. Simone Development Corp.*,
   602 F.3d 57 (2d Cir. 2010) ................................................................55

*Pringle v. Adams*,
   556 Fed. Appx. 586 (9th Cir. 2014) ..................................................23

*Quirk v. Sony Pictures Entertainment, Inc.*,
   2013 WL 1345075 *9 (N.D. Cal. Apr. 2, 2013)............................. 33, 40, 50

*Rice v. Fox Broadcasting Co.*,
   330 F.3d 1170 (9th Cir. 2003) ..................................................... passim

*Seals-McClellan v. Dreamworks, Inc.*,
   120 Fed. Appx. 3, 4 (9th Cir. 2004) ............................................. 23, 24

*See v. Durang*,
   711 F.2d 141 (9th Cir. 1983) .............................................................50

*Selle v. Gibb*,
   741 F.2d 896 (7th Cir. 1984) .............................................................24

*Stewart v. Wachowski*,
    574 F. Supp. 2d 1074 (C.D. Cal. 2005) .................................................. 49, 50

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ...................................... 18, 19, 20, 23

*Walt Disney Productions v. Filmation Assocs.*,
    628 F. Supp. 871 (C.D. Cal. 1986) ............................................. 51

*Wild* v. *NBC Universal, Inc.*
    788 F. Supp. 2d 1083 (C.D. Cal. 2011) ............................. 26, 37, 48

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996) ......................................................... 35

*Zella v. E.W. Scripps Co.*,
    529 F.Supp.2d 1124 (C.D. Cal. 2007) .................................... 43

## **STATUTES**

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. §§ 1331 and 1338(a) ............................................................. 1

Federal Rule of Appellate Procedure 3(c)(1)(B) .................................. 52

Federal Rule of Civil Procedure 16 ....................................................... 53

Federal Rule of Civil Procedure 56(a) ................................................... 17

Federal Rule of Evidence 801 ................................................................ 22

## **OTHER AUTHORITIES**

*Nimmer on Copyright* § 12.10 ............................................................... 55

*Nimmer on Copyright* § 13.02[B] (2005) ............................................ 24

vi

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this is an action by Plaintiff and Appellant Steve Wilson Briggs ("Plaintiff") for copyright infringement. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, as this is an appeal from a final decision of the District Court granting summary judgment in favor of Defendants and Appellees ("Defendants") and disposing of all claims. Plaintiff's notice of appeal from the District Court's October 3, 2014 order was timely filed on October 31, 2014.

## ADDITIONAL ISSUES PRESENTED FOR REVIEW

Defendants present the following additional issues for review:

1.     Whether the District Court properly granted summary judgment when (a) Plaintiff failed to present evidence of access, and admitted he had none, and (b) the copyrighted and accused works at issue in the case, which have entirely dissimilar plots, sequences of events, characters, settings, dialogue, and themes, are not strikingly or substantially similar as a matter of law.

2.     Whether the District Court properly exercised its discretion in denying Plaintiff leave to file a Second Amended Complaint when his request for leave was filed months after the scheduled deadline, where no diligence was shown in seeking leave, and where the proposed amended pleading was futile given the lack of striking or substantial similarity between the parties' works.

1

3.     Whether the District Court properly exercised its discretion in granting Plaintiff a 30-day continuance of discovery deadlines rather than the 120-day continuance Plaintiff requested, where Plaintiff was not diligent in conducting discovery, where Plaintiff had allowed the deadline to serve discovery to pass without serving any requests, and where discovery was futile in any event given the lack of substantial or striking similarity between the parties' works.

## STANDARD OF REVIEW

This Court reviews de novo the District Court's grant of summary judgment in favor of Defendants. *L.A. Printex, Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012). The Court reviews the District Court's denial of leave to amend to file a Second Amended Complaint for an abuse of discretion. *Parker v. Joe Lujan Enterprises, Inc.*, 848 F.2d 118, 120 (9th Cir. 1988). The District Court's decision to continue the discovery cut-off for 30 days but deny Plaintiff a 120-day continuance is reviewed for an abuse of discretion, but "will be disturbed only upon the clearest showing that the denial of discovery results in actual and substantial prejudice to the complaining litigant." *Martel v. County of Los Angeles*, 56 F.3d 993, 995 (9th Cir. 1995).

2

## STATEMENT OF THE CASE

Plaintiff is the author of a motion picture screenplay entitled *Butterfly Driver* ("Screenplay"). Plaintiff's First Amended Complaint ("FAC") asserted a single count for copyright infringement, alleging that the feature film *Elysium* ("*Elysium*" or "Film"), written and directed by Oscar-nominated filmmaker Defendant Neill Blomkamp, infringed the copyright in his Screenplay. Plaintiff admits he never submitted his Screenplay to Blomkamp or any of the other Defendants. Plaintiff hypothesizes, rather, that Blomkamp must have found his Screenplay on a now-defunct internet forum for screenwriters called triggerstreet.com, where it was allegedly posted some six years before *Elysium* was theatrically released. Plaintiff's rank speculation is false. The evidence is undisputed that Blomkamp was unaware of triggerstreet.com before this suit was filed, he never visited the site, he did not access Plaintiff's Screenplay there or anywhere else, and the Film was independently conceived, written, and directed by Blomkamp.

Not only is Blomkamp's testimony of independent creation uncontroverted, but it is plainly corroborated by the works themselves. Not one plot element, scene, setting, character, or line of dialogue from the Screenplay can be found in the Film. Plaintiff has attempted to create an illusion of similarity between two incomparable works in the same way that one might disingenuously argue that *The DaVinci Code* copied *Indiana Jones and the Last Crusade* because both works feature an

3

adventurous, handsome college professor with a signature piece of apparel who solves ancient riddles on a quest to find the "Holy Grail." Plaintiff scrubs the Screenplay and Film of all detail and compares them at the highest level of generality. He uses tortured and often misleading abstractions in an effort to obscure the radical differences between the works. In so doing, Plaintiff establishes nothing more than that these two works share a few stock concepts that they share with countless other works—*e.g.*, a futuristic Earth, a space station, and a sick child in need of help. The fact that the parties' works share common ideas does not evidence copying or support an inference of infringement. "It merely remind us that in Hollywood . . . there is only rarely anything new under the sun." *Berkic v. Crichton*, 761 F.2d 1289, 1294 (9th Cir. 1985).

Plaintiff's claim flies in the face of Ninth Circuit authority holding that vague, abstracted, and general plot ideas are not copyrightable and are ignored in testing for infringement. Copyright infringement requires substantial similarities in the concrete, expressive elements in the parties' work. Here, there is none.

The District Court properly granted Defendants' motion for summary judgment and properly denied Plaintiff's cross-motion for summary judgment. The Screenplay and Film are not substantially similar as a matter of law, let alone strikingly similar as Plaintiff must prove because of the absence of evidence of access. An unvarnished comparison of the works—free of abstractions and

4

mischaracterizations—demonstrates that no reasonable trier of fact could find the Film infringing of the Screenplay. For the reasons set forth in detail below, Defendants respectfully request that the judgment entered by the District Court be affirmed in its entirety.

## STATEMENT OF FACTS

### A.    *Elysium* **Is An Original Work Of Oscar-Nominated Writer/Director Neill Blomkamp.**

Defendant Neill Blomkamp is the writer and director of *Elysium*. The South African filmmaker began his career as a teenager creating 3D animation and visual effects. From 2004 to 2007, Blomkamp wrote and directed three short films— *Tetra Vaal*, *Alive in Joburg*, and *Tempbot*. Blomkamp's second short inspired the hit film, *District 9*, which he wrote and directed. *District 9* explored themes of racism and segregation by telling the story of extraterrestrials who are marooned on Earth after their spacecraft becomes disabled and are confined to a camp outside Johannesburg. The film earned Oscar nominations for Best Adapted Screenplay and Best Picture. SER 411.[1]

Following *District 9*, Blomkamp began developing what would later become *Elysium*. As a "visual" screenwriter and filmmaker, Blomkamp began the

---

[1] Plaintiff filed several sets of excerpts of record.  To avoid confusion and for the Court's convenience, all citations herein are to Defendants' Supplemental Excerpts of Record ("SER") unless stated otherwise.

5

development process as he did with his other works—by starting with visual concepts and building from there. SER 411. Before writing a screenplay, Blomkamp thought about the visuals that he wanted to use in the Film. *Id.* During this process, Blomkamp reviewed images of several space stations, some of which were in the shape of a circular "torus." *Id.* Those images, especially including images from a 1970s concept called the "Stanford torus," sparked the idea of a utopian space station. *Id.* With that imagery in mind, Blomkamp began writing a screenplay which would explore some of the same themes as *District 9*. SER 412.

The end product bears Blomkamp's hallmarks. *Elysium* is a science fiction film that integrates computer animation and live action in a style for which Blomkamp is known. It focuses on issues of racism and segregation that are obviously germane to Blomkamp's South African heritage and were the subject of *District 9*. It features elements from Blomkamp's prior works, such as a robotic police force similar to that in his 2004 short *Tetra Vaal*. SER 412. And as discussed below, the Film does not resemble Plaintiff's work in the slightest.

**B.    Plaintiff's Infringement Claim Is Based On A Speculative, Improbable, And False Theory Of Access.**

Plaintiff alleges that he authored his Screenplay in 2007. SER 57. After seeing *Elysium* six years later, Plaintiff perceived similarities between the two works. Plaintiff knew (and admits) that he never sent the Screenplay to

6

Blomkamp or his representatives, nor to anyone else involved in the Film including Defendants. Thus, to rationalize the notion that his work was copied, Plaintiff was forced to arrive at the inherently improbable conclusion that Blomkamp found the Screenplay when it was posted for a few months in 2007 on an internet forum for writers and filmmakers called "triggersteet.com." SER 57-58.

