No. 14-17175

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

STEVE WILSON BRIGGS,
*Plaintiff-Appellant*,

v.

NEILL BLOMKAMP, SONY PICTURES ENT., INC., TRISTAR PICTURES,
INC., MEDIA RIGHTS CAPITAL, QED INTERNATIONAL
*Defendants-Appellees.*

_____

Appeal from The United States District Court for the Northern District of
California
Case No. 4:13-cv-4679 PJH
(The Honorable Phyllis J. Hamilton)

_____

## APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 1 OF 3

_____

Michael J. Kump (SBN 100983)
Gregory P. Korn (SBN 205306)
KINSELLA WEITZMAN ISER KUMP &
ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
(310) 566-9800

Attorneys for Defendants and Appellees
NEILL BLOMKAMP, SONY PICTURES ENTERTAINMENT INC., TRISTAR
PICTURES, INC., MEDIA RIGHTS CAPITAL II, L.P., AND QED
INTERNATIONAL

# TABLE OF CONTENTS

| TAB | ND Cal Docket# | PAGE | DATE | DESCRIPTION OF DOCUMENT |
|---|---|---|---|---|
| | | | | **VOLUME 1** |
| 1 | 88 | 00001 | 10-31-14 | Notice of Appeal |
| 2 | Docket | 00003 | 3-21-15 | District Court Docket |
| 3 | 86 | 00015 | 10-3-14 | Order Re Motions for Summary Judgment |
| 4 | 83 | 00047 | 8-20-14 | Order Denying Motion to Amend Complaint |
| | | | | **VOLUME 2** |
| 5 | 37 | 00052 | 4-17-14 | Civil Minutes re: Case Management Conference |
| 6 | 17 | 00054 | 12-19-13 | Amended Complaint for Copyright Infringement (with exhibits) |
| | | | | **VOLUME 3** |
| 7 | 17-1 | 00334 | 12-19-13 | **[Continued]** Exhibits to Amended Complaint for Copyright Infringement |
| 8 | 65 | 00410 | 7-30-14 | Declaration of Neill Blomkamp in Support of Defendants' Motion for Summary Judgment |
| 9 | 67 | 00413 | 7-30-14 | Declaration of Jeff Rovin in Support of Defendants' Motion for Summary Judgment |
| 10 | 82 | 00509 | 8-13-14 | Defendants' Opposition to Plaintiff's Motion for Summary Judgment |

## <u>TABLE OF CONTENTS</u>

| <u>TAB</u> | <u>ND Cal Docket#</u> | <u>PAGE</u> | <u>DATE</u> | <u>DESCRIPTION OF DOCUMENT</u> |
|---|---|---|---|---|
| 11 | 61 | 00538 | 7-18-14 | Plaintiff's Amended Notice and Motion for Leave to File Second Amended Complaint |
| 12 | 31 | 00541 | 1-17-14 | Case Management and Pretrial Order |
| 13 | 30 | 00549 | 1-16-14 | Civil Minutes re: Initial Case Management Conference |

Steve Wilson Briggs
681 Edna Way
San Mateo, CA 94402
Telephone: (510) 200 3763
Email: snc.steve@gmail.com

Pro Se Plaintiff

FILED

2014 OCT 31 P 12: 01

CLERK ... KING
U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| STEVE WILSON BRIGGS )<br><br>Plaintiff )<br>)<br>vs. )<br>)<br>NEILL BOMKAMP, SONY PICTURES )<br>ENT., INC., TRISTAR PICTURES, INC., )<br>MEDIA RIGHTS CAPITAL II LP, QED )<br>INTERNATIONAL )<br>)<br>Defendants ) | Case No.: CV 13-4679  PJH<br><br>Hon. Phyllis J. Hamilton<br><br><br>**NOTICE OF APPEAL** |

     **NOTICE IS HEREBY GIVEN** that Steve Wilson Briggs, plaintiff in the above named case,

hereby appeals to United States Court of Appeals for the Ninth Circuit from the final judgment of

the District Court's October 3rd, 2014 Order Re Motions For Summary Judgment.

DATED: October 31st, 2014.

                                    Respectfully Submitted,

Steve Wilson Briggs
Plaintiff, In Pro Per
681 Edna Way,
San Mateo, CA 94402
Telephone: (510) 200 3763
Email: snc.steve@gmail.com

---

NOTICE OF APPEAL   CV 13-4679 PJH

# PROOF OF SERVICE

This is to certify that on the 31st day of October, 2014, I, Steve Wilson Briggs,

served, by way of the U.S. mail, true copies of the document described as

## "NOTICE OF APPEAL"

on the interested parties below:

Michael J. Kump, and Gregory P. Korn

(of Kinsella, Weitzman, Iser, Kump & Aldisert)

808 Wilshire Boulevard, 3rd Floor

Santa Monica, California, 90401

310 566 9800

Executed on October 31st, 2014

By, _____

Steve Wilson Briggs

- 1 -

**PROOF OF SERVICE**

00002

ADRMOP,AO279,APPEAL,CLOSED,E-ProSe,ProSe

# U.S. District Court
## California Northern District (Oakland)
## CIVIL DOCKET FOR CASE #: 4:13-cv-04679-PJH

Briggs v. Blomkamp et al
Assigned to: Hon. Phyllis J. Hamilton
Referred to: Magistrate Judge Laurel Beeler
Case in other court: Ninth Circuit Court of Appeals, 14-
          17175
Cause: 17:501 Copyright Infringement

Date Filed: 10/08/2013
Date Terminated: 10/03/2014
Jury Demand: None
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Steve Kenyatta Wilson Briggs**　　　　　represented by　**Steve Kenyatta Wilson Briggs**
681 Edna Way
San Mateo, CA 94402
510-200-3763
Email: snc.steve@gmail.com
PRO SE

V.

**Defendant**

**Sony Pictures Ent., Inc.**　　　　　represented by　**Michael Joseph Kump**
Kinsella Weitzman et al LLP
808 Wilshire Blvd 3FL
Santa Monica, CA 90401
310-566-9855
Fax: 310-566-9850
Email: mkump@kwikalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory Philip Korn**
Kinsella Weitzman et al LLP
808 Wilshire Blvd 3FL
Santa Monica, CA 90401
310-566-9800
Fax: 310-566-9850
Email: gkorn@kwikalaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tristar Pictures, Inc.**　　　　　represented by　**Michael Joseph Kump**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Gregory Philip Korn
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Media Rights Capital**                    represented by    Michael Joseph Kump
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Gregory Philip Korn
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**QED International**                    represented by    Michael Joseph Kump
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Gregory Philip Korn
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Neill Blomkamp**                    represented by    Michael Joseph Kump
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Gregory Philip Korn
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/08/2013 | 1 | COMPLAINT against Neil Blomkamp, Media Rights Capital, QED International, Inc., Inc., Sony Pictures Ent., Inc., Tristar Pictures, Inc. (Filing fee $ 400.). Filed bySteve Wilson Briggs. (Attachments: # 1 Part 2, # 2 Part 3, # 3 Civil Cover Sheet)(vlkS, COURT STAFF) (Filed on 10/8/2013) (Entered: 10/10/2013) |
| 10/08/2013 | 2 | **ADR SCHEDULING ORDER: Case Management Statement due by 1/2/2014. Case Management Conference set for 1/9/2014 02:00 PM. (Attachments: # 1 Standing Order)(vlkS, COURT STAFF) (Filed on 10/8/2013) (Entered: 10/10/2013)** |
| 10/10/2013 | 3 | REPORT on the filing of an action regarding copyright infringement (cc: form mailed to register). (vlkS, COURT STAFF) (Filed on 10/10/2013) Modified on |

| | | 10/11/2013 (jlmS, COURT STAFF). (Entered: 10/10/2013) |
|---|---|---|
| 10/15/2013 | 4 | Summons Issued as to Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (vlk, COURT STAFF) (Filed on 10/15/2013) (Entered: 10/15/2013) |
| 11/27/2013 | 5 | NOTICE of Appearance by Michael Joseph Kump *For Defendants* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 11/27/2013) (Entered: 11/27/2013) |
| 11/27/2013 | 6 | NOTICE of Appearance by Gregory Philip Korn *For Defendants* (Attachments: # 1 Certificate/Proof of Service)(Korn, Gregory) (Filed on 11/27/2013) (Entered: 11/27/2013) |
| 11/27/2013 | 7 | *DEFENDANTS' ANSWER to Complaint and Affirmative Defenses to Complaint for Copyright Infringement* byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 11/27/2013) (Entered: 11/27/2013) |
| 11/27/2013 | 8 | Certificate of Interested Entities identifying corporate parent Media Rights Capital II, L.P. by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 11/27/2013) Modified on 11/29/2013 (vlkS, COURT STAFF). (Entered: 11/27/2013) |
| 11/27/2013 | 9 | Corporate Disclosure Statement of Defendants by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 11/27/2013) Modified on 11/29/2013 (vlkS, COURT STAFF). (Entered: 11/27/2013) |
| 12/19/2013 | 10 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) (Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 11 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by Neill Blomkamp* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 12 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by QED International, LLC* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 13 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by Tristar Pictures, Inc.* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 14 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by Sony Pictures Entertainment Inc.* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 15 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *filed by MRC II Distribution Company, L.P.* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 12/19/2013) (Entered: 12/19/2013) |

| 12/19/2013 | 16 | Proof of Service re 10 Notice of need of ADR Phone Conference (ADR L.R. 3-5 d) by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Kump, Michael) (Filed on 12/19/2013) Modified on 12/20/2013 (kcS, COURT STAFF). (Entered: 12/19/2013) |
|---|---|---|
| 12/19/2013 | 17 | AMENDED COMPLAINT against Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. Filed bySteve Wilson Briggs. (Attachments: # 1 Part 2, # 2 Part 3)(vlkS, COURT STAFF) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 18 | NOTICE of need for ADR Phone Conference (ADR L.R. 3-5 d) (vlkS, COURT STAFF) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/19/2013 | 19 | SUMMONS Returned Executed by Steve Wilson Briggs. Neill Blomkamp served on 11/26/2013, answer due 12/17/2013; Media Rights Capital served on 12/5/2013, answer due 12/26/2013; QED International served on 12/4/2013, answer due 12/26/2013; Sony Pictures Ent., Inc. served on 11/7/2013, answer due 12/2/2013; Tristar Pictures, Inc. served on 11/7/2013, answer due 12/2/2013. (vlkS, COURT STAFF) (Filed on 12/19/2013) (Entered: 12/19/2013) |
| 12/20/2013 | 20 | ADR Clerk's Notice Setting ADR Phone Conference on 1/6/2014 at 10:00 a.m. Pacific time. Please note that you must be logged into an ECF account of counsel of record in order to view this document. (Attachments: # 1 Certificate/Proof of Service)(cmf, COURT STAFF) (Filed on 12/20/2013) (Entered: 12/20/2013) |
| 12/30/2013 | 21 | STIPULATION WITH PROPOSED ORDER re 17 Amended Complaint re Extension to Answer and Continue January 9, 2014 Case Management Conference filed by Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Proposed Order to Continue January 9, 2014 Case Management Conference)(Kump, Michael) (Filed on 12/30/2013) (Entered: 12/30/2013) |
| 12/30/2013 | 22 | Declaration of Gregory Korn in Support of 21 STIPULATION WITH PROPOSED ORDER re 17 Amended Complaint re Extension to Answer and Continue January 9, 2014 Case Management Conference filed byMedia Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Related document(s) 21 ) (Kump, Michael) (Filed on 12/30/2013) (Entered: 12/30/2013) |
| 01/02/2014 | 23 | **ORDER GRANTING STIPULATION TO CONTINUE JANUARY 9, 2014 CASE MANAGEMENT CONFERENCE by Hon. Phyllis J. Hamilton granting 21 Stipulation. (Attachments: # 1 Certificate/Proof of Service) (nahS, COURT STAFF) (Filed on 1/2/2014) (Entered: 01/02/2014)** |
| 01/02/2014 | | Set Deadlines/Hearings: Case Management Statement due by 1/9/2014. Initial Case Management Conference set for 1/16/2014 02:00 PM. (nahS, COURT STAFF) (Filed on 1/2/2014) (Entered: 01/02/2014) |
| 01/03/2014 | 24 | MOTION for Sanctions filed by Steve Wilson Briggs. Responses due by 1/17/2014. Replies due by 1/24/2014. (vlk, COURT STAFF) (Filed on |

| | | 1/3/2014) (Entered: 01/06/2014) |
|---|---|---|
| 01/06/2014 | 25 | AMENDED MOTION for Sanctions filed by Steve Wilson Briggs. Motion Hearing set for 2/19/2014 09:00 AM before Hon. Phyllis J. Hamilton. Responses due by 1/21/2014. Replies due by 1/28/2014. (Attachments: # 1 Proposed Order)(vlkS, COURT STAFF) (Filed on 1/6/2014) (Entered: 01/07/2014) |
| 01/07/2014 | | ADR Remark: ADR Phone Conference held 1/6/2014 with Howard Herman, ADR Program Director. (cmf, COURT STAFF) (Filed on 1/7/2014) (Entered: 01/07/2014) |
| 01/09/2014 | 26 | CASE MANAGEMENT STATEMENT *and Rule 26(f) Report* filed by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 1/9/2014) (Entered: 01/09/2014) |
| 01/09/2014 | 27 | *Defendants'* ANSWER to Amended Complaint *and Affirmative Defenses* byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Certificate/Proof of Service) (Kump, Michael) (Filed on 1/9/2014) (Entered: 01/09/2014) |
| 01/09/2014 | 28 | CASE MANAGEMENT STATEMENT filed by Steve Wilson Briggs. (vlk, COURT STAFF) (Filed on 1/9/2014) (Entered: 01/09/2014) |
| 01/09/2014 | 29 | MOTION for Permission for Electronic Case Filing filed by Steve Wilson Briggs. (Attachments: # 1 Proposed Order)(vlk, COURT STAFF) (Filed on 1/9/2014) (Entered: 01/09/2014) |
| 01/16/2014 | 30 | Minute Entry: Initial Case Management Conference held on 1/16/2014 before Phyllis J. Hamilton (Date Filed: 1/16/2014). Bench Trial set for 5/18/2015 08:30 AM before Hon. Phyllis J. Hamilton. Final Pretrial Conference set for 4/30/2015 02:00 PM. (Court Reporter Not Reported.) (Attachments: # 1 Certificate/Proof of Service) (nahS, COURT STAFF) (Date Filed: 1/16/2014) (Entered: 01/17/2014) |
| 01/17/2014 | 31 | **CASE MANAGEMENT AND PRETRIAL ORDER re 30 Case Management Conference - Initial. Signed by Judge Phyllis J. Hamilton on 1/17/14. (Attachments: # 1 Certificate/Proof of Service)(nahS, COURT STAFF) (Filed on 1/17/2014) (Entered: 01/17/2014)** |
| 01/23/2014 | 32 | Answer to Amended Complaint 17 Amended Complaint *(Answer Filed By Media Rights Capital II, L.P.)* byMedia Rights Capital. (Attachments: # 1 Certificate/Proof of Service PROOF OF SERVICE)(Kump, Michael) (Filed on 1/23/2014) (Entered: 01/23/2014) |
| 01/23/2014 | 33 | Certificate of Interested Entities by Media Rights Capital identifying other affiliate MRC II Distribution Company L.P. (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 1/23/2014) Modified on 1/24/2014 (vlkS, COURT STAFF). (Entered: 01/23/2014) |
| 01/23/2014 | 34 | Certificate of Interested Entities by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. *CORPORATE DISCLOSURE STATEMENT OF DEFENDANT MEDIA RIGHTS CAPITAL II.,* |

