No. 14-17175

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

STEVE WILSON BRIGGS,
*Plaintiff-Appellant*,

v.

NEILL BLOMKAMP, SONY PICTURES ENT., INC., TRISTAR PICTURES,
INC., MEDIA RIGHTS CAPITAL, QED INTERNATIONAL
*Defendants-Appellees.*

_____

Appeal from The United States District Court for the Northern District of
California
Case No. 4:13-cv-4679 PJH
(The Honorable Phyllis J. Hamilton)

_____

## APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD
## VOLUME 3 OF 3

_____

Michael J. Kump (SBN 100983)
Gregory P. Korn (SBN 205306)
KINSELLA WEITZMAN ISER KUMP &
ALDISERT LLP
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
(310) 566-9800

Attorneys for Defendants and Appellees
NEILL BLOMKAMP, SONY PICTURES ENTERTAINMENT INC., TRISTAR
PICTURES, INC., MEDIA RIGHTS CAPITAL II, L.P., AND QED
INTERNATIONAL

# TABLE OF CONTENTS

| TAB | ND Cal Docket# | PAGE | DATE | DESCRIPTION OF DOCUMENT |
|-----|------|------|------|-------------------------|
| | | | | **VOLUME 1** |
| 1 | 88 | 00001 | 10-31-14 | Notice of Appeal |
| 2 | Docket | 00003 | 3-21-15 | District Court Docket |
| 3 | 86 | 00015 | 10-3-14 | Order Re Motions for Summary Judgment |
| 4 | 83 | 00047 | 8-20-14 | Order Denying Motion to Amend Complaint |
| | | | | **VOLUME 2** |
| 5 | 37 | 00052 | 4-17-14 | Civil Minutes re: Case Management Conference |
| 6 | 17 | 00054 | 12-19-13 | Amended Complaint for Copyright Infringement (with exhibits) |
| | | | | **VOLUME 3** |
| 7 | 17-1 | 00334 | 12-19-13 | **[Continued]** Exhibits to Amended Complaint for Copyright Infringement |
| 8 | 65 | 00410 | 7-30-14 | Declaration of Neill Blomkamp in Support of Defendants' Motion for Summary Judgment |
| 9 | 67 | 00413 | 7-30-14 | Declaration of Jeff Rovin in Support of Defendants' Motion for Summary Judgment |
| 10 | 82 | 00509 | 8-13-14 | Defendants' Opposition to Plaintiff's Motion for Summary Judgment |

## TABLE OF CONTENTS

| TAB | ND Cal Docket# | PAGE | DATE | DESCRIPTION OF DOCUMENT |
|-----|-----|------|------|-------------------------|
| 11 | 61 | 00538 | 7-18-14 | Plaintiff's Amended Notice and Motion for Leave to File Second Amended Complaint |
| 12 | 31 | 00541 | 1-17-14 | Case Management and Pretrial Order |
| 13 | 30 | 00549 | 1-16-14 | Civil Minutes re: Initial Case Management Conference |

Ex. C

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## PAu 3-683-232

**Effective date of registration:**

June 21, 2013

## Title

| | |
|---|---|
| **Title of Work:** | Butterfly Driver |
| **Previous or Alternative Title:** | Uberopolis: City of Light |

## Completion/Publication

**Year of Completion:** 2005

## Author

| | | | |
|---|---|---|---|
| **Author:** | Steve Kenyatta Wilson Briggs | | |
| **Author Created:** | text | | |
| **Citizen of:** | United States | **Domiciled in:** | United States |
| **Year Born:** | 1964 | | |

## Copyright claimant

**Copyright Claimant:** Steve Kenyatta Wilson Briggs

681 Edna Way, San Mateo, CA, 94402, United States

## Certification

**Name:** Steve Kenyatta Wilson Briggs

**Date:** June 21, 2013

00335

EX. D

Case 1:15-cv-04293 Case 1:15-cv-04293 Document 33-1 Appeal Case-App Filed-Case Appeal Progress 10 Page 7 of 220

# THINKPROGRESS

## 'Elysium's Success Or Failure Is A Big Test For The Appeal Of Deeply Political Films

BY **ALYSSA ROSENBERG** 🐦 ON JULY 31, 2013 AT 11:03 AM



*Credit: Screencrush*

In the New York Times yesterday, <u>Brooks Barnes makes the case</u> that *Elysium*, Neill Blomkamp's much-anticipated–at least at this blog and in this household–follow-up to his creative alien invasion movie *District 9* is a major test case for Sony, which has had a number of high-profile blockbuster flops this summer, including *After Earth* and *White House Down*, and is being pressured by an activist investor to either overhaul its movie business or get out of the game entirely. As Barnes notes, the movie has some genuine claims to originality: "There is no sex. There is no goofy sidekick. It will not be released in 3-D. It is rated R….Don't expect to see the obligatory camera shot of a ruined New York City."

But towards the end of the piece, Barnes quotes Mordecai Wiczyk, the co-chairman of Media Rights Capital, which helped finance *Elysium* as saying that the movie will draw in viewers because it is deeply politically relevant. Barnes writes:

> Mr. Wiczyk declined to speculate on ticket sales, saying it was much too early to make a judgment. But he did say that "Elysium" has a counterintuitive insurance policy. While trying not to give moviegoers the same "orgy of special effects" that

00337

they have seen over and over, the film also deals with topics that are very relatable — familiar, even.

"Look at Bangladeshi working conditions, people having problems accessing health care, immigration issues, the Occupy movement," Mr. Wiczyk said. "This movie may be science-fiction, but it's also about what is happening in the world right now."

What he doesn't say, though, and what makes *Elysium* an anxiety-inducing prospect as well as an exciting one, is that Wiczyk is setting up the movie as a test case for whether politics will get audiences to movie theaters. It's become extremely fashionable to have a patina of politics in action movies, whether Bane and Catwoman are nodding at economic inequality in *The Dark Knight Rises*, or *Star Trek*, *Iron Man 3* and *Man of Steel* are getting their quota of drone politics in. But that's very different from having a political issue like inequality or [...]ing a story with a

Share this:

*The Dark Knight Rises* revealed Bane's rhetoric to be a red herring for a more nebulously ideological plot, sticking with the rather comfortable idea that private generosity could cure Gotham's social ills. *Star Trek*'s rhetorical gestures at the idea that war criminals need to be tried to ensure the integrity and moral legitimacy of the Federation dissolved in favor of a storyline that advocated keeping Khan alive so his blood could be used to cure Kirk: the much-discussed trial happened off-screen if it happened at all (one can imagine it might have been complicated by his single-handed destruction of much of San Francisco), and the last we saw of Khan, he was being packed away again into permanent hibernation. These are convenient endings for movies that would rather not risk drawing a conclusion that an audience there to see punchings and explosions disagrees with.

But Blomkamp *is* a political director. *District 9* was a searing examination of what human beings are willing to do to the other, and of the agony of moving from a state of personhood and citizenship to a category outside of those designations. *Elysium* is obviously and bluntly about inequality and health care, and has rhetorically situated audiences on the side of the have-nots. I doubt *White House Down* or *After Earth* will be used to discredit the idea of generating stakes by putting the president in danger, or destroying entire cities, or even of post-apocalyptic fiction. But I can very easily see a failure by *Elysium* at the box office discrediting the kind of political science fiction that would really invigorate our action movie environment.

## From the Web

Ex. E

FILM    TELEVISION    PRESS    ABOUT

CONTACT

# MEDIA RIGHTS CAPITAL

## SENIOR MANAGEMENT

**Asif Satchu and Modi Wiczyk**
Co-Chairmen and Co-CEOs

**Scott Tenley**
President, Business Affairs

**Erika Hindle**
Chief Financial Officer

**James Glander**
Senior Vice President, Head of Physical Production

**Joe Hipps**
Senior Vice President, Television Production

**Brye Adler**
Vice President, Production

**Jonathan Golfman**
Vice President, Head

## About MRC

MRC is an independent film and television studio founded by Asif Satchu and Modi Wiczyk. It is backed by Goldman Sachs, AT&T, WPP Group and ABRY Partners. MRC specializes in the creation of premium entertainment content that has been distributed by Universal, Sony, Warner Brothers, Paramount, Fox, HBO, ABC, CBS, Netflix, Google and other leading international distributors.

## MRC Film

MRC has been financing and producing films since 2006, all of which have been distributed by major US studios in addition to many leading international distributors. MRC's films have received Academy Award®, Golden Globe®, BAFTA® and SAG Award® nominations. Notable films include Seth MacFarlane's hit comedy Ted, which set records for the highest opening weekend ever and highest International box office gross for an original R-rated comedy; Academy Award® Best Picture nominee Babel; Bruno starring Sacha Baron Cohen; The Adjustment Bureau starring Matt Damon and Emily Blunt and District 9 director Neill Blomkamp's second feature film,

00340

Ex. F



HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS      Log In | Register Now

**The New York Times**

# Media & Advertising

○ Business ○ All NYT   [Search]

| WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS |

| MEDIA & ADVERTISING | WORLD BUSINESS | YOUR MONEY | DEALBOOK | MARKETS | YOUR BUSINESS | COMPANY RESEARCH | MUTUAL FUNDS | STOCK PORTFOLIO | ALERTS |

## Tilting Hollywood's Balance of Power to Talent Agency Clients

More Articles in Business »



Asif Satchu, left, and Mordecai Wiczyk, co-chiefs of Media Rights Capital.

Steve Goldstein for The New York Times

By MICHAEL CIEPLY
Published: March 19, 2007

LOS ANGELES, March 18 — Almost six years ago, big thinkers at Hollywood's Endeavor talent agency, best known as the players behind the industry satire "Entourage" on HBO, drilled into a bothersome question: Why should a star or director work for low pay on a labor of love only to see a film studio or foreign sales company strike it rich if the movie thrives in worldwide theatrical and video markets?



Murray Close/Paramount Vantage
Media Rights Capital, the firm that helped finance "Babel," is partly owned by the prominent talent agency Endeavor.

Far better, they reckoned, would be to put those dollars in the pockets of clients and, not incidentally, of the agents who represent them.

By late 2003, a young agent, Mordecai Wiczyk, under the wing of the Endeavor partners Ariel Emanuel and Patrick Whitesell, joined with a Harvard Business School classmate, Asif Satchu, to do just that by creating Media Rights Capital.

It soon built high-profile movies — like Alejandro González Iñárritu's "Babel" and the comedic actor Sacha Baron Cohen's planned "Bruno" — around clients of Endeavor, which was quietly given part ownership in return for helping to find film projects and make deals.

AT&T and the advertising conglomerate WPP Group joined Goldman Sachs as investors. This combination, Mr. Wiczyk

TWITTER

LINKEDIN

SIGN IN TO E-MAIL OR SAVE THIS

PRINT

REPRINTS

SHARE

**MOST POPULAR - BUSINESS**

EMAILED | BLOGGED | VIEWED

1. Glaxo Says It Will Stop Paying Doctors to Promote Drugs
2. Whole Foods Finds Success in Smaller Cities
3. More Retailers See Haggling as a Price of Doing Business
4. Shortcuts: An Alternative to Giving Up the Car Keys
5. DealBook: Big Bonuses, but a Shift in Who Gets the Biggest
6. Many Detect End of Line for Stimulus by the Fed
7. Wealth Matters: For Top Earners, a Bigger Tax Bite This Year
8. Surge Seen in U.S. Oil Output, Lowering Gasoline Prices
9. The Sketch Guy: How to React to Diminishing Returns
10. On the Road: Credit Card Peace Offerings Bring an Outcry Instead

Go to Complete List À»


NEW! TRADE NOW FOR $6.95
• No account minimum to open
• Free stock ratings & analyst reports
shareBUILDER
[Click here]


SAVE ONCE. READ ANYWHERE. The New York Times
FOR REGISTERED USERS ONLY.   Register for Free



HBO

Other projects have included "Bruno,"
based on a character created by
Sacha Baron Cohen.

and Mr. Satchu said, gives Media Rights the ability to invest $400 million a year into movies, television shows and broadband Internet episodes, a considerable amount even at a time when Hollywood is crawling with aspiring financiers.

If they succeed, the pair may help shift the balance of power in Hollywood by increasing opportunity for idiosyncratic movies like the multilingual "Babel," and by giving filmmakers and stars more earning power and ownership of their projects.

Despite the new money and the seven Oscar nominations for "Babel," the company has yet to convince a skeptical film business that it is not just a stalking horse for Endeavor and its clients. To expand its reach, Media Rights must overcome a widespread sense that the company is playing loose with restrictions on agencies employing their own clients or that it is somehow beholden to the agency that helped create it. "Everyone who is not in the bus, we're going to keep stopping by the house and opening the door," Mr. Wiczyk said in an interview this month at the company's office in the building that also houses Endeavor.

Mr. Wiczyk, who previously worked at the foreign sales company Summit Entertainment, and Mr. Satchu, who co-founded and later sold the online industrial supply–chain management company SupplierMarket at the height of the dot-com boom, remain more business school than Hollywood in their delivery.

Working the phones from their barebones office on Wilshire Boulevard in Beverly Hills, Mr. Satchu, 35, acknowledged a penchant for making points with scrawls on a whiteboard. Mr. Wiczyk, 34, spoke with considerable passion about their zeal for market information. "We spend all of our time thinking about the data we don't have and what would we do if we had it," he said.

The pair described a process in which information shared among partners like WPP and AT&T at the formative stages of a project — like a DVD and Internet program for homemakers, suggested by the actress Raven-Symoné — may increase its marketability later. They said the company worked through likely outcomes from, say, a series of 10 five-minute spots as opposed to 20 of half that length, granting the actress and her collaborators the final call.

Meanwhile, detailed assessments of foreign markets may influence decisions about selling rights to films like "Sleuth," coming in the fall.

"We get people comfortable; we get people to give us their information," said Mr. Wiczyk, who described himself as being "evangelical" about using data to help artists seize the value in their own work.

And they dream big. They talk of financing 10 films, five or six television shows, and 20 mobile or broadband shows annually.

A financier's connection with a talent agency is not a novelty in Hollywood. Stung by the studios' continuing retreat from star-driven films, talent companies like Creative Artists Agency, the William Morris Agency, International Creative Management and the United Talent Agency have all sought to connect their clients with alternative financing.

Cassian Elwes and his division, William Morris Independent, for instance, have helped Morris clients put together movies (like the planned "Grace Is Gone") outside the studio system. But representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights.

Films backed by the financier have included substantial talent from other agencies — Brad

Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists.

But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist."According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify. They added that no Endeavor agent holds an individual stake or sits on the Media Rights board.

Still, those at other agencies would like to know more. Requesting anonymity because of general industry reluctance to speak publicly about a rival's business, some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds.

"For us, financing opportunities are always exciting and interesting," said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights, but might do so if it was satisfied that the company's ownership and influences were clear. "What becomes critical is who is the management?" he asked. "What level of transparency are we going to have?"

Robert Jones, California's acting labor commissioner, whose office regulates talent agents, said the state's labor code has a provision banning conflicts of interest by agencies. The law, from a time when models were sometimes sent for hair and makeup work by operators with a close connection to their agencies, says that no agent may refer a client for services to any entity in which the agency has a direct or indirect financial interest.

The law's wording has a broad sweep, but does not specifically address film financing. Mr. Jones said he was not aware of any complaints related to the Media Rights-Endeavor association. Any ruling on a conflict, he added, would depend on the facts of a particular case.

An overall franchise agreement under which the Screen Actors Guild restricted the right of agencies to engage in film production expired in 2001, and Hollywood's major agencies have since operated without a formal agreement with that guild.

Media Rights has been careful to distinguish itself as a financier rather than a producer. Representatives of Endeavor and Media Rights said the two companies became involved only after a legal review, conducted by an outside labor lawyer, persuaded them that agency law and guild regulations permitted the venture.

Meanwhile, the studios are wary because they are likely to have only so much appetite for films in which they are not the principal owners. Last year, Universal paid $42.5 million to acquire the rights in English-speaking regions and some European territories to Mr. Baron Cohen's "Bruno," based on its namesake character, a gay Austrian fashion expert.

Some rival executives considered the figure excessive, given the limited scope of the rights (Universal will not own the negative) and the risk factor in returning to the mockumentary format that worked in "Borat: Cultural Learnings of America for Make Benefit Glorious Nation of Kazakhstan."

"From my perspective, this kind of deal is only bad for the business if you did it all the time," David Linde, the studio's co-chairman, said. He pointed out that his company had agreed to make more than two dozen of its own movies over the last 10 months; adding "Bruno" would only strengthen its release schedule.

Yet John Lesher, president of Paramount Vantage, which released "Babel," said a similar arrangement was ultimately sound, if not spectacularly lucrative, for his company. Paramount Vantage bought rights in English- and Spanish-speaking territories, and left the rest. "I'm not going to make a tremendous amount, but I'm going to make money on the film," said Mr. Lesher, who made the deal as the director's agent before joining the boutique studio.

00344

The film has made about $114 million at the box office, almost 70 percent of that abroad. Paramount will most likely have strong sales from DVD, thanks to the movie's Oscar nominations, but it also invested heavily in a sustained award campaign.

According to Jon Kilik, a producer of "Babel," the film cost about $30 million to make, and Paramount Vantage paid less than the production cost for its rights. Mr. Kilik said Media Rights assisted the process by providing what he called bridge financing, which held the movie together for several months while talent deals and more conventional film lending were put in place. Financial benefit from the deal was ultimately split among Mr. Iñárritu, the producers, stars and writer of the film, he said.

Endeavor had a jolt last week when Mr. Iñárritu — whose film was a showcase for that agency and Media Rights — bolted to the competing Creative Artists Agency. People associated with the director said his departure had nothing to do with Media Rights, and in a statement on Friday, Mr. Iñárritu said he hoped to find a new project with the financier.

Mr. Whitesell of Endeavor, in a phone interview, said he believed that the information-sharing tack taken by Media Rights would persuade other agencies to embrace its projects, though he suspected that some might foster similar financing entities rather than signing on.



"I have mixed feelings about other people getting into it," Mr. Whitesell added. "But that will just create more opportunity for clients."

More Articles in Business »

Get 50% Off The New York Times & Free All Digital Access.

Ads by Google                                                        what's this?

**Modeling Agencies**
Training for serious models seeking representation. Register Now!
www.modelandactnow.com

**2013 Best Skin Tighteners**
An Unbiased Review List of The Top Performing Skin Tighteners In 2013
www.skincaresearch.com/FaceLifting

**Start Acting with Us**
Open Audition for Extras: Roles in Movies, & TV - Become an Actor!
www.onesourcetalent.com

Tips
To find reference information about the words used in this article, double-click on any word, phrase or name. A new window will open with a dictionary definition or encyclopedia entry.

**Related Searches**
  Motion Pictures
  Finances
  Endeavor Agency
  Actors and Actresses

**INSIDE NYTIMES.COM**

| HEALTH » | OPINION » | WORLD » | SPORTS » | OPINION » | ARTS » |
|---|---|---|---|---|---|
|  |  |  |  | A Global Standard for High Schools Room for Debate asks whether American secondary schools should offer the rigorous International Baccalaureate program. |  |
| Terrible Twos Who Stay Terrible | Op-Ed: A Transgender Volunteer | Growth Spurt Alarms the House of Lords | Britain Is Pushing for an Olympic Medal in Curling | | A New Preamble Before the Big Show |

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

www.nytimes.com/2007/03/19/business/media/19fund.html?pagewanted=all&_r=0

4/5

00345

Ex. G

# Fw: Read this screenplay -not the other one

From: **Saul Goode** (q22skidoo@yahoo.com)    This sender is in your contact list.
Sent: Sat 6/01/13 4:54 PM
To:   Steve Wilson-Briggs (birdynumnumz@hotmail.com)


----- Forwarded Message -----
**From:** Steve Wilson-Briggs <birdynumnumz@hotmail.com>
**To:** Saul Goode <q22skidoo@yahoo.com>; Morgan Marchbanks <mmarchba@seq.org>; marina wilson
<marinahope@hotmail.com>; dennis <denwil@sonic.net>; Cecile Lusby <cecilusby@hotmail.com>
**Sent:** Wednesday, May 25, 2005 6:31 AM
**Subject:** Read this screenplay -not the other one

Uberopolis: City Of Light

ANGLE ON: A DEAD MAN'S BODY FLOATS IN SPACE HIGH ABOVE
THE EARTH. IN THE BACKGROUND, THE EARTH IS SEEN -HALF
SHADED IN THE COVER OF NIGHT, BUT THE SUNLIT HALF IS SEEN
WITH ENORMOUS GRAY AND BROWN CLOUDS OF POLLUTION
COVERING MOST OF THE SKY. THE OCEAN IS AN UNHEALTHY
GREENISH-BLUE -NOT THE VIBRANT BLUE OCEAN OF THE PAST.
THE DEAD BODY IS SLOWLY SUCKED INTO EARTH'S
GRAVITATIONAL PULL UNTIL ITS SKIN BEGINS TO PEEL AND
BURN FROM THE HEAT GENERATED FROM THE FRICTION OF RE-
ENTRY. THE BODY IGNITES AND ROCKETS TOWARD THE DARK
SIDE OF EARTH.
THE CAMERA DESCENDS FROM THE SKY TO A SMALL CITY AT
NIGHT, FULL OF LIGHT, SOMEWHERE IN SOUTH AMERICA. THE
CAMERA DESCENDS AND MOVES IN CLOSER AND CLOSER UNTIL
IT IS CLEAR THAT THE LIGHTED CITY IS LITTLE MORE THAN A
WASTELAND.
EXT. A GLOOMY WASTELAND STREET -- NIGHT
Beneath a polluted night sky, an attractive Latina mother (perhaps 35) walks
alongside her fairly-muscular ("multinational looking") teen-aged son (John
Carlos) on a desolate street on the outskirts of a large third world city. She
carries a small bag of groceries while her son carries the woman's 6 year old
daughter (his sister, Franny). On the streets around them futuristic police and
military vehicle hover ominously over the streets as they cruise slowly past,
belching ever-more pollution into the air, homeless people burn fires in trash cans
and barrels to keep warm, children run in and out of shanty-town dilapidated box

00347

houses, few teens wearing headphones sniff paint from a plastic bag in the
shadows, other shabbily dressed teen-aged boys wearing headsets and
headphones, stand eerily on the corners and stoops, scanning the street
predatorily for some unsuspecting prey. The woman's teen-aged son keeps a firm
tough look on his face, careful not to seem like an easy target. The mother keeps
her gaze down, not wanting to invite the thugs' cat calls and advances.

The flash of the shooting star (the dead body) whips across the sky. The young
daughter (Franny) notices it and lifts her head from her brother's shoulder and
points a weak finger.

                                                FRANNY

                        Mama, look! A shooting star!

The mother (Rianna) and her son (John Carlos) turns to see.

                                                RIANNA

                        Easy, relax remember your breathing.

                                                FRANNY

                        But a star...

                                                RIANNA

                        You're right, Franny. Make a wish.

                                                FRANNY

                        No, you.

                                                RIANNA

                        No, I'm too old. Wishes are for the young. You sound
                        wheezy... I think you need your inhaler.

Rianna digs in her jacket pocket and produces a long kid's inhaler. Rianna hands
the inhaler to Franny.

                                                FRANNY

                        Then you, John Carlos.

As John Carlos speaks Franny puffs the inhaler.

                                                JOHN CARLOS

                        I didn't see it. You make the wish.

00348

FRANNY

                                   FRANNY

                Maybe I'll save it for daddy.

                                   JOHN CARLOS

                The person who sees it is supposed to make the wish.

                                   FRANNY

                OK. I want...

John Carlos puts a finger over each of their lips.

                                   JOHN CARLOS

                Shhh. You're not supposed to tell...

John Carlos's eyes dot back and forth, as if he's aware that perhaps the local
thugs have caught him in a tender moment with his sister. He takes his fingers
down from their lips.

                                   FRANNY

                Oohhh...

Franny contemplates, then closes her eyes briefly to wish.

                                   FRANNY

                It was a good one.

Franny takes another puff of her inhaler.

                                   JOHN CARLOS

                Yeah. But mine woulda been better, if I woulda seen
                it.

                                   RIANNA

                When I was a little girl shooting stars were so
                uncommon -maybe once or twice a year I'd see one.
                Now, it seems like every night you can see them -even
                through all this pollution.

A teen age male's voice calls out from the streets in a tough Spanish accent.

                                   VOICE

Ex. H

# Documentation of Registration

Writers Guild of America, West, Inc.
Intellectual Property Registry
7000 West Third Street
Los Angeles, California 90048-4329
Telephone: 323-782-4500
Fax: 323-782-4803

The Writers Guild of America, West, Inc. issues this certificate to:

STEVE KENYATTA WILSON BRIGGS

for the material entitled

Uberopolis: City of Light

by the following

STEVE KENYATTA WILSON BRIGGS - Writer

Registration #: 1108267
Material Type: SCREENPLAY
Registered By: STEVE KENYATTA WILSON BRIGGS

Effective Date: 12/16/05
Expiration Date: 12/16/10

00351

Ex I

Steve Wilson Briggs
4996 Broadway #4G
New York, NY 10034

02/01/2006

AABAAL LITERARY ASSOCIATES
1110 STATE ROUTE 109
P.O. BOX 482
HOQUIAM, WA 98550

Dear Aabaal Literary Associates,

911... Iraq... Outsourcing...
    How will the world look 100 years from now if current geo-political trends continue? "Uberopolis: City Of Light" is an unblinking look into the eye of that future.
    I'm a screenwriter looking for a committed representative, and thought a reading of my new screenplay "Uberopolis: City Of Light" might interest you in adding me to your client family. City Of Light is a thoughtful action-adventure, set 114 years in the future, predicated on the ripple-effect of recent headlines, with a simple storyline:

In 2120, fugitive and former American war hero, Arlo Grainer, (has his wife turn-him-in to the government to collect the bounty to pay his daughter's medical expenses. Aware of a dark government secret, the high profile prisoner is taken to labor on Uberopolis, a huge half completed satellite-city, where on one side of a giant construction wall the ultra-rich live in decadent excess; while on the other side, countless prisoners toil to complete the ultimate-city. But when the government attempts to dump him and 200 other prisoners from a shuttle into space, Arlo narrowly escapes back to Earth –where he discovers the state has reneged on the bounty to his wife, and his daughter is near death. Learning of a guardedly protected medication for his daughter (rumored to be made on Uberopolis) Arlo races through Earth's urban underbelly to get a shuttle ticket back to Uberopolis –this time to the glamorous golf course and casino-filled side of the construction wall. Soon, Arlo is racing security forces down the crowded, silver streets of Uberopolis –with time and the armies of the world against him.

    In addition to "Uberopolis: City Of Light", I've recently completed "Sunflowers", a smart comedy-adventure about four young American artist (and friends) who haplessly stumble into an English counterfeit art ring.
    "Uberopolis: City Of Light" is available at your request. I've included an SASE for your convenience. Thanks for your consideration

Best Regards,
Steve Wilson Briggs

birdynumnumz@hotmail.com
646 508 6389

00353

2-9-2006

"Suggest that the wife be the one to "turn in" your hero Arlo. Her motivation is a new boyfriend, plus money for the daughter's medical expenses. Why would I suggest this? It is because your hero should be blameless.

I like the idea of very high medical expenses!

Are your scenes about 1⅔ pages?

Do you have about 80 scenes?

Do you have a slug line for scenes? I imagine you do since you sound very knowledgeable.

"City of Light" sounds best but we can discuss your other screenplay over the phone. Call me from 7-9 Pacific Standard Time

Carole Bodey  ALA

00354

## Marcia Amsterdam Agency

Thank you for sending us this material. We're
sorry, but it doesn't meet our present needs.

**41 West 82 Street   New York, NY 10024-5613**



Dear Author,

Please forgive this impersonal note. We receive a tremendous number of
query letters and are forced to focus our attention on a limited number of
projects. We regret that we must decline the offer to review your work.
We encourage you to keep writing and we wish you every success.

Sincerely,

VICTORIA SANDERS



The Promark Center
3599 Cahuenga Blvd. West, 3rd Floor
Los Angeles, CA 90068

Mr Steve Wilson Briggs
4996 Broadway #4G
NEW YORK, NY

. Briggs
3 Broadway #4G
York, NY 10034



NEW YORK NY 100

02 FEB 2006 PM 14 T



THE DEITER LITERARY AGENCY
10707 AVERETT DRIVE
FAIRFAX, VA 2

NIXIE          201          1          00 02/

RETURN TO SENDER
NO SUCH NUMBER
UNABLE TO FORWARD

BC: 10034166947          *3045-03041-

22035+1220034%1669

|nnlll|nn|lnnn|l|nln|nn|l|l|nn|ln|nln|nn|l|nnllb

V. Briggs
36 Broadway #4G
w York, NY 10034

NEW YORK NY 100

02 FEB 2006 PM 13 T



STRATA SPHERES INC.
205 MULBARDY STREET ##
NEW YORK,

NIXIE          100          1          00 02/

RETURN TO SENDER
NOT DELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

BC: 10034166947          *2945-14225-

iC012+4580034%1669

|nnlll|nn|lnnn|l|nln|nn|l|l|nn|ln|nln|nn|l|nnllbi

# Re: Screeplay Query - Uberopolis: City Of Light

From: **cedargroveagency@juno.com**
Sent: Sun 1/15/06 8:57 AM
To:    birdynumnumz@hotmail.com

Dear Mr. Wilson-Briggs:

Thank you for bringing "Uberopolis: City of Light" to my attention. Although the premise sounds intriguing, I unfortunately must pass as I do not think it is something for Cedar Grove at this time.

I appreciate your interest and wish you the best of luck on your search for representation.

Sincerely,


Samantha Powers
Story Editor

http://www.theliteracysite.com/cgi-bin/WebObjects/CTDSites.woa/612/wa/gotoSite?
destSite=LiteracySite&origin=bcsTY&wosid=qr6000Cv000YW600E2&revisionCode=BCSthankyoupg_LSlogo

On Sat, 14 Jan 2006 12:15:15 -0800 "Steve Wilson-Briggs" <birdynumnumz@hotmail.com> writes:
> UBEROPOLIS: CITY OF LIGHT
>
> An omnipotent world leader forces a political captive into a
> prisoner work
> brigade on a giant satellite city orbiting Earth. There, amid a
> massive
> prisoner extermination, the hero escapes back to Earth to save his
> daughter
> —and face his nemesis... and all the world's armies.
>
> Dear Cedar Grove Agency Entertainment,
>       Thank you for reading the logline to my screenplay
> Uberopolis:
> City Of Light, a sci-fi adventure thriller . I'm querying to learn
> if you
> are currently considering new screenwriters to represent? I'm a
> new,
> energetic screenwriter, hoping to bring two new completed
> screenplays to
> market. Uberopolis is a fast past futuristic story set 115 years in
> the
> future. The story's characters mirror a broad swath of the American
> and
> international landscape, with a fair balance of compelling male and
> female

# RE: Screenwiter Seeking Agent - Uberopolis: City Of Light

From: **Paul S. Levine** (pslevine@ix.netcom.com)
Sent: Sun 1/15/06 8:51 PM
To: 'Steve Wilson-Briggs' (birdynumnumz@hotmail.com)

Not for me-thanks anyway.