Plaintiff concedes triggerstreet.com is the <u>only</u> place where Blomkamp could have accessed the Screenplay. SER 57-58. He also concedes he has <u>no</u> <u>evidence</u> this occurred. Plaintiff's "Excerpts of the Brief" (Dkt. No. 6-2 pp. 603-604 of 606 (Hearing Transcript pp. 11-12)).

Plaintiff's unsupported conjecture that Blomkamp found the Screenplay on triggerstreet.com in 2007, and then used it in writing and directing the Film years later, is false. Blomkamp had not heard of triggerstreet.com until this lawsuit was filed. SER 412. He never visited that website or accessed Plaintiff's Screenplay there, and no one provided the Screenplay to Blomkamp or discussed it with him before this lawsuit. *Id.*

### C. Synopses Of The Works Illustrate That They Are Not Similar.

Synopses of the Screenplay and Film readily show that they are entirely dissimilar; and yet as the Court will see in examining the works themselves, it is difficult to fully capture the overwhelming dissimilarities between the works within the page constraints of this answering brief.

7

*Plaintiff's Screenplay Butterfly Driver* (SER 93-211)

The Screenplay's protagonist (Arlo Grainer) is a hover-craft pilot and "legend" due to his military service and subsequent rebellion against the "Global State." Arlo lives with his wife and children in a "Zone" outside of the State's jurisdiction. His antagonist, Drexler, is the President of the State and the owner of "Uberopolis," a 3-mile wide "satellite city" that orbits Earth.

Arlo's friend and fellow pilot (Roddy) is murdered by bounty hunters who are looking for Arlo. Arlo sends his family back to the State to hide with family. To earn the money needed for them to "repatriate" to the State, Arlo agrees to transport a subversive (Tamara Gwynn) on a "butterfly run" to Los Angeles, where she is to testify in a civil suit against the government concerning her rights to a revolutionary "A-cell"—a small glass cylinder that produces electricity. Police on "sky-cars" ambush the two. Tamara is killed by police, and Arlo is caught and falsely charged for her murder. A federal agent and former military colleague of Arlo's (Jerry Mathiessen) is tasked with investigating the case.

Awaiting trial on the satellite Uberopolis, Arlo discovers that the State is killing its prisoners by shuttling and then dumping them into space. He escapes before suffering the same fate and pilots a shuttle back to Earth. Arlo returns to find his daughter (Franny) on a respirator and in need of the drug "Drexlerin." Drexlerin is no longer available, as it has been discontinued pending the release of

8

"Drexlerin 2," so Arlo must travel back to Uberopolis to find remaining supplies of the drug. Arlo evades capture by Jerry and uses a fake ID card to avoid detection while traveling to Uberopolis on a commuter shuttle.

On Uberopolis, Arlo arranges a meeting with Drexler where he will trade the A-Cell for a supply of Drexlerin. Arlo crashes a police "sky-ranger" through the glass window of Drexler's office. In a moment of calm before the storm, Arlo reveals to Drexler that they previously served together during wartime, and that he knows about Drexler's true identity and past crimes. Drexler confesses: he is an imposter actually named "Midland" who murdered the real Drexler, adopted his identity, and inherited a fortune which he used to fund Uberopolis. Unbeknownst to Drexler, surveillance cameras are tracking Arlo's movements, and a video feed of Drexler's confession is being broadcast on television stations.

A lengthy chase sequence follows, culminating in a hand-to-hand fight between Arlo and Drexler on a shuttle. Though appearing to have the upper hand, Arlo suffers a debilitating "ice pick" headache caused by a lifelong condition. Drexler shoots Arlo and is on the verge of killing him when Jerry intervenes and knocks Drexler unconscious.

Arlo and Jerry pilot the shuttle off Uberopolis. They evade a missile that is targeting them by turning back toward Uberopolis. They then launch an escape pod just before the shuttle and missile collide with and destroy the satellite.

9

### *Defendants' Film Elysium* [2]

In *Elysium*, Earth is impoverished and in squalor. The health care system is failing. The population is policed by abusive robots. The uber wealthy have long since fled to the utopian space "Elysium," where citizens have access to futuristic "med bays" that heal any disease, ailment, or injury.

Immigration to Elysium is forbidden. A rebel (Spider) runs unauthorized ships to Elysium for "illegals" wanting to travel there to use a med bay. The trips are perilous. Early in the Film, three of Spider's ships attempt to breach Elysium. Defense Secretary Delacourt (played by Jodie Foster) orders covert agent Kruger (played by Sharlto Copley) to shoot the ships down by missile. Only one ship lands safely, and everyone is captured for deportation.

The protagonist, Max (played by Matt Damon), is a lifelong thief who stole since childhood believing he could buy his way onto Elysium. Max works at "Armadyne," the company which designed and built Elysium, assembling the robots that police Earth. At work, Max is accidentally locked in a chamber and exposed to high doses of radiation which will kill him in five days.

---

[2] Defendants supported their motion for summary judgment with a DVD copy of *Elysium*. SER 11 (Dist. Ct. Dkt. No. 70 (Exhibit 2 to the Declaration of Gregory Korn In Support of Defendants' Motion for Summary Judgment)). Defendants have moved this Court pursuant to Ninth Circuit Local Rules 11-4.2 and 27-14 to request transmission of the DVD from the District Court or, in the alternative, to grant Defendants leave to transmit physical copies of the DVD to this Court. That motion remains pending as of the filing of this answering brief.

10

Max's only chance of survival is to use a med bay on Elysium. In exchange for a promised trip to the space station, Max agrees to help Spider's rebellion: Max shoots down a private shuttle carrying Armadyne's chief officer (John Carlyle); and using a futuristic device, Max hardwires their brains together and downloads important data from Carlyle's brain into his own. Included in the download is a "reboot sequence" for Elysium, which Carlyle created to help Delacourt take over control of the space station from its current president (Patel). But, Carlyle encoded the reboot sequence with a defense mechanism, and it causes Max to begin suffering seizures.

Delacourt alerts Kruger to capture Max to safeguard the reboot sequence. Max is injured but escapes and hides with a childhood friend (Frey) who nurses him back to health. Max refuses Frey's plea that he take her daughter (Matilda) to Elysium to cure her leukemia, and he leaves to find Spider.

Spider plugs into Max's brain and sees that he possesses a reboot sequence for Elysium that could override the system and make everyone a citizen. Max is uninterested in altruism and surrenders to Kruger to gain safe passage to Elysium. On board Kruger's ship, Max finds that Frey and Matilda have been kidnapped. When a fight erupts, Max drops a grenade he is holding. The detonation blows up Kruger's face and crashes the ship on Elysium. Frey and Matilda run to a house in hopes of using a med bay, but it does not work: to use a med bay, one must have a

11

special ID burned onto their writs identifying them as an Elysium citizen. The three are captured.

Kruger, now regenerated by a med bay, wants Elysium's presidency for himself. He kills Delacourt and heads after Max. Max escapes, frees Frey and Matilda, and finds Spider, who was able to land a ship full of rebels on Elysium amidst the chaos.

Max has learned he will die if the reboot sequence in his brain is uploaded to Elysium's computers. He nevertheless agrees to sacrifice himself. He directs Frey and Matilda to find a med bay while he and Spider find Elysium's control room. Kruger catches up to Max after another seizure slows him, but Max kills Kruger and is able to download the reboot sequence. As Max dies, Elysium's main computer restarts and announces that everyone on Earth is now a citizen of Elysium. Matilda is cured, and a fleet of ships with med bays leaves toward Earth.

### D. Procedural History Of The Underlying Lawsuit.

Despite the complete dissimilarities between the Screenplay and Film as shown above, Plaintiff filed an initial complaint followed by the FAC asserting one count for copyright infringement. It accused both the Film, as well as a purported screenplay for the Film that Plaintiff downloaded from the internet, of infringing the Screenplay. SER 54, 59, 88. Blomkamp was named as a Defendant, along with Sony Pictures Entertainment Inc., TriStar Pictures, Inc., Media Rights Capital II

12

L.P., and QED International LLC, who were alleged to be the financiers, producers, and distributors of the Film.

The parties filed cross-motions for summary judgment. In addition to a DVD copy of *Elysium*, Defendants supported their motion with a declaration from Blomkamp describing his creation of the Film and attesting that he had never heard of or visited triggerstreet.com before, did not receive Plaintiff's Screenplay, and did not use the Screenplay in creating the Film. SER 410-412.

Defendants also supported their motion with a declaration and accompanying report from defense expert Jeff Rovin. SER 413-508. Rovin is a writer, publisher, and editor with decades of experience in literature with an emphasis on science fiction. SER 418-419. Rovin did not opine on substantial similarity. Instead, drawing upon an encyclopedic knowledge of science fiction, Rovin showed through an examination of "prior art" that the elements of the Screenplay which Plaintiff alleges were copied are in fact stock, generic elements in the science fiction genre. Rovin described and showed excerpts from dozens of prior books, films, comics, and videogames which contained the same abstract concepts that Plaintiff believes his Screenplay and the Film share, such as the idea of utopian space station (which is common to the point of cliché in science fiction). SER 422-487.