00007

| | | |
|---|---|---|
| | | *L.P.* (Attachments: # 1 Certificate/Proof of Service)(Kump, Michael) (Filed on 1/23/2014) (Entered: 01/23/2014) |
| 04/08/2014 | 35 | MOTION For a Further CMC and Continuance of Case Management and Pretrial Order Deadlines filed by Steve Wilson Briggs. Motion Hearing set for 5/14/2014 09:00 AM before Hon. Phyllis J. Hamilton. Responses due by 4/22/2014. Replies due by 4/29/2014. (Attachments: # 1 Proposed Order)(vlkS, COURT STAFF) (Filed on 4/8/2014) (Entered: 04/08/2014) |
| 04/09/2014 | 36 | **ORDER by Judge Hamilton granting in part and denying in part 35 Motion for further case management conference and Motion to continue pretrial dates. (pjhlc1, COURT STAFF) (Filed on 4/9/2014) (Additional attachment(s) added on 4/10/2014: # 1 Certificate/Proof of Service) (nahS, COURT STAFF). (Entered: 04/09/2014)** |
| 04/17/2014 | 37 | Minute Entry: Further Case Management Conference held on 4/17/2014 before Judge Phyllis J. Hamilton (Date Filed: 4/17/2014). Discovery due by 6/17/2014. Motions due by 7/30/2014. (Court Reporter: Not Reported.) (Attachments: # 1 Certificate/Proof of Service) (nahS, COURT STAFF) (Date Filed: 4/17/2014) Modified on 4/21/2014 (jlmS, COURT STAFF). (Entered: 04/18/2014) |
| 04/17/2014 | 38 | **FIRST NOTICE OF FILING OF MOTION FOR SUMMARY JUDGMENT re 37 Case Management Conference - Further. Signed by Judge Phyllis J. Hamilton on 4/17/14. (Attachments: # 1 Certificate/Proof of Service)(nahS, COURT STAFF) (Filed on 4/17/2014) (Entered: 04/18/2014)** |
| 04/25/2014 | 39 | MOTION for Permission for Electronic Case Filing filed by Steve Wilson Briggs. (Attachments: # 1 Proposed Order)(vlk, COURT STAFF) (Filed on 4/25/2014) (Entered: 04/29/2014) |
| 04/25/2014 | 40 | Declaration in Support of 39 MOTION for Permission for Electronic Case Filing filed bySteve Wilson Briggs. (Related document(s) 39 ) (vlk, COURT STAFF) (Filed on 4/25/2014) (Entered: 04/29/2014) |
| 04/29/2014 | 41 | **ORDER by Judge Phyllis J. Hamilton finding as moot 39 Motion for Permission for Electronic Case Filing; granting 29 Motion for Permission for Electronic Case Filing (Attachments: # 1 Certificate/Proof of Service) (nah, COURT STAFF) (Filed on 4/29/2014) (Entered: 04/29/2014)** |
| 05/16/2014 | 42 | **See document 43 for attachment.**<br>NOTICE of Rebuttal to Defendants' Expert Report of Jeff Rovin by Steve Kenyatta Wilson Briggs (vlk, COURT STAFF) (Filed on 5/16/2014) Modified on 5/16/2014 (vlk, COURT STAFF). Modified on 5/16/2014 (vlk, COURT STAFF). (Entered: 05/16/2014) |
| 05/16/2014 | 43 | NOTICE of Rebuttal to Defendants' Expert Report of Jeff Rovin by Steve Kenyatta Wilson Briggs (vlk, COURT STAFF) (Filed on 5/16/2014) (Entered: 05/16/2014) |
| 05/16/2014 | 44 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs re 43 Notice (Other) (vlk, COURT STAFF) (Filed on 5/16/2014) (Entered: 05/16/2014) |
| 06/12/2014 | 45 | MOTION To Disqualify Export Report of Jeff Rovin filed by Steve Kenyatta |

| | | |
|---|---|---|
| | | Wilson Briggs. Motion Hearing set for 7/23/2014 09:00 AM before Hon. Phyllis J. Hamilton. Responses due by 6/26/2014. Replies due by 7/3/2014. (Attachments: # 1 Proposed Order)(vlkS, COURT STAFF) (Filed on 6/12/2014) (Entered: 06/13/2014) |
| 06/12/2014 | 46 | **Document STRICKEN per 49 Order.**<br>MOTION for Leave to File a Second Amended Complaint filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Proposed Order)(vlkS, COURT STAFF) (Filed on 6/12/2014) Modified on 6/17/2014 (vlkS, COURT STAFF). (Entered: 06/13/2014) |
| 06/12/2014 | 47 | Amended Rebuttal to Defendants' "Export Report of Jeff Rovin" by Steve Kenyatta Wilson Briggs (vlkS, COURT STAFF) (Filed on 6/12/2014) (Entered: 06/13/2014) |
| 06/12/2014 | 48 | Correction by Steve Kenyatta Wilson Briggs re 43 Notice (vlkS, COURT STAFF) (Filed on 6/12/2014) (Entered: 06/13/2014) |
| 06/16/2014 | 49 | **ORDER by Hon. Phyllis J. Hamilton STRIKING 46 Motion for Leave to File.(nah, COURT STAFF) (Filed on 6/16/2014) (Entered: 06/16/2014)** |
| 06/26/2014 | 50 | RESPONSE (re 45 MOTION To disqualify Export Report of Jeff Rovin ) filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Attachments: # 1 Declaration of Jeff Rovin in Opposition to Motion to Disqualify Expert Report, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(Korn, Gregory) (Filed on 6/26/2014) (Entered: 06/26/2014) |
| 07/09/2014 | 51 | MOTION to Compel Production of Documents filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 8/13/2014 09:00 AM before Hon. Phyllis J. Hamilton. Responses due by 7/23/2014. Replies due by 7/30/2014. (vlkS, COURT STAFF) (Filed on 7/9/2014) (Entered: 07/10/2014) |
| 07/09/2014 | 52 | CERTIFICATE OF SERVICE by Steve Kenyatta Wilson Briggs re 51 MOTION to Compel (vlkS, COURT STAFF) (Filed on 7/9/2014) (Entered: 07/10/2014) |
| 07/10/2014 | 53 | Amended MOTION to Compel *Production of Documents* filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 8/20/2014 09:00 AM in Courtroom 3, 3rd Floor, Oakland before Hon. Phyllis J. Hamilton. Responses due by 7/24/2014. Replies due by 7/31/2014. (Attachments: # 1 Proposed Order, # 2 Exhibit A -Blomkamp Articles, # 3 Exhibit B -Tenley Titles, # 4 Exhibit C -Plaintiff Interrogatories)(Wilson Briggs, Steve) (Filed on 7/10/2014) (Entered: 07/10/2014) |
| 07/10/2014 | 54 | Notice of Withdrawal of Motion *Notice of Motion and Motion to Compel Production of Documents; and Memorandum and Points and Authorities* (Wilson Briggs, Steve) (Filed on 7/10/2014) (Entered: 07/10/2014) |
| 07/11/2014 | 55 | **ORDER REFERRING CASE to Magistrate Judge for Discovery purposes. Signed by Judge Phyllis J. Hamilton on 7/11/14. (nahS, COURT STAFF) (Filed on 7/11/2014) (Entered: 07/11/2014)** |
| 07/14/2014 | 56 | ERRATA re 53 *Correction Concerning Motion to Compel and Proposed Order,* filed by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on |

00009

| | | |
|---|---|---|
| | | 7/14/2014) Modified on 7/15/2014 (jlmS, COURT STAFF). (Entered: 07/14/2014) |
| 07/15/2014 | 57 | **NOTICE OF REFERRAL AND ORDER REGARDING DISCOVERY PROCEDURES. See order for deadlines regarding Plaintiff's pending amended motion to compel. Signed by Judge Laurel Beeler on 7/15/2014. (Attachments: # 1 Standing Order)(lblc2, COURT STAFF) (Filed on 7/15/2014) (Entered: 07/15/2014)** |
| 07/17/2014 | 58 | **ORDER re 45 MOTION To disqualify Export Report of Jeff Rovin filed by Steve Kenyatta Wilson Briggs. Signed by Judge Hamilton on 7/17/2014. (pjhlc1, COURT STAFF) (Filed on 7/17/2014) (Entered: 07/17/2014)** |
| 07/18/2014 | 59 | MOTION for Leave to File *Amended Notice of Motion and Motion to File a Second Amended Complaint* filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Proposed Order, # 2 Exhibit Ex A Butterfly Driver, # 3 Exhibit Ex B Elysium, # 4 Exhibit Exhibits C-Z and AA-DD)(Wilson Briggs, Steve) (Filed on 7/18/2014) (Entered: 07/18/2014) |
| 07/18/2014 | 60 | Notice of Withdrawal of Motion *for Leave to File Amended Notice of Motion and Motion to File a Second Amended Complaint* (Wilson Briggs, Steve) (Filed on 7/18/2014) (Entered: 07/18/2014) |
| 07/18/2014 | 61 | Second MOTION for Leave to File *Second Amended Complaint* filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Exhibit Second Amended Complaint, # 2 Exhibit Exhibit A - Butterfly Driver, # 3 Exhibit Exhibit B - Elysium, # 4 Exhibit Exhibit C-Z and AA-DD, # 5 Proposed Order Proposed Order)(Wilson Briggs, Steve) (Filed on 7/18/2014) (Entered: 07/18/2014) |
| 07/25/2014 | 62 | RESPONSE (re 53 Amended MOTION to Compel *Production of Documents ) and Declaration of Gregory Korn in Support Thereof* filed by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Korn, Gregory) (Filed on 7/25/2014) (Entered: 07/25/2014) |
| 07/30/2014 | 63 | MOTION for Summary Judgment filed by Steve Kenyatta Wilson Briggs. Motion Hearing set for 9/3/2014 09:00 AM in Courtroom 3, 3rd Floor, Oakland before Hon. Phyllis J. Hamilton. Responses due by 8/13/2014. Replies due by 8/20/2014. (Attachments: # 1 Proposed Order proposed order, # 2 Exhibit Exhibit A Butterfly Driver, # 3 Exhibit Exhibit B Elysium, # 4 Exhibit Exhibit C Copyright reg, # 5 Exhibit Exhibit D email of script, # 6 Exhibit Exhibit E WGA reg, # 7 Exhibit Exhibit F query letters, # 8 Exhibit Exhibit G Philly logline, # 9 Exhibit Exhibit H Slamdance, # 10 Exhibit Exhibit I Ibktip, # 11 Exhibit Exhibit J TriggerStreet 1, # 12 Exhibit Exhibit K TriggerStreet 2, # 13 Exhibit Exhibit L TriggerStreet 3, # 14 Exhibit Exhibit M website logline, # 15 Exhibit Exhibit N Uber Headache, # 16 Exhibit Exhibit O signed declarations) (Wilson Briggs, Steve) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 64 | MOTION for Summary Judgment *Memorandum of Points and Authorities* filed by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. Motion Hearing set for 9/3/2014 09:00 AM in Courtroom 3, 3rd Floor, Oakland before Hon. Phyllis J. Hamilton. Responses due by 8/13/2014. Replies due by 8/20/2014. (Attachments: # 1 Proposed Order, # 2 Certificate/Proof of Service [of Exhibit 2 to the Declaration of |

| | | |
|---|---|---|
| | | Gregory Korn)(Kump, Michael) (Filed on 7/30/2014) Modified on 8/13/2014 (kcS, COURT STAFF). (Entered: 07/30/2014) |
| 07/30/2014 | 65 | Declaration of Neill Blomkamp in Support of 64 MOTION for Summary Judgment *Memorandum of Points and Authorities* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Related document(s) 64 ) (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 66 | Declaration of Gregory Korn in Support of 64 MOTION for Summary Judgment *Memorandum of Points and Authorities* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Related document(s) 64 ) (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 67 | Declaration of Jeff Rovin in Support of 64 MOTION for Summary Judgment *Memorandum of Points and Authorities* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Related document(s) 64 ) (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 68 | NOTICE by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. re 64 MOTION for Summary Judgment *Memorandum of Points and Authorities [OF MANUAL FILING OF EXHIBIT 2 - MOTION PICTURE ELYSIUM IN DVD FORMAT]* (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 69 | NOTICE by Neill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc. *TO PLAINTIFF RE: APRIL 17, 2014 FIRST NOTICE OF FILING OF MOTION FOR SUMMARY JUDGMENT* (Kump, Michael) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 07/30/2014 | 70 | EXHIBIT 2 in Support of 66 Declaration filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (vlkS, COURT STAFF) (Filed on 7/30/2014) (Entered: 07/30/2014) |
| 08/01/2014 | 71 | RESPONSE (re 61 Second MOTION for Leave to File *Second Amended Complaint* ) *AND DECLARATION OF GREGORY KORN IN SUPPORT THEREOF* filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Korn, Gregory) (Filed on 8/1/2014) (Entered: 08/01/2014) |
| 08/01/2014 | 72 | CLERK'S NOTICE. The court sets a short telephone conference call regarding Mr. Briggs's pending motion to compel for Thursday, August 7, 2014 at 11 a.m. Mr. Briggs and Defendants' counsel must email their direct-dial telephone numbers to lbpo@cand.uscourts.gov. If there are any issues regarding the timing of this conference call, the parties must call the court's chambers at 415-522-4660 to work out another time. Discovery Hearing set for 8/7/2014 11:00 AM in Courtroom C, 15th Floor, San Francisco before Magistrate Judge Laurel Beeler. (lblc2, COURT STAFF) (Filed on 8/1/2014) (Entered: 08/01/2014) |
| 08/04/2014 | 73 | **ORDER re 63 MOTION for Summary Judgment filed by Steve Kenyatta Wilson Briggs. Signed by Judge Hamilton on 8/4/2014. (pjhlc1, COURT** |