Paul S. Levine

-----Original Message-----
From: Steve Wilson-Briggs [mailto:birdynumnumz@hotmail.com]
Sent: Sunday, January 15, 2006 4:11 AM
To: pslevine@ix.netcom.com
Subject: Screenwiter Seeking Agent - Uberopolis: City Of Light

Dear Mr. Levine,
I'm a new screenwriter in need a successful representative and I
hoped to interest you in becoming my agent. I have two quick and
entertaining finished scripts to market, but I think you might be most
interested in UBEROPOLIS: CITY OF LIGHT.

Logline:
Set in the year 2120, on a depleted, overpopulated Earth, a fugitive -
and
former American hero- is drawn out of hiding to pay for medication his
ailing daughter needs. His nemesis, the omnipotent world leader,
imprisons
the hero and sends him to work in a prison labor brigade on a beautiful,
giant, half-completed satellite-city orbiting Earth. But amid a
government
planned mass prisoner extermination attempt, the hero escapes back to
Earth,
to save his ailing daughter -and face his nemesis. and all the world's
armies.

The storyline is simple enough for the youngest and most basic
viewers to appreciate, yet it replete with social, scientific and
political
themes for the most discriminating viewers to enjoy. Uberopolis is a
fast
past futuristic story, whose characters mirror a broad swath of the
American
and international landscape, balanced by compelling male and female
characters. Factors that assure Uberopolis: City Of Light a healthy
national
and international following. Further, the dark, technological social

# Re: Screenplay Query - Uberopolis: City Of Light

From: **Gregory Bell** (gbell.11@gmail.com)
Sent: Mon 1/16/06 4:38 PM
To:    Steve Wilson-Briggs (birdynumnumz@hotmail.com)


Steve,

Sounds interesting. Could you send me a script in pdf or ms word form?

Greg Bell

On 1/16/06, Steve Wilson-Briggs <birdynumnumz@hotmail.com> wrote:
> Dear G. Bell,
> The future is a deadly place...
> How will the world look 100 years from now, if current
> geo-political trends continue? UBEROPOLIS: CITY OF LIGHT is an
unblinking
> look into the eye of that future.
>
> The year is 2120. 14 years after America was absorbed into the
> new United World Nation. With little money, and his daughter ailing
from a
> pollution driven respiratory condition, a fugitive and former American
> soldier, Arlo Grainer, has his wife turn him in to the government -to
> collect the unconditional bounty offered for his arrest.
> Dubbed "a national threat" Arlo carries an explosive secret into
> the prison system. A secret the United World Nation President, Peter
Drexler
> wants forgotten. Arlo is quickly taken to work on a huge satellite
city,
> orbiting 10,000 miles above Earth, Uberopolis. But Uberopolis is only
half
> completed. On one side of the giant construction barrier the super-
rich and
> famous live in decadent excess. On the other side, thousand of prison
> workers toil to complete the ultimate-city.
> On Uberopolis, Arlo narrowly escapes a government sponsored
> prisoner extermination plan and races back to Earth in a stolen
shuttle
> -chased chased by guided warheads. Back on Earth, Arlo discovers the
state
> has reneged on the reward money to his wife, and his daughter is near
death.
> But after learning of an extremely expensive, and guardedly protected
> medicine (rumored to be made on Uberopolis) capable of reversing his
> daughter's condition, Arlo uses his underworld ties to secure a
shuttle

# (no subject)

From: **SouthSeventeen@aol.com**
Sent: Wed 1/18/06 9:09 PM
To:    birdynumnumz@hotmail.com

**Hi there,**

**I located your Logline via the screenwriters market. Your idea is very intriguing and I would love to take a look at the script at your earliest convenience. I would be happy to sign a nondisclosure if necessary. I look forward to hearing from you.**

**Cheers**
**Matthew Morris**
**South17 Entertainment**

# Re: Screenplay query

From: **Zero Gravity Mgmt** (zerogravity.mgmt@verizon.net)
Sent:  Fri 1/20/06 3:48 PM
To:    Steve Wilson-Briggs (birdynumnumz@hotmail.com)
       1 attachment
       STANDARD RELEASE FORM.doc (23.0 KB)


```
Thanks for the query. You can send your script City Of Light via regular
mail or email (.pdf only please) along with the attached submission form
and
a copy of your original email. If sending your script via email you may
'electronically' sign the form by typing in your name where it requires
your
signature.


Since we do receive a lot of scripts we are only able to reply to those
we
are interested in pursuing and do not send out rejection notices.



Best,



Georgia



Zero Gravity Management

1531 14th Street

Santa Monica, Ca 90404
----- Original Message -----
From: "Steve Wilson-Briggs" <birdynumnumz@hotmail.com>
To: <zerogravity.mgmt@verizon.net>
Sent: Friday, January 20, 2006 7:03 AM
Subject: Screenplay query


> Dear Zero Gravity Management,
>
> I am responding to your query for screenplays posted on
moviebytes.com.
```

# RE: Screenplay query: Uberopolis: City Of Light

From: **Submisions** (submissions@aeionline.com)
Sent: Mon 1/30/06 4:44 PM
To:     Steve Wilson-Briggs (birdynumnumz@hotmail.com)


Thank you for thinking of us; however, I don't think that AEI is the
right company for this project.

We appreciate your interest in AEI, and wish you the best of luck in
finding the appropriate place for your work.

Jennifer Pope
AEI

-----Original Message-----
From: Steve Wilson-Briggs [mailto:birdynumnumz@hotmail.com]
Sent: Saturday, January 14, 2006 3:59 AM
To: Submisions
Subject: Screenplay query: Uberopolis: City Of Light

UBEROPOLIS: CITY OF LIGHT
(sci-fi - adventure - thriller)
An omnipotent world leader forces a hated political prisoner into a
prison work brigade on a giant satellite city orbiting Earth. Amid a
massive prisoner extermination attempt the hero escapes back to Earth to
save his daughter -and face his nemesis -and all the world's armies.

Dear Jennifer Pope,

Thank you for reading the logline to my screenplay Uberopolis:
City Of Light. I'm querying to learn if you are currently considering
new screenwriters to represent? Uberopolis: City Of Light is one of two
completed screenplays I'm currently trying to market. Uberopolis: City
Of Light is a fast past futuristic story set 115 years in the future.
The story's characters mirror a broad swath of the American and
international landscape, with a fair balance of compelling male and
female characters.

"In the year 2120, on a depleted, overpopulated Earth, a fugitive (and
former American hero) is drawn out of hiding to fight the all powerful
world government to get the medication his ailing daughter needs."

The storyline is simple enough for the youngest and most basic
viewers to appreciate, yet it replete with social, scientific and
political themes for the most developed and discriminating viewers. All
these factors all but guarantee that Uberopolis: City Of Light will
garner a healthy national and international following. Further, the

EX. J

# The Philadelphia Logline Festival BEGINS NOW!

From: **Joe Frio** (phillyscriptfest@screenplayfest.com)
Sent: Sat 3/31/07 2:37 PM
To:    phillyscriptfest@screenplayfest.com

Congratulations!

Your Logline has been accepted into the <u>Philadelphia Logline Festival</u>!  Your Logline has been posted on our website for members to vote on and review – visit our website today!  Remember — the Logline with the highest votes wins the Logline Festival – So Tell Your Friends and Vote Now!  Voting CLOSES on July 1, 2007!

We are very excited for all our contestants and are thankful for your support in our festival.  Website updates are still being made so please be patient.

AWARDS:

The Top Twenty Loglines receive a discounted price of $20 into our Screenplay Festival.

The Top Three Loglines receive <u>Chris Soth's "Million Dollar Screenwriting"</u> and Free Entry into our Screenplay Festival.

The Top Logline also receives a Free Ticket to the <u>Great American Pitchfest</u> (a value of $250).

**VOTER'S AWARD:**

The Number One Voter/Reviewer will receive a **$20 Reward!**  So Vote Now and Tell Your Friends!  We encourage everyone to review, comment and critique the Loglines.

RULES:

**You must register with B-Side in order to vote (You have NOT done so yet - Just visit our Logline Festival Page and enter the festival to do so).**

Please use your email address as your Desired Username when registering.

You will be disqualified if you vote more then once on each Logline.

You must vote on a minimum of Ten Loglines for your votes to count.

<u>VOTER BIAS RULE</u> - your votes will NOT count if you are bias (if you vote 5 stars on one logline and 1 star on nine loglines).

ı Contestants are allowed ONE FREE revised submission of their Logline throughout the duration of the Logline Festival. You are allowed to submit more revisions but you will be charged a processing fee of $5. We do this to make the festival fair and more challenging for our contestants.

ı Email your revised Logline Submissions to <u>phillyscriptfest@screenplayfest.com</u>. An application is required to be mailed to us after using your FREE Logline Revision Submission. Please <u>click here</u> for more information.

PLEASE NOTE: One hundred percent of all fees will be plowed back into the Festival, e.g., building the best possible website, publicity and advertising, size of Awards, dinner for winners, etc.

**<u>The Philadelphia Screenplay</u> Festival is presently accepting submissions. If you would like to submit a screenplay to our festival please visit our website – you may submit more then one screenplay! $500 in prizes! We are working towards a cash prize of $10,000! Enter Today!**

We thank you for your support and wish you a great competition!

**Joseph Frio**

**Founder**

**The Philadelphia Screenplay Festival**

**www.ScreenplayFest.com**

00365

EXK

# 2006 Slamdance Screenplay Competition Quarterfinalist Announcement!

From: **John Stoddard** (screenplay@slamdance.com)
Sent: Tue 8/29/06 8:59 PM
To: John Stoddard (screenplay@slamdance.com)

Gentle Writer,

Thank you for participating in the 2006 Slamdance Screenplay
Competition. We
received over 2,000 submissions this year. Please visit the Slamdance
website for an entire list of the top 200 quarterfinalists:
www.slamdance.com/screencomp/winners.asp

Unfortunately the screenplay that you submitted did not make it to the
final
rounds of consideration in our Competition. In the event that you
submitted
multiple entries, unless you receive notification of quarterfinalist
status
for a different entry, this letter may apply to everything you
submitted.
If you resubmitted a version of your screenplay that made the
quarterfinals,
this letter may apply to an earlier draft.

We continue to hone our online application process and corresponding
online
feedback and coverage. If you haven¹t already, please visit
www.slamdance.com/screencomp and sign onto the website using your
username
and password to review feedback. If there is any missing coverage or
feedback, please alert the Slamdance office immediately by e-mail:
coverage@slamdance.com

For those that requested coverage, a new feature added midseason this
year
includes a scoring function allowing you to rate your satisfaction with
the
feedback on a scale of 1-10. If you have not already, please return to
the
Slamdance website, review your coverage, and provide a score. This will
allow us to further hone our coverage service.

We would very much appreciate any feedback you can provide on your
experience with this year¹s competition. For any delay in coverage or

feedback we apologize. You can trust that every screenplay was thoroughly
read and considered for the competition, and that any missing feedback or
coverage does not mean your script fell through the cracks. It simply means
there is a glitch in the system that we now have to rectify. Also keep in
mind that the number of responses to your screenplay does not represent the
complete amount of consideration that went into the decision-making process
regarding your submission.

Please e-mail screenplay@slamdance.com with your feedback and comments. You
can always resubmit in 2006 based on the feedback provided for a discounted
price. We begin accepting submissions in November 2006. Our 2006 Teleplay
Competition is currently accepting online applications. Please visit
www.slamdance.com/teleplay for more information. If you have any interest in
writing Horror, we are accepting applications for a brand new Horror
Screenwriting Competition. The submission deadline is October 31, 2006 visit
www.slamdance.com/screencomp/horror for more information.

Thank you for choosing Slamdance.

Sincerely,

John Stoddard
Screenplay Competition Director

Ex C

00369

# Expiration of listing

From: **jerrol@InkTip.com**
Sent: Tue 8/15/06 2:10 AM
To: birdynumnumz@hotmail.com


Dear Steve Wilson Briggs,

Re: Uberopolis

This listing has now expired and will be deleted soon.

If you would like to keep it on the site, please log in and click on the 'Purchase' tab. It is $50 per placement for 6 months. You can pay by credit card or you can mail a check to:

InkTip.com
PO Box 312
Glendale, CA 91209

Please let me know which you plan to do.

If you don't want to keep it on the site, please print the pages showing who viewed your synopsis, treatment and/or script for your records. Log into the site and click on the 'New Viewings' link at the top left in the 'Viewings Summary' box.

Thanks,
Maia
http://www.InkTip.com
This is an automated email.

00370

# 6 Week Warning

From: **jerrol@InkTip.com**
Sent: Mon 11/05/07 2:10 AM
To:    birdynumnumz@hotmail.com


Dear Steve,

Re: Butterfly Driver

This listing will be expiring in 6 weeks.
If you have not done so recently, please
update your placement for maximum exposure.

We have set up the site so that every six
weeks you can modify any part of your listing
to have it brought back up to the top of the list.
Just log into the site and click on the title of
your work on the left. We suggest at least updating
your logline and synopsis so that it shows up new
and fresh for the industry pros.

For tips on loglines and synopses, please log into
the site and click on the 'Help and Directions' tab.
Select 'Tips on Loglines and Synopses', the 4th option down.

Thanks,
Maia
www.InkTip.com
This is an automated email.

00371

# Notice: Your Work has been Viewed!

From: **Jerrol LeBaron** (jerrol@inktip.com)
Sent: Tue 11/27/07 10:50 AM
To: Steve Wilson Briggs (birdynumnumz@hotmail.com)

Dear Steve,

An industry professional has viewed or downloaded one of your works
(synopsis, treatment, or script) on www.InkTip.com. For more
information, log in and click "New Viewings" under 'Viewings Summary' on
the 'My InkTip' tab. (If you are a representative, log in and select
"Scripts I Represent.")

FOR WRITERS: If only your synopsis was viewed, please do not contact the
industry pro. If the industry pros have further interest, they will
either contact you or view your treatment or script. Please see "User
Protocol" for further details: http://www.InkTip.com/protocol.php

To ensure you get the best results from the website, please read 'Make
InkTip Work for You!' (available on the 'Help & Directions' tab).

Best Wishes,
The InkTip Team


This is an automated e-mail. Sorry we couldn't send it personally!
birdynumnumz@hotmail.com
A6020361389(*I5VW

# TriggerStreet.com Review Notification (Friday, March 2, 2007)

From: **TriggerStreet Dispatcher** (dispatcher@triggerstreet.com)
Sent: Sat 3/03/07 1:05 AM
To: birdynumnum (birdynumnumz@hotmail.com)

```
------------------------------------
TRIGGERSTREET.COM REVIEW NOTIFICATION
Friday, March 2, 2007
------------------------------------

Dear TriggerStreet User:

This nightly update charts upload and review activity at
TriggerStreet.com. In our attempt to deliver you the best possible user
experience, our system returns running stats. By following these nightly
updates you can keep track of your uploads - when they have been
reviewed, where your short film is being ranked, and who is responding
to the reviews that you may have already posted.

So get connected, and stay connected. All you have to do is log-in to:
http://www.triggerstreet.com


----------------
BUTTERFLY DRIVER
----------------
Written By: Steve Wilson Briggs

Total Reviews: 1
Reviews Today: 1
Total Views: 9
Screenplay Ranking: Review minimum currently not met.

New Review:
* "REVIEW OF BUTTERFLY DRIVER" (reviewed by Myriads In Blue Ascending)


-------------------------------------------------
If you would like to stop receiving review notification alerts, please
log-in to http://www.triggerstreet.com/ and select "My Trigger Page"
from the main navigation. Once there, select edit account on the top
left of
the page to edit your settings.
-------------------------------------------------
```

00374

# TriggerStreet.com Review Notification (Saturday, March 3, 2007)

---

From: **TriggerStreet Dispatcher** (dispatcher@triggerstreet.com)

Sent: Sun 3/04/07 1:02 AM

To: birdynumnum (birdynumnumz@hotmail.com)

```
------------------------------------
TRIGGERSTREET.COM REVIEW NOTIFICATION
Saturday, March 3, 2007
------------------------------------

Dear TriggerStreet User:

This nightly update charts upload and review activity at
TriggerStreet.com. In our attempt to deliver you the best possible user
experience, our system returns running stats. By following these nightly
updates you can keep track of your uploads - when they have been
reviewed, where your short film is being ranked, and who is responding
to the reviews that you may have already posted.

So get connected, and stay connected. All you have to do is log-in to:
http://www.triggerstreet.com


----------------
BUTTERFLY DRIVER
----------------
Written By: Steve Wilson Briggs

Total Reviews: 2
Reviews Today: 1
Total Views: 9
Screenplay Ranking: Review minimum currently not met.

New Review:
* "Review of BUTTERFLY DRIVER" (reviewed by f chong rutherford)


-------------------------------------------------
If you would like to stop receiving review notification alerts, please
log-in to http://www.triggerstreet.com/ and select "My Trigger Page"
from the main navigation. Once there, select edit account on the top
left of
the page to edit your settings.
-------------------------------------------------
```

00375

# TriggerStreet.com Review Notification (Tuesday, March 6, 2007)

From: **TriggerStreet Dispatcher** (dispatcher@triggerstreet.com)
Sent: Wed 3/07/07 1:02 AM
To: birdynumnum (birdynumnumz@hotmail.com)

```
------------------------------------------
TRIGGERSTREET.COM REVIEW NOTIFICATION
Tuesday, March 6, 2007
------------------------------------------

Dear TriggerStreet User:

This nightly update charts upload and review activity at
TriggerStreet.com. In our attempt to deliver you the best possible user
experience, our system returns running stats. By following these nightly
updates you can keep track of your uploads - when they have been
reviewed, where your short film is being ranked, and who is responding
to the reviews that you may have already posted.

So get connected, and stay connected. All you have to do is log-in to:
http://www.triggerstreet.com


----------------
BUTTERFLY DRIVER
----------------
Written By: Steve Wilson Briggs

Total Reviews: 3
Reviews Today: 1
Total Views: 10
Screenplay Ranking: Review minimum currently not met.

New Review:
* "Butteryfly Driver Review" (reviewed by filmsnoir)


------------------------------------------------
If you would like to stop receiving review notification alerts, please
log-in to http://www.triggerstreet.com/ and select "My Trigger Page"
from the main navigation. Once there, select edit account on the top
left of
the page to edit your settings.
------------------------------------------------
```

00376

Ex. N

# Re: Thanks for the input

From: **tomgilman1@netzero.net** (tomgilman1@netzero.net)
Sent:  Sat 3/03/07 7:00 AM
To:    birdymummumz@hotmail.com


All right, there are only two kinds of headings, MAJOR and MINOR. From the previous sentence you drop THREE SPACES for a MAJOR HEADING, and TWO SPACES for a MINOR HEADING. A major heading is supposed to look like this:  INT. JOE'S HOUSE - DAY  A minor heading is to be used once we're already in Joe's house and want to move around. A minor heading doesn't need INT. OR EXT. and so five minutes after you've entered the house and the scene moves, you have IN THE KITCHEN or UP THE STAIRS or UNDER THE BED. Minor headings don't need formality, they just need CAPS.

Examples of varity in headings -- INT. JOE'S HOUSE - UPSTAIRS TOILET - DAY

INT. JOE'S HOUSE - SECOND STORY LANDING - DAY

You can accomplish a great deal with a properly formatted heading, and whatever you do be brief and direct, and NEVER LET A HEADING RUN MORE THAN ONE LINE.

Time elements? You look like a pro just by keeping it simple, by which I mean use nothing but DAY or NIGHT. If you absolutely must convey to the reader that it's something else, something more precise, use your descriptive line for that, e.g. dusk, twilight, early evening, late evening, before sunrise, just after sunrise.

To qualify as a legitimate heading you need INT. or EXT. up front. You cannot just have BACK IN THE HOUSE WHERE JOE BANGED SUZY BEFORE. You cannot have IN THE KITCHEN WHERE ANNA PRAYED WITH JOHNNY FOR JOE BECAUSE THEY CAUGHT HIM BANGING SUZY.

Except for headings and specific SOUNDS it's important to stay away from using upper case words. That and too many exclamation points makes your text look like a comic strip. And you certainly don't want one, two, three or four lines of description (action lines) done in CAPS. It not only looks amatuerish, it is amatuerish. Writers I review get after me for being a stickler about formatting, but believe me when I say that nothing will get your script thrown onto the reject pile faster than formatting errors. Why? Because it tips the reader off that they're reading the work of a beginner who has not put in the time to learn the craft, and they run down the hallway screaming LEPROSY! RUN FOR YOUR LIVES!

I hope this little bit helps. If there's anything else, let me know. Enjoy the day. Tom

# Re: Thanks for the input

From: **tomgilman1@netzero.net** (tomgilman1@netzero.net)
Sent: Sat 3/03/07 10:57 AM
To: birdynumnumz@hotmail.com

Steve ~ I think I got your second email first. Here's the answer about shots and angles.

It's incredibly simple, though it seems enormously complex and troubling.

You can direct your characters and the action all you want by simply pointing the camera of your words where you want it to go. You focus our attention, just like a camera does, on who or what you want to focus it on. It's all about the headings, here's how.


EXT. JONE'S RANCH - DAY

It's a large spread, well kept. There's a RACKET in

THE BARN

and smoke rises from the roof where the fire started. The roof is almost gone when

JOHN

runs from the house. He yells at

BILL AND CURLY

as they come from

THE BUNKHOUSE

where Woody and Jeff appear.

Whatever you make your heading is what the camera in the reader's imagination shows.

Screenplays used to be filled with ANGLE ON and CUT TO and WIDEN FRAME until it was made clear that spec scripts are for storytelling, while shooting scripts are for the production people to make the movie from. You want as little fancy clutter in your spec script as possible because it makes you look like an amatuer and distracts from the story your reader is desperate fo focus on and you're equally desperate to tell.

One final thing -- invest in David Trottier's SCREENWRITER'S BIBLE. You absolutely will not make it without it or one like it. Buy it, read it, memorize it.

Anytime, Tom

00379

Ex. O

# Re: ? about "Butterfly Driver"

From: **Jason Beck** (phreesh@yahoo.com)
Sent: Thu 8/02/07 6:58 AM
To:   Steve Wilson Briggs (birdynumnumz@hotmail.com)

I think its okay. I'm not passionate about it, but it didn't bother me.

Thinking about why I didn't *love* it...

Maybe placement? Could it be put into a place that felt more like the story was possibly over? I'm not sure if there's a spot for it just a little later. Maybe something to think about.

Maybe different visuals? What would most be on Arlo's mind when he's dying? And it'd be double-good if you could include either some foreshadowing or reveal a plot twist.

I think you've done a good job making it suitably 'dreamlike'. The child in the cockpit, the dolphin in the cargo bay (bonus points for making the window look like a porthole) work well, I think.

Frankly, I don't have any concrete advice. Like I said, I think it's decent (I, too, generally dislike dream sequences), but not mind-blowing.

Good luck,

Phreesh
----- Original Message ----
From: Steve Wilson Briggs <birdynumnumz@hotmail.com>
To: phreesh@yahoo.com
Sent: Thursday, August 2, 2007 7:14:39 AM
Subject: Re: ? about "Butterfly Driver"

Phreesh (or Jason),

I've been laboring to repair my script. I'm still floored by all the insight and sage advise you offered. I was wondering, if you have a moment -and still remembered the script this long after the fact- but when Arlo was apparently dying, at the end, and had the dream, with the dolphin, which triggered his final epiphany, did that work for you? I usually avoid flashbacks and dreams like the plague, but this tied into Benni's belief in dreams, which may work for a motiff, but not for the story. So I was hoping to get your thoughts. If you don't have time, or don't recall, I understand. Thanks again.

>From: Jason Beck <phreesh@yahoo.com>
>To: Steve Wilson Briggs <birdynummumz@hotmail.com>
>Subject: Re: ? about landscape of "Butterfly Driver".
>Date: Tue, 31 Jul 2007 06:57:53 -0700 (PDT)
>
>I have to first say that the instinct to pare down description is the right
>one. Especially in the first ten pages. You want to get your story going
>right away and engage the reader. That said, because you set this in a
>world very different from our own, I think you need to orient us a little.
>
>The thing that was missing to me was, I guess, a sense of the
>'neighbourhood'. Is Arlo's place a typical suburban house that has all the
>comforts of the modern future? Or is this more of a downtrodden place that
>has a lot of abandoned homes and makeshift shelters? I guess I'm wondering
>what the quality of life is like for Arlo and his friends. And then
>describe the important bits of technology a little more fully. What does
>Arlo's bike look like and what does it do (I recall that you did a pretty
>decent job of this). And the omni-com. What size is it? What does it
>look like?
>
>And then, what life is like in Los Angeles. Is it like the Star Warz
>prequels with beautiful, immaculate, huge buildings or like Blade Runner
>with a hodgepodge of different cultures and economic lifestyles?
>
>Now that I think about it, I think a sense of 'lifestyle' is what I'm
>looking for. You do a pretty good job of describing Uberopolis and its
>decadent lifestyle. I think you need to do just as good a job with Earth
>(or at least the bits that you show).
>
>Best of luck,
>
>Phreesh
>
>
>
>----- Original Message ----
>From: Steve Wilson Briggs <birdynummumz@hotmail.com>
>To: phreesh@yahoo.com
>Sent: Monday, July 30, 2007 3:07:50 PM
>Subject: Re: ? about landscape of "Butterfly Driver".
>
>

00382

>Jason,
>
>I'm honored that you emailed back. I haven't had an opportunity to read
>your
>work, but from the great reviews and your evident acumen, I have a feeling
>I'm corresponding with a future "insider".
>Anyway, if you have a minute or two...
>You mention that maybe I should make the world I've envisioned a little
>more
>clear. I cut out substantial stuff after receiving input that the world was
>too elaborate, a few months ago. I have about twenty out takes that could
>help concretize my world of the future -and some new ideas. Are there any
>specific ways that you felt my world lacking?
>Oh yeah. Thanks for pointing out my margin problems. I can't figure how or
>when they got screwed up.
>
>Take care.
>
>
>
> >From: Jason Beck <phreesh@yahoo.com>
> >To: "TriggerStreet Member: birdynumnum" <birdynumnumz@hotmail.com>
> >Subject: Re: Thanks fpr the review of "Butterfly Driver".
> >Date: Mon, 30 Jul 2007 08:07:31 -0700 (PDT)
> >
> >I DID notice the reference to violets at the end, but didn't give you
> >enough credit as a writer.  I thought it was more of an accidental
> >reference and it made me think of Benni and that you had forgot her.
> >
> >Now that you've pointed out that it was on purpose, I can see where you
> >were going.
> >
> >Maybe it's too subtle?  Could be just me.  Now that you've pointed it
>out,
> >I like it.
> >
> >Beaver Foods sez:
> >
> >"We take care of the meat.
> >You do the rest."
> >
> >
> >
> >----- Original Message ----
> >From: TriggerStreet Member: birdynumnum <birdynumnumz@hotmail.com>

> >To: phreesh <phreesh@yahoo.com>
> >Sent: Monday, July 30, 2007 1:02:15 AM
> >Subject: Thanks for the review of "Butterfly Driver".
> >
> >
> >This is the third time I've posted BD, and your reviw was the most
>thorough
> >and thoughtful to date. Much of your input I expect to act on as soon as
>I
> >finish this email; a few things are style decisions that I may stick
>with.
> >There were two points you mentioned I was hoping to explore with you. 1)
> >you mentionen the gens inclusion being sort of random an undeveloped. The
> >gens were suposed to part of the State's cover up of the prisoner
>execution
> >program. Let the concerned families chat with gens in a simulated
>prison...
> >I guess I may not have done my job as a writer on this point. 2) I really
> >appreciate that you noticed the VIOLET theme and how that was supposed to
> >be connect visual to Benni. In the final pages when Arlo's saying goodbye
> >to his wife Rianna, we see her VIOLET mascara runnig, and Arlo says she's
> >"...still beautiful in the rain." This was supposed to be a referrence to
> >Benni, who said of her violet was"...even prettier in the rain,". The
> >clossing reffernce was intended also to suggest that Arlo had an
>enduring
> >interest in Benni.
> >Thanks a bunch.
> >Steve
> >
> >
> >     Be smarter than spam. See how smart SpamGuard is at giving junk
> >email the boot with the All-new Yahoo! Mail at
> >http://mrd.mail.yahoo.com/try_beta?.intl=ca
> >
>
>_____
>Local listings, incredible imagery, and driving directions - all in one
>place! http://maps.live.com/?wip=69&FORM=MGAC01
>
>
>     Be smarter than spam. See how smart SpamGuard is at giving junk
>email the boot with the All-new Yahoo! Mail at
>http://mrd.mail.yahoo.com/try_beta?.intl=ca
>

Ex P

# RE: Thanks for the Butterfly Driver review

From: **Thielke, Bob** (BThielke@TLIsolutions.com)
Sent: Tue 7/31/07 8:19 AM
To: TriggerStreet Member: birdynumnum (birdynumnumz@hotmail.com)


Hey Steve

It's nice to hear the feedback on the reviews, I'm glad I was of some
help. Regarding Drexler, if you can ever get ahold of the script for LA
confidential, see how they handle the police chief whose name escapes
me. He's THE bad guy in the story, but they include him early and fairly
often as a good guy with only the slightest hints that there may be
problems with him. I know exactly what you're saying about the feeling
of arlo finding the bodies with the donor organs. The other way of
looking at it is to suggest that cloning doesn't work for some
particular organs, then you could still have the need for donor organs.
Maybe some environmental calamity causes the cloned organs to fail. just
throwing stuff out there.

I liked the story alot and think it has some serious potential.

bob

_____

From: TriggerStreet Member: birdynumnum
[mailto:birdynumnumz@hotmail.com]
Sent: Mon 7/30/2007 3:39 PM
To: Thielke, Bob
Subject: Thanks for the Butterfly Driver review


Thanks for the good input. I intend to implement most of your points.
The stuff about the donor organs vs. clonong was right on point. I
thought about changing it, but kept it only because Arlo finding the
bodies had a certain 'feeling'. But it needs to go. I decided to
introduce Drexler gradually, and maybe late, because putting too much
attention and focus on him early tended to telegraph him as the "heavy".

Thanks again for your thoughts and advice.

Steve

00386

EX 2



I'm hoping to begin shooting the following scripts, perhaps shooting Sweeter Nectar Channel first. But we need help. We are seeking investment and production partners to get these projects financed.

SEE IT! In high def and AMAZING technology!!

Ex. K

## Why Jodie Foster Is Sworn to Secrecy

By Julie Michaels March 13, 2013 ( http://wjltevansville.com/why-jodie-foster-is-sworn-to-secrecy/ )

At a Comic-Con: International press conference in San Diego, Academy Award winning actress, Jodie Foster revealed she has been sworn to secrecy. Her one and only secretive movie is the new movie "Elysium," an upcoming American sci-fi thriller, written and directed by Neill Blomkamp. Foster plays "Secretary Delacourt," a government official on a pristine man-made space station called "Elysium." In rare publicity photos from the movie, Jodie is seen sporting a very short, sassy blonde do.