13

After full briefing on the motions and oral argument, the District Court granted Defendants' motion for summary judgment and denied Plaintiff's cross-motion. SER 15-46. The District Court concluded that Plaintiff lacked evidence of access; that he therefore had to demonstrate a genuine issue of fact as to "striking" similarities between the works; and that the Screenplay and Film were not strikingly or substantially similar as a matter of law. This appeal followed.

## SUMMARY OF THE ARGUMENT

The District Court's determination that the Screenplay and Film are not substantially similar as a matter of law—let alone strikingly similar, as Plaintiff must prove because he lacks evidence of access—is unassailable. The works share absolutely no similarities of protected expression.

Plaintiff's arguments that the District Court prejudiced his case by denying him leave to file a Second Amended Complaint, and by granting a shorter continuance of the discovery cut-off than he requested, are meritless. In both instances, the District Court properly exercised its discretion. And in both instances, any error by the Court (of which there was none) was harmless. No further amendment of the pleadings or discovery by Plaintiff could alter the fact that the Screenplay and Film are incomparable on their face and not substantially or strikingly similar as a matter of law.

14

## ARGUMENT

**A.** **The District Court Correctly Held That Plaintiff's Copyright Claim Fails As A Matter Of Law.**

### 1. Legal Standards For Copyright Infringement.

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (citation omitted). Absent evidence of direct copying, plaintiff must demonstrate that (1) defendant had "access" to the plaintiff's work and (2) the two works are substantially similar. *Id.* "To determine whether two works are substantially similar, a two-part analysis—an extrinsic test and an intrinsic test—is applied." *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003).

Only the extrinsic test is applied at the summary judgment stage. *Funky Films*, 462 F.3d at 1077. "The extrinsic test focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." *Id.*, quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).

In applying the extrinsic test, courts must "take care to inquire only whether 'the protectable elements, standing alone, are substantially similar.'" *Id.*, quoting

15

*Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002) (emphasis in original); *see also Rice*, 330 F.3d at 1174 (holding that courts "must distinguish between the protectable and unprotectable material because a party claiming infringement may place 'no reliance upon any similarity in expression resulting from unprotectable elements.'") (citation omitted). In other words, courts "filter out and disregard the non-protectable elements in making [a] substantial similarity determination." *Funky Films*, 462 F.3d at 1077, quoting *Cavalier*, 297 F.3d at 822.

Thus, it is "not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters" that must be compared. *Funky Films*, 462 F.3d at 1077, quoting *Berkic*, 761 F.2d at 1293. Similarities in general plot ideas are not probative. *Id.* at 1081; *see also Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010) ("In applying the extrinsic test, we look 'beyond the vague abstracted idea of a general plot.'") (citation omitted). Likewise, *scenes a faire* that "flow naturally from generic plot-lines" are unprotected and therefore ignored under the extrinsic test. *Funky Films*, 462 F.3d at 1077.

## 2. Courts May Decide As A Matter Of Law That Two Works Are Not Substantially Similar.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). Defendants' burden on their motion was merely to show that there is no evidence to support a necessary part of Plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden is met by simply "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* Once Defendants met that burden, the burden shifted to Plaintiff to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In copyright infringement cases, "substantial similarity 'may often be decided as a matter of law,'" and this Court "frequently affirm[s] summary judgment in favor of copyright defendants on the issue of substantial similarity." *Funky Films*, 462 F.3d at 1076-1077 (citation omitted); *see also Benay*, 607 F.3d at 625; *Cavalier*, 297 F.3d 815; *Kouf*, 16 F.3d at 1045-1046.

### 3. Plaintiff Failed To Raise A Genuine Issue As To Access.

To support an inference of infringement, Plaintiff must first prove access. *Funky Films*, 462 F.3d at 1076. Absent direct evidence, access may be proved using circumstantial evidence of either (1) a "chain of events" linking the plaintiff's work and the defendant, or (2) "widespread dissemination" of the work. *L.A. Printex*, 676 F.3d at 846-847. Plaintiff presented no evidence of either.

17

Plaintiff conceded that the only means by which Defendants could have accessed his Screenplay was by visiting the website triggerstreet.com <u>six years ago</u>, where the Screenplay was posted for a short period of time. He admitted, however, that he has no evidence to prove they did. *See* Plaintiff's "Excerpts Of The Brief" (Dkt. No. 6-2, pp. 603-604 of 606 (Hearing Transcript pp. 11-12)). Plaintiff attempted to support an inference of access by pointing to allegations in the FAC that a writer/director like Blomkamp would have known of and been interested in triggerstreet.com. SER 28. Plaintiff, however, cannot rely on these allegations to oppose summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading . . . ."); *Celotex*, 477 U.S. at 324.

The mere fact that Plaintiff may have posted his Screenplay on triggerstreet.com for a few months in 2007 does not create a genuine issue as to access. "'To prove access, a plaintiff must show a reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work.'" *L.A. Printex*, 676 F.3d at 846-847, quoting *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009); *see also Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000). "Access may not be inferred through mere speculation or conjecture." *Three Boys Music*, 212 F.3d at

18

482; *see also Art Attacks*, 581 F.3d at 1144 (holding that the "slight chance" of access "does not create more than a 'bare possibility'").

Plaintiff's theory of access is speculative and unavailing. *Three Boys Music*, 212 F.3d at 482. The fact that Plaintiff posted the Screenplay on triggerstreet.com for a few months in 2007 does not even support a "bare possibility" that Blomkamp that saw it there. *See Chafir v. Carey*, 2007 WL 2702211 *3 (S.D.N.Y. 2007) ("[T]he fact that Plaintiff's song was available on a publicly accessible website does not prove access, because there is no evidence that Defendants actually visited the website on which Plaintiff's song was posted.").

Moreover, Plaintiff's speculation regarding access is refuted by Blomkamp's declaration. Blomkamp testified that he was unaware of triggerstreet.com before this lawsuit, never visited the site, and did not access the Screenplay there. SER 410-412. He also explained how he developed *Elysium* to further corroborate that it was an independent creation. *Id.* Blomkamp's uncontroverted testimony, together with Plaintiff's lack of contrary evidence, is dispositive on the issue of access.

Plaintiff argues that the District Court applied the wrong standard for access. Specifically, he claims that *L.A. Printex* reversed the holding in *Three Boys Music* that "reasonable access" requires more than a "bare possibility." Opening Brief ("OB") 19-20.

19

Plaintiff is mistaken. *L.A. Printex* cites *Three Boys Music* with approval and reaffirms that a "bare possibility" of access is inadequate. *Id.* at 846-847.

Plaintiff's contention that he established a genuine issue of fact as to widespread dissemination is also meritless. Widespread dissemination of a work can create an inference of access. *L.A. Printex*, 676 F.3d at 846-847. However, courts routinely find a lack of widespread dissemination as a matter of law. *See*, *e.g.*, *Rice*, 330 F.3d at 1178 (holding that sales of 17,000 copies of a video was not wide dissemination); *Art Attacks*, 581 F.3d at 1144-1145.

Plaintiff presented no evidence of widespread dissemination. Claiming, without any evidence, that the Screenplay was widely read on triggerstreet.com, Plaintiff states that TIME magazine voted the site "one of the 50 Best Websites of 2004," that it was the "ONLY online social network for filmmakers and screenwriters," that it had a "membership over 100,000" and was of "unparalleled importance to screenwriters and filmmakers." OB 22. However, Plaintiff submitted no evidence to corroborate these assertions.

Even if Plaintiff substantiated triggerstreet.com's popularity (which he did not), it does not follow that the Screenplay was widely disseminated. This Court's *Art Attacks* opinion is on point.[3] In *Art Attacks*, the plaintiff argued that its

---

[3] Plaintiff's accusation that the District Court relied upon *Art Attacks* though the case was not cited in the briefs is false. Defendants cited *Art Attacks* in their papers on the cross-motions for summary judgment. SER 518-519.

"Spoiled Brats designs" were widely disseminated via a trade show booth, on T-shirts, and on the internet. 581 F.3d at 1144. This Court affirmed that the designs were not widely disseminated as a matter of law. *Id.* at 1144-1145. The Court held that even though "millions of people attend the relevant county fairs," there was "no evidence that significant numbers of passerby would notice the Art Attacks booth among the many other similar booths at the fair." *Id.* at 1144. The Court found that 2,000 sales of "Spoiled Brats" T-shirts were not evidence of widespread dissemination. *Id.* The Court also found that use of the allegedly infringed designs on the plaintiff's website did not create a genuine issue of fact because the designs "were only one of several images on the page," viewers had to scroll down to see the designs, and the images would not be caught by search engines because they lacked meta tags. *Id.* at 1145. The Court concluded: "A website with such limitations could not have widely disseminated the copyrighted Spoiled Brats material." *Id.*

These same considerations preclude an inference that the Screenplay was widely disseminated on triggerstreet.com. As in *Art Attacks*, Plaintiff's Screenplay could not have been located by search engine searches because triggerstreet.com was a members-only site. SER 57. Also as in *Art Attacks*, the fact that triggerstreet.com is alleged to have had a large membership does not mean that

21

large numbers read the Screenplay. Plaintiff's Screenplay was just one of thousands on the website. SER 57.

Notably, the only "evidence" Plaintiff submitted concerning the distribution of his Screenplay on triggerstreet.com refutes that it was widely read. Plaintiff provides emails generated by triggerstreet.com which state that the Screenplay was downloaded only nine times. OB 12. The emails are inadmissible hearsay. Fed. R. Evid. 801. But even if considered, the emails belie Plaintiff's argument that his Screenplay was widely distributed. Furthermore, although Plaintiff "assures the Court" that the downloads for the rest of the time the Screenplay was on triggerstreet.com were "very healthy," OB 12, he provides absolutely no evidence to support this claim. Plaintiff's allegation of widespread dissemination is completely unfounded and speculative.