| | | |
|---|---|---|
| | | STAFF) (Filed on 8/4/2014) (Entered: 08/04/2014) |
| 08/06/2014 | 74 | Declaration of Steve Wilson Briggs in Support of 17 *for authentication in support of FAC* filed by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 8/6/2014) Modified on 8/7/2014 (vlkS, COURT STAFF). (Entered: 08/06/2014) |
| 08/06/2014 | 75 | Declaration of Steve Wilson Briggs in Support of 30 *authentication in support of motion for summary judgment* filed by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 8/6/2014) Modified on 8/7/2014 (vlkS, COURT STAFF). (Entered: 08/06/2014) |
| 08/06/2014 | 76 | Request for Judicial Notice in Support of 17 *Plaintiff's Motion For Summary Judgment -and FAC* filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Exhibit 1 Exhibit B - Elysium Script, # 2 Exhibit 2 Exhibit C -Copyright Reg, # 3 Exhibit 3 Exhibit D MRC exec(s) do marketing interview, # 4 Exhibit 4 Exhibit E MRC website markets Elysium, # 5 Exhibit 5 Exhibit F NYT article about MRC's ethics concerns, # 6 Exhibit 6 Exhibit G -first few pages of script in email, # 7 Exhibit 7 Exhibit H - WGA registration, # 8 Exhibit 8 Exhibit J - Piladelphia logine, # 9 Exhibit 9 Exhibit K -Slamdance, # 10 Exhibit 10 Exhibit L -Inktip emails, # 11 Exhibit 11 Exhibit M -TriggerStreet emails, # 12 Exhibit 12 Exhibit N -TS member Tom Gilman emails, # 13 Exhibit 13 Exhibit O -TS member Jason Beck emails, # 14 Exhibit 14 Exhibit P -TS member Bob Thielke emails, # 15 Exhibit 15 Exhibit Q -logline posted on old personal website, # 16 Exhibit 16 Exhibit R -Jody Foster discusses extreme set secrecy on Elysium, # 17 Exhibit 17 Jodie Foster says her role was originally written for a man, # 18 Exhibit 18 Exhibit T -email to Kinsella Weitzman, # 19 Exhibit 19 Exhibit U -Hollywood Accounting, # 20 Exhibit 20 Exhibit V -Loeb says Sony Pictures lacks transparency, # 21 Exhibit Exhibit 21-TriggerStreet 50 best, # 22 Exhibit Exhibit 22 -TS 100,000 mebers)(Wilson Briggs, Steve) (Filed on 8/6/2014) Modified on 8/7/2014 (vlkS, COURT STAFF). (Entered: 08/06/2014) |
| 08/07/2014 | 77 | Minute Entry: Discovery Hearing held on 8/7/2014 before Judge Laurel Beeler (Date Filed: 8/7/2014). (FTR Recording: 11-58 a.m. - 12:02 p.m.) (Attachments: # 1 Certificate/Proof of Service) (wsn, COURT STAFF) (Date Filed: 8/7/2014) (Entered: 08/07/2014) |
| 08/07/2014 | 78 | **ORDER REGARDING 53 PLAINTIFF'S JULY 10, 2014 MOTION TO COMPEL. Signed by Magistrate Judge Laurel Beeler on 8/7/2014.(lblc2, COURT STAFF) (Filed on 8/7/2014) (Entered: 08/07/2014)** |
| 08/12/2014 | 79 | RESPONSE (re 64 MOTION for Summary Judgment ) *Opposition Brief* filed bySteve Kenyatta Wilson Briggs. (Attachments: # 1 Exhibit genetic reprograming, # 2 Exhibit millions of $ to live on Uberopolis, # 3 Exhibit commoners long for treatments on Uberopolis, # 4 Exhibit more treatments available on Sky Town, # 5 Exhibit the poor long for medicine from Uberopolis, # 6 Exhibit F -plot points, # 7 Exhibit G -Syd Field, # 8 Exhibit H - Syd Field's plot points, # 9 Exhibit I -more Syd Field's plot points, # 10 Exhibit J -more Syd Field's plot points, # 11 Exhibit K -more Syd Field's plot points, # 12 Exhibit L -Inciting Incident, # 13 Exhibit M -more inciting incident, # 14 Exhibit N -Law360 article, # 15 Exhibit O -Examiner.com article, # 16 Exhibit |

00012

| | | P -The Wrap article)(Wilson Briggs, Steve) (Filed on 8/12/2014) (Entered: 08/12/2014) |
|---|---|---|
| 08/13/2014 | 80 | Declaration of Steve Wilson Briggs *to authenticate and support attachment to 79 brief in opposition to Defendant's Motion for Summary Judgment* filed by Steve Kenyatta Wilson Briggs. (Wilson Briggs, Steve) (Filed on 8/13/2014) Modified on 8/14/2014 (kcS, COURT STAFF). (Entered: 08/13/2014) |
| 08/13/2014 | 81 | Request for Judicial Notice *for exhibits attached to 79 Brief In Opposition To Defendants' Motion for Summary Judgment* filed by Steve Kenyatta Wilson Briggs. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P)(Wilson Briggs, Steve) (Filed on 8/13/2014) Modified on 8/14/2014 (kcS, COURT STAFF). (Entered: 08/13/2014) |
| 08/13/2014 | 82 | RESPONSE (re 63 MOTION for Summary Judgment ) filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Kump, Michael) (Filed on 8/13/2014) (Entered: 08/13/2014) |
| 08/20/2014 | 83 | **ORDER by Judge Hamilton denying 61 Motion for Leave to File (pjhlc1, COURT STAFF) (Filed on 8/20/2014) (Entered: 08/20/2014)** |
| 08/20/2014 | 84 | REPLY (re 64 MOTION for Summary Judgment ) filed byNeill Blomkamp, Media Rights Capital, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc.. (Korn, Gregory) (Filed on 8/20/2014) (Entered: 08/20/2014) |
| 09/03/2014 | 85 | Minute Entry: Motion Hearing held on 9/3/2014 before Phyllis J. Hamilton (Date Filed: 9/3/2014) re 64 MOTION for Summary Judgment filed by Media Rights Capital, Neill Blomkamp, QED International, Sony Pictures Ent., Inc., Tristar Pictures, Inc., 63 MOTION for Summary Judgment filed by Steve Kenyatta Wilson Briggs. (Court Reporter Kelly Polvi.) (nahS, COURT STAFF) (Date Filed: 9/3/2014) (Entered: 09/03/2014) |
| 10/03/2014 | 86 | **ORDER by Judge Hamilton denying 45 Motion to Exclude Expert; denying 63 Plaintiff's Motion for Summary Judgment; granting 64 Defendants' Motion for Summary Judgment (pjhlc1, COURT STAFF) (Filed on 10/3/2014) (Entered: 10/03/2014)** |
| 10/03/2014 | 87 | **JUDGMENT. Signed by Judge Hamilton on 10/3/2014. (pjhlc1, COURT STAFF) (Filed on 10/3/2014) (Entered: 10/03/2014)** |
| 10/31/2014 | 88 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Steve Kenyatta Wilson Briggs. Appeal of Judgment 87 , Order on Motion for Summary Judgment, 86 (Filing fee: $505.00, Receipt no. 44611011957.) (vlkS, COURT STAFF) (Filed on 10/31/2014) Modified on 11/6/2014 (vlkS, COURT STAFF). (Entered: 10/31/2014) |
| 10/31/2014 | | USCA Appeal Fees received $ 505.00 receipt number 44611011957 re 88 Notice of Appeal, filed by Steve Kenyatta Wilson Briggs. (cjlS, COURT STAFF) (Filed on 10/31/2014) (Entered: 11/10/2014) |
| 11/03/2014 | 89 | USCA Case Number 14-17175 Ninth Circuit Court of Appeals for 88 Notice of |

| | | Appeal filed by Steve Kenyatta Wilson Briggs. (cjlS, COURT STAFF) (Filed on 11/3/2014) (Entered: 11/03/2014) |
|---|---|---|
| 11/04/2014 | 90 | ORDER of USCA as to 88 Notice of Appeal filed by Steve Kenyatta Wilson Briggs re filing fees (vlk, COURT STAFF) (Filed on 11/4/2014) (Entered: 11/05/2014) |
| 11/05/2014 | 91 | TRANSCRIPT ORDER by Steve Kenyatta Wilson Briggs for Court Reporter Kelly Polvi. (Wilson Briggs, Steve) (Filed on 11/5/2014) (Entered: 11/05/2014) |
| 11/05/2014 | 92 | RESPONSE TO 90 USCA ORDER by Steve Kenyatta Wilson Briggs . (Attachments: # 1 Exhibit receipt for docketing fees)(Wilson Briggs, Steve) (Filed on 11/5/2014) Modified on 11/6/2014 (vlkS, COURT STAFF). (Entered: 11/05/2014) |
| 12/06/2014 | 93 | Transcript of Proceedings held on 09/03/14, before Judge Phyllis J. Hamilton. Court Reporter Kelly Polvi, Telephone number 503.779.7406; email kpolvi@comcast.net. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 91 Transcript Order ) Release of Transcript Restriction set for 3/6/2015. (Related documents(s) 91 ) (Polvi, Kelly) (Filed on 12/6/2014) (Entered: 12/06/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/31/2015 08:24:16 | | | |
| PACER Login: | kw1122:3086386:0 | Client Code: | 10021-15 |
| Description: | Docket Report | Search Criteria: | 4:13-cv-04679-PJH |
| Billable Pages: | 10 | Cost: | 1.00 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVE WILSON BRIGGS,

      Plaintiff,

      v.

NEILL BLOMKAMP, et al.,

      Defendants.

_____/

No. C 13-4679 PJH

**ORDER RE MOTIONS FOR
SUMMARY JUDGMENT**

     The parties' motions for summary judgment came on for hearing before this court on September 3, 2014.  Plaintiff Steve Wilson Briggs appeared in propria persona, and defendants Neill Blomkamp, Sony Pictures Entertainment, Inc., Tristar Pictures, Inc., Media Rights Capital II, L.P., and QED International LLC appeared by their counsel Michael J. Kump and Gregory P. Korn.  Having reviewed the papers and other materials submitted by the parties, and having carefully considered their arguments and the relevant legal authority, the court hereby GRANTS defendants' motion and DENIES plaintiff's motion.

**BACKGROUND**

A.   Procedural and Factual Background

     The following facts are as alleged in the first amended complaint ("FAC").  Plaintiff asserts that he completed a first draft of a screenplay entitled "Uberopolis: City of Light" in May 2005, and that he emailed copies of the screenplay to family and friends.   On December 16, 2005, he registered a revised version of "Uberopolis: City of Light" with the Writers Guild of America (West).

     In January 2006, plaintiff began attempting to market his screenplay.  During approximately the next two years, he sent dozens of query letters and emails to literary

United States District Court
For the Northern District of California

1  agents and film companies.  He also posted short synopses on screenwriter websites, and

2  entered screenwriting and scriptwriting competitions.

3    In January 2007, plaintiff again revised his screenplay, and renamed it "Butterfly

4  Driver."  He claims that in February 2007, he posted the entire "Butterfly Driver" screenplay

5  on triggerstreet.com, a filmmaker-screenwriter website designed to link filmmakers and

6  screenwriters with industry professionals, by allowing members to post screenplays, short

7  films, and short stories to get feedback from peers and professionals.  Plaintiff asserts that

8  at that time, the triggerstreet.com website had approximately 50,000 active members.

9    Plaintiff alleges that between February 2007 and August 2007, he posted "Butterfly

10  Driver" on triggerstreet.com approximately four times, making script revisions each time.  In

11  December 2007, plaintiff stopped marketing the "Butterfly Driver" screenplay, as he had

12  decided to film it himself some day.  From 2008 to 2012, he worked on other film projects.

13    On May 27, 2013, plaintiff went to a movie theater, where he watched a trailer for a

14  film called "Elysium," featuring a plot, characters, and settings that appeared to plaintiff to

15  have been misappropriated from "Butterfly Driver."  Later that evening, plaintiff read an

16  entry on Wikipedia about the film "Elysium."  He claims that this reading confirmed his view

17  that the story structure of "Elysium" closely conformed to his "Butterfly Driver" screenplay.

18    Plaintiff alleges that on June 13, 2013, he located a version of the screenplay for

19  "Elysium" online, and downloaded it.  He claims that the text of the script conformed to the

20  portion of the dialogue he had observed when he watched the trailer on May 27, 2013.

21  After an attorney recommended that he register his copyright for "Butterfly Driver," he

22  obtained a copyright registration from the U.S. Copyright Office on June 21, 2013.

23    Defendants released "Elysium" in August 2013, and plaintiff viewed the film for the

24  first time on August 10, 2013.  Upon viewing the film, he concluded that the "Elysium" film

25  and screenplay infringed his copyright in "Butterfly Driver," as a whole and with regard to

26  features such as plot, characters, settings, and themes.  He speculates that defendant Neill

27  Blomkamp ("Blomkamp") accessed the "Butterfly Driver" screenplay on triggerstreet.com,

28  and used it as the basis for his own screenplay for "Elysium."

00016

Plaintiff filed the present action on October 8, 2013, asserting one cause of action for copyright infringement. Each side now seeks summary judgment.

B. Synopsis of "Butterfly Driver"

The protagonist of plaintiff's screenplay "Butterfly Driver" is Arlo Grainer. The year is 2120. Arlo is a "legend" on Earth because of his prior military service and subsequent defiance of the "Global State" (or "State"). Arlo lives in a "Zone" outside the State's jurisdiction, working as a "hover-jet" pilot flying supplies between Zones. Living in the same building, but in a separate apartment, are Arlo's estranged wife (Rianna) and his two children (John Carl and Franny).