Geektyrant.com describes Elysium as a "ring-shaped world created and inhabited by the rich that orbits the Earth; a paradise where any sickness can apparently be healed and on which only people who reach a certain income level can afford to step foot." Anti-immigration laws are in place on Elysium to preserve their citizens' luxurious lifestyle.

## Jodie Foster Talks ELYSIUM

by Christina Radish   ( http://collider.com/jodie-foster-elysium-2/ )

At the press day for the independent drama The Beaver, directed by Jodie Foster, Collider was able to briefly talk to the multi-talented artist about her upcoming role in Neill Blomkamp's next sci-fi alien film, the highly anticipated Elysium, which is starring Matt Damon, Sharlto Copley and William Fichtner. While we'll run the portion of the interview about The Beaver closer to that film's May 6th release date, we wanted to post the little bits she did hint at, as the film has been so closely guarded, having only revealed previously that it will involve a battle between an alien race and the human race. Check out what she had to say after the jump. You can catch up on all of our Elysium coverage here.

jodie-foster-imageQuestion: The L.A. Times quoted you this week as saying that you would be playing "the head of an alien planet" in Neill Blomkamp's next film, Elysium. Would you say that's an accurate description of the role?

JODIE FOSTER: Yes. I hope I'm allowed to say that. I think I'm allowed to say that. That's pretty vague.

Is there anything else you can say about the film?

FOSTER: Those sci-fi movies are all really hush-hush. I don't even own a screenplay. They won't even give me a screenplay. I've read it, but they won't give me one to physically keep in my home 'cause they're so worried about everybody.

What was it about that project that appealed to you and made you want to get involved? Did you just want to work with Neill Blomkamp?

FOSTER: Yes, definitely. He did District 9, which I think is as close to a perfect movie as you can get. It's just an extraordinary film. And, this film has a lot of that social commentary in it, but uses sci-fi to get there. It's great.

EX.5

December 17, 2013

ENTERTAINMENT

## Jodie Foster's 'Elysium' Role Was Originally Written For A Man

Posted: 07/29/2013 12:43 pm EDT | Updated: 07/29/2013 12:56 pm EDT



Jodie Foster's "Elysium" role was originally a man.

Jodie Foster stars as the antagonist in Neill Blomkamp's "Elysium," making her one of the few female villains on screen this summer. In a new interview with EW.com, however, Blomkamp revealed that Foster's character was initially written as a male, before he had a change of heart. It was then that Foster entered into his thinking for the role.

"I thought, 'That would be f—king awesome, but there's just no way,'" Blomkamp said about casting Foster. "But then, within, like, a day I had a meeting with her and she said, 'I want to play it.' I was like, 'Holy sh-t!'"

The news that Foster's character in "Elysium" was initially written for a man might have surprised the actress. In an interview with Movieline at the 2012 edition of Comic-Con, Foster said the part "pretty much was" always a woman.

"I think genre films, because they have to, usually paint things much more in black and white, whether it's women or not women, because the storytelling in ways is a lot more primitive," Foster said.

Foster isn't the first actress this summer to play a character originally written for a man; Helen Mirren's role in "Monsters University" was also male, before the part changed genders in the development process.

For more on "Elysium," head to EW.com.

[via EW]

Loading Slideshow

00392

Ex. T



# Seeking representation vs Sony Pictures, Tristar...

**Steve Wilson Briggs** <snc.steve@gmail.com>
To: dkinsella@kwikalaw.com

Mon, Jun 3, 2013 at 6:35 PM

Dear Kinsella,

My name is Steve Wilson Briggs, the writer/producer/director of the feature film The Amazing Mr. Excellent, filmmaker and writer of several other developmental scripts. Recently I discovered that one of scripts (written in 2004-2005, registered wga-w # 1103287) was stolen, wholesale (changing only dialogue and peripheral content) and produced into a major motion picture, projected **to be released August 2013, by Sony and TriStar Pictures**. There are no differences in plot, setting or structure.

The synopsis/logline to my script, titled "Uberopolis: City of Light" and/or "Butterfly Driver" reads:

*To get medicine to save his daughter, a fugitive has seven days to travel across the impoverished, crime-ridden ruins and wastelands of Earth to find transport to the beautiful space satellite city -and home of the ultra-rich, Uberopolis. Because the fugitive has secret information about the villainous owner of Uberopolis, he is tracked by a relentless special investigator.*

The synopsis/logline to my stolen script (now called "Elysium" by Sony, TriStar) reads almost identically:

*To get medicine to save himself, a fugitive has five days to travel across the impoverished, crime-ridden ruins and wastelands of Earth to find transport to the beautiful space satellite city -and home of the ultra-rich, Elysium. Because the fugitive has secret information about the villainous administrator of Uberopolis, he is tracked by a relentless tracker.*

The plagiarizers even kept my underlying themes of the indignity of immigration, healthcare themes, and my treatment of genetic reprogramming for the rich on Uberopolis/Elysium. They also took my post apocalyptic vision of the war-torn overpopulated, brutal, police-state wasteland of planet Earth, where corporations capitalize on cheap labor by manufacturing in the ruins. Additionally they took my vision of futuristic hover-cars, trucks and cycles flying above these ruins –and on Uberopolis/Elysium.

From 2005-2007 I marketed my script, heavily, online and through conventional mail. Among other places I posted my script on Inktip.com (connecting 50,000 users with thousands of industry professionals), Kevin Spacey's Triggerstreet.com (also serving thousands of members and industry professionals). I also posted my loglines and synopses on countless screenwriting websites, and sent it to many agents and producers, as well as entering the script into several screenplay competitions. I've kept most of those exchanges and verifications.

In addition to the script and my WGA registration, I have a bounty of verification of my efforts to sell my script from 2005 to almost 2008. I DID attract some interests before I decided not to sell the script; choosing to keep it to produce myself -after I garnered a reputation producing and directing a few less ambitious projects.

That said, I am contacting you to see if you might be willing to represent me in suits against Sony, TriStar, Simon Kinberg, Media Rights Capital, QED International and Neill Blomkamp. The movie will be released in just over two months. I know time is critical. I am hoping to find an attorney who is willing to represent me on contingency, because I have no disposable income. I am also hoping to find an attorney who might consider NOT settling and going to trial, if necessary, as I convinced the entire movie is my intellectual property. Thus, in addition to monetary compensation, it's important to me to reclaim creative credit and licensing rights of my intellectual property –which means a reasonable share of profits and licensing. Because of the exciting landscape that I designed, Sony (owner of Playstation) will likely make more from video-gaming from this movie than they will make from the actual movie itself.

12/18/13

Case:14-17175 04/09/2013 Small's Screenplay representation of Spataro & Fathers Copy of 220 Page: 65 of 220
Case4:13-cv-04679-PJH Document17-2 Filed12/13/13 Page65 of 70

I will forward you a copy of the screenplay upon your request. I live in the SF Bay Area (California), but I'm hoping to arrange a meeting with you next week, if you are interested.

Thanks for your consideration.


Steve Wilson Briggs

Ex. U

Hollywood Accounting

From Wikipedia, the free encyclopedia
(some passages of this article have been edited out, for brevity)

Hollywood accounting (also known as Hollywood bookkeeping)[1] refers to the opaque accounting methods used by the film, video and television industry to budget and record profits for film projects. Expenditures can be inflated to reduce or eliminate the reported profit of the project, thereby reducing the amount which the corporation must pay in royalties or other profit-sharing agreements, as these are based on the net profit.

Hollywood accounting gets its name from its prevalence in the entertainment industry—that is, in the movie studios of Hollywood. Those affected can range from the writers[2] to the actors.[3]
John D. MacDonald's novel Free Fall in Crimson (1981) references Hollywood accounting in its dialogue:
Darling! This is the Industry! The really creative people are the accountants. A big studio got over half the profit, after setting breakeven at about three times the cost, taking twenty-five percent of income as an overhead charge, and taking thirty percent of income as a distribution charge, plus rental fees, and prime interest on what they advanced.

How it works

Hollywood accounting can take several forms. In one form, a subsidiary is formed to perform a given activity and the parent entity will extract money out of the subsidiary not in terms of profits but in the form of charges for certain "services". The specific schemes can range from the simple and obvious to the extremely complex.
Three main factors in Hollywood accounting reduce the reported profit of a movie, and all have to do with the calculation of overhead:
Production overhead: Studios, on average, calculate production overhead by using a figure around 15% of total production costs.
Distribution overhead: Film distributors typically keep 30% of what they receive from movie theaters ("gross rentals").
Marketing overhead: To determine this number, studios usually choose about 10% of all advertising costs.
All of the above means of calculating overhead are highly controversial, even within the accounting profession. Namely, these percentages are assigned without much regard to how, in reality, these estimates relate to actual overhead costs. In short, this method does not, by any rational standard, attempt to adequately trace overhead costs.
Due to Hollywood accounting, it has been estimated[citation needed] that only about 5% of movies officially show a net profit, and the "losers" include such blockbuster films as Rain Man, Forrest Gump, Who Framed Roger Rabbit, and Batman, which all took in huge amounts in box office and video sales.
Because of this, net points (a percentage of the net income (i.e. gross income minus expenses), as opposed to a percentage of the gross income) are sometimes referred to as "monkey points", a term attributed to Eddie Murphy, who is said to have also stated that only a fool would accept net points in his or her contract.[5][6]
All of this shows why so many big-name actors insist on "gross points" (a percentage of some definition of gross revenue) rather than net profit participation. This practice reduces the likelihood of a project showing a profit, as a production company will claim

a portion of the reported box-office revenue was diverted directly to gross point participants.

Examples

Winston Groom's price for the screenplay rights to his novel Forrest Gump included a share of the profits; however, due to Hollywood accounting, the film's commercial success was converted into a net loss, and Groom received nothing.[7] That being so, he has refused to sell the screenplay rights to the novel's sequel, stating that he "cannot in good conscience allow money to be wasted on a failure".

Stan Lee, co-creator of the character Spider-Man, filed a lawsuit after the producers of the movie Spider-Man (2002) did not give him a portion of the gross revenue.[8]

The estate of Jim Garrison sued Warner Bros. for their share of the profits from the movie JFK, which was based on Garrison's book On the Trail of the Assassins.[9]

Art Buchwald received a settlement after his lawsuit Buchwald v. Paramount over Paramount's use of Hollywood accounting. The court found Paramount's actions "unconscionable", noting that it was impossible to believe that a movie (1988's Eddie Murphy comedy Coming to America) which grossed US$350 million failed to make a profit, especially since the actual production costs were less than a tenth of that. Paramount settled for an undisclosed sum, rather than have its accounting methods closely scrutinized.

The film My Big Fat Greek Wedding was considered hugely successful for an independent film, yet according to the studio, the film lost money. Accordingly, the cast (with the exception of Nia Vardalos who had a separate deal) sued the studio for their part of the profits. The original producers of the film have sued Gold Circle Films due to Hollywood accounting practices because the studio has claimed the film, which cost less than $6 million to make and made over $350 million at the box office, lost $20 million.[10]

Peter Jackson, director of The Lord of the Rings, and his studio Wingnut Films, brought a lawsuit against New Line Cinema after "an audit... on part of the income of The Fellowship of the Ring". Jackson stated this is regarding "certain accounting practices", which may be a reference to Hollywood accounting. In response, New Line stated that their rights to a film of The Hobbit were time-limited, and since Jackson would not work with them again until the suit was settled, he would not be asked to direct The Hobbit, as had been anticipated.[12] Fifteen actors are suing New Line Cinema, claiming that they have never received their 5% of revenue from merchandise sold in relation to the movie, which contains their likeness.[13] Similarly, the Tolkien estate sued New Line, claiming that their contract entitled them to 7.5% of the gross receipts of the $6 billion hit.[14] Overall according to New Line's accounts the trilogy made "horrendous losses" and no profit at all.[15]

According to Lucasfilm, Return of the Jedi despite having earned $475 million at the box-office against a budget of $32.5 million, "has never gone into profit".[16]

A WB receipt was leaked online, showing that the hugely successful movie Harry Potter and the Order of the Phoenix ended up with a $167 million loss on paper.[17]

Michael Moore is suing Bob and Harvey Weinstein for creative accounting to deprive him of his share of profits for the film Fahrenheit 9/11.[18]

The famous and critically acclaimed educational TV show Bill Nye the Science Guy was ended because the producers had not "shown a profit" in twenty years due to this practice.

Ex. √

12/17/13

Loeb's Letter: Sony Entertainment Lacks Discipline, Accountability - MoneyBeat - WSJ

THE SHOPS

News, Quotes, Companies, Videos    SEARCH

Log In

MARKETS & FINANCE

ONLY $1 A WEEK FOR 12 WEEKS

SUBSCRIBE NOW >>    for a limited time

# ∿MONEYBEAT



MARKETS
Morning
Money Beat: How to
Play the Fed? Look
to the Smart Money



MARKETS
Bubble in U.S.
Stocks? Think Again

MARKETS    DEALS    BANKS    PRIVATE EQUITY    HEDGE FUNDS    BANKRUPTCY

HOT TOPICS:  DELL BUYOUT    MICROSOFT-NOKIA    VERIZON WIRELESS          SELECT A REGION: GLOBAL

8:11 pm
Jun 17, 2013    DEALS

## Loeb's Letter: Sony Entertainment Lacks Discipline, Accountability

PREVIOUS
Morning MoneyBeat
Asia: Like, Chill Out

NEXT
REITS in Hong Kong,
Singapore Lose Their
Allure

ARTICLE    COMMENTS (1)

SEARCH MONEYBEAT    GO

DAN LOEB    SONY    THIRD POINT

Email    Print

By STEPHEN GROCER

Daniel Loeb is ratcheting up a campaign to convince Sony 6758.TO -1.06% to launch an initial public offering of its entertainment division.

Loeb has boosted its stake in Sony and Tuesday morning his hedge fund hand-delivered a letter from him to Sony Chief Executive Kazuo Hirai that reiterates the investor's argument that Sony should sell a 15% to 20% stake in its entertainment arm.

Here is the letter:

* * *

Mr. Kazuo Hirai
President and CEO
Sony Corporation
7-1, Konan 1-Chome, Minato-ku,
Tokyo 108-0075 Japan

Dear Mr. Hirai:

Sony Corporation ("Sony" or "the Company") appears to be regaining its competitive edge. Recent highlights include the debut of PlayStation 4 with its consumer-friendly approach to next-generation gaming and Xperia, which recently overtook Apple as the #1 smartphone in Japan. We expect the upcoming Xperia Z Ultra to generate similar success in Europe and were pleased to see Vodafone VOD.LN +0.37% 's CEO using an Xperia Z in a recent meeting.

As a sign of our increased confidence in the Company's direction under your leadership, funds managed by Third Point LLC ("Third Point") have increased their stake in Sony to 70 million shares valued at ¥136.5 billion ($1.4 billion), held via 46 million shares of ordinary stock valued at ¥89.7 billion ($944 million) and economic exposure to 24 million shares valued at ¥46.8 billion ($492 million) through cash-settled swaps. Given our large stake, we reiterate our offer to serve on Sony's Board of Directors.

Another sign of progress is the news that the Company has retained financial advisors to help evaluate our proposal to publicly list a minority stake in Sony Entertainment ("Entertainment") through a rights offering backstopped by Third Point. We remain convinced that the proposed transaction will strengthen the Company as a whole. The newly-listed entity will thrive with a governance structure which focuses on increasing profitability, competitiveness and accountability. We expect that this transaction will strengthen rather than diminish Sony's ability to exploit meaningful synergies between

Popular Now    What's This?

1  First-Year Law School Enrollment At 1977 Levels



2  A Full-Featured, $38 Tablet Is Coming to the U.S.

the Entertainment and Electronics divisions, a goal we share.

Our proposal is a simple one: it contemplates a semi-independent governance structure. We believe that you, Mr. Hirai, should serve as Chairman of both Boards, to promote synergies between Entertainment and Sony Corporation. Entertainment's dedicated Board should be composed of diverse individuals with deep knowledge of media, entertainment and digital technology, who value creative talent and can institute best practices of governance. Today, Entertainment is a sleeping giant — a multi-platform content business with a global footprint, encompassing leading film and television production, cable networks and music interests. An incredible opportunity exists to integrate Entertainment's components to create a dominant creative platform for today's artist-entrepreneurs – *but the right leadership at the Board level is imperative.*

An independent Entertainment Board will go a step further: holding management accountable by establishing goals for growth while setting compensation tied to value creation using stock and options. It can also help determine important capital allocation decisions, ensuring that Entertainment's robust cash flow is used efficiently. A capital shortfall has prevented Sony from taking advantage of attractive acquisition opportunities; instead, the Company has resorted to joint ventures and costly loans to engage in strategic transactions like those in music publishing (i.e. EMI). Our research has confirmed media reports depicting Entertainment as lacking the discipline and accountability that exist at many of its competitors. In light of this track record, it seems difficult to argue that Entertainment would not be strengthened by the transparency that comes with public reporting, an active media analyst community evaluating financial performance regularly, and an expert Board with strongly aligned incentives.



We understand past Sony management teams have considered a complete spin-off of Entertainment, but concluded that the potential for synergies outweighed the obvious value that would result. We respectfully disagree with any suggestion that listing a minority stake in the Entertainment division would curtail opportunities for cooperation. While we trust management's judgment that this theoretical opportunity is ripe, it remains an unfulfilled aspiration twenty-four years after the acquisition of Columbia Pictures. Shareholders should not have to wait any longer. We support efforts to create an integrated Sony ecosystem but must not forget that today the Company's most valuable untapped synergies lie within Entertainment itself.

While the transaction we have proposed is not a panacea, it will provide a necessary organizational apparatus to streamline an overly cumbersome corporate structure and allow each company to *focus* on its strengths without sacrificing potential alliances. We encourage management and the newly-appointed Board members to maintain the brisk pace of change you have recommended. Indeed, Sony has an opportunity to serve as a shining example of how structural reforms, the "Third Arrow" of Prime Minister Abe's economic plan, can be implemented successfully through constructive shareholder engagement.



Although we have not yet been asked to discuss our ideas with the Company's investment bankers or Board, we would like to do so promptly. We hope that after seriously considering the merits of our proposal, Sony's Board will share the enthusiasm that other shareholders have resoundingly expressed for it. We can think of no better opportunity for you and the Board to demonstrate real commitment to your declaration that "Sony Must Change."

Sincerely,

Daniel S. Loeb
Chief Executive Officer

DAN LOEB    SONY    THIRD POINT

PREVIOUS
Morning MoneyBeat Asia: Like, Chill Out

NEXT
REITS in Hong Kong, Singapore Lose Their Allure

MONEYBEAT HOME PAGE

Email    Print

## Don't Miss

[?]



Charles Schwab: Biggest Mistake Investors Make



Intermittent Fasting: Better for the Waistline and Brain

---

3   First-Year Law School Enrollment Lowest Since 1977


4   The 1% Secret to Getting Richer


5   'The Voice' Finale: Who Will Win?




Show 5 More

### The MoneyBeat Team

 Stephen Grocer Editor

 Phillipa Leighton-Jones European Editor

 Paul Vigna Reporter New York

 Steven Russolillo Reporter New York

 David Benoit Reporter New York

 Isabella Steger Reporter Hong Kong

 Gillian Tan Reporter Sydney

 David Cottle Reporter London

### MoneyBeat Columnists

 Ronald Barusch Dealpolitik

 Francesco Guerrera Current Account

 David Weidner Writing on the Wall

 Jason Zweig The Intelligent Investor

 Michael J. Casey Horizons

 Spencer Jakab Ahead of the Tape

 E.S. Browning

Simon Nixon

00401

EX. W



SOCIAL SECURITY ADMINISTRATION
PO BOX 33018
BALTIMORE MD 21290-3018

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

TO BE OPENED BY ADDRESSEE ONLY, UNDER PENALTY OF LAW

PRESO
FIRST-CL
POSTAGE &
SOCIAL S
ADMINIST
PERMIT I

000104727  01 AV   0.324  A1 R 0412
STEVEN K. WILSON BRIGGS
4322 CHICO AVE
SANTA ROSA  CA  95407-6506

00403

# CALIFORNIA

### DRIVER LICENSE
CLASS: C

EXPIRES 09-24-13



STEVE KENYATTA
WILSON-BRIGGS
4322 CHICO AVE
SANTA ROSA CA 95407

SEX:M    HAIR:BLK    EYES:GRN
HT:5-10  WT:178  DOB:09-24-68

12/10/2008 SSS 07  FD/13

Name
STEVE WILSON BRIGGS

Acct.
No.

Signature

**Member Identification Card**
Present This Card When You Conduct Business Here.

**Platinum Check Card**

WELLS
FARGO



4342

CUSTOMER        VALID
SINCE           THRU

DEBIT
**VISA**

Member
Emergency Road Service
**(800) 222-4357**

CLUB CODE    MEMBERSHIP NUMBER
MEMBER SINCE    VALID THRU
2013        JUL 6 2014
STEVE K WILSON BRIGGS

00404

SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR

PASSPORT
PASSEPORT
PASAPORTE



UNITED STATES OF AMERICA

Code / Codigo        Passport No. / No. du Passeport / No. de Pasaporte
USA

Surname / ... / ...
BRIGGS
Given Names / Prénoms / Nombres
STEVE KENYATTA
Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA
Date of birth / Date de naissance / Fecha de nacimiento
24 Sep 1964
Place of birth / Lieu de naissance / Lugar de nacimiento
CALIFORNIA, U.S.A.

Sex / Sexe / Sexo
M

Date of issue / Date de délivrance / Fecha de expedición
04 Aug 2009
Date of expiration / Date d'expiration / Fecha de caducidad
03 Aug 2019

Authority / Autorité / Autoridad
United States
Department of State

Endorsements / Mentions Speciales / Anotaciones
SEE PAGE 27

USA

P<USABRIGGS<<STEVE<KENYATTA<<<<<<<<<<<<<<<<<<
JUSA6409247M1908033230761636<287278

00405

Official Business
Penalty for Private Use, $300

95407

 Department of the Treasury
**Internal Revenue Service**
Fresno, CA 93888-0010

PRE
FIRST-
POSTAGE

PERM

319807.449858.1497.034 1 AV 0.324 863



STEVE K  WILSON-BRIGGS
4322 CHICO AVE
SANTA ROSA   CA   95407-6506224

319807

---

SR 12 (REV. 11/2003)

# *DEPARTMENT OF MOTOR VEHICLES*
*P.O. BOX 942884*
*SACRAMENTO, CA 94284-0884*



PRESORTED
FIRST-CLASS



021210+1609C3254539WIL051609
STEVE KENYATTA WILSONBRIGGS
4322 CHICO AVE
SANTA ROSA, CALIFORNIA 95407

AGOWN31  95407

00406

Store    iPod + iTunes    Mac    QuickTime    Support    Mac OS X

Address Book    Bookmarks    HomePage    iCards    Help    Log Out    iokon

Mail  Compose  Delete  Reply  Reply All  Forward  Add Sender  Print Ready

**Move Message To:**

Logout

↑ ↓  13 of 40 in INBOX

**From:** JetBlue Reservations <jetblue.190480.7903.25430214@reply.jetblue.com>

**To:** ~~████████████~~

**Date:** Sat Jun 04, 2005 08:18:36 PM PDT

**Subject:** Your JetBlue E-tinerary

*[handwritten:]* Dcl to California from NYC June 21 2005


Kiosk Check-in

# Blue
## AIRWAYS·

### You're all set!

Thanks for choosing JetBlue. Attached is the booking confirmation for your trip. Please review the confirmation carefully as it includes some important information about flying with us. Although you do not need this document to check in, we recommend that you print it out for your own reference.

Change your flights online and save $5. It's fast and easy.

Find out what's showing on our DIRECTV® service. Print a program guide for your flight.

You can also access our Real-Time Flight Tracker to check the arrival or departure status of your trip.

Do-it-yourself check in. Now customers traveling without checked baggage have two new ways to check in for their flights. At the airport, take advantage of our easy-to-use self-service kiosks to check in, select or change seat assignments and print boarding passes. Or, from your home or office, check in using our new Online Flight Check-in tool, which is available up to 24 hours, but no less than 90 minutes, prior to your scheduled departure time.

Extra! Extra! Legroom! Those who would prefer two extra inches of legroom should pick seats between rows 11-26. Remember to pick the seat that's right for you. There's not a bad seat in the house.

Please note: JetBlue's terminal at JFK now offers great new food and dining options. There are delicious choices whether you want to sit and relax or grab and go. Soon even more choices will be available, so we appreciate your patience during the construction period.

We look forward to welcoming you aboard.

### Flight Summary

**STEVE WILSON BRIGGS**
600 W. 218th St. # 1-B
New York, NY 10034

Confirmation Number: **KK54CX**
(change flights)
Date Booked: 04 Jun 05
Modified: 04 Jun 05
Booked By: 96641

| | Name | TrueBlue Number |
|---|---|---|
| Welcome Aboard: | STEVE WILSON BRIGGS | |
| | ~~████████~~ | |

| Date | Flt | Depart | Arrive | Stops |
|---|---|---|---|---|
| 21 Jun 05 | 93 | New York, JFK 07:05am | Oakland, CA 10:15am | 0 |

Total for 2 customers

| | | |
|---|---|---|
| Fare: | 295.82 |
| Tax: | 28.58 |
| Security Fee: | 5.00 |
| Passenger Facility Charge: | 6.00 |
| **Total:** | **$335.40** |

00407



**PASSENGER TICKET AND BAGGAGE CHECK**
SUBJECT TO CONDITIONS OF CONTRACT

ISSUED BY
ATA AIRLINES

PASSENGER RECEIPT

DATE OF ISSUE: 06SEP05

ISS. AGENT ID: SFO 4HT

PLACE OF ISSUE: SAN FRANCISCO

NAME OF PASSENGER NOT TRANSFERABLE
WILSON BRIGGS/STEVE

**NOT VALID FOR**
**TRANSPORTATION**

PSGR TICKET 3662113564773

ATA AIRLINES
REFUNDABLE ONLY WITH
RELATED FLIGHT CPN
RETAIN THIS RECEIPT
THROUGHOUT YOUR
JOURNEY

FOR CONDITIONS OF
CONTRACT SEE
PASSENGER TICKET AND
BAGGAGE CHECK

NOT VALID FOR TRAVEL

SFOMDW-T2 MDWLGA-T2
01    OVERWEIGHT 51-70 LBS

ISSUED IN EXCHANGE FOR    25.00

PNR CODE: MUDNP2/T2

FARE
USD    25.00

EQUIV FARE PAID    FORM OF PAYMENT
FP CASH

TAX    NA
TAX    NA
TAX    NA    36600939639444    0 366 2600226882 2
TOTAL
USD    25.00

---

**⫾UNITED**    DEPARTURE MANAGEMENT CARD

WILSONBRIGGS/STEVE

CONFIRMED IN    UNITED ECONOMY
BP CATEGORY:    BP2
TIME ADDED TO DM:    1246
UA577    20-DEC-05
FROM:    CHICAGO/OHARE
TO:    SACRAMENTO
GATE:
BOARDS AT:    450P
DEPARTS AT:    520P

DOCS CHECKED:    N    BAGS CHECKED:    N

RECLOC:    N57R58
AGENT ID:    RLGAU03
037 2160429681 2

ETKT    SSRS: NONE

---

**⫾UNITED**    ETKT    PASSENGER RECEIPT
DUPLICATE    1579452645
A24639860
01WZ    19DEC05
WILSONBRIGGS/STEVE JMLW64/UA SA14UNL    0
""NOT VALID FOR ""    THIS IS YOUR RECEIPT
""TRANSPORTATION""    WZ2WEB
M WREF-CHG100PLUSFAREDIF-/CXL BY FLT DATE OR NOVALUE
XXXXXXXXXXXX8020
XT 6.40ZP 5.00AY 9.00XFSF04.50RD4.5

USD125.11
US9.39
XT20.40
USD154.90    ***********    0 016 1579452645 2

**⫾UNITED**
1579452645
WILSONBRIGGS/STEVE
SFOORDUA 906 S 3JAN
ORDLGAUA 692 S 3JAN
********************
********************
********************
********************
********************
********************
********************
********************
NOT VALID FOR TRAVEL
0 016 1579452645 2

00408



00409

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
MICHAEL J. KUMP (SBN 100983)
  mkump@kwikalaw.com
GREGORY P. KORN (SBN 205306)
  gkorn@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for Defendants
NEILL BLOMKAMP, SONY PICTURES
ENTERTAINMENT INC., TRISTAR
PICTURES, INC., MEDIA RIGHTS CAPITAL
II, L.P., and QED INTERNATIONAL, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

STEVE WILSON BRIGGS,

Plaintiff,

vs.

NEILL BLOMKAMP; SONY PICTURES
ENT., INC., TRISTAR PICTURES, INC.,
MEDIA RIGHTS CAPITAL, and QED
INTERNATIONAL,

Defendants.

Case No. CV 13-4679-PJH

**DECLARATION OF NEILL BLOMKAMP
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Date:     September 3, 2014
Time:     9:00 a.m.
Crtrm.:   3

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## DECLARATION OF NEILL BLOMKAMP

I, Neill Blomkamp, declare as follows:

1.      I am a Defendant in the above-entitled action.  I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

2.      I am a writer and director of motion pictures.  I am originally from Johannesburg, South Africa, where I lived for eighteen years before moving to Vancouver.  As a teenager, I began pursuing 3D animation and design, which I studied further in film school.

3.      Between 2004 and 2007, before I made my first feature film, I produced a series of short films. *Tetra Vaal* was a short film about a third-world robotic police force. *Alive in Joburg* was a faux documentary about extraterrestrials marooned in Johannesburg. *Tempbot* was a comedic short about a robotic worker.  Each of these short films integrated computer animation with live action, a style for which I have become known.

4.      My first feature film was *District 9*, which I wrote and directed. *District 9* was inspired by my short film *Alive in Joburg*. *District 9* tells the story of extraterrestrials who are marooned in South Africa when their spacecraft becomes disabled, and who are confined to a camp outside of Johannesburg called "District 9."  The film explores themes of racism and segregation while telling the story of a lead character, who transforms into an alien after coming in contact with an extraterrestrial substance. *District 9* received an Oscar nomination for Best Picture, and I earned an Oscar nomination for Best Adapted Screenplay along with Terri Tatchell.

5.      *Elysium* was the second feature film that I wrote and directed.  I created *Elysium* in the same way I create my other films.  I am a "visual" screenwriter and filmmaker, in that I start with visual concepts and build from there, which is what I did with *Elysium*.  Before I wrote a screenplay for the film, I spent time thinking about and developing the visuals that I wanted to use in the film.  During that process, for example, I reviewed several images of space stations, some of which were in the shape of a circular "torus," including a decades-old concept that I found known as the "Stanford torus."  The idea of a utopian space station, which is referred to in *Elysium* as "Elysium" or "the torus," was inspired by these images.