The Ninth Circuit's *L.A. Printex* case, which Plaintiff relies upon heavily, is easily distinguished. In support of an allegation of widespread dissemination of a copyrighted fabric design, the plaintiff there submitted a declaration evidencing that 50,000 yards of the fabric were sold to numerous customers between 2002 and 2009 in the Los Angeles area, where the defendant was located. *Id.* at 847. The Court found this sufficient to create a genuine issue of fact given that the plaintiff and defendant "operate in the same industry in the same Los Angeles area," "many or most of [the] purchasers [of the copyrighted fabric] were in the

22

Los Angeles area," and "the dissemination . . . occurred over a four-year period

immediately preceding Defendants' alleged infringement." *Id.* at 847-848.

Nothing in *L.A. Printex* supports an inference of widespread dissemination

here. Unlike in *L.A. Printex*, Plaintiff provided no admissible evidence of the

extent of dissemination of his Screenplay. Further, whereas in *L.A. Printex* the

copyrighted design sold for seven years including a four-year period preceding the

infringement, Plaintiff only posted his Screenplay online between February and

August 2007, which was approximately six years before *Elysium* was released.

The District Court correctly held that Plaintiff failed to establish a genuine

issue of fact as to access or widespread dissemination.

### 4. The District Court Did Not Err In Defining Striking Similarity.

Because Plaintiff failed to create an issue of fact as to access, the "striking

similarity" standard applied. *Three Boys Music*, 212 F.3d at 485 ("[I]n the absence

of any proof of access, a copyright plaintiff can still make out a case of

infringement by showing that the [works] were 'strikingly similar'") (citations

omitted); *see also Pringle v. Adams*, 556 Fed. Appx. 586, 587 (9th Cir. 2014);

*Seals-McClellan v. Dreamworks, Inc.*, 120 Fed. Appx. 3, 4 (9th Cir. 2004).

Plaintiff criticizes the District Court for citing *Nimmer on Copyright* for the

definition of "striking similarity." Nimmer states: "At base, 'striking similarity'

23

simply means that, in human experience, it is virtually impossible that the two works could have been independently created.'" SER 30 (Order citing 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.02[B] (2005)). Nimmer's recitation of the standard is not only cited with approval by district courts in this Circuit, *see*, *e.g.*, *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1052 (C.D. Cal. 2010), but it is entirely consistent with the standard proffered by this Court in *Seals-McClellan*, which held: "To show a striking similarity . . . a plaintiff must produce evidence that the accused work could not possibly have been the result of independent creation." *Seals-McClellan*, 120 Fed. Appx. at 4. The District Court cited *Seals-McClellan* as well and clearly applied the correct standard. SER 30.

Plaintiff argues that the District Court should have applied Seventh Circuit case law defining striking similarity. The District Court did not err in applying Ninth Circuit law, and in any event, the two Circuits' standards are comparable. *See Selle v. Gibb*, 741 F.2d 896 (7th Cir. 1984) (holding that striking similarity requires such high similarities that the possibility of independent conception is "as a practical matter, precluded").

The District Court properly held that Plaintiff was subject to the striking similarity standard, and it properly defined "striking similarity" by reference to Ninth Circuit authority. Regardless, the District Court assessed the works under

both standards. And for the reasons discussed below, the Screenplay and Film are neither strikingly nor substantially similar as a matter of law.

### 5. The Screenplay And Film Are Not Substantially Or Strikingly Similar As A Matter Of Law.

It is a rare case in which a plaintiff can prove striking similarity. This was no exception. Plaintiff's burden was to establish a genuine issue of fact as to "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events"' in the Screenplay and Film. *Kouf*, 16 F.3d at 1045 (9th Cir. 1994). No reasonable trier of fact could find substantial or striking similarity between these elements of the two works.

### (a) The Plots Are Dissimilar.

The plots of the Screenplay and the Film are incomparable. In the Screenplay, protagonist Arlo is on the run from bounty hunters. To afford his family's return to the "State," he agrees to fly Tamara Gwynn to Los Angeles, where she is to appear at a trial against the State over the rights to her revolutionary energy-producing A-Cell. Arlo is captured and framed for Tamara's murder; escapes imprisonment from Uberopolis and pilots a shuttle back to Earth; evades federal agent Jerry Mathiessen while seeking the drug Drexlerin to save his daughter Franny; covertly travels back to Uberopolis to obtain remaining supplies of the drug; negotiates with President Drexler to exchange the A-Cell for

25

Drexlerin; exposes Drexler to the world as a murderous imposter; and destroys

Uberopolis while piloting off the space station to safety. Not one of these plot

elements occurs in the Film.

Copyright holders often attempt to use self-serving abstractions of the

copyrighted and accused works to manufacture an illusion of similarity. *See, e.g.*,

*Wild* v. *NBC Universal, Inc.* 788 F. Supp. 2d 1083, 1102 (C.D. Cal. 2011)

(criticizing an analysis which "addresses the plots abstractly and ignores the

requirement that the Court focus on the expression of the idea in applying the

extrinsic test"); *Bernal*, 788 F. Supp. 2d at 1067 ("Plaintiff's argument of plot

similarities essentially boils down to an abstract list of random similarities . . . .");

*Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1181 (C.D. Cal. 2001)

(disregarding 106 alleged similarities that were "at the abstract level of 'ideas' . . .

rather than 'expression.'"). That is exactly what Plaintiff does here. Rather than

describe the actual plots of the Screenplay and Film, Plaintiff portrays the stories in

conspicuously generalized terms. For example, he alleges that the works share the

plot idea of "a hero who must get to the satellite world for medicine (medical

care)." SER 61. Plaintiff uses this abstract comparison to try to hide that the actual

plot of the Film, in which Max travels to Elysium to use a med bay to cure his

radiation poisoning, is very different from the actual plot in the Screenplay, in

which Arlo travels to Uberopolis to find Drexlerin for his daughter.

26

Similarly, Plaintiff alleges that both works feature a hero who "needs I.D. and transport to a satellite world." SER 61. But in the Screenplay, the "I.D." Arlo needs is simply a fake ID card which will allow him to take a commuter shuttle to Uberopolis without being detected by police. In the Film, the "I.D." is a mark that must be burned onto Max's arm so that med bays will recognize him as an Elysium citizen. This is an unwarranted comparison which obfuscates the differences in the actual plots of the works.

In these and his other examples, Plaintiff distorts the actual plots of the Screenplay and Film. Even were the descriptions accurate, moreover, the general plot ideas Plaintiff contends were copied are unprotected and must be disregarded under the extrinsic test.

In *Funky Films*, the copyrighted and accused works appeared to share some unique plot features: both were narratives about a family-run funeral parlor, the death of the family patriarch, the inheritance of the business by the patriarch's two sons, and the return of the "prodigal son" to run the business. 462 F.3d at 1077-1078, 1081. Despite the fact that the works shared specific similarities involving an unusual premise/setting for a television show, the Court found the shared ideas to be "uneventful." *Id.* at 1078. It explained: "At first blush, these apparent similarities in plot appear significant; however, an actual reading of the two works reveals greater, more significant differences and few real similarities at the levels

27

of plot, characters, themes, mood, pace, dialogue, or sequence of events." *Id.*

The Court concluded that the plot similarities existed only "[a]t a very high level of

generality," and that the works were not substantially similar as a matter of law

because "'[g]eneral plot ideas are not protected by copyright law; they remain

forever the common property of artistic mankind.'" *Id.* at 1081, quoting *Berkic*,

761 F.2d at 1293.

In *Benay*, in both the copyrighted and accused works "an American war

veteran travels to Japan in the 1870s to train the Imperial Army in modern Western

warfare in order to combat a samurai uprising." 607 F.3d at 625. The stories shared

numerous elements arising from their "shared premise," including that "the

protagonist starts in America and travels to Japan where he meets the Emperor,

who is struggling to modernize Japan"; "[b]oth protagonists introduce modern

warfare to the Imperial Army, using contemporary Western weaponry and tactics";

"[b]oth works feature a Japanese foil in the form of the leader of the samurai

rebellion"; "[a]nd in both works the protagonist suffers a personal crisis and is

transformed as a result of his interaction with the samurai." *Id.* Despite these

similarities, the Court affirmed summary judgment, holding that the works were

similar only at a "cursory" level, and that a "closer examination of the protectable

elements . . . exposes many more differences than similarities." *Id.*

28

In *Berkic*, similarly, both the copyrighted and accused works concerned "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants." 761 F.2d at 1293. Both works depicted "the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization." *Id.* The Court nevertheless held that "this degree of similarity between the basic plots of two works cannot sustain a plaintiff's claim that the works are 'substantially similar.'" *Id.*

In this case, the most that can be said is that the Screenplay and Film each involve a protagonist who travels to a space station for medicine or medical care of some sort and saves the life of a young girl in the process. As in the above cases, this "similarity" (to use the term loosely) exists only at the highest level of generality. This plot idea is even more abstract than the shared plot ideas in *Funky Films*, *Benay*, and *Berkic*, and it is unprotected by copyright.[4] *See Lichtfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984) ("Any similarities in plot exist only at the general level for which plaintiff cannot claim copyright protection.").

---

[4] *See also Cavalier*, 297 F.3d at 824 (holding that "general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep" is a "basic plot idea" which is not protected); *Kouf*, 16 F.3d at 1045 (affirming summary judgment where both works involved children who were shrunk to a fraction of their sizes).