Arlo's antagonist, Drexler, is President of the State and the owner of "Uberopolis," a "satellite city" that orbits Earth. Uberopolis is three miles in diameter, and is enclosed in a transparent, spherical shield, with a "flora-sphere" and an "aqua-sphere" beneath the city floor. It is an ultra-modern city, with casinos, golf courses, high-rise apartments, and offices. At the time of the story, half of Uberopolis (also called "Sky Town") is developed; the other half (separated by a wall) is still under development.

At work in the warehouse from which he flies supplies, Arlo receives a distress signal from a fellow pilot, Roddy, and races on a "sky-cycle" to Roddy's location to find that he has been shot and is near death. Roddy tells Arlo that he was ambushed by bounty hunters, who "set us up to find the butterfly – Tamara." He says they will be seeking out Arlo and his family next. Arlo flies home to collect his children and estranged wife, and send them to New York, away from the Zone.

Knowing that to reenter the State, his family will need a hundred thousand dollars to begin the "repatriation" process, Arlo accepts an offer from the warehouse operator, Dylan, to make a dangerous "butterfly run" to transport Tamara Gwynn to Los Angeles on a sky-cycle. Tamara is heading to Los Angeles for a trial in a civil suit against the State concerning her rights to the "A-cell" – a small glass cylinder that produces electricity from "anti-matter" water. She tells Arlo that use of the A-cell can potentially save more than 100 million people every year, who would otherwise die from "fuel pollution."

3

**United States District Court**
For the Northern District of California

Arlo sends the real A-cell to a different Zone to hide it; Tamara travels with a decoy. On the flight, they are ambushed by police in "sky-cars" and crash into the streets of Los Angeles. They separate, and Arlo is apprehended. Television news reports falsely claim that Arlo kidnapped and killed Tamara. Jerry Mathiessen, a federal agent who once attended flight school with Arlo, is sent to investigate. The State Secretary persuades Jerry to take the case by promising to pay for medical assistance for Jerry's son.

Arlo is criminally charged and transported to a "work program" on Uberopolis until his trial date. Four months later, he is given a "ticket" to return to Earth for his trial. While waiting for the shuttle transport, he meets a fellow prisoner, David Levine, also set to return for trial. They discuss the fact that the citizen-commute shuttles take five hours to travel from Uberopolis to Earth and back, while the inmate return shuttles take only two hours. As they are being loaded onto the shuttle along with other prisoners, they notice that there are no pilots, and conclude that Uberopolis has been killing prisoners by dumping them into space during the shuttle flights. They escape into an "airlock" to avoid suffering the same fate. They pilot the shuttle back to Earth and part ways.

Arlo locates his family in Rianna's mother's Manhattan apartment, and discovers that daughter Franny is on a respirator, near death, and in need of the drug "Drexlerin." Arlo races to a warehouse that normally stocks the drug, but supplies on Earth are temporarily exhausted because production of Drexlerin has been discontinued in anticipation of the release of its replacement, "Drexlerin 2." At the warehouse, Arlo meets brother and sister Louis and Benni. They provide Arlo with more respectable clothing, and help him obtain a fake ID and passport that will enable him to covertly travel by shuttle to Uberopolis to find Drexlerin. As Arlo is arranging for his transport on the shuttle, he also recovers the A-cell, which he had arranged to be sent to a friend for safekeeping. Benni gives Arlo a yellow butterfly "dreamcatcher" for luck.

Jerry manages to track Arlo down, but Arlo disarms Jerry and forces him into the trunk of a sky-car. Arlo tells Jerry he must find Drexlerin for Franny, and proceeds to Uberopolis. Upon arrival, Arlo obtains a police uniform and proceeds to the hospital

**United States District Court**
For the Northern District of California

1   warehouse to search for the Drexlerin.  He discovers that the warehouse is empty, and as

2   he is leaving the hospital, the security guards recognize him and give pursuit.  He steals an

3   unattended police "sky-ranger," and then contacts Drexler.  After he tells Drexler he has the

4   genuine A-cell, Drexler agrees to a meeting.

5        Based on the investigation he has been conducting, Jerry has figured out that Arlo

6   and Drexler are acquainted from their past during wartime.  After he is released from the

7   trunk of the sky-car, Jerry follows Arlo to Uberopolis and orders a technician in the "Drexler

8   Media" building to track Arlo's movements with surveillance cameras located throughout

9   the satellite.  Jerry forces the tech to broadcast the video from the surveillance cameras to

10  television stations.

11       With the surveillance cameras tracking and broadcasting his movements, Arlo

12  crashes the police sky-ranger through the glass windows of Drexler's 57th floor conference

13  room.  He persuades Drexler to dismiss the security guards by threatening to break the

14  glass A-cell and release the anti-matter, which will result in a massive explosion.

15       Arlo and Drexler converse.  Not knowing that the conversation is being televised,

16  Drexler confesses to a number of crimes, including dumping prisoners into space and

17  killing Zone residents and prisoners for transplant organs, and also to being an imposter.

18  Drexler is actually "Midland," a soldier previously known to Arlo.  Midland murdered the real

19  Drexler, adopted his identity, and inherited Drexler's fortune.

20       Drexler tells Arlo that Drexlerin is produced on Earth, but was "warehoused" on

21  Uberopolis "to keep it safe from pirates until our bunkers were ready" – and that the last

22  shipments were returned to Earth the previous day.  However, he has a few doses of

23  Drexlerin in his possession, and offers to exchange them for the A-cell.  He also offers to

24  have Arlo "escorted" to give his daughter the Drexlerin, after which he will be returned to

25  prison.

26       Arlo initially hesitates, telling Drexler that Tamara didn't want him to have the A-cell.

27  Drexler responds that "Tamara would have destroyed the energy industry and our economy

28  for her cause."  Drexler's plan is to phase the A-cell technology in over a thirty-year period,

00019

1  in order to protect the existing energy industry and the "quality of life," notwithstanding that

2  billions of people will die in the interim.

3    They begin to exchange the A-cell for the Drexlerin.  Drexler opens his briefcase and

4  removes the Drexlerin.  Arlo slowly extends the A-cell to Drexler, and takes the Drexlerin

5  from him.  He then sees in a mirror reflection that Drexler is reaching for a gun with his

6  other hand.  As Drexler's fingers come within an inch of the A-cell, Arlo tosses it out the

7  broken window.  Drexler scrambles out the window after the A-cell, gun in hand, followed

8  by Arlo.

9    As Drexler is about to grab the A-cell, Arlo seizes Drexler's ankle, and flings Drexler

10  toward the city floor.  However, Arlo's throw is not hard enough to hurt Drexler, because of

11  the reduced gravity on Uberopolis.  Arlo then seizes the A-cell, just before his own "gravity

12  garments" pull him down.

13    A lengthy fight and chase scene follows, involving Arlo, Drexler, Jerry, and the

14  police, culminating in Drexler bearing down on Arlo on a sky-ranger and shooting him in the

15  leg.  Arlo dives into a harbor to escape Drexler and encounters a dolphin named Spike

16  (whom he had previously met while waiting for transport with fellow prisoner David Levine)

17  and is guided to an escape hatch.

18    Drexler finds Arlo on a shuttle.  Just as Arlo is gaining the upper hand, he suffers a

19  debilitating "ice pick" headache caused by a longstanding chronic affliction.  Drexler shoots

20  Arlo and is on the verge of killing him when Jerry arrives and discharges his stun-gun into

21  Drexler's back, knocking him unconscious.  Arlo and Jerry pilot the shuttle off Uberopolis.

22  They are immediately targeted by a missile launched from Uberopolis.

23    Arlo drifts out of consciousness (from his bullet wound) and has a dreamlike vision of

24  a pale child with a respirator holding a yellow flower, and of Benni's dream catcher in the

25  eyes of Spike the dolphin.  Arlo awakes and orders Jerry to turn back toward Uberopolis.

26  The missile follows, and just before the shuttle collides with Uberopolis, Arlo launches an

27  evacuation pod.  The shuttle and missile continue forward and destroy Uberopolis.

28    Arlo and Franny survive.  They attend the funeral of Jerry's son, Matty, who died

United States District Court
For the Northern District of California

from a respiratory illness.  Rianna asks Arlo to "repatriate" into the State with his family, but he declines, and returns to his job as a hover-jet pilot.

C.    Synopsis of "Elysium"

Defendants' film "Elysium" opens with images of Earth in total squalor.  The year is 2154, and the extremely wealthy have abandoned the planet to live on a luxurious space station called "Elysium."  Elysium is exclusive to its wealthy citizens, who have access to futuristic devices called "med bays," which cure all diseases and injuries, and can even halt aging.  The less fortunate remaining on Earth are poor.  They live in rundown apartments and have inadequate medical care, and are policed by a brutal robotic police force.

The film's protagonist, Max, grows up as a child in a convent where he befriends a young girl, Frey.  As a child, Max steals under the delusion that he can buy his way onto Elysium.  He continues stealing as an adult and has an extensive criminal history.  On parole, Max lives in Los Angeles and works at a company called Armadyne building the robots that police Earth.  Walking toward a bus headed to work, Max is confronted and battered by robot police officers.  He proceeds to a hospital and is surprised when he is treated by Frey, now a nurse.

The film cuts to a mass of people trying to board shuttles bound for Elysium.  An ID is burned onto the wrist of everyone who boards the shuttle.  The shuttles take off.  As they approach Elysium, the space station's Defense Secretary, Delacourt, gives an order to a covert agent on Earth, Kruger, to destroy the shuttles.  Kruger destroys two of the shuttles with shoulder-fired rockets.  The third shuttle lands on Elysium, and the "illegal aliens" on board flee robot police forces.  One young girl enters a residence and is able to use a med bay because the ID on her wrist fools the device into believing she is a citizen of Elysium.  Patel, the President of Elysium, reprimands Delacourt and dismisses Kruger.

Back on Earth, Max is accidentally shut in a chamber while working at Armadyne, and is exposed to a heavy dose of radiation.  In a flashback scene, a nun hands the child Max a locket with a photo of Earth to remind him that Earth looks as beautiful from there as Elysium "looks beautiful from here."  Max awakes and is told by an Armadyne robot that he

7

will die in five days from the radiation exposure.

Max finds Spider, a smuggler who runs the illegal shuttles to Elysium.  In exchange for a promise of a shuttle ride to Elysium where he might be able to access a med bay to cure his fatal condition, Max accepts a dangerous mission: he must kidnap Armadyne's chief officer, John Carlyle, and download valuable data from Carlyle's brain into his own using a futuristic device.  An exoskeleton is installed onto Max's body and head to give him super-human strength.

Meanwhile, Delacourt has persuaded Carlyle, who also designed Elysium, to prepare a "reboot sequence" that will allow her to wrest the presidency of Elysium from the current President, Patel, with whom she has political differences.  Carlyle uploads the software program into his brain, and leaves Earth on a private shuttle.  However, Max and his fellow rebels intercept the shuttle, capture Carlyle, and plug Carlyle's brain into Max's.  Max's brain seizes when the download starts because of a defense mechanism that Carlyle encoded into the reboot sequence.

Delacourt learns of the kidnapping and orders Kruger to intercede but to avoid harming Max (because Max holds the reboot sequence in his brain).  Max evades Kruger and his men, who arrive in an airship and kill everyone else.  Severely injured, Max finds Frey, who takes him to her home.  He tells Frey that he must travel to Elysium to save his life.  Frey begs Max to take her daughter Matilda, who is dying of leukemia, with him.  He refuses, in order to protect them, and leaves.

Max returns to Spider's hideout to get a shuttle to Elysium, but the air traffic system has been frozen by the authorities on Elysium.  Spider plugs a computer into Max's brain and is astonished to see that Max now possesses a reboot sequence that would "override the whole system" and "open the borders," thus making everyone a citizen of Elysium.  Max is interested only in saving his own life and refuses to help Spider.  He leaves and voluntarily surrenders to Kruger.  Max threatens that he will blow up Kruger's ship with a grenade unless he is taken to a med bay on Elysium, but as he boards the ship, he discovers that Kruger has found and kidnapped Frey and Matilda.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    A fight erupts en route to Elysium.  Max drops the grenade.  It detonates, destroying

2    Kruger's face and crashing the ship on Elysium.  Frey and Matilda flee to a house in hopes

3    of using a med bay, but it does not work because Matilda is not a citizen.  All three are

4    captured.

5    Delacourt confronts Kruger for crashing a ship onto Elysium.  Kruger, whose

6    mangled face has been regenerated by a med bay, decides that he will use the reboot

7    sequence to make himself the president of Elysium, and he stabs and kills Delacourt.

8    Max, Frey, and Matilda are being held separately in a control center on Elysium.

9    Max escapes and sees on a video screen that Spider and his men have landed on

10   Elysium. He contacts Spider to set up a rendezvous, and also rescues Frey and Matilda

11   and tells them to head to a med bay.  Max and Spider race to download the reboot

12   sequence as Kruger chases them.  Max suffers a seizure which allows Kruger to catch up,

13   but he is able to kill Kruger.

14   Max and Spider make it to a control room.  Max understands that he will die the

15   moment the reboot sequence is extracted from his brain.  Max studies his locket with the

16   picture of Earth while staring at the actual planet out a large window.  He pushes a button

17   to start the download and dies instantly.  When the download completes, Elysium's

18   computer systems recognize everyone on Earth as citizens of Elysium. Matilda's leukemia

19   is cured by a med bay, and an armada of shuttles equipped with med bays is dispatched

20   toward Earth.

21   **DISCUSSION**

22   A.    Legal Standards

23   1.    Motions for Summary Judgment

24   A party may move for summary judgment on a "claim or defense" or "part of . . . a

25   claim or defense." Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is

26   no genuine dispute as to any material fact and the moving party is entitled to judgment as a

27   matter of law. Id.

28   A party seeking summary judgment bears the initial burden of informing the court of

9

00023

1    the basis for its motion, and of identifying those portions of the pleadings and discovery

2    responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp.

3    v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome

4    of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a

5    material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

6    verdict for the nonmoving party. Id.

7         Where the moving party will have the burden of proof at trial, it must affirmatively

8    demonstrate that no reasonable trier of fact could find other than for the moving party.

9    Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where

10   the nonmoving party will bear the burden of proof at trial, the moving party can prevail

11   merely by pointing out to the district court that there is an absence of evidence to support

12   the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the moving party meets its

13   initial burden, the opposing party must then set out specific facts showing a genuine issue

14   for trial in order to defeat the motion. Anderson, 477 U.S. at 250; see also Fed. R. Civ. P.