4:13-CV-04679-PJH

6. In addition to the visuals I wanted to use in *Elysium*, I also wanted to continue to explore in *Elysium* some of the themes from my earlier works, including the themes of racial and class segregation featured in *District 9*, and the notion of a robotic police force from my earlier films.

7. I have been informed that the plaintiff in this lawsuit wrote a screenplay, and that he accuses me of finding that screenplay on a website called triggerstreet.com and copying it in writing *Elysium*. That accusation is false and offensive.

8. Before this lawsuit was filed, I had never heard of the website triggerstreet.com. I never visited that website and have not to this day. I did not obtain a copy of the plaintiff's screenplay on that site or anywhere else. No one provided me with a copy of the plaintiff's screenplay, nor did anyone discuss plaintiff's screenplay with me or describe it to me in any way whatsoever. Nothing in *Elysium* was based in any way upon plaintiff's screenplay, which still to this day I have not read.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 28, 2014, at Vancouver, British Columbia, Canada.

Neill Blomkamp

1  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
    MICHAEL J. KUMP (SBN 100983)
2    mkump@kwikalaw.com
    GREGORY P. KORN (SBN 205306)
3    gkorn@kwikalaw.com
    808 Wilshire Boulevard, 3rd Floor
4  Santa Monica, California 90401
    Telephone: 310.566.9800
5  Facsimile: 310.566.9850

6  Attorneys for Defendants
    NEILL BLOMKAMP, SONY PICTURES
7  ENTERTAINMENT INC., TRISTAR
    PICTURES, INC., MEDIA RIGHTS CAPITAL
8  II, L.P., and QED INTERNATIONAL, LLC

9

10           **UNITED STATES DISTRICT COURT**

11     **NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)**

12

13  STEVE WILSON BRIGGS,        Case No. CV 13-4679-PJH

14        Plaintiff,

15     vs.             **DECLARATION OF JEFF ROVIN IN**
                         **SUPPORT OF DEFENDANTS' MOTION**
16  NEILL BLOMKAMP; SONY PICTURES  **FOR SUMMARY JUDGMENT**
    ENT., INC., TRISTAR PICTURES, INC.,
17  MEDIA RIGHTS CAPITAL, and QED    Date:      September 3, 2014
    INTERNATIONAL,              Time:     9:00 a.m.
18                        Crtrm.:  3
          Defendants.
19

20

21

22

23

24

25

26

27

28

                                   4:13-CV-04679-PJH
                      DECLARATION OF JEFF ROVIN

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## DECLARATION OF JEFF ROVIN

I, Jeff Rovin, declare as follows:

1.     Unless stated on information and belief, I have personal knowledge of the following facts, and I could and would testify competently to these facts under oath.

2.     I have been retained by Kinsella Weitzman Iser Kump & Aldisert LLP on behalf of Defendants in the above-referenced action to conduct an analysis and to provide expert testimony concerning Plaintiff's allegation that the feature film *Elysium* is substantially similar to his screenplay entitled *Butterfly Driver*.

3.     Attached hereto as **Exhibit 3** is a true and correct copy of the Expert Report of Jeff Rovin dated March 14, 2014 (the "Report").  I hereby incorporate by reference the Report as if fully set forth herein and adopt it as my testimony in this Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 29, 2014, at New York, New York.

_____
Jeff Rovin

00414



# EXHIBIT 3

00415

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
MICHAEL J. KUMP (SBN 100983)
  mkump@kwikalaw.com
GREGORY P. KORN (SBN 205306)
  gkorn@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for Defendants NEILL BLOMKAMP,
SONY PICTURES ENTERTAINMENT INC.,
TRISTAR PICTURES, INC., MEDIA RIGHTS
CAPITAL II, L.P., and QED
INTERNATIONAL, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| STEVE WILSON BRIGGS,<br><br>Plaintiff,<br><br>vs.<br><br>NEILL BLOMKAMP; SONY PICTURES ENT., INC., TRISTAR PICTURES, INC., MEDIA RIGHTS CAPITAL, and QED INTERNATIONAL,<br><br>Defendants. | Case No. CV 13-4679-PJH<br><br>**EXPERT REPORT OF JEFF ROVIN** |

1

00416

## I.    INTRODUCTION AND SUMMARY OF OPINION

I have been retained as an expert witness on behalf of Defendants Neill

Blomkamp, Media Rights Capital II L.P., Sony Pictures Entertainment Inc., TriStar

Pictures, Inc. and QED International LLC ("Defendants") in the matter of *Steve*

*Wilson Briggs v. Neill Blomkamp, et al.*, Case No. 13-4679-PJH (N.D. Cal.) (the

"Action").  My compensation is $500 hourly.

I have been asked to analyze and compare Plaintiff's unproduced dramatic

screenplay *Butterfly Driver* (originally known as *Uberopolis: City of Light*) and

Defendants' motion picture *Elysium* and to opine whether the common elements in

the works, if any, are elements that are present in "prior art" literature and film.

Stated another way, I have been asked to assess whether the elements in Plaintiff's

screenplay which Defendants allegedly copied are common elements in prior

works or are *scènes à faire*.

As discussed at length below, my opinion is that if *Butterfly Driver* and

*Elysium* share anything it all, it is nothing more than a few bare ideas that could be

described as similar only when viewed at the broadest, most general level of

comparison.  All of the ideas that Plaintiff contends were copied, moreover, are

ideas that are common in the prior art (literature, films, television, comic books)

2

00417

especially in the science fiction genre, and that are expressed differently in the two works.

## II.    QUALIFICATIONS

I have supported myself entirely as a professional writer since 1971, from the age of nineteen.  I have written dozens of non-fiction and encyclopedic books on film history, fantasy and science fiction, spaceships, and pop culture.  Among my many books are *A Pictorial History of Science Fiction Films* (1975), the science fiction saga *The Transgalactic Guide to Solar System M-17* (1981), *The Laserdisc Film Guide* (1993), *Aliens, Robots, and Spaceships* (1995) and many others. I recently sold the fiction trilogy *EarthEnd* to Simon & Schuster: it will be the inaugural novel of their new Simon451 science fiction imprint. My magazine publications include creating and editing the Atlas Comics line – several titles of which were set in dystopian futures – and serving as the exclusive film columnist for the science fiction magazines *Analog* and *Omni*.  I have also edited licensed science fiction film souvenir magazines, including *Moonraker* and *Alien*.

I am a member of seven professional authors' guilds and have written 14 national bestsellers, including 12 novels on the *New York Times* bestseller list.  I have also adapted numerous science fiction and adventure motion picture screenplays to novel form ("novelization") including *The Re-Animator*, *The Game*,

00418

and *Broken Arrow*. A copy of my CV listing my professional activities and publications is attached to this report as Appendix 2.

During the past five years I have provided legal testimony in a variety of legal matters. A listing of these cases is provided in Appendix 3.

## III.  MATERIALS CONSIDERED

To form my opinion, I have watched the film *Elysium* and read Plaintiff's unproduced screenplay and Amended Complaint. I have also referred to the additional works discussed and shown in this report, a list of which is attached as Appendix 1. All of the images contained in this report from prior works are true and correct copies of images that I culled from films, books, and other prior art materials as identified in my report.

## IV.  OVERVIEW OF THE PARTIES' WORKS

The following is a brief summary of the plots of Plaintiff's *Butterfly Driver* and Defendants' *Elysium*:

*Butterfly Driver*

Arlo Grainer is a 45 year-old hover-jet operator, volunteer cop, and parent at an unspecified time in the future. A former war hero, Grainer is hired to take war exile Tamara on a risky "butterfly run," smuggling an A-cell (Antimatter cell)

4

prototype that will prevent many deaths from traditional fuel pollution. When police attack Arlo's transport, Tamara is killed and Arlo is falsely imprisoned for her kidnap and death.

Concerned for the declining health of his seven-year old daughter, Arlo escapes from the Earth prison and runs amok in New York City, seeking a ride to the ultra-modern floating city Uberopolis, slangily referred to as "Sky Town." Arlo's goal is to obtain an Earth-manufactured medicine called Drexlerin-2. The drug is temporarily being stored in Uberopolis to keep it safe from piracy, after which it will be returned to Earth for use by the population. Arlo makes his way to Uberopolis searching for the drug. Unsuccessful in these efforts, Arlo contacts the developer of Uberopolis, President Drexler, and proposes a deal: he will trade the potentially valuable A-cell for Drexlerin. A showdown between the two is broadcast to Earth television by security cameras throughout Uberopolis. Arlo exposes the fact that Drexler is, in fact, a murderous war criminal named "Midland" who killed Drexler, stole his identity, and inherited his wealth. Arlo causes a diversionary riot by releasing several prisoners on Uberopolis, which enables him to obtain the medicine he needs. He heads home, saving his daughter and returning to his life as a hover-jet pilot.

5

00420

*Elysium*

Elysium is a torus (donut-shaped) habitat in Earth orbit in the year 2154. It is a bucolic home to the wealthy who seek refuge from a crowded, dilapidated world patrolled by soulless robots. Max Da Costa, 36, is a paroled thief who lives in ruined Los Angeles and works for the Armadyne factory that builds those robots. After suffering a lethal dose of radiation, Max's only hope for survival is to reach one of the "Med-Bays" located exclusively on Elysium. Spider, a smuggler, agrees to help Max reach Elysium if Max will download financial data from the brain of John Carlyle, CEO of Armadyne. Max has an exoskeleton grafted to his body to give him superhuman physical abilities and a skull-penetrating brain-interface to upload data. Intercepting Carlyle, Max downloads the information. Max is wounded during the adventure and goes to the home of his friend Frey – a nurse – whose daughter Matilda is dying of leukemia.

On Elysium – where all the robot police carry firearms – Secretary of Defense Delacourt wants to become President, a goal Carlyle was helping her to achieve by creating a program to give her control over Elysium's computers. That override was stored in Carlyle's brain and was dumped into Max's brain during the download. When Max goes back to Spider, they realize that this program can be used to make everyone on earth a citizen of Elysium – and, thus, eligible for advanced medical care. Ultimately, Max, Frey, Matilda, and Spider rocket to

6

Elysium where Delacourt is slain and Max is able to activate the new computer program. Though he perishes in the process, Matilda is cured by a Med-Bay and Elysium's reprogrammed computer sends medical ships to Earth to begin curing the habitat's "new citizens."

## V.    ANY SHARED ELEMENTS BETWEEN PLAINTIFF'S AND DEFENDANTS' WORKS ARE *SCENES-A-FAIRE* OR GENERIC IDEAS

As the summaries above reveal, *Butterfly Driver* and *Elysium* are two entirely different stories.  A detailed comparison of the plots, dialogue, characters, settings, and themes of these works, such as is performed under the "Extrinsic Test" for copyright infringement, proves that *Butterfly Driver* and *Elysium* are completely dissimilar. Indeed, the only way Plaintiff can identify similarities is by distilling the works into abstract elements, which he scrubs of detail and context before making comparisons. This exercise could be performed with any two films, particularly those in the somewhat formulaic big-budget action/adventure and science fiction genre, to create the false illusion of similarity.  That is what Plaintiff has done.

Here, the crux of Plaintiff's infringement claim is that *Butterfly Driver* and *Elysium* allegedly share these settings and plot elements: (1) a "dystopian" Earth set in the future with social and income inequality; (2) a satellite space station that

00422

orbits Earth; (3) the aforementioned satellite as a refuge for the "super-rich" who are isolated from the poor masses living on Earth; (4) the satellite requires special identification to enter; (5) the satellite enjoys advanced medical resources which are unavailable to the masses on Earth; (6) the protagonist travels to the satellite to obtain medical help that is otherwise unavailable on Earth; (7) the protagonist is prone to excruciating headaches; (8) the protagonist has a "keepsake necklace" that is critical to the character; and (9) the "villain" in the story has been "genetically reprogrammed" to appear younger than he or she is.

As discussed in the sections that follow, all of these elements are basic ideas that can be found extensively throughout the prior art; to the extent that they are shared between the two works they are *expressed* very differently; and in some instances it is incorrect to state that these general ideas actually appear in both *Butterfly Driver* and *Elysium*.

1.    A Dystopian Earth With Social And Income Inequality

Plaintiff alleges that both works present a "Poor Dystopic Earth," which is a "unique setting" (Amended Complaint, p. 16).  "Dystopia" is a word coined by British philosopher John Stuart Mill in 1868 to describe the flip side of utopia. In fiction, dystopia is typically the result of military, political, and economic

8

00423

oppression that results in dehumanization, often accompanied by poverty and disease.

A dystopic future is an exceedingly common theme in the prior art, and science fiction has often depicted dystopian futures in which there is a wide separation between the wealthy and the poor. This is a theme that frequently drives the plot. As the Tramp says at the beginning of the classic 1971 film *A Clockwork Orange*, "What sort of a world is it at all? Men on the moon, and men spinning around the earth, and there's not no attention paid to earthly law and order no more."

In literature, one of the first dystopian novels to address the idea of conflict arising from financial disparity was H.G. Wells' *The Time Machine* (1895), in which the author spoke unenthusiastically of a future in which "the exclusive tendency of richer people—due, no doubt, to the increasing refinement of their education, and the widening gulf between them and the rude violence of the poor—is already leading to (disaster)" (p. 63) and "(t)he rich had been assured of his wealth and comfort, the toiler assured of his life and work" (p. 87).

This dim view of tomorrow was followed by Jack London's *The Iron Heel* (1907), in which the tyrannical Oligarchy sends the middle class into poverty and then uses the poor to build Asgard, a city for the rich. The Oligarchy also frees

9

well-heeled men of science for the task of "probing space for the stars and the laws of the stars" (p. 8).

This social divide has also been expressed in novels like Aldous Huxley's *Brave New World* (1932) — in which people live in strictly enforced castes – and in Margaret Atwood's *Oryx and Crake* (2003), whose wealthy dwell in compounds inaccessible to the poor.

In films, poverty and wealth clash in the science fiction masterpiece *Metropolis* (1927), where the rich live in gleaming towers and the poor dwell underground with revolution the inevitable result (EXHIBITS 1 and 2).



10



EXHIBITS 1 and 2

Nearly a half-century later, science fiction was still exploiting this theme in films like *Soylent Green* (1973) with smoggy, overcrowded, dilapidated streets of the future depicted in sharp contrast with the sterile, elegant abodes of the wealthy (EXHIBITS 3 and 4).

11

00426





EXHIBITS 3 and 4

Following the success of *Soylent Green*, science fiction films and TV series increasingly exploited the financial divide. The animated film *Rock and Rule* (1983) is set in Earth's post-apocalyptic future. In the biggest city, Nuke York, the

12

00427

villain lives in splendor within his sleek skyscraper, while below the common

citizens scrape by in a dank city (EXHIBITS 5 and 6).





EXHIBITS 5 and 6

13

00428

That same year, 1983, in the film *Demolition Man,* society of the future has become a utopia of good behavior and clean living. However, rebels dwell in the sewers to escape and overturn the repressive society (EXHIBITS 7 and 8).





EXHIBITS 7 and 8

14

00429

In the animated TV series *Futurama* (1999-2013), humans live in splendor above-ground while the mutated, sickly and less fortunate live underground, in slums (EXHIBITS 9 and 10). These are but a few of the many examples that draw on the theme of economic disparity.





EXHIBITS 9 and 10

15

Clearly, even if Plaintiff's and Defendants' works shared the idea of a dystopian Earth, it is a common and unoriginal theme. But they do *not*, in fact, share this element. *Elysium* is uncompromising in its depiction of a dystopian Earth with extreme poverty and shantytowns, drug and alcohol abuse, and rampant unsanitary conditions. An opening scene shows crumbling, burning skyscrapers (EXHIBIT 11). Robot police abuse the populace and there is little work or little reason *to* work. The chasm between rich and poor cannot be crossed as only extremely wealthy people are permitted to dwell on Elysium.



EXHIBIT 11

By contrast, in Plaintiff's screenplay, citizens on Earth enjoy "100 percent employment" and "almost no crime" (screenplay, p. 4). Plaintiff describes Earth as being overpopulated (15 billion people) with "pollution and congestion," but not

16

00431

unlivable.  In the screenplay, New York's Manhattan retains the recognizable contours and personality of a major city: there are upscale areas and slums, apartment complexes, shopping malls, subways, and the like.  Citizens drive sky-cars, sky-cycles, and hover-jets using freeways in the sky.

Plaintiff's vision of Earth is futuristic, but not dystopian.  In that respect, Plaintiff clearly draws upon past science fiction.  Personal flying vehicles, much like those described by Plaintiff, were a staple of the 1962-3 cartoon series *The Jetsons*, the 1965 TV series *Thunderbirds*, and many others (EXHIBITS 12 and 13).

 

EXHIBITS 12 and 13

Flying police vehicles as in Plaintiff's work are also a staple of science fiction, dating back to the long-running comic book *Magnus Robot Fighter 4000 A.D.* (1963) #1 (EXHIBIT 14), which is also set in the future and features a hero

17

00432

who, like Plaintiff's Arlo, is skilled in martial arts. *Magnus Robot Fighter 4000 A.D.* is, in fact, a seminal work in many ways, not the least of which is its depiction of a hero who frees an oppressed populace of the future and gets them much-needed medical care (EXHIBIT 15) (#7, 1964).



EXHIBIT 14



EXHIBIT 15

18

00433

I created the comic book *Planet of Vampires* (1974) in which police ships fly over a war-ravaged earth that is suffering extreme poverty (EXHIBIT 16). Heroes who had been in space for an extended period return to Earth to help the oppressed masses.



EXHIBIT 16

19

Plaintiff's vision of future Earth also shares a great deal with the film *Blade Runner* (1982), in which Spinners – flying police cars – pass over a seedy, overpopulated Earth of the future (EXHIBIT 17). This dismal future also features off-world colonies worked by slave labor, as in Plaintiff's screenplay.



EXHIBIT 17

Plaintiff's expression of a futuristic Earth is vastly different than *Elysium's* expression of a ruined and hopeless dystopian planet policed by harsh, unfeeling robots.  At most, the two works coincidentally share the idea of an overpopulated and polluted planet, where wealthy individuals live separate from the masses. This

20

00435

idea is common in the prior art to the point of being a cliché.  It is not a "unique" creation of Plaintiff's as the Amended Complaint alleges (p. 8, paragraph 47).

### 2.    A Satellite Orbiting Earth

 Plaintiff alleges that a second "unique setting" of *Butterfly Driver* is a "satellite for the super-rich, orbiting Plaintiff's dystopic future-Earth" (Amended Complaint, p. 16).  Plaintiff alleges that he is "aware of no other story, prior to *Butterfly Driver*, featuring a gigantic man-made super satellite with giant aquatic and forested areas, great medical technologies for the rich, and other aspects" of the satellite world he calls "Uberopolis" (Amended Complaint, p. 16).

In fact, as discussed in this and the following two sections, there are countless prior works which feature satellite stations with "aquatic and forested areas" and "great medical technologies for the rich."  Defendants' satellite station in *Elysium* was obviously inspired by one such example, the "Stanford torus" (see EXHIBITS 25 - 28, below).

While the idea of space travel was popularized by the likes of Jules Verne and H.G. Wells in the 19th century, the "space station" – a habitat that didn't travel to or from a destination but remained in planetary orbit – was first proposed by engineer Herman Potočnik in his 1928 book *Das Problem der Befahrung des*

21

*Weltraums - der Raketen-Motor* (*The Problem of Space Travel - the Rocket Motor*) (EXHIBIT 18).



EXHIBIT 18

Potočnik's work established the familiar "space wheel" look that was embraced by science fiction films such as *The Conquest of Space* (1955), Japan's *The Mysterians* (1957), *2001: A Space Odyssey* (1968) – in which shuttles routinely travel from Earth – and in novels like *Earthwreck* (1975) by Thomas N.

22

Scortia, in which space stations represent salvation from a ravaged Earth. While adhering to the general fundamental design espoused by Potočnik, each space station is different in specific look and function (EXHIBITS 19-22).





23





EXHIBITS 19 - 22

00439

These space stations were typically upscale environments populated by the military, scientists, or politicians. There was rarely a trace of squalor and never a hint of poverty.

The "space station" evolved into the more sophisticated "space habitat."

In literature, the most celebrated artificial space habitat was introduced in author Larry Niven's *Ringworld* (1970) and its many sequels (EXHIBITS 23 and 24).

 

EXHIBITS 23 and 24

25

This massive space habitat was a harbinger of the "second generation" of space stations: the Stanford torus, which emerged from a 1975 NASA study conducted at Stanford University.  As mentioned above, the torus is doughnut-shaped ring which attempts to simulate the configuration and conditions of a planet-based colony.  Shown in the images below (EXHIBITS 25 and 26), the Stanford torus envisioned a lush habitat with "aquatic and forested areas" – exactly what Plaintiff incorrectly claims as his own unique creation.



26



EXHIBITS 25 and 26

I am informed that *Elysium* director Neill Blomkamp says he was inspired by the Stanford torus when conceiving his film. That claim is borne out by comparing the torus visualizations above (EXHIBITS 25 and 26) and the *Elysium* images below (EXHIBITS 27 and 28).

00442





EXHIBITS 27 and 28

Further, as shown below, the exterior appearance of the satellite station in

*Elysium* is also consistent with the Stanford torus and other prior works (EXHIBIT

29).

28



EXHIBIT 29

In summation, the idea of a satellite space station orbiting the Earth, as shown in *Elyisum*, is common in science fiction.

Additionally, Plaintiff's screenplay does not express the idea of a satellite habitation in the same way as depicted in *Elysium*. Plaintiff categorizes Uberopolis as "a giant satellite world" without describing whether it's a satellite like the moon (perhaps built from harvested lunar rock or a captured asteroid), a space station, or something else. In any case, it is never depicted as a donut-shaped space station as in *Elysium*.

The dimensions and altitude of each habitat also appear to vary greatly. Uberopolis is described as being one thousand miles from earth and three miles wide (screenplay, p. 3). Elysium is large enough to be conspicuously visible and

29

quickly reachable from Earth, suggesting it is both closer and larger (see EXHIBIT 29, above).

### 3. The Satellite Serves as a Refuge For The Rich

Plaintiff claims that it was his unique idea to have a satellite world that serves as a refuge for the "super-rich," a concept he alleges Defendants must have copied (Amended Complaint p. 8, paragraph 46). The idea of the rich living in a refuge away from the poor is common in literature and film (e.g., the Jack London novel, *Metropolis*, *Soylent Green*), and the specific idea of a satellite world for the rich has been used in numerous prior works.

The early, outstanding example is Jack Vance's classic short story "Abercrombie Station" (1952). According to a "ferry" pilot shuttling an earth girl to space, the space station is exclusively inhabited by the rich "who wouldn't spit on the best part of an Earth girl" (p. 20). That does not deter the heroine, "a juvenile delinquent with million dollar ambitions" (p. 12-13). She wants to leave Earth proper, "A…black crumble of surface buildings (and) pallid roadways" (p. 14). To realize her dream she has to marry Abercrombie who, she is told, "suffers from…an incurable disease" (p. 13) (EXHIBIT 30).

30

00445



EXHIBIT 30

On television, the *Star Trek* episode "The Cloud Minders" (1969) sent

Captain Kirk and Mr. Spock to a planet where intellectuals and artists inhabit a

31

stratospheric utopian city, physically unattached to the planet, while everyone else labors in mines on the barren world (EXHIBIT 31).



EXHIBIT 31

The Christopher Stasheff novel *A Wizard in Bedlam* (1979) similarly features "a successful planetary colony – for the very rich" (EXHIBIT 32).

32

00447



EXHIBIT 32

Plaintiff's work was also predated by the A. Bertram Chandler novel *The Anarch Lords* (1981) in which the wealthy denizens of Liberia, in space, "had made that world a paradise of cheap labor…which included slavery" (back cover).

In its August, 1981 issue, the comic book *Heavy Metal* published the story "Paradise Lost" in which the pristine space habitat Earth 2 (populated with

33

skyscrapers, as in Plaintiff's later work) is "the artificial moon of Earth 1" (p. 38)

and features police-like robots as well as floating vehicles (EXHIBIT 33)



EXHIBIT 33

The idea of a wealth-oriented space station was also notably represented in

the novel *The Taking of Satcon Station* (1982) by Barney Cohen and Jim Baen,

about the space habitat known as "the Queen of the Sky" (p. 11), home to a

lucrative Exxon research division (p. 10). That same year, the science fiction comic

34

book *1994* #24 featured "the high roller pleasure satellite," an exclusive

playground for the wealthy (EXHIBITS 34 and 35)



EXHIBITS 34 and 35

In 1983, John Dalmas and Carl Martin published *Touch the Stars:*

*Emergence,* about wealthy individuals wanting to control space in order to control

35

Earth. As the hero thinks about the politics of wealth: "*A 'crowded planet,'* he mused. *It's not a matter of room. It's habitability and economics*" (p. 16). As in Defendants' *Elysium*, the politics of wealth creates a schism: "If this (is) backed by some of the world's richest, most powerful men, why was the world in such lousy shape?" (p. 19)  (EXHIBIT 36).



EXHIBIT 36

In Mack Reynolds's 1983 novel *The Lagrangists* (named for the point in space where a habitat can be constructed and "held in place" by the opposing pull of the moon and the Earth), characters discuss the obvious appeal of space habitats to "racial minorities, fed up with society as it is on Earth" while at the same time

36

00451

fearing that space stations are "on the expensive side....Where would a few hundred crackpots, or malcontents, raise the funds to build themselves a space colony?" (p. 145-6). By the time of Reynolds' second novel in the series, *Chaos in Lagrangia* (1984), the finished space habitat has "foothills (and) a quite sizeable lake" (p. 9) and streams (p. 11). Yet Reynolds once again worried about elitism: an officer states, "We demanded a minimum I.Q. of 130 and left the rest behind, Earthside" (p. 250) (EXHIBITS 37 and 38).

 

EXHIBITS 37 and 38

37

*Threshold* (1991) by Janet and Chris Morris is also about an elite space habitat (coincidentally, the same name as the space station in my *Phoenix* comic book) that is: "…paradise….Nowhere was dirt. Nowhere was squalor. Nowhere was pain or misery or want. Here beggars did not sit with their bowls beside your palace….Here it never rained or snowed, the wind never howled…a world of colored lights and turbo lifts and shiny electric cars…" (p. 24).

In another example of separating rich from poor in space, the 2004 comic book *Ministry of Space* was set on a space station where blue collar people of color were segregated from white citizens  (EXHIBIT 39).



EXHIBIT 39

38

There are many other examples. To name just a few: Robert Asprin's novel *Phule's Paradise* (1992) is set on Lorelei, a resort space station for the wealthy. The comic book *Kamandi At Earth's End* # 5, 1993, not only features a stratospheric habitat: it's called Sky City, very similar to Plaintiff's Sky Town (EXHIBIT 40).



EXHIBIT 40

The novels of the *Night's Dawn* trilogy (1996-99) by Peter F. Hamilton portray a dangerous future in which many humans live on giant, wealthy space stations such as *Eden*, which controls Earth's fuel source; the tax haven base *Tranquility*; and others. People who live on war-torn worlds dream of escaping into space (EXHIBITS 41 and 42).

39

 

EXHIBITS 41 and 42

On the 2002 Cartoon Network series *Spaced Out*, the wealthy Krach Industries builds a very exclusive space station on which only specially selected families are invited to settle. The habitat is located in earth orbit, accessible only by shuttlecraft.  There is also a sophisticated medical bay (EXHIBITS 43-45).

40

00455







EXHIBITS 43 - 45

41

00456

The enormously popular and enduring (since 1963) TV series *Dr. Who* aired the episode "End of the World" in 2005. In it, a satellite for the exclusive use of the wealthy was a vantage point from which to watch the destruction of Earth (EXHIBIT 46).



EXHIBIT 46

In the 2008 film *WALL-E*, a massive space settlement called "*Axiom*" carries generations of obese passengers who are meant to re-colonize a ruined Earth. They live a life of leisure, allowing the ship's automated systems to take care of them.

The videogame *Mass Effect* (2007; sequels in 2010 and 2012) features a pristine space station habitat called "*Citadel*" where the wealthy occupants are

42

served by all the conveniences and recreational facilities of a major city

(EXHIBITS 47 - 50).





43





EXHIBITS 47 - 50

44

Far from being new, Plaintiff's concepts of wealth and privilege in connection with space habitats have been a part of science fiction for decades. Moreover, while that idea is something Plaintiff's work and Defendants' work happen to share at a very general level, they do not express that common idea similarly.

Plaintiff's Uberopolis is open to anyone who can afford it. The screenplay describes advertisements which are shown on Earth to induce people to buy real estate off-world. People can book passage on the shuttles that travel regularly between Earth and Uberopolis, and Plaintiff's hero Arlo easily passes through customs and onto a shuttle to get to Uberopolis.

By contrast, in *Elysium*, the habitat is primarily rural, with no structures more than a few stories tall. Laborers do not live on Elysium; the "help" are all robots. Importantly, there is also a blatant class divide between Earth and the satellite world: the underprivileged are relegated to Earth with no hope of moving to Elysium or enjoying its health care benefits – other than by trying to reach it via illegal shuttles, which are shot down killing those onboard.

There are skyscrapers in Uberopolis and a large area for prisoners/workers who are not wealthy and are kept behind a great wall; this is not the case with

45

00460

Elysium. And while a trip to Uberopolis requires several hours, the journey to Elysium takes just 19 minutes.

Clearly, there is no expressive similarity between Elysium – an isolated space station that is completely cut-off from an impoverished, trapped citizenry of Earth – and Uberopolis, which is essentially a freely accessible condominium complex in the sky, one where such access is encouraged by the builders.

4.     Special Identification For Entering The Satellite

Plaintiff alleges that an "unusual aspect" of his satellite world is that "entering the satellite requires special identification" (Amended Complaint, p. 15). This is not unusual and naturally follows from the very idea of a space station: because consumable resources must be imported at great expense, access to fictional space stations is necessarily restricted to authorized and accredited occupants, and thus, by definition, exclusive.

Science fiction has repeatedly embraced this theme of exclusivity, as well as the *scènes à faire* idea of people trying to sneak onto such a space habitat. Murray Leinster's *Space Platform* (1953) presented the core elements that Plaintiff claims as proprietary – a space station that is resented by those who are not aboard, a base that not only represents wealth but is a fortified sanctuary removed from the threat of war hanging over Earth:

46

00461

"The Platform was guarded as no object in all history had ever been guarded. It was ironic that it had to be protected so, because it was actually the only hope of escape from atomic war. But that was why some people hated the Platform, and their hatred had made it seem obviously an item of national defense. Ironically that was the reason the money had been provided for its construction. But the greatest irony of all was that (its proponents) would in time become rich beyond envy" (p. 131-2) (EXHIBIT 51).



EXHIBIT 51

47

In my own comic book *Phoenix* # 1 (1975), only uniquely qualified individuals are permitted to board the earth-orbit space station *Threshold* (EXHIBIT 52).