29

**(b)     The Sequences Of Events Are Dissimilar.**

The sequences of events in the Screenplay and Film are as dissimilar, if not more so than the plots. Not one scene in the Screenplay is replicated in the Film.

Plaintiff lists ten events that he contends appear in both the Screenplay and Film. OB 23-24. Again, Plaintiff uses abstractions to compare scenes which are in fact nothing alike:

Plaintiff states that in both works "the hero resolves to go to the satellite world for medical aide," "contacts underworld figure to get ID & transport to the satellite," "struggles to find transport to the satellite," and "successfully gets fake ID and ticket to the satellite." OB 23. These general plot ideas about someone needing an ID to travel to a space station, and needing advanced medical care on the space station, pre-date both parties' works and are generic. SER 422-487. They are also expressed very differently by Plaintiff and Defendants. Plaintiff is trying to compare: (i) events in the Screenplay where Arlo escapes from a prison on Uberopolis, finds his daughter at home on life support, decides to travel back to Uberopolis to find Drexlerin, and obtains a fake ID card so he can avoid detection when he travels to Uberopolis on a commuter shuttle; with (ii) events in the Film where Max suffers a fatal dose of radiation in a factory accident, is told he has five days to live, decides he must travel to Elysium to use a med bay, has an ID burned onto his arm so the med bay will believe he is an Elysium citizen, kidnaps Carlyle

30

and downloads the reboot sequence from his brain, learns that Spider's ships are grounded, and surrenders to Kruger to gain passage to Elysium. These story lines and events are not similar.

Plaintiff argues that the "heroes of both works then threaten to detonate explosives as they confront the villains." OB 23. Plaintiff is comparing a scene in the Screenplay where Arlo threatens to break the A-Cell and annihilate Uberopolis with a scene in the Film where Max threatens to destroy Kruger's shuttle if he is not taken safely to Elysium. These scenes are not alike save for the ubiquitous idea of someone using an explosive as a bargaining tool. *Accord Berkic*, 761 F.2d at 1294 (holding that two works' uses of "familiar," "stock" scenes does not support an inference of substantial similarity).

Plaintiff argues that in both works "the hero begins a lengthy battle against the villain on the satellite world," and "[d]uring the climax of the battle, as the hero seems to gain the upper-hand, the hero has a terrible headache, giving the villain the advantage." OB 23. The obligatory fight and chase scenes in the Screenplay and Film are totally different. So too are the protagonists' so-called "headaches." The idea of someone being knocked to their knees by a headache is common stock in literature and film. SER 478-482. This generic idea is expressed differently in the parties' works. In the Screenplay, Arlo has a lifelong chronic affliction which causes "ice pick" headaches. He suffers a headache while fighting Drexler on a

31

shuttle, which allows Drexler to gain the upper hand and shoot him. SER 115-116, 202-203. By contrast, Max begins having seizures after downloading the reboot sequence from Carlyle's brain. *Elysium* DVD at 00:45-00:51. Max has a momentary seizure while running from Kruger in the end of the Film, but he immediately regains his strength and kills Kruger by throwing him over a railing. "These events might appear similar when described in the abstract, but in context, they are exceedingly different." *Bernal*, 788 F.Supp.2d at 1067.

Plaintiff argues that in both works, "[a]s the hero seems to die his keepsake necklace factors back into the story." OB 24. The idea of a necklace being important to a character is generic, SER 483-485, and the specific story lines in the Screenplay and Film are not comparable. In the Screenplay, Arlo's love interest (Benni) gives him a yellow butterfly dream catcher for luck. Near the end of the Screenplay, Arlo is unconscious due to a gunshot wound and sees the dream catcher in the eye of a dolphin in a dreamlike vision, causing him to regain consciousness and devise a plan to evade the missile tracking his shuttle. SER 205-206. Conversely, in the Film, the nun who raises Max in an orphanage gives him a locket with a picture of Earth to remind him of the beauty around him. The locket ties into the Film's conclusion in a unique way that is not relatable to Plaintiff's Screenplay. The actual events in the two works are utterly dissimilar.

32

Plaintiff argues that in both works the "hero's actions are shown to have saved the girl central to the story" and "have far reaching, global consequences (effectively liberating or saving much of the world)." OB 24. The actual events are nothing alike. In the Screenplay, Arlo destroys Uberopolis, survives, and returns to Earth with Drexlerin for his daughter. In the Film, Max dies but succeeds in rebooting Elysium's computers so that everyone, including Matilda, can be cured by a med bay.

This Circuit has recognized that "lists of similarities" like the one contained in Plaintiff's Opening Brief are "inherently subjective and unreliable," and that courts should be "particularly cautious where . . . the list emphasizes random similarities scattered throughout the works." *Lichtfield*, 736 F.2d at 1356. Here, Plaintiff not only lists random scattered elements, but he compares them using "highly unfair <u>characterizations</u> . . . to create highly strained purported 'similarities.'" *Quirk v. Sony Pictures Entertainment, Inc.*, 2013 WL 1345075 *9 (N.D. Cal. Apr. 2, 2013) (disregarding plaintiff's "35 pages of alleged substantial similarities").

Setting aside Plaintiff's artificial characterizations, the sequences of events in the Screenplay and Film are not at all similar.

### (c) The Settings Are Dissimilar.

Plaintiff contends that Defendants copied the "two central settings" of his Screenplay—a "giant satellite world for the rich" and a "dystopian Earth." SER 67-69. These generalized settings are not protectable. *See Funky Films*, 462 F.3d at 1080 (disregarding the "basic premise of a family-run funeral home" where the specific settings were otherwise dissimilar); *Bernal*, 788 F.Supp.2d at 1071 ("A generic suburban neighborhood is not a copyrightable expression."). Indeed, science fiction is replete with past works involving a futuristic or dystopian Earth, as well as utopian space stations that are exclusive to the rich. SER 423-460.

The idea of a futuristic Earth and a space station are also disregarded under the extrinsic test because they are *scenes a faire* which follow from the basic premises of the Screenplay and Film. *See Benay*, 607 F.3d at 627-628 (holding that the "Imperial Palace," the "Imperial Army's training grounds," and "battle scenes in various places in Japan" were "scenes-a-faire that flow naturally from the works' shared unprotected premise" of "an American war veteran who travels to Japan to help the Emperor fight a samurai rebellion").

To support an inference of infringement, the Film must express these settings in a strikingly similar way. *See Funky Films*, 462 F.3d at 1080 ("Although both works take place in a contemporary, family-run funeral home, the similarities in setting end there."). It does not.

34

In the Screenplay, the "Global State" on Earth enjoys "100 percent employment" and "almost no crime." SER 96-97. Manhattan is a typical major city with apartment complexes, shopping malls, and subways. SER 126-127. The populace drives futuristic sky-cars, sky-cycles, and hover-jets. SER 112 (Screenplay at 19 (referencing "heavily trafficked 'skyways'")). Plaintiff's Earth is futuristic but not dystopian.[5]

The Film portrays Earth very differently. It truly is dystopian. Skyscrapers are crumbling and dilapidated. The population is poor, largely unemployed, and living in shanty towns and rundown apartments. Abusive robots police these slums.

Plaintiff argues that Earth is presented similarly in the two works because there are slums overrun by thugs, poor with little access to medical care, flying police vehicles, and rich businesses that capitalize on cheap labor. OB 20. As shown in the report of defense expert Jeff Rovin, these are all *scenes a faire* that are pervasive in literary works, film, and television, and which naturally follow from the basic premise of a futuristic Earth. *See Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) (holding that "electrified fences, automated tours, dinosaur nurseries, and uniformed workers . . . are classic *scenes a faire* that flow from the unprotectable concept of a dinosaur zoo").

---

[5] The Opening Brief quotes a "logline/synopsis" of *Butterfly Driver* that Plaintiff allegedly posted online and which describes that 95% of the population in his work lives in poverty. OB 22. That synopsis is inconsistent with the Screenplay and is irrelevant in determining whether the Screenplay and Film are similar.

35

The space stations in the Screenplay and Film are likewise dissimilar. Physically, they look nothing alike. Whereas Plaintiff's Uberopolis is "an ultra-modern city, replete with casinos, golf courses, towering apartments and offices," SER 119, the Film's Elysium is a tropical paradise with palatial residences rather than towering offices.

More important, Uberopolis and Elysium differ with regard to their exclusivity. The absolute separation between Earth and Elysium defines the Film. There is no immigration or travel between the two (except by Carlyle and Kruger, who have their own private ships). This separation is also responsible for the juxtaposition of a crumbing healthcare system on Earth and a revolutionary healthcare system on Elysium, where med bays cure all disease, illness, or injury.

Elysium is the antithesis of Plaintiff's Uberopolis. In the Screenplay, everyone is invited to travel to Uberopolis. Anyone can move there. There is constant shuttle travel back and forth between Earth and Uberopolis. SER 96-97, 122. Moreover, in spite of Plaintiff's false claims to the contrary, there is no disparity between the health care available on Earth and Uberopolis. The advanced drug Drexlerin is available on Earth as well. The only reason Arlo must travel to Uberopolis to find the drug is that supplies on Earth are momentarily exhausted. SER 128 (Screenplay at 35) ("Drexlerin was discontinued. Drexlerin 2 will be released in a week or two. There's none left in The State.").

36

Beyond the generalized ideas of Earth and a space station, everything about these settings in the Film and Screenplay is dissimilar.