15   56(c).

16        When deciding a summary judgment motion, a court must view the evidence in the

17   light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

18   Anderson, 477 U.S. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

19        2.    Copyright infringement

20        To prevail on a claim of copyright infringement, a plaintiff must demonstrate

21   ownership of a valid copyright, and infringement – the copying of protected elements of the

22   work. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Absent

23   evidence of direct copying, the plaintiff must demonstrate both that the defendant had

24   "access" to the plaintiff's work and that the two works are substantially similar. Funky

25   Films, Inc. v. Time Warner Entm't Co., L.P., 462 F.3d 1072, 1076 (9th Cir. 2006).

26        In evaluating whether two works are substantially similar, the Ninth Circuit employs

27   an "extrinsic test" and an "intrinsic test." See Benay v. Warner Bros. Entm't, Inc., 607 F.3d

28   620, 624 (9th Cir. 2010); Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1174 (9th Cir.

United States District Court
For the Northern District of California

10

00024

2003).  The extrinsic test is "an objective comparison of specific expressive elements[,]" while the intrinsic test is a subjective comparison that focuses on "'whether the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'"  Benay, 607 F.3d at 624 (quoting Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002)).  Only the extrinsic test is applied at the summary judgment stage.  Funky Films, 462 F.3d at 1077.  The intrinsic test is left to the trier of fact.  Id.

The extrinsic test "'focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works.'"  Benay, 607 F.3d at 624 (quoting Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994)).  The court must take care to inquire only whether the protectable elements, standing alone, are substantially similar.  Id. (citing Cavalier, 297 F.3d at 822); see also Rice, 330 F.3d at 1174 (courts "must distinguish between the protectable and unprotectable material because a party claiming infringement may place 'no reliance upon any similarity in expression resulting from unprotectable elements.'") (citation omitted).  In other words, courts "filter out and disregard the non-protectable elements in making [a] substantial similarity determination."  Funky Films, 462 F.3d at 1077 (quoting Cavalier, 297 F.3d at 822).

B.     The Parties' Motions for Summary Judgment

Plaintiff has attached a copy of the June 21, 2013 Certificate of Registration from the Copyright Office to the FAC.  A copyright registration is "prima facie evidence of the validity of the copyright and the facts stated in the certificate" if the work is registered before or within five years of when it is first published. 17 U.S.C. § 410(c); see also Entertainment Research Grp., Inc. v. Genesis Creative Grp., Inc., 122 F.3d 1211, 1217 (9th Cir. 1997).  Defendants do not challenge plaintiff's ownership of a valid copyright in a work entitled "Butterfly Driver" (formerly "City of Light: Uberopolis").

Thus, plaintiff's burden on summary judgment is to show that there are no triable issues with regard to the second element of the claim of copyright infringement – the copying of protected elements of his original work – such that summary judgment must be

11

1    granted as a matter of law.  Celotex, 477 U.S. at 323; Soremekun, 509 F.3d at 984.

2    Specifically, plaintiff must provide direct evidence of copying, or circumstantial evidence

3    "through a combination of access to the copyrighted work and substantial similarity

4    between the copyrighted work and the accused product."  Three Boys Music Corp. v.

5    Bolton, 212 F.3d 477, 481 (9th Cir. 2000).

6         For their part, defendants' burden on summary judgment is to point out an absence

7    of evidence to support the "copying" element of plaintiff's claim; and, if they are successful,

8    the burden then shifts to plaintiff to set out specific facts showing a genuine issue for trial in

9    order to defeat the motion.  Anderson, 477 U.S. at 250; Fed. R. Civ. P. 56(c).

10             1.    Access

11        Defendants contend that plaintiff has no evidence of access.  Direct access is shown

12   if there is proof that the defendant actually viewed, read, or heard the work at issue.  Lucky

13   Break Wishbone Corp. v. Sears, Roebuck & Co., 528 F.Supp. 2d 1106, 1122 (W.D. Wash.

14   2007), aff'd, 373 Fed. Appx. 752 (9th Cir. 2010).  Here, plaintiff has provided no direct

15   evidence that defendants ever saw the "Butterfly Driver" screenplay.

16        Access may also be demonstrated by circumstantial evidence, which requires a

17   showing that the defendants had a "reasonable opportunity" or a "reasonable possibility" of

18   viewing plaintiff's work prior to the creation of the infringing work.  See Three Boys Music,

19   212 F.3d at 482 (access may be shown by a chain of events connecting plaintiff's work and

20   the defendant's opportunity to view/hear/copy the work, such as dealings through a third

21   party that had access to the plaintiff's work and with whom both the plaintiff and the

22   defendant were dealing; or by the plaintiff's work being widely disseminated).  Reasonable

23   access requires more than a "bare possibility," and "may not be inferred through mere

24   speculation or conjecture."  Id. (citations and quotations omitted); see also Art Attacks Ink,

25   LLC v. MGA Entm't Inc., 581 F.3d 1138, 1143-44 (9th Cir. 2009).

26        Both in his own motion and in his opposition to defendants' motion, plaintiff relies on

27   the allegations in the FAC.  There, he asserts that he posted the "Butterfly Driver" script on

28   a website operated by triggerstreet.com in February 2007, and that triggerstreet.com was

United States District Court
For the Northern District of California

12

1   "the only place" he ever posted a complete script of "Butterfly Driver."  FAC ¶¶ 18-22.  At

2   the time, triggerstreet.com allowed members to post screenplays and short films to get

3   feedback from peers and professionals – and gave them "a small hope of being noticed by

4   a Hollywood insider."  FAC ¶ 231.

5       Based on this, plaintiff asserts that triggerstreet.com "is where the [d]efendants had

6   access to [p]laintiff's script."  FAC ¶ 23.  He claims that he posted four versions of "Butterfly

7   Driver" on triggerstreet.com between February and August 2007, and that after he posted

8   one of the versions in late July 2007, "[a] young director (whose name escapes the

9   [p]laintiff) . . . praised the script through the [website's] message board."  FAC ¶ 26.

10  Plaintiff alleges that this director "MAY have been [d]efendant, Neill Blomkamp[,]" although

11  he also asserts that "Blomkamp, or any associate, may have accessed the work, without a

12  word."  FAC ¶ 26 (emphasis in original).  He does not believe that the founders of

13  triggerstreet.com "were complicit in the access of his work or the infringement[,] but . . . is

14  certain that one or more of the [d]efendants, or an acquaintance, accessed the [p]laintiff's

15  work on triggerstreet.com."  FAC ¶ 226.

16      In plaintiff's view, Blomkamp, who is credited with writing "Elysium," is "most likely

17  the infringer" because (a) triggerstreet.com is a website for short filmmakers and

18  screenwriters; (b) in 2007 Blomkamp was exclusively a short filmmaker, who was based in

19  Los Angeles (home of Trigger Street); (c) Blomkamp was "perhaps the most social media

20  savvy short filmmaker in the world – and living in the screenwriting hub of the world;" and

21  (d) plaintiff was a screenwriter.  See FAC ¶¶ 227, 232, 233.

22      Defendants contend, however, that plaintiff alleges no facts in the FAC to support his

23  claim that Blomkamp found the "Butterfly Driver" screenplay on triggerstreet.com.  They

24  argue further that plaintiff has no evidence that any defendant, including Blomkamp, had a

25  reasonable opportunity or any reasonable possibility of viewing "Butterfly Driver," and that

26  plaintiff is simply speculating when he alleges in the FAC (and argues in these motions)

27  that Blomkamp accessed his screenplay on triggerstreet.com.

28      Defendants also assert that such a contention is rebutted by Blomkamp's

**United States District Court**
For the Northern District of California

13

1  uncontroverted declaration filed in support of defendants' motion.  In his declaration,

2  Blomkamp states that before this lawsuit was filed, he had never heard of the website

3  triggerstreet.com; that he has never visited the website; and that he did not obtain a copy of

4  plaintiff's screenplay on that site or anywhere else, and was not given a copy by anyone.

5  Declaration of Neill Blomkamp ("Blomkamp Decl.") ¶¶ 7-8.

6        Blomkamp briefly explains the genesis of "Elysium" as follows.  He states that he

7  was raised in Johannesburg, South Africa, where he lived for 18 years before moving to

8  Vancouver.  As a teenager he began pursuing 3D animation and design, which he

9  continued studying in film school.  Blomkamp Decl. ¶ 2.  He made several short films

10  between 2004 and 2007, with storylines involving extraterrestrials and robotic workers.  His

11  first feature film was "District 9," which tells the story of extraterrestrials who are marooned

12  in South Africa when their spacecraft becomes disabled, and are confined to camp outside

13  of Johannesburg, and which explores themes of racism and segregation, and has a main

14  character who transforms into an alien after coming in contact with an extraterrestrial

15  substance.  Blomkamp Decl. ¶¶ 3-4.  He asserts that he created "Elysium" as he creates all

16  his works, proceeding from visual concepts (in this case, utopian space stations and a

17  robotic police force) and incorporating themes of racial and class segregation (building on

18  his earlier works).  Blomkamp Decl. ¶¶ 5-6.

19        As noted above, to establish infringement, a plaintiff that has a valid copyright

20  registration must provide evidence of both access and copying.  Here, plaintiff has no

21  evidence that Blomkamp or any defendant had access to his "Butterfly Driver" screenplay.

22  Plaintiff contends that he "dedicated over a page of the FAC (page 4 line 11 to page 5 line

23  13) to alleging facts supporting the plausibility of Blomkamp accessing his screenplay on

24  triggerstreet.com."  However, allegations in a complaint are not evidence that can be used

25  to support or oppose summary judgment.  See Celotex, 477 U.S. at 324; see also

26  Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003).  Moreover, the

27  allegations in the FAC are entirely speculative as they relate to Blomkamp's access to the

28  screenplay.  Plaintiff has failed to provide any evidence supporting his assertion that

United States District Court

For the Northern District of California

14

United States District Court
For the Northern District of California

1   defendants had access to his screenplay.

2        In his own motion, plaintiff argues that access can be established under the "chain of

3   events" theory.  He reiterates that he posted his screenplay on triggerstreet.com; that

4   triggerstreet.com was based in Los Angeles; that the majority of triggerstreet.com members

5   were "short filmmakers and screenwriters;" and that Blomkomp was a short film-maker who

6   was "media-savvy" and who was based in Los Angeles (the "screenwriting hub of the

7   world").

8        Even assuming for the sake of argument that these factual assertions are judicially

9   noticeable and/or supported by evidence, together they do no more than suggest a bare

10  possibility of access, which is insufficient to sustain a copyright infringement claim.  Plaintiff

11  has not provided evidence of a chain of events sufficient to establish a reasonable

12  possibility of access.  See Jason v. Fonda, 698 F.2d 966, 967 (9th Cir. 1982); see also Art

13  Attacks, 581 F.3d at 1144.

14       He also asserts that his screenplay was so widely disseminated that it is reasonably

15  possible that Blomkamp had access to his work.  He claims that he emailed the screenplay

16  to his family and friends, and that he posted drafts of the screenplay on triggerstreet.com.

17  However, even were this claim supported by evidence, it does not show  wide

18  dissemination sufficient to support an inference that defendants had access to his work, or

19  to raise a triable issue as to access.  He also contends that over a 23-month period he sent

20  queries to agents seeking representation, posted short synopses of the storyline on

21  screenwriter websites, and entered screenwriting competitions.  Again, these

22  communications and Internet postings do not constitute evidence of wide dissemination of

23  the screenplay.

24       2.    Infringement

25       Had plaintiff provided some evidence of access (even circumstantial), he could

26  potentially show infringement by demonstrating that the two works are "substantially

27  similar."  Because plaintiff lacks any evidence of access, however, he can establish

28  copyright infringement only by showing "striking similarity."  See Three Boys Music, 212

15

1   F.3d at 485 ("in the absence of any proof of access, a copyright plaintiff can still make out a

2   case of infringement by showing that the [works] were 'strikingly similar'") (citations

3   omitted); see also Pringle v. Adams, 556 Fed. Appx. 586, 587 (9th Cir. Feb. 21, 2014);

4   Seals-McClellan v. Dreamworks, Inc., 120 Fed. Appx. 3, 4 (9th Cir. 2004) (citing Baxter v.

5   MCA, Inc., 812 F.2d 421, 424 n.2 (9th Cir. 1987)).

6        Striking similarity is a high bar.  "At base, 'striking similarity' simply means that, in

7   human experience, it is virtually impossible that the two works could have been

8   independently created."  4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright

9   § 13.02[B] (2005), quoted in Stewart v. Wachowski, 574 F.Supp.2d 1074, 1103 (C.D. Cal.

10  2005); see also Bernal v. Paradigm Talent and Literary Agency, 788 F.Supp.2d 1043,

11  1052 (C.D. Cal. 2010).  That is, "[t]o show a striking similarity between works, a plaintiff

12  must produce evidence that the accused work could not possibly have been the result of

13  independent creation."  Seals-McClellan, 120 Fed. Appx. at 4 (emphasis in original)

14  (citation omitted).

15       Defendants contend that the protectable elements of the two works share no

16  similarity in expression – let alone "striking similarity."  Protectable expression includes "the

17  specific details of an author's rendering of ideas."  Funky Films, 462 F.3d at 1077 (citation

18  and quotation omitted).  What is not protectable are "basic plot ideas for stories" or other

19  generic concepts.  Id.; see also Van v. Cameron, 566 Fed. Appx. 615, 616 (9th Cir. 2014).

20       Plaintiff asserts that "Elysium" infringes numerous elements of his "Butterfly Driver"

21  screenplay, including "plot, characters, settings, conflicts, themes, catalyst, crisis, climax,

22  inciting incident, his hero's 'character affliction,' and 'keepsake necklace' and more."

23  Defendants argue that neither the plot/sequence of events, nor the settings, nor the

24  dialogue, nor the characters, nor the themes, nor the mood/pace in the two works are

25  similar.  In addition, defendants assert that the parties' works share nothing more than

26  "stock" or "cliché" ideas.  In opposition and in support of his own motion, plaintiff argues

27  that all the elements alleged in the FAC are similar.