EXHIBIT 52

In the comic book *Time Warp* (1980), the story "The Dimensions of Greed" posited that the wealthy will be the first to colonize space (EXHIBIT 53) only to be

48

followed by thugs from Earth who would infiltrate "legitimate" tours with forged

documentation (EXHIBIT 54).

 

EXHIBIT 53                              EXHIBIT 54

This exclusivity is seen repeatedly in films as well. To name just two

examples: in *2001: A Space Odyssey,* no one can board the space station without

passing through a sophisticated security checkpoint (EXHIBIT 55). And in the

1979 film *Moonraker*, James Bond leaves earth aboard a shuttle to infiltrate an

elite space station (EXHIBIT 56).

49



EXHIBIT 55



EXHIBIT 56

The prior art aside, this common idea of special identification required for entering a space station is depicted in *Elysium* but *not* in Plaintiff's screenplay. In *Elysium*, only a select few can travel openly to the space habitat, and for outsiders to make the journey they must employ mercenary-operated shuttles and steal air

50

00465

traffic codes. (This harks back to the 1983 "Star Wars" film *Return of the Jedi*, in which the heroes require a stolen code to land on the world Endor.)

In Plaintiff's script, as mentioned above, travel back and forth between Uberopolis and Earth is easily accomplished on regularly scheduled civilian shuttles. There is nothing in Plaintiff's screenplay about illegal aliens trying to secretly immigrate to the satellite using stolen codes. While the hero Arlo does need a fake ID to sneak on to Uberopolis, that is *only* because he's a fugitive.

In short, the idea of a space stations requiring special identification is common and, in any event, does not accurately describe Plaintiff's screenplay.

5.    Disparate Medical Resources On Earth And On The Satellite

Plaintiff alleges copying of the idea that a satellite for rich has advanced health care (Amended Complaint p. 8, paragraph 46). This, too, is a common idea in the prior art.

One expects that an advanced satellite would have advanced medical facilities. This is certainly the case in the prior art, such as the slick, sophisticated medical bays on the space station in the luridly-titled 1969 film *The Green Slime* (EXHIBITS 57 and 58) and in the 1972 film *Silent Running* in which robots perform surgery onboard the space station Valley Forge (EXHIBIT 59).

51





EXHIBITS 57 and 58

52

00467



EXHIBIT 59

Another example of exclusive, restorative medical technology appears in the science fiction classic *The Day The Earth Stood Still* (1951), in which a spaceship has a healing bed, run by the robot Gort, that cures a fatal bullet wound (EXHIBIT 60).



EXHBIT 60

53

The idea of sophisticated space station medicine is also the subject of the enduring James White novels known as the "Sector General" series about a large hospital-space station. The series began in 1957 and consists of a dozen major books that were published through 1999 (EXHIBITS 61 and 62) (See D, below, for more on this series).

 

EXHIBITS 61 and 62

54

In comic books, the only issue of *UFO and Alien Comix* (1977) published the story "Stars, My Salvation" which featured an alien being who uses a "cure-all" scientific device on his starship to heal himself, then brings it to war-torn earth to save humans (EXHIBITS 63 and 64).





EXHIBITS 63 and 64

55

Also in comic books, the Justice League of America (a DC Comics teaming of Superman, Batman, Wonder Woman, and others) has had an earth-orbit satellite with a sick bay since 1981 (EXHIBITS 65 and 66).



56

00471



EXHIBITS 65 and 66

57

For my own 1981 science fiction, *The Transgalactic Guide to Solar System M-17*, I created an exclusive space settlement that offers "royal" accommodations with advanced medical facilities for those who can afford them, services which include "genetic surgeons, sonar-toners for the skin, cellpins to firm weak muscles, an energizing blood wash…" and more (p. 279).

Again, while the idea of a space station with medical advances is clearly not new, Plaintiff's screenplay and *Elysium* are not comparable in this regard. In *Elysium*, medical care on Earth is dismal. The hospital where Frey works is like a *M\*A\*S\*H* unit in a war zone. Most importantly, the contrast between health care on Earth and on Elysium is stark. While citizens of Earth struggle to get any health care at all, every resident of Elysium has special beds that can cure any ailment including cancer. The technology is so advanced that it can even rebuild a face that has been utterly destroyed by an explosion.

By contrast, in Plaintiff's screenplay, there is no technology similar to the medical beds in *Elysium* that are reserved *only* for the residents of the satellite. In fact, the health care on Earth and on Uberopolis is comparable. There are medicines and advanced curatives on Earth including, for example, oxygen chambers for the son of Arlo's partner Jerry. Even the drug Drexlerin, needed by Arlo's daughter, is *not* limited to Uberopolis. It is produced on Earth (screenplay, p. 135) and is typically available on Earth (screenplay, p. 46: Arlo is looking in a

58

00473

terrestrial warehouse that normally stores Drexlerin).  The issue in *Butterfly Driver* is that Drexlerin is being pulled from the market to make room for Drexlerin 2. This singular situation forces Arlo to travel to Uberopolis to find remaining supplies.

In summation, the idea of a satellite habitat with advanced health care is common in the prior art. Even if it could be said that Plaintiff's screenplay includes this idea, Plaintiff expresses the concept very differently than in *Elysium*.

6.      The Protagonist Who Must Travel To The Satellite World For Medicine

Plaintiff alleges that in both works the protagonist must travel to a satellite to obtain medical care, and that this is evidence of copying by Defendants (Amended Complaint p. 8, paragraph 46).  Even if it could be fairly said that the works share the idea of a character needing to travel to a satellite world for medical care (which is discussed more below), this idea is common in the prior art.

Author Edgar Rice Burroughs pioneered the concept of a journey undertaken for advanced medical care on another world in *The Master Mind of Mars*. In this 1927 novel, a Martian scientist provides healthy bodies for aging, wealthy clients. Hero John Carter – who is originally from Earth – must travel vast distances on Mars to get medical aid for his gravely injured bride (EXHIBIT 67).

59



EXHIBIT 67

In the abovementioned Sector General series, the idea of off-world medical technology is the crux of *Star Surgeon* (1963). The team of the Sector General station not only heals the hero – who arrives in a ship "broadcasting distress signals" (p. 8) – they confront a world plagued by corruption and oppression, assisting until "the Emperor and his administration are virtually extinct" (p. 158).

60

On TV, *Star Trek: The Next Generation* used this idea in the 1989 episode "Samaritan Snare" in which Captain Picard must take a shuttle to a star base to repair his failing artificial heart.

The series *Star Trek: Deep Space 9* also employed this idea in the episode "Armageddon Game" (1994), when engineer Miles Obrien becomes deathly ill on a planet and must get to space station Deep Space 9 to be cured.

The film *Contact* (1997; based on the Carl Sagan novel from 1985) features a space station that is said to prolong the life of wealthy, cancer-ridden S.R. Hadden (EXHIBIT 68).



EXHIBIT 68

This common idea of traveling to a space station for medical care is also expressed by Plaintiff and Defendants in two entirely different plots and sequences

61

of events.  In Plaintiff's screenplay, Arlo must travel to Uberopolis to obtain Drexlerin for his daughter only because she has little time to live and because the curative drugs – which are normally available on Earth – are temporarily being stored on Uberopolis to keep them from thieves.

In *Elysium*, Max suffers a fatal dose of radiation.  There is no cure on Earth and never will be.  His only hope is to sneak onto Elysium and use a medical bay, reserved only for citizens of Elysium, which has the ability to cure any sickness. Other needy souls are eventually cured as a result of his efforts.

This is a key difference in the works.  The foundational idea in Defendants' film is a class divide so great that some kind of revolutionary response is the only remedy for Max. That is radically different than Plaintiff's plot, in which Arlo is forced to travel to Uberopolis because the drug he wants for his daughter – and only for his daughter – will not be made available on Earth in time to help her.

Additionally, the motivations for the protagonists traveling to the satellite are very different.  In Plaintiff's work, Arlo has no medical problems of his own. He selflessly travels to Uberopolis to get medication for his daughter.  Critical to *Elysium*, on the other hand, is that Max abandons those around him and travels to Elysium to save himself.  Initially, he even refuses to help his longtime friend Frey whose daughter is dying of leukemia. It is only in the climactic scenes that Max

62

decides to sacrifice his life to help make Elysium's advanced medical bays available to the impoverished residents of Earth, including Frey's daughter.

In conclusion, the basic idea of needing health care from a satellite is not only common in the prior art, it is expressed very differently in *Butterfly Driver* and *Elysium*.

### 7.     A Hero Prone To Excruciating Headaches

Plaintiff alleges that the protagonists in both works suffer headaches, and that this shared element is evidence of copying (Amended Complaint p. 8, paragraph 46).  The idea of a hero suffering headaches is common in science fiction (as it is in all drama). The following are just a few examples from science fiction films:

In the 1953 film version of Curt Siodmak's 1942 novel *Donovan's Brain*, Dr. Cory suffers his first debilitating headache and ends up on his knees after being put under the control of a disembodied brain (EXHIBIT 69, at 57:56).

63

00478



EXHIBIT 69

In the 1970 film *Beneath the Planet of the Apes*, astronaut Brent suffers

crippling headaches (EXHIBIT 70; at 1:02:42) after being subjected to an assault

by telepathic mutants.



EXHIBIT 70

64

In the 1988 film *They Live*, hero John Nada – who is hunting for aliens posing as earthlings – suffers from migraines.

The short story "Where I Wasn't Going" (1963) by Leigh and Walt Richmond is set on a space station with an advanced medical bay and a hero who is injected with "sulph-hydral anti-radiation shots" resulting in "a headache" that leaves him "quite ill in the shower," causes him "to slash himself rather badly with the razor while shaving... and so weak he could hardly move." (EXHIBIT 71)



EXHIBIT 71

The comic book *Warp* (1983) is about an ordinary earthman who is about to become a space hero (on a space habitat) and who suffers crushing headaches (EXHIBITS 72 and 73).



00481



EXHIBITS 72 and 73

67

Notwithstanding that this is an oft-used plot device, headaches are expressed differently in *Butterfly Driver* and *Elysium*. In Plaintiff's work, Arlo has long suffered a medical condition that gives him "ice-pick" headaches. In *Elysium*, Max only suffers seizures because of a computer implant that has been surgically bolted into his head and a lethal software program that has inadvertently been downloaded to his brain. These are hardly the same.

8.    A "Keepsake" Necklace

Plaintiff alleges that another similarity between his screenplay and *Elysium* is the protagonists in each story having "keepsake" necklaces that are important to them (Amended Complaint, p. 8, paragraph 46).

Such pendants and necklaces are a common device in films. For example, it is one of the most iconic elements in the 1985 blockbuster *Rambo: First Blood Part II*. When the hero's beloved female companion Co Bao is slain, the muscular avenger dons the very feminine necklace (EXHIBIT 74 and 75).

68

00483





EXHIBIT 74 and 75

A keepsake necklace is also prominently featured in the above-mentioned

film *Contact* (1997) whose heroine ends up in space (EXHIBITS 76 and 77).

00484





EXHIBITS 76 and 77

Not only is the idea of a necklace which has special meaning to a character

common, the nature and significance of the objects in the two works are very

different.  In *Butterfly Driver*, the keepsake is described as, "A large handmade

woven-yarn pendant of a YELLOW BUTTERFLY on a simple string" (screenplay,

p. 54) and it is given to the adult Arlo by a 25 year-old woman.  It is barely present

in the screenplay, it has no bearing on plot or character development, and it is one

of several such "keepsake" items used throughout.

70

00485

In *Elysium*, Max's necklace is a metal chain with a locket that contains a photograph of Earth. It is given to Max when he's a boy by a much older caretaker and is akin to a lifelong beacon. It is something Max refers to constantly and which is notably present at his death.

There is nothing similar about the roles that the necklaces play in Plaintiff's screenplay and in *Elysium*.

9.     A genetically reprogrammed villain

Plaintiff alleges that in his screenplay and *Elysium*, the villains have been genetically reprogrammed to look younger than they are (Amended Complaint p. 8, paragraph 46). This idea is hardly new: it dates back to Greek mythology when aged Zeus physically transformed into the likeness of beautiful Alcmene's handsome young husband in order to seduce her. Charles Dickens employed this conceit in his short fantasy story "The Magic Fishbone" (1867), in which Prince Certainpersonio is "waiting to be ninety" when an enchantment makes him young (p. 21).

In science fiction, the idea was previously used in *Supernova* (2000) (EXHIBITS 78 and 79), among many other works.

71

00486



EXHIBITS 78 and 79

Regardless, it is not accurate to state that Plaintiff's screenplay and *Elysium* share the idea of a genetically reprogrammed villain. The "reveal" in Plaintiff's screenplay (p. 94) is that the main villain, President Drexler, only *claims* to have been genetically reprogrammed. In fact, he is actually the soldier Midland who adopted the identity of a soldier named "Drexler" and underwent plastic surgery. President Drexler looks younger than he claims to be only as a secondary byproduct of this subterfuge.

In *Elysium*, there is no villain who has been uniquely reprogrammed to look younger, as Plaintiff suggests. Secretary Delacourt may appear younger than she actually is because of her ability to access medical bays on Elysium which mask the effects of aging, but this is never highlighted in the film and it makes the Secretary no different than everyone else on Elysium. The villain Kruger has his

72

face rebuilt in a medical bay after it is blown apart by a grenade, but that does not fit Plaintiff's description of a villain who has been reprogrammed to look younger, and *no* reference is made to this fact in the film other than his looking less weather-worn than he once did.

## VI. CONCLUSION

Any elements the works of Plaintiff and Defendants happen to share are *scènes à faire* or are basic ideas that are alike only at the most abstract, general level of comparison and are exceedingly common in the prior art. The two works bear no resemblance to each other and can only be made to *appear* similar by erroneously comparing shared ideas at the most abstract level.

The approach taken by Plaintiff is fundamentally unreliable. By selectively emphasizing cherry-picked elements and de-emphasizing others, and then describing them in the abstract, it is possible to create false similarities between almost any two films. For example, one could isolate the following elements found in *Elysium*:

1. A beefy thug named Spider.

2. An ambitious woman who secretly conspires with a well-to-do businessman to control her district (Delacourt and Carlyle).

73

00488

3. Unfeeling police (robots).

4. A major city setting (Los Angeles)

5. An impoverished setting in the city for part of the film (LA slums).

6. A woman wooed by a former boyfriend who is an ex-con (Frey by Max).

7. A major female character is stabbed and dies (Delacourt).

8. The ex-con dies in the end (Max).

9. There is an illegal underground operation (smuggling people to Elysium).

10. A main character receives keepsake jewelry (Max).

11. The urban populace in the film drinks and smokes to excess (the Los Angelians).

12. The hero carries secret information in his head (Max).

13. The story is set over a century from our time (2154)

In fact, each of these elements is also present, precisely as described above, in the 1933 Mae West film *She Done Him Wrong*. That film is set in New York's Bowery during the "Gay Nineties" (over a century ago) and is about a power-hungry entertainer named Lady Lou who is assisted by her beefy aide Spider, is courted by a former boyfriend – a crook, who dies at the climax – and who works

74

00489

with a businessman to buy more buildings, all the while hounded by bullying cops. One of Lou's rivals, Rita, is stabbed to death after learning that Lou has been given a diamond keepsake by a mutual male friend. Other characters are secretly counterfeiters who smuggle their illicit bills. Still others are heavy drinkers and smokers. The hero is a clergyman who possesses secret knowledge: that he is, in fact, an FBI agent.

Needless to say, even though one can identify many abstract ideas that are present in both *Elysium* and *She Done Him Wrong*, the two works are in reality nothing alike.

One could apply the same exercise with Plaintiff's screenplay which utilizes many ideas that were expressed in the film *Soylent Green* – so much so that one could argue it was the inspiration for *Butterfly Driver*. Early in Plaintiff's script, President Drexler addresses the populace via television to extol the virtues of a government initiative which is the subject of the film. Similarly, early in *Soylent Green*, the leader – Governor Santini – appears on TV to celebrate the benefits of a new government initiative which is the subject of the film (EXHIBIT 80).

75



EXHIBIT 80

Both works open with the bloody murder of a leading citizen; both works feature police who have specially-equipped vehicles; both works have a secret facility the hero must infiltrate to obtain products that are guarded within. The scene on p. 39 of Plaintiff's screenplay, where characters talk wistfully about a time when "real meat" hotdogs were available, is similar to a scene in *Soylent Green* when one character says wistfully, "When I was a kid, you could buy meat anywhere!" (at 5:46).

Though this comparison may be superficially appealing, it exaggerates, quarantines, and over-emphasizes similarities in what are different works. It is likewise reductive and overbroad to describe Plaintiff's screenplay and *Elysium* as

76

00491

similar. These works are clearly and deeply rooted in the prior art, using ideas that have been part of the language of science fiction for generations – in some cases, for millennia.  If Plaintiff's screenplay and *Elyisum* share anything at all, it is only those basic science fiction ideas that have been utilized frequently in the past.

Further, Plaintiff repeatedly invokes necessarily vague language in comparing the two works because a comparison of the *expressive* specifics does not hold up under scrutiny.  Any idea shared by Plaintiff's screenplay and *Elysium* is expressed dissimilarly, resulting in two completely different works with different stories, different sequences of events, different dialogue, and different characters.

Respectfully submitted, this 14th day of March, 2014

Jeff Rovin

77

APPENDIX 1

Primary sources cited:

"The Magic Fishbone," 1867, *Masterpieces of Fantasy and Enchantment*,
    International Collectors Library, 1988

*The Time Machine* by H.G. Wells, 1895, Fawcett Premier edition, 1968

*The Iron Heel* by Jack London, 1907, Bantam Books edition, 1971

*Metropolis,* 1927, Kino Blu-ray DVD.

*After Worlds Collide* by Philip Wylie and Edwin Balmer, 1933, Paperback
    Library edition, 1970

*The Day the Earth Stood Still*, 1951, 20th Century Fox Home Video

"Abercrombie Station" by Jack Vance*, Thrilling Wonder Stories*, 1952

*Donovan's Brain*, 1953, MGM "Midnight Movies" DVD

*Space Platform* by Murray Leinster, Pocket Books edition, 1953

*Conquest of Space*, 1955, Paramount Home Video

*The Mysterians*, 1957, Toho Home Video

*Star Surgeon* by James White, 1963, Del Rey edition, 1981

"Where I Wasn't Going," *Analog Magazine*, October and November, 1963

*Magnus Robot Fighter 4000 A.D.* #1, Gold Key Comics, 1963

*Magnus Robot Fighter 4000 A.D.* #7, Gold Key Comics, 1964

*2001: A Space Odyssey*, 1968, Warner Home Video

"The Cloud Minders," 1969, *Star Trek*, Paramount Home Video

*The Green Slime*, 1969, Warner Brothers Archive Collection

*Beneath the Planet of the Apes*, 1970, 20th Century Fox Home Video

*Ringworld* by Larry Niven, Ballantine Books edition, 1970

*A Wizard in Bedlam* by Christopher Stasheff, DAW SF edition, 1970

78

*A Clockwork Orange*, 1971, Warner Home Video

*Silent Running*, 1972, Eureka Home Video

*Soylent Green*, 1973, Warner Home Video

*Phoenix* #1, Atlas Comics, 1975

*Planet of Vampires* #1, Atlas Comics, 1975

"The Stars My Salvation," *UFO and Alien Comix* #1, Warren Publishing, 1977

*Moonraker,* 1979, MGM Home Video

"The Dimensions of Greed," *Time Warp* #3, D.C. Comics, 1980

*The Transgalactic Guide to Solar System M-17* by Jeff Rovin, Perigee Books, 1981

"Paradise Lost," *Heavy Metal Magazine*, August, 1981

*The Anarch Lords* by A. Bertram Chandler, DAW SF edition, 1981

*The Taking of Satcon Station* by Barney Cohen and Jim Baen, Tor edition, 1982

"The Ugliest Woman in Creation," *1994* Magazine # 24, Warren Publishing, 1982

*Touch the Stars: Emergence* by John Dalmas and Carl Martin, Tor edition, 1983

*Warp* #1, First Comics, 1983

*Rock & Rule*, 1983, Unearthed Films Home Video

*Demolition Man*, 1983, Warner Home Video

*The Lagrangists* by Mack Reynolds, Tor Books edition, 1983

*Chaos in Lagrangia* by Mack Reynolds, Tor Books edition, 1983

*The Void Captain's Tale* by Norman Spinrad, Bantam Spectra edition, 1986

*Threshold* by Janet and Chris Morris, Roc edition, 1991

*Kamandi At Earth's End* #5, D.C. Comics, October, 1993

*Contact,* 1997, Warner Home Video

00494

*A Second Chance at Eden* by Peter F. Hamilton (story collection), Pan Books edition, 1999

*Futurama*, 1999, 20th Century Fox Home Video

*Supernova* , 2000, MGM Home Video

*Spaced Out* , 2002, http://www.youtube.com/watch?v=j9WIm-T_XIA
http://www.youtube.com/watch?v=ptIZr0pHQOw

*Ministry of Space* #3, Image Comics, 2004

80

00495

APPENDIX 2

**Jeff Rovin Curriculum Vitae**

Jeff Rovin, One West Street, PH 10, NY, NY 10004, 212-742-7917,
Jeffrovin@aol.com

PUBLISHED BOOKS (from the earliest)

1. A PICTORIAL HISTORY OF SCIENCE FICTION FILMS (reprinted as
CLASSIC SCIENCE FICTION FILMS): NF/Citadel/1975

2. HOLLYWOOD DETECTIVE: GARRISON: F/Manor/1975

3. HOLLYWOOD DETECTIVE: THE WOLF: F/Manor/1975

4. THE HINDENBURG DISASTER: F/Manor/1975

5. OF MICE AND MICKEY: NF/Manor/1975

6. THE FABULOUS FANTASY FILMS: NF/Barnes/1977

    Playboy Book Club/Movie Book Club

7. FROM JULES VERNE TO STAR TREK: NF/Drake/1977

8. THE SUPERNATURAL MOVIE QUIZBOOK: NF/Drake/1977

9. THE GREAT TELEVISION SERIES: NF/Barnes/1977

    Nostalgia Book Club selection.

10. MOVIE SPECIAL EFFECTS: NF/Barnes/1977

11. THE FILMS OF CHARLTON HESTON: NF/Citadel/1977

    Movie Book Club

12. FROM THE LAND BEYOND BEYOND: The Films of Ray Harryhausen:
NF/Berkley-Windhover/1977

13. MARS!: NF/Corwin-Pinnacle/1978

14. THE UFO MOVIE QUIZ BOOK: NF/Signet/1978

15. THE SUPER HERO MOVIE AND TV QUIZBOOK: NF/Signet/1979

16. THE FANTASY ALMANAC: NF/Dutton/1979

81

17. COUNT DRACULA'S VAMPIRE QUIZ BOOK: NF/Signet/1979

18. THE SIGNET BOOK OF MOVIE LISTS: NF/Signet/1979

19. THE ANDRASSY LEGACY: F/Jove/1981

20. THE TRANSGALACTIC GUIDE TO SOLAR SYSTEM M-17: F/
    Perigee/1981

21. THE SCIENCE FICTION COLLECTOR'S CATALOG: NF/Barnes/1982

22. THE SIGNET BOOK OF TV LISTS: NF/Signet/1982

23. THE SECOND SIGNET BOOK OF MOVIE LISTS: NF/Signet/1982

24. ALWAYS, LANA: NF/Bantam/1982 (bio of Lana Turner)

25. THE COMPLETE GUIDE TO CONQUERING VIDEOGAMES:
    NF/Macmillan/1982, Doubleday Book Club

26. RICHARD PRYOR: BLACK AND BLUE: NF/Bantam/1983 (bought by HBO
    in 1996 for a movie)

27. THE MADJAN: F/Charter/1984

28. WINNING AT TRIVIAL PURSUIT: NF/Signet/1984
    National Bestseller

29. IN SEARCH OF TRIVIA: NF/Signet/1984
    National Bestseller

30. TV BABYLON: NF/Signet/1984; revised 1987

31. JOAN COLLINS: NF/Bantam/1984

32. JULIO!: NF/Bantam/1985

33. THE ENCYCLOPEDIA OF SUPER HEROES: NF/Facts-On-File/1985
    Movie/Entertainment Book Club

34. STALLONE: A HERO'S STORY: NF/Pocket Books/1985

35. APRIL FOOL'S DAY: F/Pocket Books/1986

82

36. 1,001 GREAT JOKES: NF/Signet/1987

37. THE RE-ANIMATOR: F/Pocket Books/1987

38. THE ENCYCLOPEDIA OF SUPER VILLAINS: NF/Facts-On-File/1987

39. STARIK: F/Dutton/1988 (Pinnacle/paperback/1989)

40. DAGGER: F/Charter/1988

41. HOW TO WIN AT NINTENDO GAMES: NF/St. Martins/1988 updated 1989
    National Bestseller

42. 1,001 MORE GREAT JOKES: NF/Signet/1989

43. FORCE FIVE: DESTINATION ALGIERS: F/Lynx/1989

44. FORCE FIVE: DESTINATION STALINGRAD: F/Lynx/1989

45. FORCE FIVE: DESTINATION NORWAY: F/Lynx/1989

46. THE ENCYCLOPEDIA OF MONSTERS: NF/Facts-On-File/1989

47. 1,001 GREAT ONE-LINERS: NF/Signet/1989

48. HOW TO WIN AT NINTENDO GAMES 2: NF/St. Martins, 1989

49. HOW TO WIN AT NINTENDO GAMES 3: NF/St. Martins, 1990

50. THE RED ARROW: F/Dutton/1990

51. THE SPIRITS OF AMERICA: NF/Pocket Books/1990

52. 500 HILARIOUS JOKES FOR KIDS: NF/Signet/1990

53. 500 MORE HILARIOUS JOKES FOR KIDS: NF/Signet/1990

54. THE UNAUTHORIZED TEENAGE MUTANT NINJA TURTLES QUIZ
    BOOK: NF/St. Martins/1990

55. HOW TO WIN AT NINTENDO SPORTS GAMES: NF/St. Martins, 1990

56. HOW TO WIN AT SUPER MARIO BROS. GAMES: NF/St. Martins, 1990

57. SIMPSON FEVER! NF/St. Martins, 1990

58. 1,001 GREAT SPORTS JOKES: NF/Signet/1991

83

00498

59. HOW TO WIN AT SEGA/GENESIS GAMES: NF/St. Martins, 1991

60. THE ILLUSTRATED ENCYCLOPEDIA OF CARTOON ANIMALS: NF/Prentice Hall   Press/1991

61. TV BABYLON 2: NF/Signet/1991

62. HOW TO WIN AT GAME BOY GAMES: NF/St. Martins/1991

63. HOW TO WIN AT NINTENDO GAMES 4: NF/St. Martins/1991

64. LUKE MANIA/JASON FEVER: NF/Berkley/1991

65. LAWS OF ORDER: NF/Ballantine/1992

66. 500 GREAT LAWYER JOKES: NF/Signet/1992

67. 500 GREAT DOCTOR JOKES: NF/Signet/1992

68. 1,001 GREAT PET JOKES: NF/Signet/1992

69. HOW TO WIN AT SUPER NES GAMES: NF/St. Martins/1992

70. THE BEST OF HOW TO WIN AT NINTENDO GAMES: NF/St. Martins/1992

71. THE WORLD ACCORDING TO ELVIS: NF/HarperCollins/1992

72. THE LASERDISC FILM GUIDE: NF/St. Martins/1993

73. THE FIRST GOOD NEWS/BAD NEWS JOKE BOOK: NF/Signet/1993

74. SPORTS BABYLON: NF/Signet/1993

75. COUNTRY MUSIC BABYLON: NF/St. Martins/1993

76. CLIFFHANGER: F/Berkley/1993

77. THE SECOND GOOD NEWS/BAD NEWS JOKE BOOK: NF/Signet/1994

78. THE UNBELIEVABLE TRUTH!: NF/Signet/1994

79. WHAT'S THE DIFFERENCE?: NF/Ballantine/1994

80. BACK TO THE BATCAVE! with Adam West: NF/Berkley/1994

81. DINOMITE DINOSAUR JOKES: F/Pocket Books/1994

84

00499

Case 4:13-cv-04679-2015 Document 102 Filed 07/02/14 Page 170 of 220

82. GAMEMASTER: HOW TO WIN AT SUPER NES GAMES: NF/St. Martins/1994

83. GAMEMASTER: HOW TO WIN AT SEGA GENESIS GAMES: NF/St. Martins/1994

84. ELLEN!: NF/Pocket/1994

85. ADVENTURE HEROES: NF/Facts on File/1995

86. GAMEMASTER: HOW TO WIN AT VIDEOGAMES: NF/St. Martins/1995

87. DUMB MOVIE BLURBS: NF/Berkley/1995

88. ROBOTS, SPACESHIPS, AND ALIENS: NF/Facts on File/1995

89. MORTAL KOMBAT: F/Boulevard Books/1995

90. CAT ANGELS: F/HarperCollins/1995

91. KELSEY GRAMMER: NF/HarperCollins/1995

92. BROKEN ARROW: F/Berkley/1995

93. TOM CLANCY'S OP-CENTER: F/Berkley/1995: New York Times #1 bestseller

94. TOM CLANCY'S OP-CENTER: MIRROR IMAGE: F/Berkley/1995: New York Times Bestseller

95. TOM CLANCY'S OP-CENTER: GAMES OF STATE: F/Berkley/1996: New YorkTimes Bestseller

96. TOM CLANCY'S OP-CENTER: ACTS OF WAR: F/Berkley/1997: New York Times Bestseller

97. THE ESSENTIAL JACKIE CHAN: NF/Pocket Books/1997

98. THE GAME: F/Boulevard Books/1997

99. TOM CLANCY'S OP-CENTER: BALANCE OF POWER: F/Berkley/1998: New York Times Bestseller

100. THE RETURN OF THE WOLF MAN: F/Boulevard Books (MCA)/1998

85

101. VESPERS: F/St. Martins/1998 (bought by Touchstone and Sonnenfeld-Josephson for a motion picture; Book of the Month Club Main Selection; Random House Audio Book)

102. TOM CLANCY'S OP-CENTER: STATE OF SIEGE: F/Berkley/1999: New York Times Bestseller

103. ST. WAR: F/Berkley/2000 (optioned by Bob Rehme Productions for a TV mini-series)

104. FATALIS: F/St. Martins/2000 (optioned by Universal Pictures for Sylvester Stallone)

105. TOM CLANCY'S OP-CENTER: DIVIDE AND CONQUER: F/Berkley/2000: New York Times Bestseller

106. ST. WAR: DEAD RISING F/Berkley/2004

107. TOM CLANCY'S OP-CENTER: LINE OF CONTROL: F/Berkley/2001: New York Times Bestseller

108. TOM CLANCY'S OP-CENTER: MISSION OF HONOR: F/Berkley/2002: New York Times Bestseller

109. TOM CLANCY'S OP-CENTER : SEA OF FIRE: F/Berkley/2003: New York Times Bestseller

110: TOM CLANCY'S OP-CENTER: CALL TO TREASON: F/Berkley/2004 New York Times Bestseller

111: TOM CLANCY'S OP-CENTER: WAR OF EAGLES: F/Berkley/2005

New York Times Bestseller

112. UNIT OMEGA: LOCH NESS: F/Berkley/2004 (as Jim Grand)

113: UNIT OMEGA: MEDUSA: F/Berkley/2004 (as Jim Grand)

114: TEMPEST DOWN: F/St Martins/2004

115: ROGUE ANGEL: F/St Martins/2005

116: THE DEVIL'S RANGERS: F/Berkley/2006 (as Jim Grand)

117: CONVERSATIONS WITH THE DEVIL: F/Tor/2007

00501

118: DON'T EVEN THINK ABOUT TELLING THIS JOKE AT WORK: F/Berkley/2007 (as Henry Bergen)

119: DON'T EVEN THINK ABOUT TELLING THIS JOKE TO YOUR LAWYER: F/Berkley/2007 (as Henry Bergen)

120: GOLDIE'S LOX AND THE THREE BAGELS: F/Kensington/2007 (as Lila Dubinsky)

121: MOTHER GOOSEBERG'S NURSERY RHYMES: F/Kensington/2008 (as Lila Dubinsky)

122: ERNIE: The autobiography of Ernest Borgnine; NF/Kensington/2008 (Ghostwritten)

123: YINGLISH: Jewish-American neologisms; F/Kensington/2009 (as Sasha Klotz)

124: 3:10 TO BOCA: Jewish Westerns: F/Kensington/2009 (as Zane Greyberg)

125: ONE FOOT IN THE GRAVY: F/Kensington/2011 (as Delia Rosen)

126: (Confidential, ghostwritten New York Times bestseller): F/St. Martins/2012

127: BLOOD OF PATRIOTS: F/Kensington/2012 (as William Johnstone)

128: THE OPERATIVE: F/Kensington/2012 (as Andrew Britton)

129: KILLER IN THE RYE: F/Kensington/2012 (as Delia Rosen)

130: FROM HERRING TO ETERNITY: F/Kensington/2013 (as Delia Rosen)

131: (Confidential, ghostwritten sequel to 126) F/St. Martin's/2013

132: (Confidential, ghostwritten novel) F/Headline Books/2013

133: TO KILL A MATZOBALL: F/Kensington/2014 (as Delia Rosen)

134: THE COURIER: F/Kensington/2014 (as Andrew Britton)

135: CRY ME A LIVER: F/Kensington/2014 (as Delia Rosen)

136: EARTHEND: VISION OF FIRE: F/Simon & Schuster/2014 with Gillian Anderson

137: (Confidential, ghostwritten sequel to 132) F/Headline Books/2015

87

00502

138: THE PROPHET: F/Kensington/2015 (as Andrew Britton)

139: EARTHEND: A DREAM OF ICE: F/Simon & Schuster/2015 with Gillian
    Anderson

140: (Confidential, ghostwritten sequel to 131) F/St. Martin's/2015

141: EARTHEND: A SOUND OF SEAS: F/Simon & Schuster/2016 with Gillian
    Anderson


DVD AUDIO COMMENTARY

Perhaps Love (2007)

Dragon Tiger Gate (2007)

Shamo (2008)

Sleepy Eyes of Death (2009)


SHORT STORIES

1. "The Horse that Jack Built," Analog Yearbook, Avon, 1979

2. "A Knight at the Opera," The Further Adventures of Batman: Catwoman:
Bantam, 1992

3. Gotham City 14 Miles: Afterword for Batman book: Sequart Research &
Literacy     Organization, 2010


SELECTED MAGAZINES

IN TOUCH Magazine (Bauer Publications): (Content consultant, March, 2014 -
    present)

THE BROADSHEET (film columnist, November, 2009 to October, 2012)

WEEKLY WORLD NEWS (freelance editor-in-chief, March, 2005 -August,
    2007): Paranormal, monster and extraterrestrial reportage.