### (d) The Works Contain No Similar Dialogue.

To support a claim of substantial or striking similarity based on dialogue, Plaintiff must show "extended similarity of dialogue." *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988). Here, there is no similarity at all. No dialogue from the Screenplay is in the Film.

In his briefing to the District Court, Plaintiff stressed that his Screenplay and the purported *Elysium* screenplay which he downloaded from the internet both used words and phrases like "pressure," "go faster," and "surveillance." These "[o]rdinary phrases" and words "are not entitled to copyright protection" and are irrelevant. *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989). No inference of copying or striking similarity is supported by Blomkamp using stock words or phrases that can be found in countless other works.

### (e) The Characters Are Dissimilar.

Plaintiff attempts to compare several characters in the Film to their supposed counterparts in the Screenplay. In each case, "through the use of abstraction, Plaintiff obscures the radical differences between the two characters." *Wild*, 788 F.Supp.2d at 1107.

37

## Arlo v. Max

The protagonists in the two works are completely dissimilar. Plaintiff's Arlo is a war hero and hover-craft pilot who flies supplies in territories outside the Global State. He is a married father of two who goes on a selfless mission to save his daughter and succeeds. The Film's Max is none of these things. He is an orphan, raised in a convent, who grows up into a petty criminal. He is unmarried, has no kids, and works at Armadyne fabricating robotic police officers. Unlike Arlo, Max is on a self-centered mission to save his own life at the expense of the lives of others. Arlo and Max are similar only in that they occupy the role of a male protagonist. *See Funky Films*, 462 F.3d at 1078 ("The 'prodigal son' characters of the two works, while similar at the abstract level, are markedly different in the two scripts.").

## Drexler v. Delacourt

Plaintiff argues that President Drexler from the Screenplay is similar to Secretary Delacourt (Jodie Foster) from the Film because they are each "a villain who has been genetically reprogrammed to appear much younger than he/she is." SER 61. These two characters are nothing alike. Drexler is a male ex-soldier who murdered the real Drexler, stole his identity, killed Drexler's family, and used Drexler's fortune to build Uberopolis. SER 186-187. Delacourt is female, did not kill anyone to steal their identity, and does not own Elysium. They both occupy the

38

role of "villain," but the similarities stop there. *Cf. Funky Films*, 462 F.3d at 1079 (finding two characters "remarkably different" despite that both played the role of "young brothers").

Drexler and Delacourt do <u>not</u> share the trait of having been genetically modified to appear younger. The purported *Elysium* screenplay that Plaintiff found on the internet references Delacourt being "re-atomized" to appear younger. This reference never made it into the Film. Compare SER 215, 231 with *Elysium* DVD at 25:40-27:08. Either way, the idea of a character being modified to look younger is generic. SER 486-487. Drexler and Delacourt are not strikingly similar because they may share this one common, non-copyrightable trait. *See Kouf*, 16 F.3d at 1046; *Rice*, 330 F.3d at 1175; *Idema*, 162 F.Supp.2d at 1186 ("[T]o the extent that the two characters <u>are</u> similar, it is only with respect to traits that are so generalized and/or cliché as to be nearly *scenes a faire* . . . .").

Dylan v. Spider

Plaintiff argues that the Screenplay's Dylan and the Film's Spider are similar because they are each "a disabled transporter who will help the hero's emigration plan – IF the hero does a very dangerous mission." This comparison exemplifies the lengths to which Plaintiff goes to use abstractions to compare dissimilar characters and story lines.

39

In the Screenplay, Dylan is Arlo's boss and plays a minor role by setting Arlo up with a "butterfly run" to earn the money necessary for his family to return to New York. SER 99-100, 106-107. Unlike Dylan, Spider is a main character in the Film. *Accord Funky Films*, 462 F.3d at 1079 (distinguishing two young female characters on the basis that one was "a very minor character" and the other a "central character"). Spider's role is also unlike Dylan's. Spider is not Max's boss. He does not send Max on a "butterfly run"—a concept that is absent from the Film. Spider bribes Max to kidnap Carlyle and download data from his brain in exchange for a ride to Elysium. Spider then spearheads the effort to use the reboot sequence in Max's brain to override Elysium's system and make everyone a citizen. *Elysium* DVD at 1:07:19-1:10:28, 1:20:45-1:41:20. These incomparable characters are not similar because, in Plaintiff's words, one is "missing an arm" and the other has "a paralyzed leg." SER 77 (FAC ¶¶ 176-178).

### Jerry v. Kruger

Plaintiff tries to compare the Screenplay's Jerry, the federal agent who pursues Arlo and eventually saves his life, with the Film's Kruger, because they are each "an agent (sent by the villain to apprehend the hero)." SER 61. The comparison is "emblematic of how tortured the attempt to find substantial similarity between the works becomes." *Quirk*, 2013 WL 1345075 *9. Those characters and their roles in the stories could not be more dissimilar.

40

In the Screenplay, Jerry is a law-abiding federal officer and an acquaintance of Arlo. SER 115-116. Jerry investigates Arlo for his alleged kidnapping and murder of Tamara. SER 117-118. Jerry learns during his investigation that Arlo is innocent, he helps Arlo expose Drexler as a criminal, and he rescues Arlo as Drexler is preparing to kill him. SER 182-185, 195-196, 202-203.

The Film's Kruger is the polar opposite of Jerry. He is a maniacal murderer and rapist. *Elysium* DVD at 25:40-27:08. Serving as Delacourt's personal agent, Kruger shoots down undocumented shuttles bound for Elysium; hunts Max to obtain the reboot sequence that he downloaded from Carlyle's brain; kidnaps Max's childhood friend Frey and her daughter Matilda to use as bait; transports Max to Elysium; is blown up by a grenade after a fight erupts en route to Elysium; is regenerated by a med bay; kills Delacourt after deciding to use the reboot sequence to make himself the president of Elysium; and then kills everyone in his path before being thrown off a platform by Max. There is nothing similar at all about these characters.

## Franny v. Matilda

Plaintiff compares the two young girls in the Screenplay and Film—Franny and Matilda, respectively. Both are young, sick, and female, but none of those traits is protectable. *See Kouf*, 16 F.3d at 1046 (holding that "the genius kid with thick-rimmed glasses . . . is not distinctive enough to be a protectable character");

41

*Rice*, 330 F.3d at 1175 (holding that "characters are ordinarily not afforded copyright protection" unless they are "especially distinctive"). The "similarities," moreover, end with these generic traits. Franny appears sparingly in the Screenplay and has little or no dialogue. Matilda, on the other hand, is central to the Film. She is kidnapped by Kruger, taken to Elysium, and she is the catalyst for Max's decision to sacrifice his life for the rest of humanity. *Elysium* DVD at 1:01:00-1:04:06, 1:35:43-1:38:45. Matilda's key role in the Film is unlike Franny's negligible part in the Screenplay.

* * *

Not only are the main characters in the Screenplay and Film dissimilar, but "[t]here are a number of important characters in the Film and the Screenplay who have no obvious parallel in the other work." *Benay*, 607 F.3d at 627. Tamara Gwynn plays an important role in Plaintiff's screenplay and has no possible counterpart. Several key characters from the Film, including John Carlyle, President Patel, the nun who raised Max, and the robot police force, also have no "obvious parallel" in Plaintiff's Screenplay.

**(f)     The Works Explore Different Themes.**

There are no similarities between the themes of the Screenplay and Film. The Film overtly explores themes of current relevance in the United States and in Blomkamp's native South Africa, including racial segregation, universal health

42

care, and class inequality. None of these themes are present in the Screenplay. Racial segregation is not an issue in the Screenplay because racial distinctions are omitted altogether. SER 74 (FAC ¶ 139). The Screenplay does not deal with immigration issues like the Film given that travel between Earth and Uberopolis is unfettered. The Screenplay also fails to explore the theme of universal healthcare because medical treatment is equally available on Earth and Uberopolis. It is difficult to discern what themes are present in the Screenplay, but clearly it is not the themes that pervade the Film.

**(g)    The Mood And Pace Of The Works Are *Scenes A Faire.***

The Screenplay and Film fall into the science fiction and/or action/adventure genres. Thus, *ipso facto*, they have chase scenes, fight scenes, and other stock issues relating to the pacing of an action film. But any similarities in this regard are *scenes a faire* which merge with the idea of this type of work and are not indicative of striking or substantial similarities. *See Rice*, 330 F.3d at 1177 (holding that "an overall mood of secrecy and mystery" is "generic, constitute[s] *scenes a faire*, and merge[s] with the idea of [a show about] revealing magic tricks"); *Zella v. E.W. Scripps Co.*, 529 F.Supp.2d 1124, 1136 (C.D. Cal. 2007) (holding that an "upbeat mood flowing from a cooking/talk show . . . is merely another example of *scenes a faire* and merger, common to all cooking/talk shows.").

43

**6.      Plaintiff Cannot Claim Infringement Of A Collection Of**

**Unprotected Elements.**

For the reasons discussed above, there are no "articulable similarities between the plot, themes, mood, setting, pace, characters, and sequence of events" in the Screenplay and Film, *Kouf*, 16 F.3d at 1045, let alone the striking similarity that must be shown in this case because of the absence of evidence of access. The District Court correctly found that the works at most share one or two generalized plots ideas which are expressed in entirely different ways. SER 31-46.

Citing *L.A. Printex* and *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002), Plaintiff argues that even if every element from the Screenplay which he believes was copied is unprotectable, his selection and arrangement of the unprotectable elements was copyrightable and was infringed. Plaintiff misunderstands the holding of *L.A. Printex* and *Metcalf*, and he ignores a fundamental distinction between those cases and this one. While the Courts in *L.A. Printex* and *Metcalf* found the copyrighted and accused works to be substantially and strikingly similar, respectively, the Screenplay and Film here are utterly dissimilar.