28       When evaluating literary works for similarity, courts compare the works' plot, themes,

United States District Court

For the Northern District of California

16

1    dialogue, mood, setting, pace, characters, and sequence of events. See Berkic, 761 F.2d

2    at 1292. Here, while there may be some superficial similarities between the two works, a

3    close examination of the screenplay and the film reveals many significant differences and

4    few real similarities among the protectable elements.[1]

Plot/sequence of events

6    Plaintiff asserts that defendants copied numerous "plot features" of the "Butterfly

7    Driver" screenplay. Generally, the "plot features" identified by plaintiff are similar only at a

8    very abstract level. Indeed, many of these features reflect generic themes that are not

9    expressly similar in the two works.[2]

10   First, plaintiff contends that in both "Butterfly Driver" and "Elysium," there is a hero

11   who must get to the satellite world for medicine or medical care. This is an abstract idea

12   that is not expressed similarly in the screenplay and the film. In the screenplay, Arlo is on a

13   mission to save his daughter Franny, and travels to Uberopolis after he discovers that

14   supplies of Drexlerin on Earth are exhausted. In the film, Max is dying of a fatal dose of

15   radiation, and must travel to Elysium because that is the only place that there is any

16   possibility of receiving the necessary medical treatment to counter the radiation poisoning.

17   He travels there to save himself, not a child.

18

---

19   [1] Plaintiff compares the "Butterfly Driver" screenplay to the apparently unauthorized

20   (and unauthenticated) version of the "Elysium" screenplay he downloaded. The proper
     comparison is between the "Butterfly Driver" screenplay and the film "Elysium." See Quirk v.
     Sony Pictures Entm't, Inc., 2013 WL 1345075 at *6 (N.D. Cal. Apr. 2, 2013) (in a case where

21   the plaintiff alleged that the defendant's film infringed his novel, the "only relevant question

22   [was] . . . whether the final movie as filmed, edited, and released" contained matter
     substantially similar to protectable elements of the plaintiff's novel); see also See v. Durang,

23   711 F.2d 141, 142 (9th Cir.1983).

24   In addition, plaintiff claims he downloaded the "Elysium" screenplay on June 13, 2013,
     a week before he obtained his copyright registration. However, he had seen a trailer for the

25   film "Elysium" on May 27, 2013. While the actual film was not released in the theaters until
     October 9, 2013, plaintiff cannot maintain an action for copyright infringement based on an

26   undated version of an "Elysium" screenplay that he downloaded prior to his copyright
     registration.

27   [2] In addition, a number of what plaintiff characterizes as "plot features" appear to the

28   court to instead be features of setting, theme, or character. Accordingly, the court has
     endeavored to place any analysis of those features under the appropriate heading.

17

1   Second, plaintiff asserts that the hero in the "Butterfly Driver" screenplay is poor,

2   witnesses the death of his best friend, and needs I.D. and transport to a satellite world, and

3   that the same is true of the hero in the film "Elysium."  However, these ideas are not

4   expressed similarly in the two works.  In the screenplay, Arlo requires a fake ID because he

5   is a fugitive on the run from the authorities and can't travel to Uberopolis under his own

6   identity.  In the film, Max (or anyone traveling to Elysium) needs an ID burned onto his/her

7   arm so he/she will be recognized as a citizen of Elysium.

8   There is no support for plaintiff's assertion that the two works are similar in the

9   manner that each hero "witnesses the death of his best friend."  Arlo responds to a distress

10  call from Roddy, and arrives just as Roddy (who was shot by bounty hunters) is dying, to

11  learn that bounty hunters are after his (Arlo's) family.  Max and his friend Julio are on a

12  mission to kidnap Carlyle and steal data from his brain, when the covert agent Kruger

13  arrives and kills Julio with a sword.

14  Third, plaintiff contends that in both works, there is a disabled transporter who helps

15  the hero's emigration plan, on condition that the hero accept a dangerous mission.  This

16  appears to be an attempt to compare the screenplay's Dylan and the film's Spider – two

17  very different characters who play very different roles in the story.

18  In "Butterfly Driver," Dylan is Arlo's boss at the warehouse, and he plays a minor role

19  by setting Arlo up with a "butterfly run" so that Arlo can earn the money he needs for his

20  family's repatriation.  In the film "Elysium," Spider is not Max's boss, and there are no

21  "butterfly runs."  Rather, Spider is an independent operator who runs undocumented

22  shuttles from Earth to Elysium.  He engages Max to kidnap Carlyle and download data from

23  his brain, and coordinates the effort to reboot Elysium's computers to make everyone on

24  Earth a citizen of Elysium.  While it is true that both Dylan and Spider have physical

25  disabilities, there is no comparison between the role played by Spider in the plot of the film

26  "Elysium" and the minor role played by Dylan in the plot of the "Butterfly Driver" screenplay.

27  Fourth, plaintiff asserts that there is an agent in each work who is sent by the villain

28  to apprehend the hero, and who accepts the assignment after negotiating.  This appears to

**United States District Court**
For the Northern District of California

18

United States District Court

For the Northern District of California

1    be an attempt to compare the roles of Jerry and Kruger in the plots of the screenplay and

2    the film, respectively.  However, their roles are vastly different.  In the screenplay, Jerry is a

3    federal agent working for the State.  He investigates Arlo on suspicion of murdering Tamara

4    Gwynn.  After discovering that Arlo is innocent, he helps Arlo expose Drexler as a murderer

5    and imposter, and saves Arlo from Drexler.  In the film, Kruger does none of those things.

6    Instead, he pursues Max with the goal of obtaining the reboot sequence that has been

7    downloaded into Max's brain.  And rather than attempting to rescue Max, Kroger hunts him

8    down and attempts to kill him.

9           Fifth, plaintiff contends that in each work, the hero carries a "keepsake necklace,"

10   which factors in to the story's conclusion.  In the "Butterfly Driver" screenplay, Benni, who

11   appears to be interested romantically in Arlo, gives him a yellow butterfly dreamcatcher for

12   good luck.  Although Arlo sees the dreamcatcher in Spike the dolphin's eye during his

13   dreamlike vision, its significance to the work is negligible.  By contrast, in the film "Elysium,"

14   the nun who raises Max in the orphanage gives him a locket with a picture of Earth.  This

15   locket is not a dreamcatcher, a good luck charm, or a token of romantic interest.  It is a

16   teaching tool to remind Max of the beauty around him.  Moreover, the locket plays into the

17   climax of the film in a way that is unrelated to the plot of the screenplay.

18          Sixth, plaintiff asserts that in each work, the hero threatens the villain with detonating

19   an explosive device.  In "Butterfly Driver," Arlo threatens to use the A-cell to blow up

20   Uberopolis if Drexler refuses to dismiss the security guards and meet with him.  In the film

21   "Elysium," Max threatens that he will blow up Kruger's shuttle if Kruger or his men try to

22   harm him.  The only similar element here is the stock idea of using a threatened explosion

23   as leverage.

24          Seventh, plaintiff contends that both the screenplay and the film have "techie"

25   programmers who help the hero with fake identification to get into the satellite world.

26   However, this characterization is misleading and does not reflect the actual plot of either

27   work.  The identification required by Arlo (fake ID, necessitated by fact that he is a fugitive

28   and can't travel under his own name) is different from the identification required by Max (ID

19

1    burned into the arm, which will enable him to pass as a citizen of Elysium).

2          Eighth, plaintiff asserts that each work includes a primary character who negotiates

3    with insurers (or a hospital) for the life of his/her child.  This is a common or even generic

4    idea which, as defendants note, has been previously used in the plot of films such as the

5    2002 film "John Q" with Denzel Washington.  As for the "negotiating," plaintiff appears to be

6    attempting to compare the screenplay's Jerry, whose son Matty needs a "filter room"

7    because of respiratory ailments, with the films's Frey, whose daughter is in the hospital with

8    leukemia.  However, Jerry is offered financial help with the "filter room" if he accepts the

9    task of investigating Arlo, but nothing like this occurs with Frey, who is simply forced to take

10   her daughter home from the hospital because her daughter cannot be cured there.

11   Ninth, plaintiff contends that both "Butterfly Driver" and "Elysium" include a climatic battle

12   between the hero and the villain, during which the hero suffers a terrible headache.

13   Plaintiff appears to be attempting to compare the chase and fight scene between Arlo and

14   Drexler in his screenplay, and the chase and fight scene between Max and Kruger in

15   "Elysium."

16         These scenes are not similar except at the most general level.  In the "Butterfly

17   Driver" screenplay, Arlo confronts Drexler by flying a sky-cycle through the glass windows

18   of his 57th floor office.  Not knowing that the conversation is being recorded by surveillance

19   cameras and broadcast on television, Drexler confesses to his crimes including being an

20   imposter.  In the ensuing struggle, Arlo and Drexler exit the office through the broken

21   window, but float to the ground unharmed because of reduced gravity on Uberopolis.  Their

22   chase and fight scene takes them through the streets of Uberopolis and eventually onto a

23   shuttle.  Arlo suffers a headache mid-combat and Drexler seizes the moment to shoot him

24   in the neck. Drexler is about to kill Arlo when Jerry intercedes and saves his life.

25         By contrast, in the film "Elysium," Max is being held captive in an Elysium control

26   center. He escapes and sees on a video screen that Spider and his men have arrived on

27   the space station.  Max rescues Frey and Matilda and tells them to find a med bay.  He

28   then meets Spider, and the two of them race to a control room where they can start the

United States District Court
For the Northern District of California

1   reboot sequence in Max's brain.  Max and Spider are fleeing Kruger when Max suffers a

2   seizure caused by the defense mechanism that Carlyle coded into the reboot sequence.

3   Kruger catches up, but Max kills him in a hand-to-hand fight with the help of an exoskeleton

4   that was grafted onto his body to give him added strength.  Max and Spider continue to the

5   control room where they succeed in rebooting Elysium's computers.  These scenes from

6   the film are nothing like the scenes in the screenplay.

7        Tenth, plaintiff asserts that both works conclude with a "globally significant

8   resolution."  This is a generic idea that is not copyrightable.  Moreover, it is not expressed

9   in a similar manner in the two works.  The screenplay concludes with Arlo destroying

10  Uberopolis, while the film concludes with the software program that was downloaded into

11  Max's brain rebooting Elysium's computers to open up citizenship to everyone on Earth.

12  While these resolutions may be "global" and even "significant," they are clearly not similar.

13       In short, none of the "plot features" identified by plaintiff is similar in the two works,

14  except at the highest level of abstraction.  Because unprotected elements are irrelevant, it

15  is "not the basic plot ideas for stories, but the actual concrete elements that make up the

16  total sequence of events and the relationships between the major characters" that must be

17  compared.  Funky Films, 462 F.3d at 1077 (quoting Berkic v. Crichton, 761 F.2d 1289,

18  1293 (9th Cir. 1985)).  Similarities in general plot ideas are not probative of infringement.

19  Id. at 1081; see also Benay, 607 F.3d at 624 ("[f]amiliar stock scenes and themes that are

20  staples of literature are not protected").  Likewise, scènes à faire – or situations that "flow

21  naturally from generic plot-lines" – are unprotected and therefore ignored under the

22  extrinsic test.  Funky Films, 462 F.3d at 1077; see also Benay, 607 F.3d at 624-25.

23       Benay, Funky Films, and Berkic are all cases in which the Ninth Circuit noted

24  similarities between the plaintiff's work and the accused work at relatively high level of

25  abstraction, but many substantial differences upon closer examination.  In Benay, the

26  authors of a screenplay ("The Last Samurai") sued the creators of a film (also called "The

27  Last Samurai") alleging copyright infringement.  Both works told the story of an American

28  war veteran who travels to Japan in the 1870s to train the Japanese Imperial Army in

21

United States District Court
For the Northern District of California

1  modern Western warfare in order to combat a "samurai uprising."  Id., 607 F.3d at 625.  In

2  both works, the protagonist meets the Emperor, who is struggling to modernize Japan; the

3  protagonist introduces modern warfare to the Imperial Army, using contemporary Western

4  weaponry and tactics; and the protagonist suffers a personal crisis and is transformed as a

5  result of his interaction with the samurai.  Id.  Nevertheless, the court found that the two

6  works were similar only at a "cursory" level, and that a closer examination of the

7  protectable elements exposed more differences than similarities.  Id.

8        The court described the screenplay as "largely a revenge story," in which the

9  protagonist "emerges from domestic security, to despair at the loss of his son, to revenge

10  and triumph when he defeats his ruthless antagonist, Saigo."  Id.  In contrast, the film,

11  which the court described as "more a captivity narrative," somewhat reminiscent of

12  "Dances with Wolves," the protagonist "moves from isolation and self-destructive behavior,

13  to the discovery of traditional values and a way of life that he later comes to embrace."  Id.

14        In Funky Films, the creator of a screenplay ("The Funk Parlor") sued the creators of

15  a television series ("Six Feet Under") alleging copyright infringement.  Among other things,

16  both works involved narratives about a family-run funeral parlor, the death of the family

17  patriarch, the inheritance of the business by the family's two sons (one older and more

18  "creative" and the other younger and more "conservative"), and the return of the older

19  brother from a distant city to help run the family business, which was on fragile financial

20  footing and was fighting off a rival funeral parlor.  Id., 462 F.3d at 1077-78.  Nevertheless,

21  despite these apparent similarities, the court found that an actual reading  of the two works

22  reveals numerous significant differences.

23        For example, the court found that the father's suicide in "The Funk Parlor" sets the

24  stage for a series of additional murders, including several of the main characters.  The

25  story revolves around the older brother, who rehabilitates the business, falls in love with

26  one of the central characters, proposes to her, and then discovers she is a serial murderer

27  and feels compelled to kill her to save his own life.  Id. at 1078.  By contrast, the court

28  noted, "Six Feet Under" is not a murder mystery, and does not revolve around a particular

22

plot line, as the series develops separate plot lines around each member of the family, and examines each character's psyche and his or her interpersonal interactions and emotional attachments in the wake of the cataclysmic death of the patriarch of the family.  Id.

In Berkic, the author of a screenplay ("Reincarnation, Inc.") sued the writer/director and producer of a film ("Coma"), which was based on a novel by the same name by Robin Cook. The plaintiff alleged that both the book and the movie infringed his screenplay.  The court found that "[a]t a very high level of generality, the works do show a certain gruesome similarity," as both works "deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants[.]"  In addition, the court noted, both works "[t]o some extent . . . take their general story from the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization."  Id., 761 F.2d at 1293.

However, looking at "the actual concrete elements that make up the total sequence of events," the court found the plot ideas to be less similar than dissimilar, as the main character in the screenplay does not, until very late in the story, participate in the investigation that exposes the criminal organization, and was in fact a dupe of the criminal organization.  Id.  In addition, the police lieutenant who investigates the deaths was seeking to advance his career, while the main character in the film/book – a doctor investigating the unexplained brain deaths of young, healthy patients – was motivated by  personal concerns, as her best friend had previously fallen victim to the organization.  Id.