00503

SCIENCE FICTION CHRONICLE: 1990 - 2007 (monthly film/DVD/TV/Comic book column, "SF Cinema")

FASCINATING FACTS FROM THE BIBLE: NEW TESTAMENT (2001)

FASCINATING FACTS FROM THE BIBLE (1995)

I WISH I'D THOUGHT OF THAT (1995)

GREAT AMERICAN GHOST STORIES (1994)

MYSTERY SCENE: 1994-1998 (film column, "Mystery Media"), 1999 - 2001 (monthly film column, "Mystery Scinema") (also ran on Hollywood.com)

MAD MAGAZINE: 1986 -1998 (monthly "quote" from Alfred E. Neuman)

LADIES HOME JOURNAL: 1978 - 1993 (celebrity interviews)

EYE-ON: 1984 -1985 (publisher/editor magazine of pop-culture)

VIDEOGAMING ILLUSTRATED: 1982 - 1984 (publisher/editor)

OMNI: 1980 -1982 (monthly film column)

ANALOG: 1975 -1980 (film articles)

HARVEY COMICS: writer, NEW KIDS ON THE BLOCK comic book

ARCHIE COMICS: writer for LAUGH comic book

CRACKED MAGAZINE (humor)

MUPPET MAGAZINE (humor)


TV SERIES

ACCESS HOLLYWOOD, 1997 - 1999, consultant to syndicated entertainment series.

ENTERTAINMENT TONIGHT, 1994-5, daily consultant.

THOMASON, Linda Bloodworth and Harry, 1993-5, consultant on prime time series Designing Women, Evening Shade and Hearts Afire.

TRIVIA TRAP: written for Mark Goodson Productions. Aired on ABC 1984-5.

89

00504

OMNI TV SHOW: writer/consultant, 1980.


MEDIA CONSULTANT

WORLD TRADE ART GALLERY: December, 2013 – present: curator of comic book and Animation art.

APPLE/NATIONAL ENQUIRER: December, 2011 - August, 2012: Editor, Enquirer-Plus iPad App

RadarOnline: October, 2008 – March, 2009: Oversaw the transition from print to web-based, including dramatic demographic shift.

BIG Entertainment (now Hollywood Media) 1996-7 (consultant on comic books, graphic novels, novels, toys, and multimedia enterprises)

DC COMICS 1986-9 (consultant book publishing program)

BLOCKBUSTER VIDEO 1992-3 (consultant on improving rentals)

ENCYCLOPEDIA AMERICANA 1988-91 (wrote entries on popular culture)

LJN 1986 (national spokesperson for Photon toy)

WORLD BOOK ENCYCLOPEDIA 1981-83 (consultant on film coverage)

MGM 1981 (creative consultant on film CLASH OF THE TITANS and developed motion picture THAT'S SPECIAL EFFECTS!)

WARREN PUBLISHING COMPANY 1976 – 1983 (consultant, special projects editor)

CONDE NAST 1975 (created touring science fiction film program)

PETER PAN INDUSTRIES 1975 (packaged series of STAR TREK records)

SCHOLASTIC MAGAZINES 1975 (consultant, fantasy publications)


STAFF EMPLOYMENT

(1971-75; freelance since then)

90

Editor, Seaboard magazines and comics, 1974-5: superhero and horror comics, romance magazines, puzzle books, etc.

Associate Editor, Warren magazines 1973-4, including FAMOUS MONSTERS, CREEPY, VAMPIRELLA, others.  Ran Captain Company mail order division.

Copywriter, Country Studios Advertising, 1972-3.

Assistant Editor, DC Comics, 1972. Wrote for comic books TARZAN, LOIS LANE, LEGION OF SUPER-HEROES, GI WAR STORIES, SGT. ROCK, others. Worked with Gloria Steinem on Wonder Woman book.

Assistant Editor, Skywald Publishing, 1971-2. Worked on horror and science fiction comics.

Editorial Assistant, Beagle Books (Ian Ballantine): 1970


ACTIVE PROFESSIONAL MEMBERSHIPS

AUTHORS GUILD

SCIENCE FICTION AND FANTASY WRITERS OF AMERICA

MYSTERY WRITERS OF AMERICA

WESTERN WRITERS OF AMERICA

HORROR WRITERS ASSOCIATION

ROMANCE WRITERS OF AMERICA

THE INTERNATIONAL ASSOCIATION OF MEDIA TIE-IN WRITERS

00506

APPENDIX 3

Legal matters in which I have provided testimony during the past five years. The party on whose behalf I testified is underlined, and the names of the works at issue are in quotations following each party's name.

| CASE NAME | COURT |
|---|---|
| Mark Gable ("Karma") v. NBC ("My Name is Earl") | C.D. Cal. |
| Warren Publishing Company v. J. David Spurlock | E.D. Pa. |
| James Muller ("The Lost Continent") v. Twentieth Century Fox ("Alien vs. Predator") | S.D.N.Y. |
| Joseph Davis ("Animal's Night Out") v. DreamWorks Animation ("Madagascar") | S.D. Fla. |
| Yolanda Buggs ("Critter Island") v. DreamWorks Animation ("Flushed Away") | C.D. Cal. |
| Terence Dunn ("Zen-Bear") v. DreamWorks Animation ("Kung Fu Panda") | Cal. Sup. Ct. |
| Summit Entertainment ("Twilight") v. Beckett Media | C.D. Cal. |
| Anthony Spinner ("Lost") v. ABC ("Lost") | Cal. Sup. Ct. |
| Corbello v. DeVito ("Jersey Boys") | D. Nev. |
| Chuck Zito ("Nomads") v. FX ("Sons of Anarchy") | Cal. Sup. Ct. |
| CBS ("Big Brother") v. ABC ("Glass House") | C.D. Cal. |
| Don Bellisario v. CBS ("NCIS") | Cal. Sup. Ct. |
| Bryant Moore ("Aquatica/Pollination") v. Lightstorm Entertainment ("Avatar") | D. Md. |
| Randall Shuptrine ("Woodsculpting") v. | |

92

00507

Scripps Network  ("Man Caves")                    Chanc. Ct. Tenn.

Jayme Gordon ("Panda Power") v.

DreamWorks Animation   ("Kung Fu Panda")          D. Mass.

00508

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
MICHAEL J. KUMP (SBN 100983)
  mkump@kwikalaw.com
GREGORY P. KORN (SBN 205306)
  gkorn@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
Facsimile: 310.566.9850

Attorneys for Defendants
NEILL BLOMKAMP, SONY PICTURES
ENTERTAINMENT INC., TRISTAR
PICTURES, INC., MEDIA RIGHTS CAPITAL
II, L.P., and QED INTERNATIONAL, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| STEVE WILSON BRIGGS,<br><br>Plaintiff,<br><br>vs.<br><br>NEILL BLOMKAMP; SONY PICTURES ENT., INC., TRISTAR PICTURES, INC., MEDIA RIGHTS CAPITAL, and QED INTERNATIONAL,<br><br>Defendants. | Case No. CV 13-4679-PJH<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  September 3, 2014<br>Time:  9:00 a.m.<br>Crtrm.:  3 |

1

**TABLE OF CONTENTS**

2                                                                                                                    **Page**

3  I.    INTRODUCTION ................................................................................................ 1

4  II.   STATEMENT OF UNDISPUTED FACTS ....................................................... 2

5        A.    *Butterfly Driver* And *Elysium* Are Dissimilar Works. ............................ 2

6        B.    Defendant Neill Blomkamp Wrote *Elysium* Independently. ..................... 3

7  III.  LEGAL STANDARDS ....................................................................................... 3

8        A.    Legal Standard For Infringement. .............................................................. 3

9        B.    Legal Standard For Summary Judgment. ................................................... 5

10 IV.   PLAINTIFF'S MOTION IS PROCEDURALLY DEFICIENT ........................ 5

11 V.    *ELYSIUM* DOES NOT INFRINGE THE SCREENPLAY AS A MATTER OF
         LAW ................................................................................................................... 6

12
13       A.    The Lack Of Evidence Of Access Compels Plaintiff To Prove "Striking
               Similarity" Between His Screenplay And The Film. .................................. 6

14       B.    Plaintiff Can Establish Neither Striking Nor Substantial Similarity. ........ 7

15             1.    The Plots and Sequences of Events are not Similar. ...................... 8

16             2.    Plaintiff's Argument that the Film Infringes the Screenplay's "Plot
                     Structures" Improperly Analyzes the Works Abstractly. ............. 10
17
18             3.    The Works' Settings are not Similar. ........................................... 22
19             4.    The Dialogue is not Similar. ........................................................ 23

20             5.    The Characters are not Similar. .................................................... 23

21             6.    The Themes are not Similar. ......................................................... 24

22             7.    The Mood / Pace is not Similar. ................................................... 25

23 VI.   CONCLUSION ................................................................................................. 25

24
25
26
27
28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Art Attacks Ink, LLC v. MGA Entertainment Inc.*
    581 F.3d 1138 (9th Cir. 2009) ................................................................. 6, 7

*Benay v. Warner Bros. Entertainment, Inc.*
    607 F.3d 620 (9th Cir. 2010) ........................................................ 4, 9, 11, 24

*Berkic v. Crichton*
    761 F.2d 1289 (9th Cir. 1985) ...................................................... 4, 8, 9, 11

*Bernal v. Paradigm Talent & Literary Agency*
    788 F.Supp.2d 1043 (C.D. Cal. 2010) ........................................................ passim

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*
    213 F.3d 474 (9th Cir. 2000) ....................................................................... 5

*Cavalier v. Random House*
    297 F.3d 815 (9th Cir. 2002) .................................................................... 4, 9

*Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*
    499 U.S. 340, 345 (1991) ............................................................................. 8

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*
    462 F.3d 1072 (9th Cir. 2006) .................................................................. passim

*Gable v. National Broadcasting Co.*
    727 F.Supp.2d 815 (C.D. Cal. 2010) ................................................... 8, 9, 14

*Goldberg v. Cameron*
    787 F.Supp.2d 1013 (N.D. Cal. 2011) ........................................................ 9

*Greer v. Lockheed Martin Corp.*
    855 F. Supp. 2d 979 (N.D. Cal. 2012) ........................................................ 5

*Idema v. Dreamworks, Inc.*
    162 F.Supp.2d 1129 (C.D. Cal. 2001) ............................................ 10, 11, 15

*Jorgensen v. Epic/Sony Records*
    351 F.3d 46 2d Cir. 2003) ............................................................................ 6

*Kouf v. Walt Disney Pictures & Television*
    16 F.3d 1042 (9th Cir. 1994) .................................................................. 4, 16

*Muller v. Twentieth Century Fox Film Corp.*
    794 F.Supp.2d 429 (S.D.N.Y. 2011) .......................................................... 9

*Narell v. Freeman*
    872 F.2d 907 (9th Cir. 1989) ..................................................................... 23

*Quirk v. Sony Pictures Entertainment Inc.*
   2013 WL 1345075 *6 (N.D. Cal. Apr. 2, 2013) ........................................ passim

*Rice v. Fox Broadcasting Co.*
   330 F.3d 1170 (9th Cir. 2003) .............................................. 4, 16, 25

*Stewart v. Wachowski*
   574 F.Supp.2d 1074 (C.D. Cal. 2005) ........................................... 7

*Three Boys Music Corp. v. Bolton*
   212 F.3d 477 (9th Cir. 2000) ................................................ 6, 7

*Wady v. Provident Life & Accident Ins.*
   216 F.Supp.2d 1060 (C.D. Cal. 2002) ........................................... 5

*Wild v. NBC Universal, Inc.*
   788 F.Supp.2d 1083 (C.D. Cal. 2011) ....................................... passim

*Zella v. E.W. Scripps Co.*
   529 F.Supp.2d 1124 (C.D. Cal. 2007) ........................................... 25

**STATUTES**

Fed. R. Civ. P. 56(a) ............................................................ 5

Fed. R. Evid. 901(a) ............................................................ 5

**TREATISES**

4 Melville B. Nimmer & David Nimmer,
   NIMMER ON COPYRIGHT § 13.02[B] (2005) ................................... 7

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

00512

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Defendants and Plaintiff Steve Wilson Briggs have each filed motions for summary judgment on Plaintiff's claim for copyright infringement, which requires proof of (i) access to Plaintiff's *Butterfly Driver* ("Screenplay") and (ii) substantial similarity between the Screenplay and the motion picture *Elysium* ("Film").  (Dkt. No. 64 ("Defs.' Mot.") [1]  Plaintiff's Motion is procedurally deficient and can be denied on those bases alone.  (*See infra* pp. 5-6.)  Furthermore, Plaintiff has failed to meet his burden of proof on summary judgment; he produces no evidence of access, which means he must prove the two works are "strikingly similar."  Plaintiff has not and cannot make such a showing because, as demonstrated below, the Screenplay and the Film are not at all similar when examined under the extensive copyright case law of the Ninth Circuit.

The contrast between Plaintiff's and Defendants' approaches in moving for summary judgment is telling.  As Ninth Circuit case law requires, Defendants focused on the concrete expression in the Screenplay and Film in comparing and contrasting the two works.  To do so, Defendants submitted the Screenplay and Film, and provided more than four pages of synopses of the two works.  (Defs.' Mot. pp. 3-7.)  Although a literal scene-by-scene description was not possible given page constraints, Defendants' synopses described the **specific** scenes and events that occur in the Screenplay and the Film.  (*Id.*)

In contrast, Plaintiff fails to provide an unvarnished description of *Butterfly Driver* and *Elysium* in his Motion.  Nowhere in the Motion does Plaintiff describe the **actual** scenes of the Screenplay or the Film.  Instead, Plaintiff takes the same improper, ill-fated approach that is criticized throughout copyright jurisprudence in this Circuit—i.e., rather than describe the Screenplay and Film faithfully, he mischaracterizes the works with abstractions that are intended to create the illusion of similarity.  For example, Plaintiff takes two characters and their story lines which bear no resemblance whatsoever in the works themselves, but claims to find a "similarity"

---

[1]  Neither party has requested a jury trial.

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

00513

1    because they are each a "disabled transporter who will help the hero's emigration plan." (Mot. at

2    11.) In another example, he takes two characters who are polar opposites—the first, a peaceful,

3    law-abiding officer who helps the Screenplay's protagonist; the second, a crazed murderer who is

4    unceasing in his efforts to kill the Film's protagonist—and argues that they are similar because

5    they are "agents" who were "sent by the villain to apprehend the hero." (*Id.*)

6         Plaintiff contravenes Ninth Circuit law by comparing the works at the highest level of

7    abstraction. The vague, abstract plot ideas on which Plaintiff focuses are not copyrightable and

8    are disregarded in assessing similarity. The test for similarity focuses exclusively on the

9    "concrete" elements in the works that are protectable. Were the law otherwise, **every** feature film

10   could be manipulated, as Plaintiff has done here, to support a claim of copying. No film would be

11   safe under this approach, including Plaintiff's own Screenplay, which is highly derivative—and

12   lawfully so—of prior science fiction films like *Blade Runner* and *Total Recall*.

13        As demonstrated below and in Defendants' Motion for Summary Judgment, there is **not**

14   **one scene**, **one line of dialogue**, or **one specific plot point** from Plaintiff's Screenplay that can be

15   found in the Film. The works have **no** similarities at the level of protectable expression and

16   certainly not the striking similarities that Plaintiff must prove to prevail.

17        For the reasons discussed further below, Plaintiff's Motion for Summary Judgment should

18   be denied, and summary judgment should be granted in Defendants' favor.

19   II.   <u>STATEMENT OF UNDISPUTED FACTS</u>

20        A.   <u>*Butterfly Driver* And *Elysium* Are Dissimilar Works</u>.

21        Plaintiff attached a copy of his Screenplay as Exhibit A to the Motion. Plaintiff, however,

22   did not submit the Film, but instead relied upon an unauthenticated copy of what is claimed to be a

23   screenplay for *Elysium* attached as Exhibit B to the Motion. Defendants filed a DVD copy of

24   *Elysium* with their Motion, which is incorporated by reference. (Dkt. No. 70.) To avoid

25   redundancy, Defendants also incorporate by reference the detailed synopses of *Butterfly Driver*

26   and *Elysium* from their Motion for Summary Judgment. (Defs.' Mot. pp. 3-7.)

27        As discussed below, *Elysium* was independently written by Defendant Neill Blomkamp

28   without access to Plaintiff's Screenplay, and the two works are nothing alike.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

00514

**B.** **Defendant Neill Blomkamp Wrote *Elysium* Independently.**

Plaintiff's Motion presents no evidence of access. Plaintiff states that he posted his Screenplay on a website called triggerstreet.com from "February to August of 2007." (Mot. at 6:8.) The Motion states that "Trigger Street is the ONLY place the Plaintiff ever posted his complete script." (*Id.* at 6:11.) The Motion argues that "TriggerStreet.com is where the Defendants had access to the Plaintiff's script." (*Id.* at 6:12.) But Plaintiff provides **no evidence** supporting these allegations. He bases his claim of access on wild speculation that Blomkamp "would have been drawn to Trigger Street" in 2007 to find ideas for a film. (Mot. at 6.)

The Declaration of Neill Blomkamp filed in support of Defendants' Motion for Summary Judgment, which is incorporated by reference, dispels this conjecture. (Dkt. No. 65 ("Blomkamp Decl.").) Blomkamp's Declaration is uncontroverted that he had not heard of triggerstreet.com before this suit was filed; he did not obtain Plaintiff's Screenplay on triggerstreet.com or from any other source; and no one ever discussed the Screenplay with him. (*Id.* ¶ 8.)

Blomkamp's Declaration explains the **actual** genesis for the settings, story, and characters in *Elysium*. The South African writer/director first developed the visual concepts for the Film. (Blomkamp Decl., ¶ 5.) During this process, he reviewed images of several space stations, some of which were in the shape of a circular "torus" like the space station featured in *Elysium*. (*Id.*) Those images inspired the Film's utopian space station. (*Id.*) The plot for *Elysium* followed from that idea and from some of the themes that Blomkamp wanted to explore like racial and class segregation, which are also evident in his previous hit film, *District 9*. (*Id.* ¶ 6.)

**III.** **LEGAL STANDARDS**

**A.** **Legal Standard For Infringement.**

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (citation omitted). Absent evidence of direct copying, the plaintiff must demonstrate (1) that the defendant had "access" to the plaintiff's work and (2) that the two works are substantially similar. *Id.*

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    "To determine whether two works are substantially similar, a two-part analysis—an

2    extrinsic test and an intrinsic test—is applied." *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170,

3    1174 (9th Cir. 2003). Only the extrinsic test is applied at the summary judgment stage.

4    *Funky Films*, 462 F.3d at 1077.

5    "The extrinsic test focuses on 'articulable similarities between the plot, themes, dialogue,

6    mood, setting, pace, characters, and sequence of events' in the two works." *Id.*, quoting *Kouf v.*

7    *Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994). In applying the extrinsic

8    test, courts must "take care to inquire only whether 'the **protectable elements, standing alone**,

9    are substantially similar.'" *Id.*, quoting *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir.

10   2002) (emphasis in original); *see also Rice*, 330 F.3d at 1174 (holding that courts "must

11   distinguish between the protectable and unprotectable material because a party claiming

12   infringement may place 'no reliance upon any similarity in expression resulting from

13   unprotectable elements.'") (citation omitted). In other words, courts "filter out and disregard the

14   non-protectable elements in making [a] substantial similarity determination." *Funky Films*, 462

15   F.3d at 1077, quoting *Cavalier*, 297 F.3d at 822.

16   Because unprotected elements are irrelevant, it is "not the basic plot ideas for stories, but

17   the actual concrete elements that make up the total sequence of events and the relationships

18   between the major characters" that must be compared. *Funky Films*, 462 F.3d at 1077, quoting

19   *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Similarities in general plot ideas are not

20   probative of infringement. *Id.* at 1081; *see also Benay v. Warner Bros. Entertainment, Inc.*, 607

21   F.3d 620, 625 (9th Cir. 2010) ("In applying the extrinsic test, we look 'beyond the vague

22   abstracted idea of a general plot.'") (citation omitted). Likewise, *scenes a faire* that "flow

23   naturally from generic plot-lines" are unprotected and therefore ignored under the extrinsic test.

24   *Funky Films*, 462 F.3d at 1077.

25   Contrary to Plaintiff's suggestion, the burden of establishing substantial similarity of

26   protectable elements is not relaxed on the basis that the Screenplay is "entirely imaginative; owing

27   nothing to fact, history, or the public domain." (Mot. at 24.) Plaintiff cites no case law supporting

28   the proposition that "entirely imaginative" works receive greater protection than other works.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   Further, as discussed throughout this Opposition, *Butterfly Driver* is anything but "entirely

2   imaginative." The Screenplay is heavily derivative of prior science fiction. (*See infra* pp. 10

3   *et seq.*)

4       **B.      Legal Standard For Summary Judgment.**

5       "The court shall grant summary judgment if the movant shows that there is no genuine

6   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

7   Civ. P. 56(a). "Where the party moving for summary judgment would bear the burden of proof at

8   trial, that party bears the initial burden of producing evidence that would entitle it to a directed

9   verdict if uncontroverted at trial." *Greer v. Lockheed Martin Corp.*, 855 F. Supp. 2d 979, 984

10  (N.D. Cal. 2012), citing *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480

11  (9th Cir. 2000).

12  **IV.     PLAINTIFF'S MOTION IS PROCEDURALLY DEFICIENT**

13      Because of three technical deficiencies, Plaintiff fails to carry his burden of producing

14  evidence entitling him to a directed verdict. **First**, the Motion relies **exclusively** on a purported

15  copy of the screenplay for *Elysium* printed off the Internet. (Dkt. No. 75.) Plaintiff has no basis to

16  authenticate that document as a genuine copy of the screenplay for *Elysium*. *See* Fed. R. Evid.

17  901(a); *Wady v. Provident Life & Accident Ins.*, 216 F.Supp.2d 1060, 1064 (C.D. Cal. 2002)

18  (refusing to consider documents printed from website where the proponent "has no personal

19  knowledge of who maintains the website, who authored the documents, or the accuracy of their

20  contents"). Plaintiff's Motion cannot be granted when the accused work is not authenticated.

21      **Second**, Plaintiff's burden is **not** to prove that a purported underlying screenplay for

22  *Elysium* infringes his work, but to prove that the **film version** of *Elysium* released to the public is

23  infringing. *See Quirk v. Sony Pictures Entertainment Inc.*, 2013 WL 1345075 *6 (N.D. Cal. Apr.

24  2, 2013) ("[E]ven assuming the preliminary drafts of *Premium Rush* scripts would be admissible

25  to show access, and that they include indications of copying that was later deleted or revised, the

26  only relevant question at this juncture is whether the final movie as filmed, edited, and released

27  contains matter substantially similar to protectable elements of Quirk's novel."). Plaintiff cannot

28  carry that burden by submitting an unauthenticated screenplay for the Film, **especially given that**

1  the Film departs substantially from the document Plaintiff submitted.

2      **Third**, Plaintiff presents no evidence demonstrating that each named Defendant is

3  responsible for the alleged infringement.[2]  Each of these deficiencies is fatal to Plaintiff's Motion.

4  **V.    *ELYSIUM* DOES NOT INFRINGE THE SCREENPLAY AS A MATTER OF LAW**

5      In addition to the procedural deficiencies described in the preceding section, Plaintiff fails

6  to carry his burden to prove that the Film is sufficiently similar to his Screenplay to infringe the

7  copyrights therein.  As discussed below, the lack of evidence of access in this case compels

8  Plaintiff to prove such "striking" similarities between *Butterfly Driver* and *Elysium* that it is

9  inconceivable Blomkamp wrote the Film without copying his work.  Plaintiff does not and cannot

10  come close to meeting that heavy burden.

11      **A.    The Lack Of Evidence Of Access Compels Plaintiff To Prove "Striking**

12          **Similarity" Between His Screenplay And The Film.**

13      To support an inference of infringement, Plaintiff must first prove access.  *Funky Films*,

14  462 F.3d at 1076.  "To prove access, Plaintiff must show that Defendants had a 'reasonable

15  opportunity' or 'reasonable possibility' of viewing Plaintiff's work prior to the creation of the

16  infringing work."  *Bernal v. Paradigm Talent & Literary Agency*, 788 F.Supp.2d 1043, 1053 (C.D.

17  Cal. 2010), citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000).

18  "**Reasonable access requires more than a 'bare possibility,' and 'may not be inferred**

19  **through mere speculation or conjecture**.'"  *Id.*, quoting *Three Boys Music*, 212 F.3d at 482

20  (emphasis added).  "In order to support a claim of access, a plaintiff must offer 'significant,

21  affirmative and probative evidence.'"  *Bernal*, 788 F.Supp.2d at 1054, quoting *Jorgensen v.

22  Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (affirming summary judgment on access where

23  plaintiff produced "no reasonable documentation that he actually mailed" the copyrighted work to

24  defendants); *see Art Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d 1138 (9th Cir. 2009)

25  _____

26      [2]    In opposing Plaintiff's motion to file a further amended complaint, Defendants
    represented that they were not seeking summary judgment on the basis that Plaintiff had named
27  the wrong defendants.  Of course, Defendants never suggested that it was relieving Plaintiff of this
    burden to the extent that he affirmatively seeks summary judgment in his favor.

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    (holding that the "slight chance" defendant may have visited a fair exhibiting plaintiff's works

2    "does not create more than a 'bare possibility'" of access).

3         Plaintiff presents no **evidence** of access.  He muses that "[i]n 2007, as a short filmmaker

4    with no experience on feature-length projects, Defendant Blomkamp would have been drawn to

5    Trigger Street to: 1) to find a screenplay to direct and produce; 2) to interact with other short

6    filmmakers; 3) to observe the work of other short filmmakers; 4) to contact industry professionals

7    who might need an able director."  (Mot. at 6:20-23.)  Plaintiff states that MRC "would also have

8    had reason to scout or screenplays on triggerstreet.com."  (*Id*. at 6:24-25.)

9         Plaintiff's hypothesizing is "mere speculation or conjecture."  *Bernal*, 788 F.Supp.2d at

10   1053, quoting *Three Boys Music*, 212 F.3d at 482; and it is rebutted by the uncontroverted

11   declaration from Blomkamp.  The Motion's passing suggestion that the Screenplay was "widely

12   disseminated" is erroneous.  (Mot. at 6:27.)  Plaintiff posted his Screenplay on a single obscure

13   website from February to August 2007.  (*Id*. at 6:8)  This is not wide dissemination.  *See Art*

14   *Attacks*, 581 F.3d at 1144 (citing cases).

15        Because Plaintiff lacks any evidence of access, he can establish copyright infringement

16   only by showing "striking similarity."  *Three Boys Music*, 212 F.3d at 485; *see also Stewart v.*

17   *Wachowski*, 574 F.Supp.2d 1074, 1084 (C.D. Cal. 2005) ("Where evidence of access is lacking, a

18   'striking similarity' between the works may give rise to a permissible inference of copying.").