*L.A. Printex* concerned the protection afforded to fabric designs. 676 F.3d at 849. Relating specifically to floral fabric, the Court recognized that a design may contain ideas which are not protectable in and of themselves—for example, the idea of bouquets, branches, "open flowers," "closed buds," and the "green color of

44

stems and leaves." *Id.* at 850. However, because there are "gazillions of ways" to arrange these ideas in a floral pattern, an "original selection, coordination, and arrangement of such elements" can be protected. *Id.* at 850-851. The Court analogized to its earlier statement in *Metcalf*: "'Each note in a scale . . . is not protectable, but a pattern of notes in a tune may earn copyright protection.'" *Id.* at 850, quoting *Metcalf*, 294 F.3d at 1074. In assessing substantial similarity, the Court found numerous similarities in the specific way that the copyrighted and accused works arranged the same number of flowers, the same number of buds, the same number of branches, the same shape and number of the flower petals and leaves, and the same angles in the designs. *Id.* at 851.

*L.A. Printex* is inapposite. Defendants do not argue that the Screenplay is unprotectable because it can be parsed into thousands of words or thousands of ideas, each of which is not copyrightable by itself. Defendants readily concede that the Screenplay as a whole is copyrightable. What Defendants argue, instead, is that Plaintiff cannot establish striking or substantial similarity by stripping the Screenplay and Film of their expression and comparing them abstractly. That argument is consistent with *L.A. Printex*.

Indeed, it is Plaintiff who contravenes *L.A. Printex*, not the other way around. Rather than focusing upon the specific selection, coordination, and arrangement of elements as *L.A. Printex* dictates, Plaintiff focuses on abstract

45

ideas—like a fabric designer alleging infringement simply because both designs contain a rose. Nothing in *L.A. Printex* supports that Plaintiff can demonstrate substantial or striking similarity by showing that the works share general ideas. Nothing in *L.A. Printex* purports to overrule decades of Ninth Circuit case law holding that the extrinsic test for infringement of literary works and films ignores the "vague abstracted idea of a general plot" and focuses on the "actual concrete elements" that comprise the stories. *L.A. Printex* reaffirms, consistent with Defendants' argument, that the extrinsic test for infringement compares "specific expressive elements." *Id.* at 848.

*Metcalf* also does not support Plaintiffs' position. There, the Court found that the "cumulative weight" of a long list of similarities was sufficient to survive summary judgment despite that each similarity was not protectable when considered individually. 294 F.3d at 1074. Notably, the Ninth Circuit has since clarified that "*Metcalf* was based on a form of inverse ratio rule analysis" under which the degree of similarity required was lessened because the defendants conceded access to the plaintiff's scripts. *Rice*, 330 F.3d at 1179. In any event, *Metcalf* reaffirmed that copyright law "protects a writer's expression of ideas, but not the ideas themselves." 294 F.3d at 1074. It reaffirmed that "[g]eneral plot ideas are not protected." *Id.* It reaffirmed that to prove infringement, the copyrighted and accused works must be "substantially similar in their protected elements." *Id.* at

46

1072 (emphasis added). Just like *Funky Films, Benay*, *Berkic*, *Cavalier*, *Kouf*, and other Ninth Circuit cases, *Metcalf* prohibits Plaintiff from establishing infringement based solely on unprotected plot ideas.

Further, *Metcalf* is distinguishable on its facts. Not only was access conceded, but the Court found the similarities between the plaintiff's script and the defendants' television show to be "striking." *Id.* at 1073. The same cannot be said here—there was no access and there are no similarities of expression between the Screenplay and Film.

### B.    Plaintiff's Other Claims Of Error Regarding The Finding Of Non-Infringement Are Without Merit.

Plaintiff argues that the District Court further erred: (1) by admitting testimony from defense expert Jeff Rovin; and (2) by comparing the Screenplay to the film version of *Elysium* rather than comparing it to an underlying script for *Elysium*. Both arguments should be rejected.

#### 1.    Testimony From Defendants' Expert Supported The Court's Holding And Was Properly Considered.

The District Court properly considered Rovin's testimony (albeit without appearing to give it much weight).[6] Rovin demonstrated that the elements Plaintiff

---

[6] Rovin has been qualified as a literary expert in past copyright infringement cases. *Gable v. National Broadcasting Company*, 727 F.Supp.2d 815, 837 (C.D. Cal. 2010).

claims were copied are common, stock ideas in science fiction literature and film. His testimony supports that these allegedly-copied elements are unprotectable because they are generic *scenes a faire*. *See Berkic*, 763 F.2d at 1294 (holding that "familiar scenes" which are "among the very staples of modern American literature and film" are disregarded in the extrinsic test); *see also, e.g.*, *Bernal*, 788 F.Supp.2d at 1065 (holding that idea of "dead narrator" was not a protectable element because it occurred in prior films like *Sunset Boulevard* and *American Beauty*); *Wild*, 788 F.Supp.2d at 1099-1100 (holding that elements common in past works including Ray Bradbury's *Something Wicked This Way Comes*, the *Harry Potter* series, and *Star Trek* were unprotectable); *Gable*, 727 F.Supp.2d at 842 (holding that the "visual effect of a piece of paper magically floating back to someone is not a protectable expression" because the "effect is commonly used").

Plaintiff argues that Rovin's testimony was flawed because he used a "dissection analysis" instead of "demonstrat[ing] the combined elements of Plaintiff's work are found ALL together, in a single previously published work – NOT find each separate element, alone, in various previous works, as Rovin does." OB 10. Plaintiff misunderstands Rovin's purpose. Defendants do not contend that the Screenplay is unprotected, in which case they might be obligated to show that everything in it could be found in a prior work. Defendants contend that the generalized concepts that Plaintiff claims were copied fall on the idea side of the

48

idea/expression dichotomy. They are "basic plot ideas" rather than "concrete elements." *Funky Films*, 462 F.3d at 1077. Rovin's testimony supports this.

The District Court did not err in considering Rovin's testimony; and any error was harmless because the absence of substantial or striking similarity is apparent from the works themselves.

### 2. The District Court Did Not Err In Comparing The Screenplay To The Film Version Of *Elysium*.

Plaintiff argues that the District Court erred by comparing his Screenplay to the film version of *Elysium* instead of comparing it to a document that he downloaded from the internet which is purported to be an underlying screenplay for *Elysium*. No error was committed. The FAC alleged that the film version of *Elysium* infringed his copyright. SER 54, 88. Thus, the District Court was required to compare the Screenplay to the Film.

Any suggestion that the District Court should have compared Plaintiff's Screenplay to the purported screenplay for *Elysium* as a possible separate infringement fails for several reasons:

First, the purported screenplay for *Elysium* was unauthenticated by Plaintiff and not admissible. SER 31 (Order p. 17 n.1). Therefore, Plaintiff failed to raise a triable issue on his claim that the screenplay was infringing separate and apart from the film version of *Elysium*. *See Stewart v. Wachowski*, 574 F. Supp. 2d 1074,

49

1117 (C.D. Cal. 2005) ("Stewart failed to submit copies of the allegedly infringing works to show that they were strikingly similar to her copyrighted literary works," and "[b]ecause she failed to submit copies of defendants' films, she failed to meet her burden of raising a triable issue of fact regarding an essential element of her copyright infringement claim.").

Second, the screenplay for *Elysium* has the same plot, sequence of events, settings, and characters as the Film. SER 214-333. Thus, as a matter of law, the script is also not strikingly similar to the Screenplay.

Third, the proper comparison <u>was</u> between the Screenplay and the Film. In *See v. Durang*, 711 F.2d 141 (9th Cir. 1983), this Circuit held that early drafts of an allegedly infringing stage play were irrelevant to an infringement claim. The Court rejected that those drafts "might reflect copyright from plaintiff's play that was disguised or deleted in later drafts" because, it explained, "[c]opying deleted or so disguised as to be unrecognizable is not copying." *Id.* at 142. The holding in *See v. Durang* logically applies and has been applied in the context of films. *Quirk*, 2013 WL 1345075 *6 (relying upon *See* in rejecting relevance of intermediary screenplays because the "only relevant question . . . is whether the final movie as filmed, edited, and released contains matter substantially similar to protectable elements of [the plaintiff's work]").

50

Given that Defendants did not commercialize the purported screenplay for

*Elysium* separate and apart from the Film, the sole focus should be the Film.

If additional similarities existed in the intermediary work but were deleted from the

final published work, they are irrelevant because copying "deleted or so disguised

as to be unrecognizable is not copying." *See*, 711 F.2d at 142.

Plaintiff cites *Walt Disney Productions v. Filmation Assocs.*, 628 F. Supp.

871 (C.D. Cal. 1986), which held that materials used in the development and

production of a film could be found infringing. *Id.* at 876. That non-binding case

has two important distinctions. The defendant was alleged to have used infringing

materials in published advertising and to solicit distribution deals. *Id.* at 874. Also,

the defendant had yet to finish and release its film, and so it was unclear whether

all vestiges of copying would be removed. *Id.* at 875-876.

Besides being non-binding, *Filmation* is inapposite here, where there is no

evidence that the underlying screenplay for *Elysium* was separately exploited, and

where the final Film version of *Elysium* which was released publicly lacked the

slightest similarity to Plaintiff's Screenplay. The District Court did not err in

comparing the Screenplay and Film, and any error was harmless.