Similarly, in the present case, the general plot features identified by plaintiff are unprotected because they share only abstract similarities, and do not reflect objective details that are original to the plaintiff.  As such, they do not support a finding that there is substantial similarity between "Butterfly Driver" and "Elysium," let alone a striking similarity.

<u>Characters</u>

Plaintiff argues that the characters of "hero," "villain," and "sick child" in the film "Elysium" are similar to characters in the "Butterfly Driver" screenplay.  First, with regard to the heroes, plaintiff claims that there are similarities between Arlo and Max as to age (35-

23

45 years old); general economic status (impoverished); the fact that each carries a "keepsake necklace," which he received from a "special woman from his past;" and the fact that each "suffers from headaches," and battles a headache in the climax of the story. He also asserts that each hero has a similar goal – Arlo has less than a week to get from Earth to a satellite world, to get medicine to save his daughter, while Max has less than a week to get to a satellite world, to get medical care to save himself and his "girl-friend's" daughter, and that in order to accomplish that goal, each hero contacts underworld figures to get I.D. and transport to the satellite world.

It is true that each hero is within the same age range, but that is not a protectable character feature. As for general economic status, that too is a generic idea. Arlo is a war hero and hover-craft pilot who flies supplies in the Zones outside the "Global State," and is a father of two who goes on a selfless mission to save his daughter, and succeeds. By contrast, Max is unmarried, has no children, is on parole, and works at a local factory making robotic police officers. Also unlike Arlo, Max is on a self-centered mission to save his own life at the expense of the lives of others. Essentially, Arlo and Max are similar only in that each occupies the role of a male protagonist.

It is also true that Arlo and Max both suffer a chronic ailment. However, in "Butterfly Driver," Arlo has a long history of suffering from "ice pick" headaches that sometimes "knock him to his knees." Indeed, Jerry recalls that Arlo was "kicked out" of flight school because he was considered unfit to fly by virtue of the chronic headaches. By contrast, Max, the hero of "Elysium," suffers seizures (not headaches), but this ailment begins only after he downloads the reboot sequence from Carlyle's brain. Moreover, while Arlo suffers a headache and Max suffers a seizure in the climatic scenes of the respective works, those scenes are not similar. In the screenplay, Arlo and Drexler are fighting in a shuttle when Arlo suffers a headache, and Drexler shoots him in the neck. In the film, Max suffers a seizure, which allows Kruger time to catch up, but Max kills Kruger in a fight.

Nor are the heroes similar with regard to what plaintiff refers to as "the keepsake necklace." In "Butterfly Driver," Benni gives Arlo a yellow dreamcatcher for "good luck,"

24

1   and as he faces possible death near the end of the screenplay, he sees the dreamcatcher

2   in a "vision." However, he does not die. In "Elysium," a nun gives Max a locket when he is

3   a child, to remind him of the beauty around him, and as he is dying from the effect of the

4   downloading of the reboot sequence, he looks at the locket and remembers Frey (in a

5   dreamlike way).

6          Second, plaintiff contends that there are similarities between the two villains

7   (Delacort in "Elysium" and Drexler in "Butterfly Driver") in that each had "genetic

8   reprogramming" to make them appear younger; each orders mass killings of prisoners

9   travelling in space shuttles; each is rich and lives on a crime-free satellite world; each

10  sends an agent to apprehend the hero because of information he possesses; and each is

11  evil but attempts to justify his/her actions as good for the world.

12         A number of these features (wealth, living on a crime-free satellite world, acting with

13  evil intent but seeking to justify actions as good for the world) are generic features that are

14  not protectable. Nor are Drexler and Delacort similar in any other way. Drexler is male,

15  and ex-soldier, a former acquaintance of Arlo's and an imposter who murdered the real

16  Drexler and his family and stole Drexler's identity. Drexler is the President of the Global

17  State and owner of Uberopolis, which he built with the money he inherited as "Drexler." By

18  contrast, Delacort is female, has no prior relationship with Max, and holds no position on

19  Earth. She does not own Elysium, but is intent on staging a coup to take over its

20  presidency. While both Drexler and Delacort are ruthless authorities (a type of "stock

21  character"), the similarity ends there.

22         It is true that both Delacort and Drexler appear younger than they are. In "Butterfly

23  Driver," Drexler had his DNA "reprogrammed," with the result that his "bulging biceps" were

24  three times normal strength and he appeared younger, but the screenplay also makes clear

25  that Drexler had his DNA modified because he was really Midland but was trying to pass as

26  Drexler. By contrast, Delacort and the other citizens of Elysium routinely use the med bays

27  to prevent aging and cure disease – not to "reprogram DNA" – but in addition, only citizens

28  of Elysium are permitted access to the med bays. There is nothing comparable in the

United States District Court

For the Northern District of California

25

United States District Court
For the Northern District of California

1   screenplay.

2        Third, plaintiff asserts that there is a similarity between the two works in the use of a

3   "sick child" who will live for less than a week if medical assistance is not provided.  This is

4   an attempt to compare Franny to Matilda.  This idea of the "sick child" is a generic idea that

5   is expressed differently in the parties' works.  In the "Butterfly Driver" screenplay, Franny

6   appears briefly, has little or no dialogue, and is cured without much ado when Arlo returns

7   home with the Drexlerin.  In the film "Elysium," Matilda (the daughter of Max's friend Frey)

8   is intermixed in the drama.  She is kidnaped by Kruger, taken to Elysium, and eventually

9   successfully uses a med bay on the space station.  Moreover, unlike Franny, Matilda is

10  critical to the story arc.  She is the catalyst for Max's decision to sacrifice himself at the end

11  of the film.

12       Plaintiff also contends that there is similarity between what he calls "secondary

13  characters."  The court finds, however, that all these character comparisons focus on

14  abstract, unprotected traits. None of the characters are similar at the level of protectable

15  expression.  For example, plaintiff attempts to compare Rianna (lives in a slum but is an

16  educated, devoted mother) and Benni (hopeful, beautiful, but disappointed with men

17  around her) in "Butterfly Driver;" with Frey (alleged to be a "hybrid" of Rianna and Benni,

18  who lives in an uneducated slum, but is educated, tough, and a devoted mother, also

19  beautiful, hopeful, and disappointed with men around her) in "Elysium."

20       The assertion that Frey is a "hybrid" of Rianna and Benni demonstrates that she is

21  substantially similar to neither of them.  And indeed, Frey and Rianna share no similarities

22  except for the unprotected characteristic of having an young daughter who is ill.  Moreover,

23  Rianna appears only briefly in the screenplay, but Frey is a critical character in the film –

24  her friendship with Max is a catalyst for his decision to sacrifice his own life.  Frey and

25  Benni are even less similar than Frey and Rianna.  Benni is a mercenary who guards a

26  warehouse with her bother Louis.  She helps Arlo obtain a fake ID to enable him to travel to

27  Uberopolis, and gives him a yellow "dream catcher" for luck.  Benni has nothing in common

28  with Frey except that they both have a vague romantic interest in the male protagonist –

1    which is never acted on.

2          Plaintiff asserts that there are similarities between Jerry (a "good" character who

3    when sent to apprehend the hero by a high-ranking official, bargains for medical care for

4    his son) in "Butterfly Driver;" and Kruger (a "bad" character who when sent to apprehend

5    the hero bargains for a mansion and more before accepting the mission) in "Elysium."

6    These two characters could not be more dissimilar (law-abiding vs. outside the law; former

7    friend of the hero's vs. no former relationship with the hero; attempts to help the hero vs.

8    attempts to kill the hero).  The only similarity – that each is an "agent" who pursues the

9    protagonist – is simply a "stock" character feature that is not protectable.

10         Plaintiff also contends that there are similarities between Dylan (runs an

11   underground base with flight pattern monitors on walls, sometimes transports immigrants,

12   is disabled with missing arm) in "Butterfly Driver;" and Spider (runs and underground base,

13   with flight path monitors on walls, transports immigrants, is disabled, with paralyzed leg) in

14   "Elysium."  As noted above, however, Dylan is a minor character in the "Butterfly Driver"

15   screenplay, with virtually no relevance to the story, while Spider in the "Elysium" film is a

16   central character.  The fact that one has a missing arm and the other has a paralyzed leg

17   does not make them similar as "characters" in the story.

18         Finally, it is important to note that there are a number of important characters in

19   each work that have no parallel in the other.  For example, Tamara plays an important role

20   in "Butterfly Driver," and has no possible counterpart in the film "Elysium," while several

21   characters in the film – the nun who raised Max, Carlyle, President Patel, and the robot

22   police force – have no parallel with the screenplay.

23                                        Setting

24         Plaintiff identifies the following attributes of the setting, which he claims is similar to

25   the setting of "Elysium."  He describes Uberopolis as a giant satellite world for the super-

26   rich, between 1 and 3 miles in diameter, with forests and large aquatic features, and a

27   proposed capacity in the range of 300,000, and which orbits an overpopulated,

28   impoverished earth.  Fantastic medical technologies are available there, and it is also

27

1   where a genetically reprogrammed villain lives; where the final battle transpires; and where

2   prisoners in orange jumpsuits board shuttles bound for earth.

3         Plaintiff contends that in contrast to this world is a dystopian Earth (impoverished,

4   overpopulated ruin of earth), where the poor have little access to health care; the hero lives

5   in a slum overrun by thugs and crime; police and military vehicles loom in the sky and

6   brutalize the poor; Army ships full of "undesirables" are released into the slums; the poor

7   are brutalized by the government of the satellite world; rich businesses build manufacturing

8   plants to take advantage of cheap labor; and the poor live in the ruins of cities in decay.

9   Plaintiff claims that the "conjoined setting" of rich satellite world and poor dystopian Earth is

10  a "unique" creation, with no connection to any prior storyline with all the same features.

11        The court finds, however, that the setting of the "Butterfly Driver" screenplay is not

12  similar to the setting of "Elysium," except at the most abstract level.  Moreover, although

13  both the screenplay and the film use the common idea of "a giant satellite world for the

14  super-rich," the expressions of these locations is different.

15        Uberopolis is not exclusive to the "super-rich," as there is a constant shuttling of

16  ordinary citizens between Earth and Uberopolis, and Drexler appears in TV ads urging

17  residents of Earth to buy homes and apartments on Uberopolis.  The Global State has "100

18  per cent employment" and "almost no crime."  While there is some poverty in the "Zones,"

19  the City of Manhattan is portrayed like a typical major city with apartment complexes,

20  shopping malls, and subways.  Citizens on Earth drive sky-cars, sky-cycles, and hover-jets.

21  Moreover, advanced medical care is available both on Earth and on Uberopolis, and there

22  is no class divide between the populations of Earth and Uberopolis.

23        By contrast, Elysium is indeed reserved exclusively for the "super-rich," and Earth's

24  population is barred from moving to (or even freely traveling to) Elysium.  There are no

25  malls, apartment complexes, or subways on Earth.  The population does not drive sky-cars.

26  The entire population is heavily unemployed and extremely poor.  They live in shantytowns,

27  with defunct skyscrapers smoldering in the background.  They are policed by a abusive

28  robotic police force which has no counterpart in the "Butterfly Driver" screenplay.  There is

28

1   a stark class divide between the population of Earth and Elysium, and the med bays on

2   Elysium are reserved exclusively for "citizens" of Elysium.  Nor is there any support for the

3   assertion that both satellites "feature giant forests and aquatic features," as Uberopolis has

4   a flora-sphere and an aqua-sphere beneath the city floor, but there is no description of

5   "giant forests" on the satellite.  Apart from the generalized idea of Earth set in the future,

6   there are few similarities between the setting of the two works.

7         Moreover, a setting that combines "giant satellite world for the super-rich" and "poor

8   dystopian earth" is not new or original with the "Butterfly Driver" screenplay.  Defendants

9   have provided a declaration (and report) from their expert Jeff Rovin, who has had a long

10  career as a professional writer, and has authored more than 100 books, both fiction and

11  non-fiction, including several works analyzing films and television series in various genres

12  including science fiction.

13        The Oxford English Dictionary defines "dystopia" as "[a]n imaginary place or

14  condition in which everything is as bad as possible."  According to Mr. Rovin, the word

15  "dystopia" was coined by John Stuart Mill in 1868 to describe the flip side of "utopia."  Mr.

16  Rovin explains that in fiction, "dystopia" is typically the result of military, political, and

17  economic oppression that results in dehumanization, often accompanied by poverty and

18  disease.  See Declaration of Jeff Rovin ("Rovin Decl."), Exh. A at 8-9.

19        Mr. Rovin states that a dystopian future (with special privileges for the wealthy and

20  powerful) is an exceedingly common feature of the "prior art," a term he uses to refer to

21  earlier-published works in the same genre (futuristic science fiction).  He cites to H.G.

22  Wells' The Time Machine, Jack London's The Iron Heel, Aldous Huxley's Brave New World,

23  Margaret Atwood's Oryx and Crake, and also to the films "Metropolis" (1927), "Soylent

24  Green" (1973), "Demolition Man" (1983), and to the TV series "Rock and Rule" (1983), and

25  "Futurama" (1999-2013).  See Rovin Decl., Exh. A at 9-15.

26        Apart from this, Mr. Rovin also points out that, strictly speaking, the "Butterfly Driver"

27  screenplay does not describe a dystopian world.  In the screenplay, citizens of Earth enjoy

28  "100 percent employment" and "almost no crime."  While Earth is "overpopulated," it is not

United States District Court
For the Northern District of California

29

United States District Court
For the Northern District of California

1    unlivable.  For example, Manhattan has upscale areas and slums, apartment complexes,

2    shopping malls, and subways.  Citizens drive sky-cars, sky-cycles, and hover-jets.  Mr.

3    Rovin opines that Earth in plaintiff's screenplay is "futuristic," not "dystopian," and plainly

4    draws on past science fiction in television series and comic books.  Rovin Decl., Exh. A at

5    16-21.