19        Striking similarity is a high bar.  "At base, 'striking similarity' simply means that, in

20   human experience, it is virtually impossible that the two works could have been independently

21   created."  4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 13.02[B]

22   (2005), quoted with approval in *Stewart*, 574 F.Supp.2d at 1100-1101; *see also Bernal*, 788

23   F.Supp.2d at 1052 (defining striking similarity as "where the works are so unmistakably similar

24   that, as a matter of logic, the only explanation . . . must be copying rather than . . . coincidence,

25   independent creation, or prior common source") (citation omitted).

26        **B.**    **Plaintiff Can Establish Neither Striking Nor Substantial Similarity.**

27        To prevail, Plaintiff must prove striking similarity between the **protectable expression** in

28   the plots, sequences of events, characters, settings, dialogue, themes, and mood/pace of his

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  Screenplay and the Film.  As discussed below, there are in fact **no similarities** between the

2  protectable expression of the two works.  Plaintiff's claimed "summary" of similarities (Mot. at

3  11) relies on highly abstract ideas that are not copyrightable and would not give rise to a claim of

4  infringement even if they did inspire *Elysium* (which they did not).

5          Moreover, most if not all of the claimed similarities consist of stock ideas and *scenes a*

6  *faire* that are common in prior works.  The Declaration and report of defense expert Jeff Rovin

7  filed in support of Defendants' Motion for Summary Judgment is incorporated herein by

8  reference.  (Dkt. No. 67 ("Rovin Report")).  Rovin is an author, editor, and publisher with decades

9  of experience in science fiction and action/adventure works.  His Report shows that the

10  generalized ideas as to which Plaintiff claims copying are common in science fiction dating back a

11  century.  (*See generally id.*)  Even had such stock been appropriated from Plaintiff's Screenplay—

12  which it was not—these generic ideas are not protected and are disregarded when testing the

13  works for similarity.  *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345

14  (1991) ("To qualify for copyright protection, a work must be original to the author."); *see also*

15  *Bernal*, 788 F.Supp.2d at 1065 (holding that a "dead narrator" was not a protectable element

16  because it occurred in prior films like *Sunset Boulevard* and *American Beauty*); *Wild v. NBC*

17  *Universal, Inc.*, 788 F.Supp.2d 1083, 1099-1100 (C.D. Cal. 2011) (holding that elements common

18  in past works including Ray Bradbury's *Something Wicked This Way Comes*, the *Harry Potter*

19  series, and *Star Trek* were unoriginal and unprotectable); "); *Gable v. National Broadcasting Co.*,

20  727 F.Supp.2d 815, 842 (C.D. Cal. 2010) (holding that the "visual effect of a piece of paper

21  magically floating back to someone is not a protectable expression" because the "effect is

22  commonly used").

23              1.      **The Plots and Sequences of Events are not Similar**.

24          Plaintiff's burden is to demonstrate striking similarities between "the actual concrete

25  elements that make up the total sequence of events and the relationships between the major

26  characters."  *Funky Films*, 462 F.3d at 1077, quoting *Berkic*, 761 F.2d at 1293.  It is not sufficient

27  to show that *Butterfly Driver* and *Elysium* share a general premise (which, in any event, they do

28  not).  Courts routinely grant summary judgment for lack of substantial similarity where the

00520

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

copyrighted and accused works share specific premises but nevertheless **express** those ideas uniquely. *See Funky Films*, 462 F.3d at 1077 (granting summary judgment though both works were narratives about a family-run funeral parlor, the death of the family patriarch, the inheritance of the business by the patriarch's two sons, and the return of the "prodigal son" to run the business); *Benay*, 607 F.3d at 625 (granting summary judgment though both the copyrighted and accused works shared the same premise: "an American war veteran travels to Japan in the 1870s to train the Imperial Army in modern Western warfare in order to combat a samurai uprising"); *Berkic*, 761 F.2d at 1293 (granting summary judgment though both the copyrighted and accused works concerned "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants"); *Cavalier*, 297 F.3d at 824 (finding unprotectable the "general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep"); *Gable*, 727 F.Supp.2d at 840 (granting summary judgment where "both works have the main character win a lottery ticket, and both characters use the lottery winnings to remedy past deeds"); *Goldberg v. Cameron*, 787 F.Supp.2d 1013, 1020 (N.D. Cal. 2011) (granting summary judgment where "in both works, advanced, self-aware computer networks seek to destroy humanity, who must fight mass-produced, death-ray-shooting robot armies to survive"); *Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429, 445 (S.D.N.Y. 2011) (granting summary judgment where "both works tell the story of an expedition team that travels to Antarctica where they discover an underground ancient pyramid or city").

Looking "beyond the vague abstracted idea of a general plot," *Benay*, 607 F.3d at 625, there are **no** articulable similarities between the protectable expression in the plots of *Butterfly Drier* and *Elysium*. The plot of Plaintiff's Screenplay could be summarized as follows: War hero and hover-craft pilot Arlo Grainer learns that bounty hunters who killed fellow pilot, Roddy, are after his family. To earn his family's "repatriation" into the "Global State," Arlo accepts a "butterfly run" transporting Tamara Gwynn to Los Angeles for a trial over a revolutionary energy-producing A-Cell. Arlo is captured and framed for Tamara's murder; escapes imprisonment from Uberopolis and pilots a shuttle back to Earth; evades police while seeking the drug Drexlerin to

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    save his daughter Franny from a respiratory condition; obtains a fake ID to covertly travel back to

2    Uberopolis to obtain the drug; negotiates an exchange with Drexler of the A-Cell for Drexlerin;

3    exposes Drexler as a criminal and imposter; and destroys Uberopolis while piloting off the space

4    station to safety.  **None** of these plot points or any of the more detailed subplot points in the

5    Screenplay are in the Film.

6        Likewise, the sequences of events in the works lack a single similarity.  In fact, there is **not**

7    **one scene** from the Screenplay that is replicated in the Film, let alone in the same sequence.  *See*

8    *Bernal*, 788 F.Supp.2d at 1072 ("The sequence of events refers to the actual sequence of the

9    scenes, not just having similar scenes out of sequence.").  The Film cannot possibly infringe

10   Plaintiff's Screenplay without using a single scene from that work.  *Cf. Wild*, 788 F.Supp.2d at

11   1109 ("One cannot imagine how two works could be substantially similar without a story that

12   focuses on the actions of similar characters").

13       **2.    Plaintiff's Argument that the Film Infringes the Screenplay's "Plot**

14           **Structures" Improperly Analyzes the Works Abstractly.**

15       Plaintiff argues that *Elysium* uses eighteen[3] "plot structures" from his Screenplay.  (Mot. at

16   11.)  Each of these "plot structures," however, is a highly-generalized **characterization** of the

17   works.  Plaintiff "addresses the plots abstractly and ignores the requirement that the Court focus

18   on the expression of the idea in applying the extrinsic test."  *Wild*, 788 F.Supp.2d at 1102.

19       Courts recognize that comparing abstractions of the copyrighted and accused work is not

20   probative because it "obfuscates the radical differences in the two works' expression."  *Id.* at 1103.

21   In *Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1187 (C.D. Cal. 2001), for example, the Court

22   accepted that the plaintiffs' and defendants' works were "motivated by the same general 'story

23   idea' of the theft of nuclear weapons from the decaying and ill-guarded arsenal of Russia/the

24   former Soviet Union."  162 F.Supp.2d at 1182 .  The Court nevertheless held that the defendants'

25   _____

26       [3]    Plaintiff's Motion states that nineteen "plot structures" were used, but only
     eighteen are identified.  These eighteen "plot structures" are largely identical to the fourteen "plot
27   features" that are listed in the FAC and are addressed in Defendants' Motion for Summary
     Judgment.  (*See* Defs.' Mot., pp. 15-19.)

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  film "tells an entirely different story than that which is **expressed and protectable** in any of the

2  Plaintiffs' copyrighted works." *Id.* (emphasis in original).   The Court found that the plaintiff "has

3  clearly just emphasized those few similarities that can be observed at a general level and

4  deemphasized the many **dis**similarities between [the] works which are obvious to a casual

5  observer." *Id.* at 1180 (emphasis in original).  The Court was not persuaded by the plaintiffs' list

6  of 106 supposed similarities between the works, finding the comparisons "quite lacking in

7  objectivity, as they frequently mischaracterize the works at issue," and finding that most of the

8  similarities "are at the abstract level of 'ideas' . . . rather than 'expression.'" *Id.* at 1181; *see also*

9  *id.* at 1183 (describing particular scenes which were "similar only at a high level of abstraction").

10       In *Quirk*, the district court disregarded "35 pages of alleged substantial similarities,"

11  holding: "Review of that listing, however, reveals that Quirk is relying on subjective and often

12  highly unfair **characterizations** of material in the book and the movie to create highly strained

13  purported 'similarities.'" 2013 WL 1345075 *8.  For instance, the plaintiff's claim that two

14  "dispatcher characters" were similar relied on "generalized traits and negative behaviors." *Id.*

15  The presence of "Chinese gangsters" in both works were "too generalized and generic to support

16  an infringement claim." *Id.*  The court also found that many of the plaintiff's comparisons

17  "misstate matters to create an exaggerated sense of the degree of similarity." *Id.* *9.  In one

18  extreme example, the plaintiff re-characterized two different story lines—one in which Chinese

19  gangsters kidnap the protagonist's love interest; the other in which a bicycle is impounded—under

20  the vague heading, "'[a]ntagonists take a hostage as leverage . . . .'" *Id.*

21       Here, as in *Idema* and *Quirk*, Plaintiff has abstractly characterized—and repeatedly

22  **mischaracterized**—the Screenplay and the Film in hopes of creating a false appearance of

23  similarity.  As discussed below, **none** of the eighteen "plot structures" listed on page 11 of the

24  Motion are expressed similarly (if at all) by these two works.  Any similarity with respect to these

25  plot features solely concerns generalized ideas which are even more abstract than those found non-

26  copyrightable in *Funky Films*, *Benay*, *Berkic*, and the other cases cited above.

27       **1.     "the central setting of a giant satellite world for the super-rich, which features**

28  **giant forests and aquatic features."**  This comparison mischaracterizes *Butterfly Driver* by

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1  conscripting features of the satellite world in *Elysium* and acting as though they describe the

2  Screenplay's settings as well.

3       First, it is inaccurate to state that both the satellite in Plaintiff's Screenplay (known as

4  "Uberopolis" and "Sky Town") and the satellite in the Film (known as "Elysium") are "for the

5  super-rich" only. That assertion is true with respect to the Film, where there is a stark class divide

6  between the affluent, mansion-dwelling population of Elysium and the severely impoverished

7  population of Earth. It is **not true**, however, with respect to Plaintiff's Uberopolis. A television

8  commercial in the beginning of the Screenplay reflects that Uberopolis is **not** reserved for the

9  "super-rich." In that commercial, the satellite's owner, Drexler, states to TV viewers on Earth: "I

10 invite you to come enjoy our casinos, museums and golf courses, all orbiting 1000 miles above the

11 worries of Earth." (Screenplay at 4.) He adds:

12      Last year the first half of Uberopolis sold out in 6 months. The second half is

13      under construction, to be opened next year. Reserve your home now. See why

14      over 150,000 people like me call Sky Town home.

15 (Screenplay at 4.) There is no indication in the Screenplay that the hundreds of thousands moving

16 from Earth to Uberopolis are any wealthier than the rest of the population living in Earth's "Global

17 State," who enjoy "100 percent employment." (*Id.*)

18      Second, Plaintiff's claim that both satellite worlds feature "giant forests and aquatic

19 features" is also false. This is a fair description of the Film's Elysium, which is a lushly

20 landscaped, tropical paradise with residential mansions surrounded by heavy vegetation, large

21 lakes, and swimming pools. It is **not**, however, an accurate description of Plaintiff's Uberopolis.

22 The Screenplay describes Uberopolis as "three miles in diameter, enclosed in a transparent,

23 spherical shield, with a flora-sphere and aqua-sphere **beneath the city floor**." (Screenplay at 26

24 (emphasis added).) Although this suggests water and plant life below ground, above ground

25 Uberopolis is an "ultra-modern city, replete with casinos, golf courses, towering apartments, and

26 offices." (*Id.*) Nowhere in the Screenplay is Uberopolis described as having "giant forests and

27 aquatic features."

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

00524

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

1   Third, the satellite worlds in the Screenplay and Film have another critical, distinguishing

2   feature. The defining characteristic of Elysium is that Earth's population is prohibited from

3   traveling or emigrating to the space station. Those who attempt to illegally board Elysium on

4   undocumented shuttles are shot down and killed. (Film at 13:15-17:30.) By contrast, in the

5   Screenplay Earth's population is moving in droves to Uberopolis. (Screenplay at 4.) There are

6   hourly commuter shuttles traveling between Uberopolis and Earth. (Screenplay at 29 ("the hourly

7   citizen commuter shuttle takes five hours – to Earth and back").) The free travel back-and-forth

8   between Earth and Uberopolis is the antithesis of the setting described in the Film.

9   Uberopolis and Elysium are similar **only** in that they are both satellites of some sort.

10  This setting is beyond common in film, television, and literature. (Rovin Report at 21-59.)

11  Accordingly, it is not copyrightable. *Bernal*, 788 F.Supp.2d at 1071 ("A generic suburban

12  neighborhood is not a copyrightable expression."). Plaintiff's burden is to show that these settings

13  are **expressed** similarly. For the reasons discussed above, he has not and cannot meet that burden.

14  *Cf. Funky Films*, 462 F.3d at 1080 ("Although both works take place in a contemporary, family-

15  run funeral home, the similarities in setting end there.").

16      **2.    "a hero prone to excruciating headaches (which knock him to his knees)."**

17  Plaintiff asserts a "highly unfair characterization[ ] of material in the [Screenplay] and the [Film]

18  to create highly strained purported 'similarities.'" *Quirk*, 2013 WL 1345075 *9. In the

19  Screenplay, the protagonist, Arlo, suffers "ice-pick headaches" caused by a lifelong condition

20  called opthalmodynia. (Screenplay at 22-23.) In the Film, the protagonist Max (played by Matt

21  Damon) does not suffer from an equivalent condition. Instead, he begins to suffer seizures after he

22  uses a futuristic device to download a computer program from the brain of Elysium's designer

23  John Carlyle into his own brain—the seizures resulting from a defense mechanism that Carlyle

24  installed in the program. (Film at 46:00-51:00.)

25      Plaintiff notes that the purported screenplay for *Elysium* describes Max's symptoms as

26  "like a migraine." (Mot. at 12.) It also describes Max as suffering "an epileptic white static," "a

27  mini seizure," and "searing white light." (*Id.* at 12-13.) Whatever it is called, the stories behind

28  Arlo's and Max's afflictions are dissimilar. "These events might appear similar when described in

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

the abstract, but in context, they are exceedingly different." *Bernal*, 788 F.Supp.2d at 1067.

Moreover, even if the Screenplay's and Film's protagonists suffered from similar headaches (which they do not), this is a common idea in past films. Several prior works have featured lead characters who are brought to their knees by headaches. (Rovin Report at 63-68.) Plaintiff cannot own this stock idea. *Cf. Gable*, 727 F.Supp.2d at 841 (disregarding "several unprotectable stock elements . . . that are scattered throughout the works").

**3. "a villain who has been genetically reprogrammed to appear much young than he/she is."** Plaintiff is attempting to compare the Screenplay's Drexler and the Film's Delacourt (played by Jodie Foster). These two characters are not alike. In the Screenplay, Drexler is male, an ex-soldier, and an imposter actually named "Midland" who murdered the real Drexler, stole his identity, killed Drexler's family, and inherited his fortune, which he used to build Uberopolis. (Screenplay at 93-94.) Plaintiff's protagonist, Arlo, was previously acquainted with Drexler and exposes him as an imposter. (*Id.*) Arlo and Drexler have a lengthy fight and chase scene in the climactic scenes of the Screenplay, culminating in Arlo's escape from Uberopolis, the destruction of the satellite, and the death of Drexler. (*Id.* at pp. 97 *et seq.*)

The Film's Delacourt is not similar to Drexler. Delacourt is female and has no prior relationship with the Film's protagonist, Max. She has not murdered anyone to steal their identity. She does not own Elysium but rather stages a coup to take over its presidency. (Film at 35:20-37:00.) She has no fight scene with Max and is not killed by him; she is killed, rather, by her own agent Kruger. (Film at 1:26:30-1:27:55.) Other than being ruthless authorities, Drexler and Delacourt are not similar. *See Wild*, 788 F.Supp.2d at 1108 ("These are stock characters of the type one would expect to find in [plaintiff's work].").

Plaintiff argues that these characters are nevertheless similar because they were both genetically modified to appear younger. Plaintiff's Screenplay contains vague references to Drexler's "DNA reprogramming," (Screenplay at 36, 90), and the purported *Elysium* screenplay submitted with this Motion alludes to Delacourt being "re-atomized" to appear younger than her actual age of 108. (Mot., Exh. B at 2, 18.) However, the film version of *Elysium* has different dialogue than in Plaintiff's unauthenticated screenplay. In the Film, the scene to which Plaintiff

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  points does not refer to Delacourt's advanced age and thus does not allude to her being "re-

2  atomized" to look younger.  (Film at 25:40-27:08.)  Whatever similarity existed in a previous

3  (purported) version of the *Elysium* screenplay is irrelevant.  *See Quirk*, 2013 WL 1345075 *4-6.

4      Moreover, even assuming for the sake of argument that both Drexler and Delacourt used

5  futuristic medical procedures to reduce the appearance of aging, this is a stock idea that neither

6  Plaintiff nor Defendants invented.  (Rovin Report at 71-72.)  These two incomparable characters

7  are not similar simply because they share this one unprotectable trait.  *Cf. Idema*, 162 F.Supp.2d at

8  1186 ("[T]o the extent that the two characters <u>are</u> similar, it is only with respect to traits that are so

9  generalized and/or cliché as to be nearly *scenes a faire* . . . .").

10      **4.**      **"advanced medicine only found on the satellite world."**  This is another

11  mischaracterization designed to exaggerate the appearance of similarity.  Plaintiff is correct that in

12  the Film, the advanced med bays are available only on Elysium.  In Plaintiff's Screenplay,

13  however, the advanced medicine—a drug called "Drexlerin"—is **equally available** on Earth.

14  (Screenplay at 35.)  As the Screenplay explains, Plaintiff's protagonist is forced to travel to the

15  satellite to find Drexlerin solely because supplies on Earth are momentarily exhausted pending the

16  release of a replacement drug: "Drexlerin was discontinued.  Drexlerin 2 will be released in a

17  week or two.  **There's none left in The State**."  (*Id.* (emphasis added).)

18      Additionally, the idea of advanced medicine found only in a satellite world is common in

19  prior works.  (Rovin Report at 51-58.)  Thus, this setting is not original or copyrightable.

20      **5.**      **"a hero who must get to the satellite world for medicine (or medical care)."**

21  This is another misleading abstraction.  The specific story lines and sequences of events in the

22  Screenplay and Film which express this idea are not comparable.  Whereas the Screenplay's Arlo

23  travels to Uberopolis because his daughter, Franny, is dying of respiratory failure and needs

24  Drexlerin, the Film's Max travels to Elysium to use a med bay to cure himself of a fatal dose of

25  radiation that he received.  All of the specific scenes showing how Arlo and Max travel to the

26  satellites and what they do once there are different.  The conclusions of the stories are also

27  different.  Arlo exposes Drexler as a criminal and imposter, escapes with the Drexlerin his

28  daughter needs, destroys Uberopolis, and returns to life as normal.  (Screenplay at 92 *et seq*.)

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  Max, on the other hand, sacrifices his own life by downloading the reboot sequence from his brain

2  into Elysium's computers, thereby turning all of Earth's population into citizens of Elysium who

3  are eligible to use its med bays.  (Film at 1:26:30-1:41:00.)  These stories are similar only at the

4  most abstract level.

5        **6.**     **"a 'plight of immigrant' theme."**  This generic theme is not expressed similarly in

6  the two works.  The Screenplay references Arlo's family "repatriating" to the "State" to obtain

7  better healthcare for his daughter.  (Screenplay at 12-14.)  This is nothing like the illegal

8  immigration that occurs in the Film, where people on Earth risk their lives on undocumented

9  shuttles bound for Elysium to access the space station's med bays.  (Film at 12:01-17:24.)

10        **7.**     **"a sick girl, who will die without the hero's action."**  This is an attempted

11  comparison of the Screenplay's Franny and the Film's Matilda.  (Mot. at 14.)  These two

12  characters are both sick children, but this is not a protectable trait.  *See Kouf*, 16 F.3d at 1046

13  (holding that "the genius kid with thick-rimmed glasses . . . is not distinctive enough to be a

14  protectible character"); *Rice*, 330 F.3d at 1175 (holding that "characters are ordinarily not afforded

15  copyright protection" unless they are "especially distinctive").  Apart from being young girls who

16  are sick, Franny and Matilda do not have similar roles in the works.  Franny appears sparingly in

17  the Screenplay, has little or no dialogue, and is simply cured when Arlo returns home with

18  Drexlerin.  In the Film, on the other hand, Matilda is central to the drama.  She is kidnapped by

19  Kruger, taken to Elysium, and successfully uses a med bay once Max reboots Elysium's

20  computers.  Importantly, Matilda is a catalyst for Max's decision to sacrifice his left for the rest of

21  humanity—a role that is very different from Franny's negligible role in the Screenplay.  (Film at

22  1:01:00-1:04:06, 1:35:43-1:38:45.)  Setting aside stock traits, these characters are not similar.

23        **8.**     **"a hero who witnesses the death of his best-friend, and struggles to get I.D.**

24  **and transport to a satellite world."**  Here too, Plaintiff uses generalizations to mask the vast

25  differences between the **actual** stories in the Screenplay and Film.

26        The scenes in which the works' protagonists witness the death of a friend are dissimilar.

27  In the Screenplay, Arlo responds to a distress signal from his fellow pilot Roddy, who was shot by

28  bounty hunters, and Roddy warns Arlo that the bounty hunters are after Arlo's family.

1  (Screenplay at 8-10.)  This bears no resemblance to the Film, where Max and his friend Julio are

2  on a mission to kidnap Carlyle and steal data from his brain, when covert agent Kruger arrives and

3  kills Julio with a sword.  (Film at 45:54-56:40.)  Arlo and Max both witness a friend die, but such

4  a scene is "so common as to require little comment."  *Wild*, 788 F.Supp.2d at 1103.

5      Plaintiff's assertion that Arlo and Max both "struggle to get I.D. and transport to a satellite

6  world" is also disingenuous.   In the Screenplay, Arlo takes an ordinary commuter shuttle to

7  Uberopolis but needs a fake I.D. card because he is a fugitive and must avoid detection.

8  (Screenplay at 56-58.)  In the Film, Max does not require an I.D. card, but rather an I.D. burned

9  onto his arm so that the med bays on Elysium will recognize him as a citizen.  (Film at 37:03-

10  40:10.)  In context, these characters' stories are entirely different.

11      **9.      "an 'anguish of living without healthcare' theme."**  Both works confront the

12  generic idea of inadequate healthcare, but the Film does so differently.  Whereas in Plaintiff's

13  Screenplay, medical care including the drug Drexlerin is available both on Earth and on the

14  satellite, in the Film, the wealthy citizens of Elysium have exclusive access to med bays.

15  The Film thus explores the idea of arbitrarily denying access to readily available health care in a

16  way that the Screenplay does not.

17      **10.      "a disabled transporter who will help the hero's emigration plan – IF the hero**

18  **does a very dangerous mission**."  This comparison exemplifies the lengths to which Plaintiff will

19  go to use abstractions to compare dissimilar characters and story lines.  Although the Motion does

20  not elaborate, this is clearly an attempt to compare the Screenplay's Dylan and the Film's Spider.

21  (*See* FAC ¶¶ 176-178.)  These characters and their roles are not alike.  In the Screenplay, Arlo's

22  boss, Dylan, plays a minor role by setting Arlo up with a "butterfly run" to earn the money

23  necessary for his family to "repatriate" to the Global State.  (Screenplay at 6-7, 13-14.)  In the

24  Film, Spider is not Max's boss.  He does not provide Max a "butterfly run"—a concept that is

25  absent from the Film.  Rather, Spider operates undocumented shuttles to Elysium, and Max seeks

26  his help to obtain a shuttle ride to Elysium to use a med bay to cure his fatal condition.  (Film at

27  30:11-34:10.)  Spider engages Max to kidnap Carlyle and download data from his brain, and he

28  spearheads the effort to use the computer program that Max obtains from Carlyle to reboot

Kinsella Weitzman Iser Kump & Aldisert llp
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Tel 310.566.9800 • Fax 310.566.9850

00529

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  Elysium's computers.  (*Id.* at 1:07:19-1:10:28, 1:20:45-1:41:20.)  The fact that one character is

2  "missing an arm" and the other has "a paralyzed leg" (FAC ¶¶ 176-178) does not make these

3  incomparable characters similar.

4      **11.    "an agent (sent by the villain to apprehend the hero) who accepts the**

5  **assignment after negotiating."**  Plaintiff is trying to compare the Screenplay's Jerry with the

6  Film's Kruger.  (*See* FAC ¶¶ 170-175.)  The comparison is "emblematic of how tortured the

7  attempt to find substantial similarity between the works becomes."  *Quirk*, 2013 WL 1345075 *9.

8  Those characters and their roles in the stories could not be more **dissimilar**.

9      In the Screenplay, Jerry is a law-abiding federal officer and a past acquaintance of Arlo.

10  (Screenplay at 22-23.)  Jerry investigates Arlo for the kidnapping and murder of Tamara, for

11  which Arlo is framed.  (*Id.* at 24-25.)  Jerry learns during his investigation that Arlo is innocent, he

12  helps Arlo expose Drexler as a criminal, and he rescues Arlo as Drexler is preparing to kill him.

13  (*Id.* at 89-90, 102-103, 109-110.)

14      The Film's Kruger is Jerry's polar opposite—a  maniacal murderer and rapist.  (Film at

15  25:40-27:08.)  Serving as Delacourt's personal agent, Kruger shoots down undocumented shuttles

16  bound for Elysium; hunts Max to obtain the reboot sequence that he downloaded from Carlyle's

17  brain; kidnaps Max's childhood friend Frey and her daughter Matilda to use as bait; transports

18  Max to Elysium; is blown up by a grenade after a fight erupts en route to Elysium; is regenerated

19  by a med bay; kills Delacourt after deciding to use the reboot sequence to make himself the

20  president of Elysium; and then kills everyone in his path before being thrown off a platform by

21  Max.  There are **no similarities** whatsoever between these characters.

22      **12.    "a keepsake necklace, carried by the hero, which factors into the stories'**

23  **conclusion."**  This is a tortured generalization.  In Plaintiff's work, a character named Benni, who

24  is interested romantically in Arlo, provides him a yellow butterfly dream catcher for good luck.

25  (Screenplay at 64-65.)  In the Film, Max is not given a dream catcher for luck or as a sign of

26  romantic interest.  Rather, a nun who raises Max provides him a locket with a picture of Earth.

27  (Film at 23:19-23:54.)

28

4:13-CV-4679-PJH

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    These props factor in to the conclusions of the stories but in dissimilar ways.  In the

2    Screenplay, Arlo has been shot and is near death when he has a dreamlike vision and sees the

3    dream catcher in the eye of a dolphin.  (Screenplay at 113.)  This does not resemble the scene in

4    the Film, where Max stares at his locket and at the actual planet Earth, which he can see outside a

5    window in Elysium's control center, before pushing the button which starts downloading the

6    reboot sequence and ends his life.  (Film at 1:35:43-1:38:45.)

7         At most, therefore, the works share only the abstract idea of a protagonist who wears a

8    necklace of some sort.  This bare idea is not copyrightable.  Numerous past works use this same

9    device, including one film in the *Rambo* series in which Sylvester Stallone, like Plaintiff's

10   protagonist, wears a necklace belonging to his love interest.  (Rovin Report at 68-70.)

11        **13.**    **"an overpopulated, impoverished Earth, where police vehicles loom in the sky**

12   **and brutalize the poor, ruled by a rich elite who live on the satellite world."**  Plaintiff again

13   distorts his Screenplay to manufacture similarities that do not exist.  In the Screenplay, Earth is

14   overpopulated **but not** "impoverished."  The Screenplay in fact describes that there is "100

15   percent employment" and "almost no crime" in Earth's "Global State."  (Screenplay at 4.)  The

16   city of Manhattan is portrayed like a typical major city with apartment complexes, shopping malls,

17   and subways.  (*Id.* at 33-34.)  Citizens drive sky-cars, sky-cycles, and hover-jets.  (*Id.* at 19

18   (referencing "heavily trafficked 'skyways.'").)  Moreover, Earth's population is **not** brutalized by

19   police, as Plaintiff claims.  Bounty hunters and/or police target Roddy, Arlo, and Tamara, but

20   violence is not waged against the masses.

21        The Film presents Earth very differently.  The planet has lost all vestiges of how it appears

22   presently.  (Film at :57-01:15.)  There are no malls, apartment complexes, or subways.  The

23   population does not fly sky-cars.  They are heavily unemployed and extremely poor, living in

24   shanty towns with defunct skyscrapers smoldering in the background.  (*Id.*)  They are policed by

25   an abusive robotic police force which has no counterpart in the Screenplay.  (*Id.* at 06:02-07:00.)

26        The only similarity between Earth in the Screenplay and in the Film is that it is set in the

27   future.  This setting is generic and unprotectable.  Countless works feature a futuristic Earth akin

28   to Plaintiff's Screenplay, including the science fiction classic *Blade Runner*, which appears to

have heavily inspired Plaintiff's Screenplay.  (Rovin Report at 8-21.)

14.  **"a hero who threatens the villain with detonating an explosive device."**  The two scenes that Plaintiff references look nothing alike in context.  In the Screenplay, Arlo threatens that he will use Tamara's A-Cell to blow up Uberopolis if Drexler refuses to meet with him.  (Screenplay at 85-88.)  In the Film, Max threatens that he will blow up Kruger's shuttle if Kruger or his men try to harm him.  (Film at 1:11:20-1:13:31.)  The only similarity between these two scenes is the stock idea of using an explosive as leverage—a cliché element that is commonly present, for example, in films with hostage scenes.

15.  **"underground 'techie' programmers who help the hero with fake identification to get into the satellite world"**  As discussed above, the "fake identification" that the Screenplay's Arlo and the Film's Max require is entirely different.  (*See supra* pp. 16-17.)

17.  **"a primary character who negotiates with insurers (or a hospital) for the life of his/her child."**  This idea is common, including in the 2002 Denzel Washington film *John Q*.  In any event, it is another mischaracterization.  Plaintiff appears to be comparing the Screenplay's Jerry, whose son Matty needs a "filter room" because of respiratory problems, with the Film's Frey, whose daughter Matilda is in the hospital with leukemia.  Jerry is offered financial help for his son's filter room if he accepts the task of investigating Arlo. (Screenplay at 25.)  Nothing like this occurs with Frey, who is simply forced to take her daughter from the hospital because it cannot save her.  (Film at 29:33-29:59.)  Jerry and Frey are incomparable characters who do not share a single action or word of dialogue.