## C. The Court Committed No Procedural Errors.

Finally, Plaintiff argues that the District Court erred (1) by denying him

leave to file a Second Amended Complaint, and (2) by denying a 120-day

51

continuance of discovery deadlines. OB 3. Plaintiff's notice of appeal does not identify that he is appealing from these rulings. *See* FRAP 3(c)(1)(B). Both claims of error, moreover, are factually and legally baseless.

### 1.    The District Court Properly Denied Plaintiff Leave To File A Second Amended Complaint.

Plaintiff filed his initial complaint on October 8, 2013, and Defendants answered. SER 4-5 (Dist. Ct. Dkt. Nos. 1, 7). He amended the complaint on December 19, 2013 to add superfluous allegations about his "identity and personal history," and Defendants again answered. SER 6-7 (Dist. Ct. Dkt. Nos. 17, 27).

On June 12, 2014, Plaintiff moved for leave to file a Second Amended Complaint ("SAC"). SER 9 (Dist. Ct. Dkt. No. 46). The District Court struck the motion for failure to attach a proposed SAC. SER 9 (Dist. Ct. Dkt. No. 49). One month later, Plaintiff re-filed the motion and sought leave to assert contributory and vicarious infringement, to add new parties, and to augment his list of similarities between the Screenplay and Film. SER 538-540. Defendants opposed the motion, SER 11 (Dist. Ct. Dkt. No. 71), and it was denied. SER 47-51.

Plaintiff does not establish that the denial of leave was an abuse of discretion. He does not address the District Court's bases for denying it at all.

Plainly, the District Court did not abuse its discretion. The scheduling order entered in the case required pleadings to be amended "[n]o later than 90 days

52

before fact discovery cutoff." SER 541. The eventual fact discovery cut-off was June 17, 2014, such that requests to amend were due by March 18, 2014. SER 52. Plaintiff filed his motion in June 2014, well after the deadline.

Because Plaintiff sought leave after the date set forth in the District Court's scheduling order, Rule 16 of the Federal Rules of Civil Procedure governed. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-609 (9th Cir. 1992). Plaintiff had the burden to establish "good cause" for the District Court to amend its scheduling order and permit the late amendment—a standard which "primarily considers the diligence of the party seeking the amendment." *Id.*

No good cause existed for the untimely motion for leave to amend. Plaintiff could easily have asserted contributory and vicarious infringement from the outset. *See In re W. States Wholesale Natural gas Antitrust Litig.*, 715 F.3d 716, 739 (9th Cir. 2013) ("Late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action."). The defendants that Plaintiff sought to add were known to him before. For example, Plaintiff sought to name individuals Mordecai Wiczyk and Asif Satchu, whom he had referenced in his prior pleading. SER 56 (FAC ¶ 13). An entity called MRC II Distribution Company L.P. ("MRC II"), which Plaintiff sought to name in the SAC, was known to him from the inception of the case. In fact, when Plaintiff first

53

named "Media Rights Capital," MRC II answered the complaint.

Plaintiff responded that he was intending to sue a parent company, Media Rights Capital II L.P., and he insisted that MRC II be dismissed from the case. SER 549. No good cause existed for Plaintiff to drag MRC II back into the case many months after he insisted that it be dismissed.

Even if Plaintiff had been unaware of these "new" defendants until shortly before he sought leave, the fault was his alone. Plaintiff did not conduct any discovery in the case until May 2014, after the deadline to amend pleadings passed. This lack of diligence in identifying new parties is ample basis to deny leave. *See*, *e.g.*, *Home Depot U.S.A., Inc. v. U.S. Fidelity & Guar. Co.*, 2009 WL 981321 *4 (N.D. Cal. Apr. 13, 2009); *Estate of Gonzalez v. Hickman*, 2007 WL 3237639 *1 (C.D. Cal. Jan. 8, 2007).

Not only was it appropriate, but the denial of leave was not prejudicial. Plaintiff's proposed amendments adding theories of vicarious and contributory infringement were futile because the Court found no substantial or striking similarity as a matter of law. *See Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (noting that a finding of direct infringement is a prerequisite for contributory and vicarious infringement). Plaintiff's request to name new defendants was futile for the same reason. Plaintiff's inability to augment the pleadings with new allegations of purported similarities between the Screenplay

54

and Film was also of no consequence. In copyright infringement cases, the works speak for themselves. *See Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 64 (2d Cir. 2010), quoting 3-12 *Nimmer on Copyright* § 12.10 ("In copyright infringement actions, 'the works themselves supersede and control contrary descriptions of them,' . . . including 'any contrary allegations, conclusions or descriptions of the works contained in the pleadings.'"). Any allegations Plaintiff would have added to the pleadings would not have been admissible to oppose summary judgment and could not have affected the outcome. *Anderson*, 477 U.S. at 256.

The District Court did not abuse its discretion in denying leave to amend, and Plaintiff's appeal on this basis should be denied.

## 2. The District Court Did Not Err In Continuing Pretrial Deadlines For A Shorter Period Than Plaintiff Requested.

Plaintiff claims that the District Court erred by denying him a 120-day continuance of discovery deadlines and instead extending the discovery period for only 30 days. OB 3, 28. Although discovery rulings are generally reviewed for an abuse of discretion, *Ingham v. U.S.*, 167 F.3d 1240, 1246 (9th Cir. 1999), the standard of review is even more rigorous where a party appeals from the district court's refusal to extend the discovery cut-off. *Martel*, 56 F.3d at 995. "[A] district court's decision to deny a continuance sought for the purpose of obtaining

55

discovery will be disturbed only upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Id.*

The Opening Brief does not establish that the District Court abused its discretion by continuing the discovery cut-off by 30 days rather than 120 days. It does not establish that Plaintiff suffered "actual and substantial prejudice" when the Court granted a shorter continuance. The claim of error is wholly unsupported.

Plaintiff asserts in conclusory fashion that he was precluded from taking depositions. But he does not explain what depositions he wanted to take, why he failed to notice them, or what information he would have learned that would have impacted the outcome. Plaintiff declines to offer specifics because, in truth, he simply failed to notice any depositions.

Plaintiff had ample time to take depositions had he wanted to. The District Court's January 16, 2014 scheduling order bifurcated liability and damages, and set a May 16, 2014 cut-off for discovery on liability. SER 541. After three months passed without Plaintiff conducting any discovery, he requested a scheduling conference and asked that all deadlines be continued by 120 days. SER 8 (Dist. Ct. Dkt. No. 35). The Court held a scheduling conference on April 17, 2014. SER 8 (Dist. Ct. Dkt. No. 37). By that time, the deadline to serve discovery had passed (because discovery had to be served in sufficient time for responses to be served by the May 16 deadline). The District Court rescued Plaintiff by extending the cut-off

56

to June 17, 2014 and allowing Plaintiff to serve discovery up until May 16, 2014. SER 52. Plaintiff capitalized on the District Court's leniency by serving document requests and interrogatories.

Plaintiff had a total of five months to conduct depositions, including two months to do so from the date of the April 2014 scheduling conference. This was more than enough time. The only impediment to Plaintiff taking depositions was his failure to notice them.

Plaintiff's contention that the shorter continuance prevented him from serving an interrogatory to authenticate the purported *Elysium* screenplay which he attached to his pleadings is false. Plaintiff had months to serve this one, discrete interrogatory. But when he served interrogatories, he omitted this request. The District Court is not to blame for Plaintiff's failure to use the discovery devices that were available to him.

Plaintiff provides no explanation as to how the District Court abused its discretion by granting a shorter continuance of the discovery cut-off than Plaintiff requested. Moreover, he fails to establish either that the shorter continuance prevented him from conducting needed discovery, or that the additional discovery would have altered the District Court's conclusion that the Screenplay and Film were not strikingly or substantially similar as a matter of law.

Plaintiff's appeal on this basis is without merit and should be denied.

57

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants and Appellees respectfully request that the Court affirm the District Court's judgment in its entirety.

DATED: April 9, 2015        Respectfully submitted,

                                KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP

                                By: /s/ Michael J. Kump
                                       Michael J. Kump
                                       Attorneys for Defendants and Appellees
                                       NEILL BLOMKAMP, SONY PICTURES ENTERTAINMENT INC., TRISTAR PICTURES, INC., MEDIA RIGHTS CAPITAL II, L.P., AND QED INTERNATIONAL, LLC

58

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1

that the attached Appellees' Answering Brief is proportionally spaced, has a

typeface of 14 points, and contains 13,432 words.

DATED: April 9, 2015          KINSELLA WEITZMAN ISER KUMP &
                              ALDISERT LLP


                      By:  /s/ Michael J. Kump
                           Michael J. Kump
                           Attorneys for Defendants and Appellees
                           NEILL BLOMKAMP, SONY PICTURES
                           ENTERTAINMENT INC., TRISTAR
                           PICTURES, INC., MEDIA RIGHTS
                           CAPITAL II, L.P., AND QED
                           INTERNATIONAL, LLC

59

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendants state that they are

unaware of any related cases pending before the Court.

DATED: April 9, 2015          KINSELLA WEITZMAN ISER KUMP &
ALDISERT LLP


By: /s/ Michael J. Kump
     Michael J. Kump
     Attorneys for Defendants and Appellees
     NEILL BLOMKAMP, SONY PICTURES
     ENTERTAINMENT INC., TRISTAR
     PICTURES, INC., MEDIA RIGHTS
     CAPITAL II, L.P., AND QED
     INTERNATIONAL, LLC

10021.00015/251824.1