6         Mr. Rovin asserts further that the idea of a satellite as a refuge for the super-rich is

7    not a novel idea.  He cites to the short story "Abercrombie Station" (1952), the "Star Trek"

8    episode "The Cloud Minders" (1969), the novel A Wizard in Bedlam (1979), the novel The

9    Anarch Lords (1981), the August 1981 issue of the comic book Heavy Metal, the novel The

10   Taking of Satcon Station (1982), the novel Touch the Stars (1983), the novel The

11   Lagrangists (1983), and a number of other works.  See Rovin Decl., Exh. A at 30-45.  He

12   concludes that far from being new, plaintiff's concepts of wealth and privilege in connection

13   with space habitats have been a part of science fiction for decades.  Id.

14        In order to establish similarity in settings, plaintiff must show that his screenplay and

15   the film "Elysium" express the settings similarly.  However, plaintiff cannot do that, because

16   the screenplay and the film share nothing more than the generic idea of a futuristic Earth

17   and an orbiting space station.

18                                   Themes

19        Plaintiff asserts that the two works share at least five central themes – (1) survival

20   without adequate healthcare is inhumane; (2) the plight of immigrants is brutal; (3) wealth

21   corrupts and divides us; (4) heroic sacrifice (Arlo for his daughter, Max for Matilda and

22   mankind); and (5) redemption comes from refusing to give up hope.

23        First, plaintiff contends that the theme that survival without adequate healthcare is

24   inhumane is shown by the fact that in both works, advanced medicine found on the satellite

25   world.  However, apart from a generic "medical" theme, this feature is not similar in the two

26   works.  In the "Butterfly Driver" screenplay, the drug Drexlerin is ordinarily equally available

27   on both Earth and Uberopolis.  The only question is ability to pay and availability (which is

28   limited for commercial reasons at the time Arlo is attempting to locate the drug for Franny).

                                     30

1   In the film "Elysium" the "advanced medicine" consists of med bays, not drugs, and those

2   med bays are categorically unavailable to Earth's population, which forces people who are

3   ill to attempt to travel illegally to Elysium to access the med bays. There is nothing akin to

4   that in the screenplay, which has as a theme Arlo's attempt to locate Drexlerin for his

5   daughter Franny.

6        Second, the "plight of immigrant" theme is a generic theme that is not expressed

7   similarly in the two works. "Butterfly Driver" refers to Arlo's arranging for his family to

8   "repatriate" from the Zones to the "State" to obtain better healthcare for Franny. However,

9   it describes nothing similar to the illegal immigration that occurs in "Elysium," where people

10  on Earth risk their lives to get on board undocumented shuttles, hoping to travel to Elysium

11  to access the space station's med bays, which are restricted to citizens of Elysium.

12       As for the themes of the corrupting influence of wealth, heroic sacrifice, and

13  redemption, those are abstract concepts that are not protectable. Moreover, plaintiff has

14  not established that the themes in the two works are similar. "Elysium" overtly explores

15  themes of current relevance in the United States and in Blomkamp's native South Africa,

16  including class inequality and availability of universal health care, while "Butterfly Driver"

17  includes none of those themes.

18                                    Mood/pace

19       Plaintiff contends that the film "Elysium" mirrors the mood of the screenplay

20  "Butterfly Driver," and that the pacing of both works is similar – fast but not frenetic. He

21  asserts that both works feature disabled characters, suggesting a brutal government; that

22  both works are serious, with little humor in narrative, dialog, or action; that the settings and

23  themes of both works are identical; and that both works use similar scenes to darken the

24  mood, such as unnecessary, casual police beating of the heroes.

25       The bare concept of a pace that is "fast but not frenetic" is unprotectable. In

26  addition, any elements relating to the mood/pace of the two works – to the extent they are

27  similarly "serious" or "dark" – are stock or generic ideas, or scènes à faire which are not

28  protectable. See Rice, 330 F.3d at 1177 (overall mood of secrecy and magic is generic,

31

United States District Court
For the Northern District of California

1  constitutes scènes à faire, and "merges" with the work at issue).  Thus, any similarity is not

2  indicative of striking or substantial similarity.

3  C.    Plaintiff's Motion to Exclude Defendant's Expert and his Expert Report

4        Plaintiff seeks an order disqualifying defendants' expert Jeff Rovin and excluding his

5  report.  Defendants have established that Mr. Rovin is "qualified as an expert by

6  knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Mr. Rovin is

7  knowledgeable and an expert in the area of "science-fiction genre" – and his testimony has

8  "a reliable basis in the knowledge and experience of his discipline."  Kumho Tire Co. v.

9  Carmichael 526 U.S. 137, 148 (1999).

10       As such, Mr. Rovin cites to many previously published works to show that plot

11 features, settings, and characters in "Butterfly Driver" are not new or original as plaintiff

12 suggests, but reflect themes that have appeared numerous times in the past.  As

13 defendants' motion makes clear, Mr. Rovin's testimony supports defendants' argument that

14 many of the plot features, themes, characters, and other features of the "Butterfly Driver"

15 screenplay are "stock" or "generic" elements or scènes-à-faire, which are not protectable;

16 and to support their argument that the "Butterfly Driver" screenplay and the "Elysium" film

17 are not strikingly similar or even substantially similar.

18                                      **CONCLUSION**

19       In accordance with the foregoing, defendants' motion for summary judgment is

20 GRANTED, and plaintiff's motion is DENIED.  In addition, plaintiff's motion to disqualify

21 defendants' expert Jeff Rovin is DENIED.

22

23 **IT IS SO ORDERED.**

24 Dated:  October 3, 2014                    _____

25                                            PHYLLIS J. HAMILTON
                                             United States District Judge
26

27

28

00046

1

2

3

4                     UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7

8

9    STEVE WILSON BRIGGS,

10              Plaintiff,                    No. C 13-4679 PJH

11        v.                                  **ORDER DENYING MOTION
                                              TO AMEND COMPLAINT**
12   NEILL BLOMKAMP, et al.,

13              Defendants.
     _____/

14

15        Before the court is plaintiff's motion for leave to file a second amended complaint.

16   Having read the parties' papers and carefully considered their arguments and the relevant

17   legal authority, the court hereby DENIES the motion.

18                                    **BACKGROUND**

19        Plaintiff Steve Wilson Briggs filed the above-entitled action on October 8, 2013,

20   asserting a single cause of action for copyright infringement, against defendants Neill

21   Blomkamp, Sony Pictures Entertainment, Inc., Tristar Pictures, Inc., Media Rights Capital

22   (later realleged as Media Rights Capital II L.P. or "MRC II"), and QED International.  On

23   December 19, 2013, plaintiff filed a first amended complaint, against the same five

24   defendants, who filed an answer on January 9, 2014.

25        At the January 16, 2014, initial case management conference, the court bifurcated

26   liability and damages, and set various pretrial deadlines, including discovery cut-off dates

27   and deadlines for hearing dispositive motions.  The January 17, 2014 Case Management

28   and Pretrial Order also imposed a deadline for seeking to amend pleadings – 90 days

**United States District Court**
For the Northern District of California

00047

United States District Court

For the Northern District of California

1    before the fact discovery cutoff date, or February 18, 2014.

2         On April 8, 2014, well after the deadline for seeking leave to amend pleadings,

3    plaintiff filed a request for a 90-day continuance of the deadlines set in the Case

4    Management and Pretrial Order, to allow him additional time to locate an attorney.  He also

5    requested a further case management conference.

6         The court held a further case management conference on April 17, 2014, at which

7    time the court granted plaintiff's request to extend certain pretrial deadlines.  Plaintiff's

8    deadline for serving discovery requests and for responding to defendants' discovery

9    requests was continued to May 16, 2014, and defendants were given until June 17, 2014 to

10   respond to plaintiff's discovery requests.  The deadline to complete fact and expert

11   discovery (liability) was extended to June 17, 2014.  The deadline for filing dispositive

12   motions (liability) was extended to July 30, 2014, with the hearing to be set on September

13   3, 2014.  All other pending deadlines were vacated.

14        On June 12, 2014, plaintiff filed a motion for leave to file a second amended

15   complaint ("SAC").  On June 16, 2014, the court ordered the motion stricken because it did

16   not include a copy of the proposed SAC.  On July 18, 2014, plaintiff filed the present motion

17   for leave to file a SAC.  He did not notice the motion for hearing.

18        Plaintiff seeks leave to amend under Federal Rule of Civil Procedure 15(a).  He

19   asserts that since he made the prior request for leave to amend the complaint, he has

20   discovered new details in discovery, regarding additional potential parties who were

21   involved in and profited from the infringement of his copyright.  He identifies those

22   additional parties as MRC II Distribution Company; MRC II Holdings, L.P.; MRC II Sub GP,

23   LLC; Oaktree Entertainment, Inc.; Asgari, Inc.; Sable Productions, Ltd.; Mordecai Wiczyk;

24   Asif Satchu; and Simon Kinberg.  He wants to add those parties as defendants, and also

25   wants to add what he claims are new factual details.  In addition, he wants to add causes of

26   action for contributory copyright infringement and vicarious copyright infringement.

27        Defendants filed an opposition to the motion on August 1, 2014.  Plaintiff did not file

28   a reply to the opposition.

United States District Court

For the Northern District of California

**DISCUSSION**

A.    Legal Standard

Plaintiff seeks leave to amend pursuant to Federal Rule of Civil Procedure 15(a), which requires that a plaintiff obtain either consent of the defendant or leave of court to amend its complaint once the defendant has answered, but "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2); see also, e.g., Chodos v. West Pub. Co., 292 F.3d 992, 1003 (9th Cir. 2002).  Leave to amend is thus ordinarily granted unless the amendment is futile, would cause undue prejudice to the defendants, or is sought by plaintiffs in bad faith or with a dilatory motive.  Foman v. Davis, 371 U.S. 178, 182 (1962); Smith v. Pacific Properties and Dev. Corp., 358 F.3d 1097, 1101 (9th Cir. 2004).  However, when a district court has already granted a plaintiff leave to amend, its discretion is deciding subsequent motions to amend is "particularly broad."  Chodos, 292 F.3d at 1003 (citation omitted).  In addition, amendments seeking to add claims are to be granted more freely than amendments adding parties.  Union Pacific R. Co. v. Nevada Power Co., 950 F.2d 1429, 1432 (9th Cir. 1991).

Where the deadline set by the pretrial order for amending pursuant to court order of stipulation of the parties has passed, any request for leave to amend must be first be evaluated under the "good cause" standard of Federal Rule of Civil Procedure 16.  See Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607-08 (9th Cir. 1991); see also Coleman v. Quaker Oats Co., 232 F.3d 1271, 1294 (9th Cir. 2000).  Considering only Rule 15(a) without regard to Rule 16(b) "would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."  Jackson v. Laureate, Inc., 186 F.R.D. 605, 607 (E.D. Cal. 1999) (quoting Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998)).

Under Rule 16(b), a pretrial schedule "shall not be modified except upon a showing of good cause and by leave of the district judge."  Fed. R. Civ. P. 16(b).  A party seeking to amend a complaint after the deadline set in the case management and pretrial order must first show "good cause" under Rule 16(b), and then, if good cause is shown, must

3

United States District Court

For the Northern District of California

1  demonstrate that the motion is proper under Rule 15.  <u>Johnson</u>, 975 F.2d at 608.  In

2  determining whether good cause exists, courts primarily consider the diligence of the party

3  seeking the modification.  <u>Id.</u> at 609; <u>see also</u> <u>Coleman</u>, 232 F.3d at 1294.  The court

4  should focus on "the moving party's reasons for modification.  If that party was not diligent,

5  the inquiry should end."  <u>Johnson</u>, 975 F.2d at  610.

6  B.     Plaintiff's Motion

7         Plaintiff contends that he has obtained new information in discovery that warrants

8  amendment of the complaint to include allegations against additional entities and

9  individuals who were allegedly involved in the production and/or distribution of "Elysium."

10  He argues that under Rule 15, leave to amend should be freely given.

11         In opposition, defendants assert that the motion is untimely under the court's Case

12  Management and Pretrial Order.  They contend that Rule 15 and its "liberality of

13  amendment" standard therefore does not apply, and that plaintiff must show "good cause"

14  under Rule 16 to modify the court's pretrial order.  They argue that plaintiff was not diligent

15  in seeking leave to amend (waiting until just weeks before the motions for summary

16  judgment were scheduled to be filed) – either in seeking leave to add new claims for

17  contributory and vicarious infringement that he could easily have added earlier in the case,

18  or in seeking to add new defendants that have been known to plaintiff since the early

19  stages of the case, or that would have been known to him had he not delayed in

20  propounding his discovery requests.

21         The motion is DENIED.  The January 17, 2014 Case Management and Pretrial

22  Order set a February 18, 2014 deadline for seeking leave to amend.  Even if defendants

23  were correct that the deadline for seeking leave to amend was extended to March 18,

24  2014, based on the April 17, 2014 order extending the deadline for the close of discovery to

25  June 19, 2014, either deadline had already passed well before plaintiff filed the present

26  motion on July 18, 2014.  Because the motion was filed after the deadline, plaintiff is

27  required to demonstrate good cause under Rule 16(b).  He has not done so, and indeed,

28  does not even mention Rule 16(b).

Case 4:13-cv-04679-PJH Document 89 Filed 08/20/14 Page 5 of 5

1    As for Rule 15, he does quote <u>Foman</u> and the "<u>Foman</u> factors" cited above, but does

2  not provide any argument with respect to whether these factors do or do not apply in his

3  case. He simply asserts that under Rule 15(a)(2), "[t]he court should freely give leave when

4  justice so requires."

5    Rule 16(b)'s good cause standard considers the diligence of the party seeking the

6  amendment. Johnson, 975 F.2d at 609.  If a party acted diligently but still cannot

7  reasonably meet the scheduling deadlines, the court may modify the scheduling order.  <u>Id.</u>

8  However, carelessness is not compatible with a finding of diligence and offers no reason for

9  a grant of relief.  <u>Id.</u>  Here, plaintiff made no showing of diligence in his moving papers, and

10  did not even file a reply to defendants' opposition to his motion, in an attempt to justify his

11  lack of diligence.  It appears that he simply did not read the Case Management and Pretrial

12  Order, not even the first page where the deadline to amend pleadings is set forth.

13  Moreover, even were the court permitted to consider this motion solely under Rule 15 –

14  which it cannot do – plaintiff has not included any argument supporting the relevant factors.

**CONCLUSION**

15

16    In accordance with the foregoing, plaintiff's motion for leave to file a second

17  amended complaint is DENIED.

18

19  **IT IS SO ORDERED.**

20  Dated:  August 20, 2014                              _____

21                                                    PHYLLIS J. HAMILTON
                                                      United States District Judge

22

23

24

25

26

27

28

5