18.  **"a climactic battle between the hero and villain, during which the hero suffers a terrible headache."**  Plaintiff is comparing a chase and fight scene between his characters Arlo and Drexler with a chase and fight scene between the Film's Max and Kruger.  The actual scenes are not similar except at the most general level.

In the Screenplay, Arlo confronts Drexler by flying a sky-cycle through the glass windows of his 57th floor office.  Not knowing that the conversation is being recorded by surveillance cameras and broadcast on television, Drexler confesses to his crimes including being an imposter.  In an ensuing struggle, Arlo and Drexler fly out of the office window but float harmlessly to the

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1    ground because of reduced gravity on Uberopolis. Their chase and fight scene takes them through

2    the streets of Uberopolis and eventually onto a shuttle. Arlo suffers a headache mid-combat and

3    Drexler seizes the moment to shoot him in the neck. Drexler is about to kill Arlo when Jerry

4    intercedes and saves his life. (Screenplay at 92 *et seq.*)

5            None of this occurs in *Elysium*. In the Film, Max is being held captive in an Elysium

6    control center. He escapes and sees on a video screen that Spider and his men have arrived on the

7    space station. Max rescues Frey and Matilda and tells them to find a med bay. He then meets

8    Spider, and the two of them race to a control room where they can start the reboot sequence in

9    Max's brain. Max and Spider are fleeing Kruger when Max suffers a seizure caused by the

10   defense mechanism that Carlyle coded into the reboot sequence. Kruger catches up, but Max kills

11   him in a hand-to-hand fight with the help of an exoskeleton that was grafted onto his body to give

12   him added strength. Max and Spider continue to the control room where they succeed in

13   rebooting Elysium's computers. (Film at 1:22:46-1:41:20.) In all, these scenes are nothing like

14   the scenes in the Screenplay.

15           **19.    "a globally significant resolution (rare)."** This general idea is not copyrightable

16   and is also expressed dissimilarly. The Screenplay concludes with Arlo destroying Uberopolis.

17   The Film concludes with Max rebooting Elysium's computers to open up citizenship to everyone

18   on Earth. These are hardly similar resolutions.

19           In each of the above eighteen comparisons, Plaintiff takes different plots, different

20   sequences of events, and different characters from his Screenplay and the Film, and then re-

21   defines these dissimilar elements using self-serving abstractions. This process proves nothing

22   more than that "[s]elective and/or distorted characterizations of any two things can, of course,

23   produce points of similarity." *Quirk*, 2013 WL 1345075 *9. Indeed, **any** motion picture in the

24   past 50 years could be made to appear similar to some prior work by using generalizations and a

25   little bit of imagination. Plaintiff's own Screenplay could be unfairly accused of knocking off

26   *Blade Runner*—a film which similarly featured a futuristic Earth with flying cars, a colony

27   existing off the planet Earth, people who have been genetically programmed, state-sponsored

28   bounty hunters, and a protagonist (Rutger Hauer) who is on the run from a government agent

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  (Harrison Ford) sent to apprehend him.  Imagine the **dozens** of other "similarities" that could be

2  found between stock scenes and characters in *Butterfly Driver* and *Blade Runner* if one took the

3  same liberties Plaintiff takes here to define those elements in a generalized, argumentative manner.

4        **3.**      **The Works' Settings are not Similar.**

5        Plaintiff alleges that the Screenplay and Film feature the same two settings—a "Rich

6  Satellite World & Poor Dystopic Earth."  (Mot. at 15.)  Neither of these settings is **expressed**

7  similarly by the two works.  As discussed above, the satellite worlds in the Screenplay and Film

8  differ with respect to their exclusivity; the ability to travel to and from the satellite; the wealth

9  disparity between its citizens and those on Earth; the disparity in medical care on the satellite and

10  on Earth; and the physical appearances of the satellites.  (*See supra* pp. 12-15.)  Plaintiff lists

11  thirteen supposed similarities between Uberopolis and Elysium.  (Mot. at 15.)  Several are

12  mischaracterizations, including that Uberopolis has "forests and large aquatic features," that "only

13  the super-rich live" there, that "fantastic medical technologies are available there," and that

14  "entering the satellite requires special identification."  (*See supra* pp. 12-17.)  The other

15  supposedly similar characteristics, including flying vehicles, a lack of crime, and the presence of

16  prisoners in orange jumpsuits are *scenes a faire.*

17        Plaintiff's comparison of Earth in the two works is likewise flawed.  Earth is expressed in

18  substantially different ways in the Screenplay and Film.  (*See supra* p. 19.)  Here again, Plaintiff's

19  eight comparisons of this setting mischaracterize his own work.  (Mot. at 15.)  Among other

20  things, he misrepresents that in his Screenplay "the poor have little access to medical care," that

21  "police and military vehicles loom in the sky and brutalize the poor," and that "the poor live in the

22  ruins of cities in decay."  (*See supra* p. 19.)  In fact, most of Earth's population in the Screenplay

23  lives in ordinary cities like Manhattan where they enjoy all the usual characteristics of city life,

24  drive sky cars, and are fully employed.  (*Id.*)

25        Whatever few similarities exist between the settings in the Screenplay and Film, they are

26  generic and unprotectable features.  The Rovin Report provides numerous examples of past

27  science fiction works featuring a dystopic Earth and/or space stations that are highly similar to the

28  settings in Plaintiff's Screenplay.  (Rovin Report at 8-58.)  Plaintiff cannot copyright these stock

1  ideas.  *See Bernal*, 788 F.Supp.2d at 1071 ("A generic suburban neighborhood is not a

2  copyrightable expression.").

3         **4.**       **The Dialogue is not Similar.**

4        "To support a claim of substantial similarity based on dialogue, the plaintiff must

5  demonstrate 'extended similarity of dialogue.'"  *Bernal*, 788 F.Supp.2d at 1072 (citation omitted).

6  Plaintiff admits that "[t]here are no examples of direct copying in this case."  (Mot. at 18.)

7  He claims that some of the "dialogue rings quite familiar," (*id.*), but he cites only to a handful of

8  instances in which his Screenplay and a purported screenplay for *Elysium* used common English

9  words and phrases like "pressure," "go faster," and "surveillance."  Such "[o]rdinary phrases" and

10  words "are not entitled to copyright protection."  *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir.

11  1989); *see also Bernal*, 788 F.Supp.2d at 1072 (disregarding "ordinary, common expressions that

12  are not copyrightable").

13         **5.**       **The Characters are not Similar.**

14        As discussed above, Plaintiff's comparisons of Drexler with Delacourt, Dylan with Spider,

15  Jerry with Kruger, and Franny with Matilda, are unfounded.  At most, these characters share one

16  or two generic traits.

17        The same is true of the protagonists in the two works, Arlo and Max.  (Mot. at 11-12.)

18  "Again, through the use of abstraction, Plaintiff obscures the radical differences between the two

19  characters."  *Wild*, 788 F.Supp.2d at 1107.  In the Screenplay, Arlo is a war hero and hover-craft

20  pilot who flies supplies in Zones outside the Global State.  He is a married father of two who goes

21  on a selfless mission to save his daughter and succeeds.  The Film's Max is none of these things.

22  He is an orphan, raised in a convent, who grows up into a petty criminal.  He is unmarried, has no

23  kids, and works at Armadyne fabricating robotic police officers.  Unlike Arlo, Max is on a self-

24  centered mission to save his own life at the expense of the lives of others.  Arlo and Max are

25  similar only in that they occupy the role of a male protagonist.  *See Funky Films*, 462 F.3d at 1078

26  ("The 'prodigal son' characters of the two works, while similar at the abstract level, are markedly

27  different in the two scripts.").

28

Not only do none of the characters in *Butterfly Driver* have a legitimate parallel in *Elysium*, but "[t]here are a number of important characters in the Film and the Screenplay who have no obvious parallel in the other work." *Benay*, 607 F.3d at 627. Tamara Gwynn plays an important role in Plaintiff's screenplay and has no possible counterpart. Several key characters from *Elysium* including the nun who raised Max, John Carlyle, President Patel, and the robot police force also have no "obvious parallel" in *Butterfly Driver*.

### 6.     The Themes are not Similar.

Plaintiff contends that the Screenplay and Film share five themes. (Mot. at 16.) Each theme Plaintiff identifies is trite and describes hundreds of other works. None of the themes, moreover, are expressed similarly in the Screenplay and Film:

1.     **"Survival without adequate healthcare is inhumane."** The Screenplay and Film treat the issue of healthcare very differently. In Plaintiff's work, some are in need of healthcare, but there is no disparity between the care available on Earth and in the satellite world. Absent from Plaintiff's work is one of the defining characteristics of the story in *Elysium*—the inhumanity of arbitrarily denying advanced healthcare that could easily save the lives of everyone in need.

2.     **"the plight of immigrants is brutal."** Query whether the Screenplay explores this theme at all. Its protagonist, Arlo, pays for his family to "repatriate" to Manhattan, New York, but the Screenplay does not specifically explore immigration. The Film, on the other hand, clearly does do so in showing the struggles of those on Earth who risk their lives to obtain access to Elysium's medical care by taking illegal shuttles to the space station.

3.     **"wealth corrupts and divides us."** This generic theme is not expressed similarly between the two works because Plaintiff's Screenplay lacks the wealth disparity that is shown in the Film.

4.     **"Heroic sacrifice."** The Screenplay's protagonist, Arlo, never faces the dilemma that the Film's protagonist, Max, faces of having to sacrifice his life for others to live. The Screenplay does not explore this theme in the same way as the Film.

5.     **"Redemption comes from refusing to give up hope."** This does not really describe either work, but if it does, there are no similarities in how it is expressed.

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
4:13-CV-4679-PJH

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

00536

1    **7.    The Mood / Pace is not Similar.**

2        The mood and pace of *Butterfly Driver* and *Elysium* are stock in science fiction and

3    action/adventure works.  To the extent they are similar, therefore, they are *scenes a fair* which

4    "merge" with the idea of this type of work and are not indicative of striking or substantial

5    similarities.  *See Rice*, 330 F.3d at 1177 (holding that "an overall mood of secrecy and mystery" is

6    "generic, constitute[s] *scenes a fair*, and merge[s] with the idea of [a show about] revealing magic

7    tricks"); *Zella v. E.W. Scripps Co.*, 529 F.Supp.2d 1124, 1136 (C.D. Cal. 2007) (granting motion

8    to dismiss and holding that the "upbeat mood flowing from a cooking/talk show . . . is merely

9    another example of *scenes a fair* and merger, common to all cooking/talk shows.").

10   **VI.    CONCLUSION**

11       For the reasons stated above, the Screenplay and Film are not substantially or strikingly

12   similar as a matter of law, and the Court should deny Plaintiff's Motion and grant summary

13   judgment in Defendants' favor.

14

15   DATED: August 13, 2014            Respectfully submitted,

16                                     KINSELLA WEITZMAN ISER
17                                     KUMP & ALDISERT LLP

18

19

20                                     By:        /s/ Michael J. Kump
                                           Michael J. Kump
21                                         Attorneys for Defendants
                                           NEILL BLOMKAMP, SONY PICTURES
22                                         ENTERTAINMENT INC., TRISTAR
                                           PICTURES, INC., MEDIA RIGHTS CAPITAL II,
23                                         L.P., and QED INTERNATIONAL, LLC
     10021.00015/223816
24

25

26

27

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Steve Wilson Briggs
681 Edna Way
San Mateo, CA 94402
Telephone: (510) 200 3763
Email: snc.steve@gmail.com

Pro Se Plaintiff

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

_____

### AMENDED NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A

### SECOND AMENDED COMPLAINT

**PLEASE TAKE NOTICE** that Plaintiff, Steve Wilson Briggs, respectfully requests

permission from the Honorable Judge Phyllis J. Hamilton for leave to file a Second Amended

Complaint (SAC), to provide new charges and details of the facts and issues regarding this matt

**Statement of Purpose.** This motion will be based on the Memorandum Of Points And

Authorities, and the Proposed Order filed herewith.

### MEMORANDUM AND POINTS OF AUTHORITIES

On June 12th, 2014, I, Plaintiff, Steve Wilson Briggs, submitted to the Court a Motion For

Leave To File A Second Amended Complaint. The Plaintiff did not know to attach the SAC to the

motion; thus, the Court explained, the motion was stricken.

– 1 –
AMENDED MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

00538

The Plaintiff now submits this Second Notice of Motion and Motion For Leave To File A Second Amended Complaint, with the SAC now written and attached, hopeful that the Court will grant this leave.

Since making that first request for leave the Plaintiff has learned important new details, through discovery, including learning of new parties who were involved in, and who profited from, the infringement of his copyright. These newly discovered parties had various degrees of knowledge and responsibility for the crime. Therefore, these new parties, as well as appropriate charges, have been added to the SAC. Most of the new parties are subsidiaries of, parents of, or administrators of Defendant MRC II, L.P. And several of these parties were also named in the 2011 Copyright Infringement case of the great Phillip K. Dick's estate versus the various MRC "entities", in Coelho v MRC Dist. Co, et al, (CV 11-8913-ODW) concerning the film *The Adjustment Bureau*. In that case, too, the MRC "entities" used their many identities as a shield against responsibility. The Complaint explains page 7, line 12) that:

> **"MRC Distribution and MRC Holdings are both owned in whole or in part, by a common entity, MRC II Sub GP, LLC;… that at all times materially hereto, there exists a unity of interests and ownership among MRC Distribution, MRC Holdings, and Oaktree (collectively, the "MRC Defendants") such that any individuality either ceased to exist, or never existed in the first instance…"**

In the attached SAC the Plaintiff made the following changes to the FAC:

1) Plaintiff has added parties and provided justification for this.

2) Plaintiff added claims of **Contributory Copyright Infringement**, and **Vicarious Copyright Infringement**, and evidence in support thereof.

3) Plaintiff has eliminated unnecessary details contained in the FAC.

4) Plaintiff has added new details and examples of infringement for the "extrinsic" test.

5) Plaintiff has added a detailed description of his satellite city, Uberopolis, from the fourth drafts of his screenplay. The Defendants had access to this description on the Plaintiff's early postings of Butterfly Driver on triggerstreet.com. He later reduced the description for concision. Under 17 U.S. CODE § 106 (2) (to prepare derivative works based upon the copyrighted work) all versions of Plaintiff's description of his satellite city are Plaintiff's copyright, and part and parcel of, and inextricably linked to, this suit.

00539

17 U.S.C. § 101 **Derivation Works**: "…A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

## **LAW AND PRECEDENT**

The Court has the authority to grant Plaintiff's such motions, and is encouraged to do so under Rule 15(2), which states:

> **"In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."**

\

Similarly, in *Foman v. Davis*, (1962) the Supreme Court held:

> **"In the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should, as the rules require, be "freely given."**

Nolo's Plain-English Law Dictionary provides an effective distillation of the common application of this tenet :

> **"…a second (or third, or fourth, etc.) version of a complaint submitted by the plaintiff or petitioner. A party may amend a complaint to correct facts, add new claims, substitute discovered names for persons sued as "Doe" defendants, or revise a cause of action after the court has found the complaint inadequate.**

Thank you for considering this Amended Motion For Leave To File A Second Amended Complaint.

I will attach the SAC, the proposed order, the two contested screenplays, and a single attachment containing all of the other exhibits to this motion, as there doesn't appear to be another way to attach files to this motion, and separately to the SAC using the ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of July, 2014.

Respectfully Submitted By: /s/ Steve Wilson Briggs

Steve Wilson Briggs
681 Edna Way
San Mateo, CA 94402
Plaintiff, Pro Se

AMENDED MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

00540

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

1
2
3  STEVE WILSON BRIGGS,

4          Plaintiff(s),                    No. C 13-4679 PJH

5      v.                                   **CASE MANAGEMENT
                                            AND PRETRIAL ORDER**
6  NEILL BLOMKAMP, et al.,

7          Defendant(s).
   _____/
8
          Good cause appearing, the court hereby adopts the case management statement of the
9
   parties except as modified by the following:
10
                              **PRETRIAL SCHEDULE**
11
   TRIAL DATE:  Monday, **May 18, 2015**, at 8:30 a.m., Courtroom 3, 3rd Fl.
12          JURY []      COURT [X]

13 TRIAL LENGTH:  No more than **4** days.

14 PRETRIAL CONFERENCE DATE: **April 30, 2015**, at 2:00 p.m.

15 DISPOSITIVE MOTIONS ON LIABILITY (Only one summary judgment motion per party is
   permitted without leave of court) TO BE HEARD BY: **July 30, 2014** .
16
   NON-EXPERT AND EXPERT DISCOVERY CUTOFF (Liability): **May 16, 2014** .
17
   DISCLOSURE OF EXPERTS (Liability) : **3/14/14; REBUTTAL: 4/18/14** .
18
   DISPOSITIVE MOTIONS ON DAMAGES (Only one summary judgment motion per party is
19 permitted without leave of court) TO BE HEARD BY: **February 25, 2015** .

20 NON-EXPERT AND EXPERT DISCOVERY CUTOFF (Damages): **December 31, 2014** .

21 DISCLOSURE OF EXPERTS (Damages) : **10/31/14; REBUTTAL: 11/28/14** .

22
   DISCOVERY DISPUTES REFERRED TO MAGISTRATE JUDGE AFTER MOTION IS FILED.
23
   LAST DAY TO AMEND PLEADINGS:  No later than 90 days before fact discovery cutoff date
24 a motion or a stipulation must be filed so that sufficient time remains to conduct discovery on
   added claims or parties.  Doe defendants must be identified in the motion or stipulation or they
25 will be dismissed.

26
27 ADDITIONAL ORDERS:

28

                                            1

1

**PRETRIAL INSTRUCTIONS**

2

A.   PRETRIAL MOTIONS

3

     1.  All dispositive motions are heard **no later than 120 days before trial**, unless leave of court is obtained for another deadline.

4

5

     2.  Only **one** summary judgment motion may be filed by each side, absent leave of court.  Leave of court may be sought if multiple parties comprise one or both sides.  Leave of court may be obtained by filing a motion for administrative relief pursuant to Civ. L. R. 7-11, or by requesting a case management conference or informal telephone conference.

6

7

     3.  **Separate** statements of undisputed facts in support of or in opposition to motions for summary judgment shall NOT be filed.  See Civil L. R. 56-2.  The parties may file a truly **joint** statement of undisputed facts only if all parties agree that the facts are undisputed.

8

9

     4.  **Objections** to evidence may no longer be filed separately but must be contained within a brief or memorandum.  Civil L. R. 7-3.

10

     5.  Each party filing or opposing a motion shall also serve and file a **proposed order** which sets forth the relief or action sought and a short statement of the rationale of decision, including citation of authority that the party requests the court to adopt.

11

12

     6.  **Chambers copies** of each electronically-filed document must include on each page the running header created by the ECF system and must be delivered to the Clerk's Office by noon the day following its filing.  All documents must be stapled or bound by a two-pronged fastener, and all exhibits to declarations or requests for judicial notice must be tabbed.

13

14

     7.  **Footnotes** in briefs appearing in smaller than the 12-point font required for the text, will be stricken, see Civil L. R. 3-4(c)(2), as will footnotes that are so numerous as to be clearly designed to defeat the page limits found at Civil L. R. 7-2 - 7-4.

15

16

     8.  Motions pursuant to **Daubert v. Merrill Dow Pharmaceuticals, Inc**., 509 U.S. 579 (1993), challenging the reliability of expert testimony, may be noticed for hearing on the date dispositive motions will be heard or on any available hearing date up to and including the date of the final pretrial conference.  Irrespective of the hearing date, the briefs shall be filed in accordance with Civil L. R. 7-2 - 7-5, that is, on a 35-day briefing schedule.

17

18

19

     9.  **Motions *in limine*** are limited to motions to exclude specific items of evidence on a ground and upon such authority as would be sufficient to sustain an objection to such evidence at trial.  The court will not generally consider a motion presenting a purely legal issue in the guise of a motion *in limine*.

20

21

22

     10.  **Discovery motions** will be referred to a Magistrate Judge for resolution.  The words "Discovery Matter" shall appear in the caption of all documents relating to discovery to insure proper routing.

23

24

     11.  **Confidential and/or sealed documents** shall be handled in accordance with this court's standing order and Civil L.R. 79-5, both of which the parties shall consult before moving for a protective order or requesting a sealing order.  Requests to seal documents used in conjunction with dispositive motions are rarely granted and then only upon a showing of the most compelling of reasons.

25

26

27

28

2

B.    FINAL PRETRIAL CONFERENCE

1.  Each party shall attend personally or by counsel who will try the case.

2.  **Not less than 35 days** prior to the pretrial conference, all counsel and/or parties shall meet and confer regarding preparation of the joint pretrial statement.

3.  **Not less than 28 days** prior to the pretrial conference, counsel and/or parties shall:

a.    Serve and file a **joint** pretrial statement. (Separately filed statements will not be accepted by the court and monetary sanctions will be imposed upon the party failing to cooperate in the preparation of a joint statement). The pretrial statement shall include the following:

(i)    A brief description of the substance of the claims and defenses which remain to be decided.

(ii)   A detailed statement of all relief sought, itemizing all elements of damages claimed.

(iii)  A statement of all relevant undisputed facts to which the parties will stipulate for incorporation into the trial record without the necessity of supporting testimony or exhibits.

(iv)   A statement of all relevant disputed facts which remain to be decided.

(v)    A statement of stipulations requested or proposed.

(vi)   A brief statement of disputed points of law concerning liability and relief.  Legal argument on these points shall be reserved for the trial briefs.

(vii)  A statement of whether bifurcation or a separate trial of specific issues is feasible and desired.

(viii) A statement summarizing the status of settlement negotiations and indicating whether further negotiations are likely to be productive.

b.    Serve and file trial briefs (not to exceed 25 pages), which shall specify each cause of action and defense remaining to be tried along with a statement of the applicable legal standard (no opposition shall be filed);

c     Serve and file no more than ten motions *in limine*, which shall be filed in one document not to exceed 25 pages;

d.    Serve and file a list of deposition excerpts for witnesses who will not testify in person, (specifying the witness, page and line references) and other discovery responses that will be offered at trial;

e.    Serve and file a list of all witnesses to be called at trial, in person or by deposition, other than solely for impeachment or rebuttal, with a brief statement describing the substance of the testimony to be given;

f.    Serve and file a numerical list of exhibits that will be offered as evidence in a party's case in chief in support of a claim or defense, with a brief statement describing the substance and purpose of each exhibit and the name of the sponsoring witness;

g.    Exchange exhibits which shall be <u>premarked with an exhibit sticker</u> (example attached), <u>tabbed</u> and <u>in binders.</u> Plaintiff shall use numbers (1, 2, 3, etc.) and defendant shall use numbers preceded by a letter (A-1, A-2, A-3, etc.).  Additional parties shall also use a letter preceding numbers (B-1, B-2, B-3, or C-1, C-2, C-3, etc.).

3

h.      Submit <u>two</u> sets for jury trials and <u>three</u> sets for court trials of all premarked exhibits to the Clerk's Office (exhibits are not filed);

i.      Serve and file any request regarding the treatment of confidential or sealed documents.

j.      Serve and file proposed joint voir dire questions and joint jury instructions for cases to be tried by jury;

k.      Serve and file proposed findings of fact and conclusions of law for cases or claims to be tried by the court.

l.      Serve and file a proposed verdict form which contains no reference to submitting party.

4.  No party shall be permitted to call any witness or offer any exhibit in its case in chief that is not disclosed in these pretrial filings without leave of court and for good cause.

5.  **Not less than 14 days** prior to the pretrial conference, counsel and/or parties shall serve and file any opposition to a motion *in limine*, not to exceed 25 pages, and any counter deposition designations.  No replies shall be filed.  All motions shall be heard at the pretrial conference unless otherwise ordered.  The parties shall not file separate objections, apart from those contained in the motions *in limine*, to the opposing party's witness list, exhibit list or discovery designations. **Notwithstanding Civil Local Rule 5-1(e)(7), a courtesy copy of any opposition brief must be delivered to the Clerk's Office no later than noon the day following the filing.**

C.      JURY TRIAL

<u>Jury Selection</u> shall proceed as follows:  The Jury Commissioner will summon 20 to 25 prospective jurors.  The Courtroom Deputy will select their names at random and seat them in the courtroom in the order in which their names are called.  Voir dire will be conducted of sufficient venire members so that six to eight will remain after all peremptory challenges and an anticipated number of hardship dismissals and cause challenges have been made.

The court will then take cause challenges and discuss hardship claims at side bar.  The court will inform counsel which hardship claims and cause challenges will be granted, but will not announce those dismissals until the selection process is completed.  Peremptory challenges will be made in writing.  The court will strike at one time those with meritorious hardship claims, those excused for cause, and those challenged peremptorily, and then seat the first six to eight people remaining in numerical order.

The attached <u>voir dire </u>questionnaire shall be given to the  venire members and copies of the responses will be made available to counsel at the beginning of voir dire.  Counsel shall submit a **joint set** of additional voir dire questions to be posed by the court.  Any voir dire questions on which counsel cannot agree may be submitted separately.  Counsel will be permitted brief follow-up voir dire after the court's questioning.

The following <u>jury instructions</u> from the <u>Ninth Circuit Manual of Model Jury Instructions Civil</u> (2007 Edition) shall be given absent objection:  1.0 - 1.4, 1.6 - 1.14, 1.18 - 1.19, 3.1 - 3.4.  Counsel shall submit a **joint set** of these instructions along with case specific instructions using the Ninth Circuit Manual where appropriate.  Any instructions on which counsel cannot agree may be submitted separately.  Each instruction shall be typed in full on a separate page with citations to the authority upon which it is based **and** a reference to the party submitting it.  A second blind copy of each instruction shall also be submitted omitting the citation to authority and the reference to the submitting party, but retaining the title of the instruction.

4

D.     TRIAL SCHEDULE

        The court's trial schedule is 8:30 a.m. to 1:30 p.m. with two fifteen-minute breaks, on Monday, Tuesday, Thursday and Friday.

E.     PROCEDURE FOR AMENDING THIS ORDER

        No provision of this order may be changed except by written order of this court upon its own motion or upon motion of one or more parties made pursuant to Civil. L. R. 7-11 with a showing of good cause.  Parties may file a formal brief, but a letter brief will suffice.  The requesting party shall serve the opposing party on the same day the motion is filed and the opposing party shall submit a response as soon as possible but no later than four days after service.
        If the modification sought is an extension of a deadline contained herein, the motion must be brought before expiration of that deadline. **The parties may not modify the pretrial schedule by stipulation.** A conflict with a court date set after the date of this order does not constitute good cause. The parties are advised that if they stipulate to a change in the discovery schedule, they do so at their own risk.  The only discovery schedule that the court will enforce is the one set in this order.

        IT IS SO ORDERED.

Dated: January 17, 2014

_____
PHYLLIS J. HAMILTON
United States District Judge

00545

<u>CONFIDENTIAL</u>

<u>JUROR QUESTIONNAIRE</u>

Please fill out this form as completely as possible and print clearly. This will assist the judge and the lawyers in selecting a jury and will save time for them and for you. Because copies will be made for the attorneys and the judge, do not write on the back of any page. If you need more room, continue at the bottom of the page. Thank you for your cooperation.

1.    Your name: _____

2.    Your age: _____

3.    City in which you reside: _____

4.    If you have lived there for fewer than five years, where did you live before:

_____

5.    Your place of birth: _____

6.    Your marital status: (circle one)

        single    married    separated    divorced    widowed

7.    What is your occupation and how long have you worked in it? (If you are retired, please describe your main occupation when you were working).

_____

_____

8.    Who is (or was) your employer? _____

9.    If you have held this job for fewer than five years, describe your previous job:

_____

10.   If you are married, please list your spouse's occupation.

_____

11.   If you have children, please list their ages and genders and, if they are employed, please give their occupations.

_____

_____

_____

6

12.   Please describe your education background:

Highest grade completed: _____

College and/or vocational schools you have attended:

_____

_____

_____

Major areas of study: _____

13.   Have you served in the military? _____

14.   Have you ever had jury experience? _____ No. of times? _____

If yes:  State/County Court _____  Federal Court _____

When? _____

Was it a civil or criminal case? _____

Did any of the juries reach a verdict? _____

00547

| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk |
| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk |
| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>PLNTF EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk |
| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk |
| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO._____<br><br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk |
| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO.<br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO.<br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk | UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>Case #:<br>DEFT EXHIBIT NO.<br>Date Admitted:_____<br><br>By:_____<br>Nichole Heuerman, Deputy Clerk |

8

00548

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## CIVIL MINUTES

**Date:  January 16, 2014**   (Time: 26 minutes)          **JUDGE:  Phyllis J. Hamilton**

**Case No:  C-13-4679  PJH**

**Case Name: Briggs v. Blomkamp, et al.**

**Attorney(s) for Plaintiff:**       **Steve Briggs (pro se)**
**Attorney(s) for Defendant:**    **Michael Kump**

**Deputy Clerk**: Nichole Heuerman            **Court Reporter**: Not Reported

### PROCEEDINGS

Initial Case Management Conference-Held.

1.      The plaintiff has named Medical Rights Capital (in the complaint, in the summons and in the proof of service) as a defendant but informs the court that he intended to name and serve Medical Rights Capital II.  Defense counsel informs the court that the correct defendant should be Medical Rights Capital II Distribution LP.  Plaintiff insists that the correct defendant is Medical Rights Capital II.  The plaintiff is only allowed to proceed against the defendants actually named in the amended complaint and served with process.  Thus, Medical Rights Capital II Distribution LP is not a defendant in this case.  That portion of the answer to the amended complaint (Docket No. 27) filed on behalf of Medical Rights Capital II Distribution LP, it is stricken as unnecessary.   Defense counsel shall have an additional week to answer on behalf of the unrepresented defendants Medical Rights Capital (who was named and served) or Medical Rights Capital II (who plaintiff intended to name and serve).

2.      Plaintiff's motion and amended motion for sanctions (Docket No. 24 & 25) are DENIED.

3.      Plaintiff's request to participate in electronic filing (Docket No. 29) is DEFERRED pending plaintiff's filing of a declaration attesting to three items listed in the sample order handed to him in open court.

4.      The court sets a pretrial schedule.  The court bifurcates liability and damages discovery. The parties shall proceed with liability discovery first.

00549

**PRETRIAL SCHEDULE:**

**Fact and Expert Discovery cutoff (Liability): 5/16/14**
**Expert disclosure: 3/14/14; Rebuttal: 4/18/14**
**Dispositive Motions (Liability) heard by: 7/30/14**
**Fact and Expert Discovery cutoff (Damages): 12/31/14**
**Expert disclosure: 10/31/14; Rebuttal: 11/28/14**
**Dispositive Motions (Damages) heard by: 2/25/15**
**Pretrial Conference: 4/30/15 at 2:00 p.m.**
**Trial: 5/18/15  at  8:30 a.m., for 4 days, by [] Jury  [X]  Court**

**Order to be prepared by:   [] Pl [] Def  [X]  Court**

**Notes:**

**cc: chambers**